# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

```
-------------------------------------------------------------------- x
```

| | |
|---|---|
| EYAL BALVA AND SIGALIT BALVA, *individually and on behalf of the* ESTATE of OMER BALVA, SHAHAR BALVA, ITAI HAIM BALVA, BARAK BALVA, TOM SHALOM, ESTER SASI, *individually and on behalf of the* ESTATE of AVRAHAM SASI, MORAN SASI, DANIELLE SASI, R.P., *a minor*, NATALIE SASI, LEE MELTZ SASI, SAMANTHA MELTZ, ELI SASI, DANIEL LAWRENCE SASI, ELIN LEVY SASI, TAL MELTZ SASI, SHULAMITH ZANI, RONIT RAHOUM, ESTER HALIF, YOSEF SASI, VITO SASY, IZHAK SASI, BEKHOR SASSI, MEIR SASY, YAAQOV SASI, RACHEL GOLDBERG and JON POLIN, *individually and on behalf of the* ESTATE of HERSH GOLDBERG-POLIN, LEEBIE GOLDBERG-POLIN, ORLY GOLDBERG-POLIN, GURAM BENIASHVILI, OMRI ELMALEM, EYAL WALDMAN and ELLA WALDMAN, *individually and on behalf of the* ESTATE of DANIELLE WALDMAN, GUY WALDMAN, SHARON WALDMAN, MITCHEL NEWMAN, NOACH NEWMAN, GAVRIEL NEWMAN, DVIR TUVIA NEWMAN, BATYA LEAH SPREI, ARIEL VARDI, MICHAL ZIPPORAH ZAFRANI, *individually and on behalf of the* ESTATE of ITAY ZAFRANI, INBAL CHEN, A.Z., *a minor*, DAVID ZAFRANI, ORI ZAFRANI, OSNAT TAL ZAFRANI, RONI ZAFRANI, MARK ZIERING and DEBORAH ZIERING, *individually and on behalf of the* ESTATE of ARYEH ZIERING, ELIANA ZIERING, YONATAN ZIERING, TAL ZIERING, HILLA SHAY and IZHAR SHAY, *individually and on behalf of the* ESTATE of YARON OREE SHAY, SHIR SHAY, LIOR SHAY, OPHIR SHAY, YANIV ROUSSO and FANNY ROUSSO, *individually and on behalf of the* ESTATE of OFEK ROUSSO, INBAR ROUSSO, HANNAH WACHOLDER KATSMAN, *individually and on behalf of the* ESTATE of HAYIM KATSMAN, YAEL LEVY OPPENHEIMER, *individually and on behalf of the* ESTATE of ROY JOSEPH LEVY, I.O., *a minor*, Y.L., *a minor*, J.L., *a minor*, TZURIA LEVY, ZOHAR LEVY, NAOMI KAHANA on behalf of A.L., *a minor*, JUDITH LEVY, SHLOMO LEVY, ELIYAHU LEVY, IDDO MOSHE | **Civil No. 25-cv-____**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

LEVY, NIR YEHEZKEL LEVY, MAYA TREGER                :
ROSENFELD, AVRAHAM ROTHNER, EITAN MOR               :
and SHLOMIT MIRIAM MOR, *individually and on*       :
*behalf of the* ESTATE of SMADAR MOR EDAN,          :
LERON MOR and ZOLTAN IVAN GYONGYOSI on              :
behalf of, A.E., *a minor*, M.E., *a minor*, Am.E., *a minor*,  :
LERON MOR, SARAH BOMFLEK, DONALD                    :
GOODMAN, NOA MORGAN CHERNEY, GIL BOAZ               :
DANIELS, RIVKA DAVIDOVICH, A.D., *a minor*,         :
Mi.D., *a minor*, H.M.D., *a minor*, M.D., *a minor*, S.E.D.,  :
*a minor*, Y. D., *a minor*, A.E.D., *a minor*, CHANA  :
SARAH BEN ZAKEN, S.L., *a minor*, A.L., *a minor*,  :
Ay.BZ., *a minor*, Av.BZ., *a minor*, HADAS PNINA   :
SAFFER BEN HAMO, N.B.H., *a minor*, R.B.H., *a*     :
*minor*, M.B.H., *a minor*, NAAMA SAFFER AMAR,      :
A.A., *a minor*, G.A., *a minor*, O.A., *a minor*, A.M.A., *a*  :
*minor*, A.E.A., *a minor*, YEHOSHUA GOODMAN,       :
SHIRA GOODMAN, A.G., *a minor*, B.G., *a minor*, Y.G.,  :
*a minor*, B.G., *a minor*, M.G. *a minor*, N.G., *a minor*,  :
LEOR ZER-CHEN, YAAKOV ZER-CHEN, YAEL ZER-          :
CHEN, AVRAHAM GUTSTEIN, MIRIAM GUTSTEIN,           :
Z.C.G., *a minor*, YITSHAK YISACHAR GUTSTEIN,       :
TAMAR GUTSTEIN, S.G., *a minor*, ODEYA CHEN         :
NATAN, A/K/A ODEYA CHEN TEICHER, NAOMI             :
TEICHER, MICHAEL JAY TEICHER, SHLOMI               :
REVIVO, NAOMI FEIFER-WEISER and YISRAEL            :
WEISER, *individually and on behalf of the* ESTATE of  :
ROEY WEISER, SHANI WEISER, NADAV WEISER,            :
RUBY CHEN and HAGIT CHEN, *individually and on*     :
*behalf of the* ESTATE of ITAY CHEN, ROY CHEN,      :
A.C., *a minor*, ETHAN LIBIN, SHLOME WERDE,         :
REUT ENGLE, JAY MICHAEL (YECHIEL) LEITER,           :
CHANA LEITER, NERIYA DOV LEITER, SARA              :
BRACHA ATTIAS, DAVID ELIMELECH LEITER,              :
SOPHIA REDLER, SAMUEL YAIR LEITER, NOAM            :
ELISHA LEITER, AMIKAM TZION LEITER, AARON           :
BOURS, ROBERT AIRLEY and JENNIFER AIRLEY,           :
*individually and on behalf of the* ESTATE of       :
BENYAMIN AIRLEY, A.A., *a minor*, C.A., *a minor*,  :
Y.A., *a minor*, SARAH AIRLEY, YEHUDA AIRLEY,       :
SHOSHANA BRACHA SHAFER, MICHAEL MARTIN             :
SHAFER, RIVKA YEHUDIS SHAFER, A.S., *a minor*,      :
E.L.S., *a minor*, E.P.S., *a minor*, YEHUDA SHAFER,  :
YISROEL MEIR SHAFER, YITZCHOK SHAFER,               :
NECHAMA SORAH GOVE, CHANA SHIRA                     :
ABRAHAM, CHAIM SHAFER, ELITZUR MOSES,              :

DAFNA MOSES, Y.M., *a minor*, Ei.M., *a minor*, Ey.M.,   :
*a minor*, T.M., *a minor*, C.M., *a minor*, TOVA   :
SCHENKOLEWSKI, AMICHAY KLUGHAUPT,   :
ARYEH THALER, JEFFREY THALER, KAREN   :
THALER, ZEV THALER, ELIYAHU THALER, YOSEF   :
THALER, PESHA THALER, A.T. *a minor*, L.T., *a*   :
*minor*, R.T., *a minor*, H.T., *a minor*, VARDA MORELL   :
and EITAN MORELL, *individually and on behalf of the*   :
ESTATE of MAOZ MORELL, E.E.M., *a minor*, C.M, *a*   :
*minor*, SHACHAR YEHUDA MORELL, MORDECHAI   :
ELIEZER MENACHEM MORELL, DOV   :
YERACHMIEL MORELL, AARON MOSHE SPITZ,   :
LEAH SPITZ, GAVRIEL BINYAMIN SPITZ, AVITAL   :
MIRIAM SPITZ, A.H.S., *a minor*, A.S.S., *a minor*, I.J.S.,   :
*a minor*, NADAV BENJAMIN SHINDMAN, SIMEON   :
ZIMBALIST and SARA ZIMBALIST, *individually and*   :
*on behalf of the* ESTATE of ELIYAHU MOSHE   :
ZIMBALIST, S.Z. *a minor*, B.Z., *a minor*, A.Z.,   :
NECHAMA ZIMBALIST, AVIVA ZIMBALIST, SHIRA   :
ZIMBALIST, NATHAN SUSSKIND, SHELOMO   :
TAWIL, ELIEZER BENZAKEIN, DAVID APELBAUM,   :
NECHAMA APELBAUM, MICHAL BERGER BING,   :
ELIOR BITON, E.S.N., *a minor*, R.N., *a minor*,   :
SHACHAR HANNA KAMA, CHANA RACHEL   :
KASSEL, M.S.K., *a minor*, Sh.K., *a minor*, S.K., *a*   :
*minor*, D.C.K., *a minor*, Av.K., *a minor*, Y.Y.K., *a minor*,   :
Ah.K., *a minor*, E.K., *a minor*, B-S.K., *a minor*, Ye.K., *a*   :
*minor*, BARAK KOSKAS, NAOMI RUSSEK, R.R., *a*   :
*minor*, S.R., *a minor*, T.R., *a minor*, A.R., *a minor*, Ef.R.,   :
*a minor*, C.P.R., *a minor*, M.H.R., *a minor*, Ep.R., *a*   :
*minor*, Av.R., *a minor*, ELI KNOLLER, *individually and*   :
*on behalf of the* ESTATE of NADAV KNOLLER,   :
ROSEANNE GREENWALD KNOLLER, HADAR   :
KNOLLER, Y.K., *a minor*, YUVAL KNOLLER, ORTAL   :
KNOLLER, ITAI KNOLLER, GILIT KNOLLER   :
STZRIGLER, DAVID MESSNER, AHARON   :
HOLTZMAN, SHILO SAPIR, TAYYIR AZULAI, L.A.,   :
*a minor*, H.A., *a minor*, T.A., *a minor*, Y.A., *a minor*,   :
LEAH FAYAZI, EBRAHIM FAYAZI, AVIGAIL   :
AHARONOV, MALKA MICHAEL, SHLOMO FAYAZI,   :
L.F., *a minor*, Yi.F., *a minor*, NAOMI ARONOF,   :
HADASSA MIZRACHI, ELISHEVA HAZIZA, DAVID   :
FAYAZI, AYALA PERETZ, YOCHEVED FAYAZI,   :
Yo.F., *a minor*, CHAYA MUSHKA HORDINER, DAVID   :
TAWIL, NAOMI RACHEL KASSIN, LISA BERGER,   :
DEVORAH RACHEL SAFFER, HAIM KATZIN,   :

ISRAEL KATZIN, YONATAN FRANK, NATALI            :
ROTCHES, JONATHAN KARTEN, EZRA KASSIN,          :
E.K., *a minor*, and SAMUEL BLISKO,             :
                                                :
    Plaintiffs,             :
                                                :
-against-                                       :
                                                :
BINANCE HOLDINGS LIMITED, CHANGPENG             :
ZHAO, and GUANGYING "HEINA" CHEN,               :
                                                :
    Defendants.             :
---------------------------------------------------------------------- :

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

    A.    Overview of Binance's Illegal Activities ........................................................... 2

    B.    Binance's Aiding and Abetting of Terrorist Organizations Involved in the October 7 Attacks ............................................................................................................. 8

JURISDICTION AND VENUE .............................................................................................. 13

DEFENDANTS ....................................................................................................................... 16

    Binance. ................................................................................................................... 16

    Changpeng Zhao ...................................................................................................... 21

    Guangying "Heina" Chen ........................................................................................ 22

FACTUAL ALLEGATIONS ................................................................................................... 23

I.     CRYPTOCURRENCIES AND PAYMENT PLATFORMS ........................................... 23

    A.    Blockchain ............................................................................................................... 23

    B.    Cryptocurrency Wallets ........................................................................................... 26

    C.    Categories of Cryptocurrency Assets ...................................................................... 27

        1.    Native Cryptocurrencies ............................................................................. 27

        2.    Stablecoins .................................................................................................. 31

II.    CRYPTOCURRENCY PLATFORMS ARE SUBJECT TO ANTI-MONEY LAUNDERING AND COUNTER-TERRORISM FINANCING LAWS AND REGULATIONS ................................................................................................................ 33

    A.    The IGRC, Hamas, Hezbollah, PIJ, and other Terrorist Organizations ................ 33

    B.    The Terrorist Organizations' Emerging Use of Cryptocurrency ........................... 38

    C.    Binance in the United States .................................................................................... 40

III.   BINANCE STRUCTURED ITS COMPLIANCE TO FACILITATE MONEY LAUNDERING, SANCTIONS EVASION, AND TERROR FINANCING ................. 42

    A.    Binance Used Binance.US as a Façade to Evade U.S. Oversight ............................ 42

B.      Binance's Anti-Money Laundering and Counter-Financing of Terrorism Efforts Were a Sham ................................................................ 46

C.      Binance Exempted "Level 1" or "Tier 1" accounts From KYC Requirements ..... 50

D.      Binance Knew That Hamas and Other Terrorist Groups Transacted on Its Platform ........................................................................................ 55

IV.    BINANCE KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC, HAMAS, HEZBOLLAH AND PIJ ........................................ 57

A.      Binance Knowingly and Willingly Assisted Iran and the IRGC to Evade Sanctions and Finance Terrorism ................................................ 58

B.      Tawfiq Muhammad Sa'id al-Law's IRGC/Hezbollah Network ............................ 63

1.      Binance Account No. ***6571 (Raed Abib Habib) .............................. 66

2.      Binance Account No. ***9799 (Ali Alawieh) ...................................... 70

3.      Binance Account No. ***0785 (Antonios Boutros Nehme) .................. 72

4.      Binance Account No. ***9408 (Mohamad Said El Okdi) .................... 74

5.      Binance Account No. ***9885 .............................................................. 75

6.      Binance Account No. ***8463 (Gustavo Castro) ................................ 76

7.      Binance Account No. ***3848 .............................................................. 77

8.      Binance Account No. ***3951 .............................................................. 77

9.      Binance Customer A-1 ......................................................................... 78

10.     Binance Customer A-2 ......................................................................... 78

11.     Binance Customer A-3 ......................................................................... 79

12.     Binance Customer A-4 ......................................................................... 79

13.     Binance Customer A-5 ......................................................................... 80

14.     Binance Account No. ***9830 .............................................................. 80

15.     Binance Account No. ***7790 .............................................................. 83

C.      Other Examples of Designated IRGC Binance Customers ............................... 84

1.      Ahmad Khatibi Aghada ....................................................................... 84

2.    Amir Hossein Nikaeen Ravari ........................................................ 86

D.    Nobitex Exchange Network ................................................................. 87

1.    Iranian sanctions evasion platform. ............................................. 87

2.    Binance's $7.8 billion Nobitex transaction processing. .............. 88

3.    NBCTF designation and leaked Nobitex source code analysis. ... 89

4.    Nobitex's direct on-chain interactions with FTO wallets. .......... 89

5.    Qatar–Nobitex database ............................................................... 91

6.    OFAC-designated Bitcoin addresses sending ransomware proceeds to Nobitex. ............................................................................. 93

7.    Binance's Knowledge and Deliberate Maintenance of Nobitex Relationship. ... 94

E.    IranVisaCart ........................................................................................ 94

F.    Alireza Derakhshan & Arash Estaki Alivand Network ................... 95

G.    NBCTF's September 2025 Designation of IRGC Wallets .............. 97

H.    Binance Knowingly and Willingly Assisted Hamas ........................ 98

1.    Dubai [Money] Company for Exchange ("Dubai Co.") ............ 101

a.    Binance Account No. ***3866 (Khaled A. S. Alhaddad) ... 102

b.    Binance Account No. ***6645 (Ayman Z. M. Albarbari) ... 103

2.    Buy Cash Money and Money Transfer Company ("BuyCash") ... 104

3.    Gaza Now .................................................................................. 107

4.    Al Wefaq Co. for Exchange (a/k/a Hamed Co. for Exchange) ... 108

a.    Binance Account No. ***2283 (Saeed al-Khudry) ............ 109

5.    Shamlakh Hamas Network ....................................................... 110

a.    Binance Account No. ***3593 ............................................. 112

b.    Binance Account No. ***9428 ............................................. 114

c.    Binance Account No. ***5910 ............................................. 115

d.    Binance Account No. ***6082 ............................................. 116

e.   Binance Account No. ***3901 ................................................................ 118

6.   Other Hamas Binance Customers ....................................................... 120

a.   Binance Account No. ***3382 (Hanad Adam) ............................... 120

I.   Binance Knowingly and Willingly Assisted PIJ ......................................... 124

1.   Binance Account No. ***5345 ............................................................. 124

2.   Binance Account No. ***2659 ............................................................. 129

V.   THE FOREIGN TERRORIST ORGANIZATIONS RESPONSIBLE FOR THE
     OCTOBER 7 TERROR OFFENSIVE ................................................................. 132

A.   The IRGC and Its Quds Force Form the "Axis of Resistance" ........................ 133

B.   Hamas .................................................................................................. 137

C.   Palestinian Islamic Jihad (PIJ) ................................................................ 148

D.   Hezbollah .............................................................................................. 149

VI.  ZERO HOUR: OCTOBER 7, 2023 ................................................................ 152

A.   Saturday, October 7 ................................................................................ 154

B.   Geography of the Attack ......................................................................... 154

C.   Hamas's Rocket Barrage Overwhelms Israel's Defense Systems ................... 156

D.   Hamas Attacks by Ground, Air, and Sea .................................................. 157

E.   Hamas Infiltrates Civilian Communities, IDF Outposts, and Highways ......... 159

F.   The Terrorists Committed Successive Waves of Attacks on Compromised
     Communities ......................................................................................... 162

G.   Attack on the Nova Music Festival ........................................................... 163

H.   Hostage-Taking into Gaza ....................................................................... 164

I.   The Tunnel System ................................................................................. 166

J.   Hamas's Use of Hostages as Bargaining Chips .......................................... 167

K.   Israel's Response to October 7 in Gaza ..................................................... 168

VII. PLAINTIFFS .......................................................................................... 169

iv

A.      The Balva Family .................................................................................... 169

B.      The Shalom Family ................................................................................. 170

C.      The Sasi Family ...................................................................................... 171

D.      The Goldberg-Polin Family .................................................................. 177

E.      The Beniashvili / Ben Zvi Family ......................................................... 180

F.      The Elmalem Family .............................................................................. 182

G.      The Waldman Family ............................................................................. 183

H.      The Newman Family .............................................................................. 185

I.      The Vardi Family ................................................................................... 187

J.      The Zafrani Family ................................................................................ 187

K.      The Ziering Family ................................................................................ 188

L.      The Shay Family .................................................................................... 190

M.      The Rousso Family ................................................................................ 194

N.      The Katsman Family .............................................................................. 196

O.      The Levy Family .................................................................................... 198

P.      The Rosenfeld Family ............................................................................ 200

Q.      The Rothner Family ............................................................................... 203

R.      The Edan Family .................................................................................... 203

S.      The Bomflek Family ............................................................................... 206

T.      The Goodman Family ............................................................................. 207

U.      The Cherney Family ............................................................................... 208

V.      The Daniels Family ................................................................................ 209

W.      The Davidovich Family .......................................................................... 210

X.      The Ben Zaken Family ........................................................................... 212

Y.      The Hamo Family ................................................................................... 213

Z.      The Amar Family ................................................................. 214

AA.     The Goodman Family ........................................................... 215

BB.     The Zer-Chen Family ........................................................... 217

CC.     The Gutstein Family ............................................................ 218

DD.     The Natan Family ................................................................ 219

EE.     The Revivo Family ............................................................... 220

FF.     The Weiser Family ............................................................... 223

GG.     The Chen Family .................................................................. 224

HH.     The Libin Family ................................................................. 226

II.     The Werde Family ................................................................ 226

JJ.     The Engle Family ................................................................. 227

KK.     The Leiter Family ................................................................ 228

LL.     The Bours Family ................................................................ 229

MM.     The Airley Family ............................................................... 230

NN.     The Shafer Family ............................................................... 232

OO.     The Moses Family ................................................................ 235

PP.     The Schenkolewski Family .................................................. 236

QQ.     The Klughaupt Family ......................................................... 238

RR.     The Thaler Family ............................................................... 239

SS.     The Morell Family ............................................................... 241

TT.     The Spitz Family ................................................................. 243

UU.     The Shindman Family .......................................................... 244

VV.     The Zimbalist Family .......................................................... 245

WW.     The Susskind Family ........................................................... 247

XX.     The Tawil Family ................................................................. 247

YY.    The Benzakein Family........................................................................ 248

ZZ.    The Apelbaum Family......................................................................... 248

AAA.    The Bing Family ............................................................................... 249

BBB.    The Biton Family .............................................................................. 250

CCC.    The Kama Family .............................................................................. 250

DDD.    The Kassel Family ............................................................................ 251

EEE.    The Koskas Family ........................................................................... 253

FFF.    The Russek Family ............................................................................ 253

GGG.    The Knoller Family ........................................................................... 254

HHH.    The Messner Family .......................................................................... 255

III.    The Holtzman Family ........................................................................ 256

JJJ.    The Sapir Family ............................................................................... 257

KKK.    The Azulai Family ............................................................................. 257

LLL.    The Fayazi Family ............................................................................. 258

MMM.    The Hordiner Family ....................................................................... 260

NNN.    The (David) Tawil Family ................................................................. 261

OOO.    The Kassin Family ............................................................................ 261

PPP.    The Berger Family ............................................................................. 262

QQQ.    The Saffer Family .............................................................................. 263

RRR.    Haim Katzin ....................................................................................... 263

SSS.    Israel Katzin ....................................................................................... 264

TTT.    The Frank Family ............................................................................... 264

UUU.    The Cohen Family .............................................................................. 265

VVV.    The Karten Family ............................................................................. 266

WWW. The Kassin Family ............................................................................ 266

    **XXX.    The Blisko Family**.............................................................................................. **267**

**CLAIM FOR RELIEF** ..................................................................................................... **267**

**JURY TRIAL DEMAND** ................................................................................................ **270**

**PRAYER FOR RELIEF**................................................................................................... **270**

Plaintiffs, by their undersigned counsel, submit this Complaint against Binance Holdings Limited ("Binance"), Changpeng Zhao ("Zhao"), and Guangying "Heina" Chen ("Chen") and allege as follows:

## PRELIMINARY STATEMENT

1.      This action is brought by U.S. nationals (including estates) and their close family members, who were murdered, maimed, taken hostage, or otherwise injured in acts of terrorism perpetrated by Hamas,[1] Iran's Islamic Revolutionary Guard Corps ("IRGC"), Hezbollah, and Palestinian Islamic Jihad ("PIJ") in the State of Israel on October 7, 2023 ("October 7" or "October 7 Attacks") and in various terrorist attacks that these terrorist organizations perpetrated following October 7.

2.      By this action, Plaintiffs seek damages under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. §2333(d)(2), from Defendant Binance (the world's largest cryptocurrency trading platform), Defendant Zhao (its founder and former CEO), and Defendant Chen (its co-founder and de facto CFO).

3.      For years, Defendants knowingly, willfully, and systematically assisted Hamas, the IRGC, Hezbollah, PIJ, and other terrorist groups to transfer and conceal the equivalent of hundreds of millions of U.S. dollars through the Binance platform in support of their terrorist activities.

4.      This assistance directly and materially contributed to the October 7 Attacks and to subsequent terrorist attacks perpetrated by Hamas, Hezbollah, and PIJ.

5.      As described below, the October 7 Attacks were the culmination of a meticulous multi-year effort by Hamas (with support from other Foreign Terrorist Organizations ("FTOs"))

---

[1]      Hamas is an acronym of the Arabic "Harakat al-Muqawama al-Islamiya"—Islamic Resistance Movement.

that involved amassing an extensive and well-financed arsenal of weapons and constructing hundreds of miles of subterranean attack tunnels.

6.    Because Hamas, the IRGC, Hezbollah, and PIJ had all been designated FTOs for many years prior to October 7, and because knowingly providing financial services to any of them was a federal crime with serious penalties, *see* 18 U.S.C. §2339B(a), these FTOs were compelled to raise and transfer funds covertly to finance their operations.

7.    Historically, these FTOs have used international financial institutions, money exchange houses, and occasionally couriers to move their money, but in recent years, they have increasingly turned to cryptocurrencies as a new means of moving money covertly.

A.    **Overview of Binance's Illegal Activities**

8.    Six years before the October 7 Attacks, Defendants Zhao and Chen launched Binance—a cryptocurrency trading platform that they intentionally designed as a criminal enterprise to facilitate money laundering on a global scale.

9.    Binance is the largest global cryptocurrency trading platform by user count and trading volume, with over $300 billion in daily volume across spot and futures markets.

10.    Binance serves more than 280 million users globally.[2] Its core global business involves the mode of exchange known as cryptocurrency, also referred to as "crypto assets," "tokens," or "coins."

11.    Binance rapidly grew to be the largest crypto trading platform globally because, as detailed below, it purposely attracted criminals including terrorist organizations like Hamas, the IRGC, Hezbollah, and PIJ to its platform and assisted them to launder money in order to maximize Binance's trading volume and monetize criminal activities via platform fees.

---

[2]    *See* Binance, CoinMarketCap, https://coinmarketcap.com/exchanges/binance/ (last visited Nov. 17, 2025).

12.     From the outset, Binance boasted that it maintained no headquarters anywhere in the world.

13.     Its now-disgraced CEO and owner, Defendant Zhao claimed the company was "based" wherever he was situated at any given moment: "Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office."

14.     That is, Binance pitched itself to terrorist organizations, narcotics traffickers, and tax evaders as beyond the reach of any single country's laws or regulations.

15.     It then grew quickly to become the world's largest cryptocurrency exchange—and the go-to platform for terrorists, narcotics traffickers, and other criminals to move assets while evading law enforcement, in large part because it was *designed* to launder money.

16.     As Binance's own Chief Compliance Officer Samuel Lin bluntly explained in 2020, Binance's customers "**are here for crime**."

17.     Another Binance compliance officer joked that the company might as well advertise itself with a banner saying, "is washing drug money too hard these days—come to binance we got cake for you."

18.     Then-U.S. Attorney General Merrick Garland observed in November 2023 that Binance "became the world's largest cryptocurrency in part because of the crimes it committed." In fact, years before October 7, Binance knew that Hamas, the IRGC, Hezbollah, PIJ and other terrorist organizations were all transacting regularly on its platform and nevertheless actively assisted their use of the platform. It did so at a time when Hamas, in particular, was publicly directing its donors to send funds to so-called "crypto wallets" held with Binance.[3]

---

[3]     A cryptocurrency wallet is a digital or physical tool that allows someone to store, send, and receive cryptocurrencies. Wallets have both public and private identifiers: addresses (which are public account identifiers) and keys (which function like passwords). It is called a wallet because it functions similarly to a traditional wallet used for organizing cash and cards. Instead of holding physical items, it stores the private keys that enables access to

3

19.    For instance, in 2019, a video on Hamas's official website instructed viewers to "create a new account on one of the trading platforms"—explicitly naming Binance—to contribute cryptocurrency to Hamas.

20.    In fact, in April 2019 and July 2020, Binance received reports from one of its blockchain analytics vendors specifically identifying Hamas-associated transactions on its platform.

21.    But rather than file Suspicious Activity Reports ("SARs") with U.S. regulators (as required by law), Binance instead "attempted to influence how the service provider reported these transactions" to avoid attracting scrutiny.[4]

22.    By July 2020, when yet another third-party compliance service flagged accounts associated with Hamas, Binance did not freeze or report the accounts; it affirmatively acted to protect those customers.

23.    Lin cautioned colleagues that flagging of customers by third-party compliance services was "[e]xtremely dangerous for our company," instructing Binance personnel to check if the Hamas-linked customer was "a VIP account" and, if so, "to… [o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him."

24.    In other words, Binance not only knowingly provided financial services to Hamas; it actively tried to shield its Hamas customers and their funds from scrutiny by U.S. regulators or

---

the wallet. Like a bank account, it represents the assets owned by the wallet owner. However, unlike a bank account, a cryptocurrency wallet can be held custodialy by the owner (by holding the private keys to their wallet – password, in other words) or it may be custodied by a financial intermediary, such as Binance. A self-custody wallet is pseudonymous, meaning any person can create a wallet without using their name as accountholder.

[4]    U.S. DEP'T OF TREAS., Fin. Crime Enforcement Network, Consent Order 2023-04, at 46, https://www.fincen.gov/system/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL 508.pdf. Filing SARs insulates financial institutions from prosecution or regulatory difficulties based on the reported transactions, but filing them, or implementing internal controls, naturally reduces financial institutions' usefulness to criminals. Indeed, Binance took on tremendous risk of prosecution—ending in massive fines and a prison sentence for Zhao—to establish itself as the premier cryptocurrency platform for terrorists and other criminals.

law enforcement—a practice that continues to this day.

25.     This approach was consistent with the way Binance structured its operations from its inception.

26.     Binance did not and does not operate as a traditional financial institution or corporation with a home country, physical offices, and transparent corporate governance.

27.     Instead, Zhao and his confederates set up an amorphous, decentralized structure designed to avoid regulatory scrutiny, protect the anonymity of its customers, and preserve Binance's appeal as a safe haven for global money laundering.

28.     In September 2019, Binance claimed it had begun to block customers based on their internet protocol ("IP") address, in part, to prevent U.S.-based customers from accessing the platform. In reality, Binance simply added a pop-up window on its website that appeared when customers attempted to log in from an IP address associated with the United States. The pop-up did not block customers from logging in to their accounts. Thus, in additional to knowingly and actively assisting Hamas, the IRGC, Hezbollah, and PIJ to launder money, it also permitted more than one Binance customers affiliated with Hamas to execute transactions from IP addresses in the United States, including *at least* nine operations and at least two transactions executed via IP addresses in Kindred, North Dakota.

29.     As Lin informed Binance employees in September 2020, offboarding accounts associated with criminal activity was "bad in [Zhao's] eyes."

30.     In fact, even after Binance nominally began collecting some Know-Your-Customer ("KYC") information from new users,[5] the company's standing policy (even after its 2023 settlements with the U.S. government) has been to not screen any deposits received by its

---

[5]     In February 2022, Binance acknowledged that the identities of approximately only 30–40% of its customers had been verified though KYC documentation.

customers—and not even to track funds received by Binance customers that originate from sanctioned entities or known terrorist financiers.[6]

31.    Binance only screens transactions (if at all) when a customer attempts to transfer funds *out* of Binance, meaning illicit money is welcome to flow into Binance (where the company can earn fees on it) and within it.

32.    By deliberately failing to monitor inbound funds, Binance ensured that terrorists and other criminals could deposit and shuffle enormous sums on the exchange with impunity. Moreover, when specific customers were designated or particular accounts were subject to seizure orders, Binance allowed those customers and accounts to shift the assets into other Binance accounts, thus negating the effect of any "blocking" or "seizing" of the account.

33.    Binance's deliberate money laundering IT architecture also enables its customers to open sub-accounts that may be used for different activities and often de-facto enables different people to conduct activity on the platform anonymously under the main account without KYC.[7]

34.    Although a customer's main account may be subject to some "enhanced due diligence," sub-accounts created within the main account are not.

35.    Moreover, when Binance off-boards a sub-account, even due to illegal activity, other related sub-accounts and the main account are not affected and retain their ability to perform unrestricted activities on the platform.

36.    Allowing customers to open and maintain numerous sub-accounts provides criminals (including terrorists) with a back door into Binance's platform that bypasses the (already

---

[6]    *See* Press Release, *U.S. Treasury Announces Largest Settlements in History with World's Largest Virtual Currency Exchange Binance for Violations of U.S. Anti-Money Laundering and Sanctions Laws*, U.S. DEP'T OF TREAS. (Nov. 21, 2023), https://home.treasury.gov/news/press-releases/jy1925.

[7]    *See* Binance.US, Terms of Use, Section "Corporate Account Usage," https://www.binance.us/terms-of-use#accountCreation (last updated Feb. 19, 2025).

intentionally deficient) on-boarding screening processes.

37.     That policy demonstrates Binance's deliberate and conscious effort to enable users to operate on the Binance platform and clearly helps facilitate financial crime on an industrial scale.

38.     This is especially true when those sub-accounts trade in high volumes, while registering those accounts as belonging to a single user, which indicates the main account may be performing trading activities on behalf of the sub-accounts, without ever disclosing the beneficial owners.

39.     The fact that Binance intentionally structured itself as a refuge for illicit activity, and knew full well that specific accounts controlled by terrorist organizations were among its customers, has been confirmed by, among other things, voluminous evidence from U.S. enforcement actions.

40.     In late 2023, Binance and Zhao entered criminal plea agreements and civil settlements with the U.S. Department of Justice ("DOJ"), the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"), the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), and the Commodity Futures Trading Commission ("CFTC"), culminating in Binance paying $4.3 billion U.S. dollars in penalties—one of the largest such fines in the history of both FinCEN and OFAC.[8]

41.     As part of these resolutions, Binance admitted that for years it effectively invited terrorists and other illicit actors to transact on its exchange by intentionally evading U.S. laws that require measures to identify, monitor, report, and prevent terrorism financing.

---

[8]     *See* Press Release, *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution* U.S. DEP'T. OF JUSTICE (Nov. 21, 2023), https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution. *See also* Plea Agreement, *United States v. Binance Holding Ltd.* (Nov. 21, 2023), https://www.justice.gov/archives/opa/media/1326901/dl?inline.

42.    Zhao pled guilty to various federal crimes related to Binance's massive, multi-year scheme of evading U.S. regulators and served four months in prison. After Zhao completed his prison sentence, he was pardoned by President Donald J. Trump.

43.    While Zhao was forced to step down as Binance's CEO, he remains its majority owner and the architect of its business model.

44.    Binance's conduct was far more serious and pervasive than what the U.S. government disclosed during its 2023 criminal enforcement actions. For example, FinCEN disclosed "multiple direct bitcoin transactions worth over $2,000" for Hamas's terror apparatus, the Izz al-Din al-Qassam Brigades ("Qassam Brigades"), but as described in detail below, Binance knowingly sent and received the equivalent of more than $1 billion to and from accounts and wallets controlled by the FTOs responsible for the October 7 Attacks.

45.    To this day, there is no indication that Binance has meaningfully altered its core business model.

**B.    Binance's Aiding and Abetting of Terrorist Organizations Involved in the October 7 Attacks**

46.    Binance's notorious terrorist customers included, among others:

- *BuyCash*. A Gaza-based money-services entity that raises funds for Hamas (and which was designated by the U.S. Department of Treasury in October 2023 as a Specially Designated Global Terrorist ("SDGT") for materially assisting Hamas). Binance facilitated cryptocurrency transactions worth *at least* $240 million U.S. dollars between BuyCash and Binance in the years leading up to October 7, 2023, and cryptocurrency transactions worth *at least* $1.3 million dollars since that date.

- *Dubai Company for Exchange ("Dubai Co.")*. A Gaza-based exchange house designated by the State of Israel as a terrorist organization because it sent tens of millions of dollars annually to Hamas's Qassam Brigades. Binance facilitated cryptocurrency transactions worth *at least* $22 million U.S. dollars between Dubai Co. and Binance accounts in the years leading up to October 7, 2023, and cryptocurrency transactions worth *at least* $26 million U.S. dollars since that date.

- *Al-Markaziya* f/k/a *Al-Mutahadun for Exchange.* A Gaza-based money laundering network[9] operated by Zuhair Shamlakh and his brothers that was designated by the U.S. Department of the Treasury as an SDGT because it became "the main end point for funds transferred from the IRGC-QF to Hamas and PIJ in Gaza."

- *Tawfiq Muhammad Sa'id al-Law.* A Syrian national who was designated by the U.S. Department of the Treasury as an SDGT because he "provided Hizballah with digital wallets to receive funds from IRGC-QF commodity sales," and "conducted cryptocurrency transfers for sanctioned Hizballah officials." The Israeli government seized cryptocurrency wallets controlled by al-Law on the grounds that his "terrorist infrastructure belonging to Hezbollah and the Iranian Quds Force . . . operated to transfer funds through digital currencies for Quds Force and Hezbollah." Cryptocurrency addresses controlled by al-Law and/or Hezbollah transferred the equivalent of over $400 million to Binance accounts between 2021 and 2003 and received over $190 million during the same period.[10]

- *Alireza Derakhshan* and *Arash Estaki Alivand* - Iranian money launderers designated by the U.S. Department of the Treasury as SDGTs for purchasing over $100 million U.S. dollars in cryptocurrency between 2023 and 2025 for the benefit of the IRGC-Qods Force and Iran's Ministry of Defense and Armed Forces Logistics. Alivand and Derakhshan transferred the equivalent of over $30 million in cryptocurrency transactions by and through Binance which operated as a bridge to Hezbollah's gold smuggling operations in the Tri-Border area in South America.

47.    As detailed below, BuyCash, Dubai Co., and the Al-Mutahadun for Exchange laundering networks represent only a small fraction of the wallets and transactions that Binance facilitated for Hamas, the IRGC, Hezbollah, and PIJ.

48.    The Hamas and PIJ cryptocurrency money laundering network is tied, *inter alia*, to

---

[9]    Binance collects all geolocation data on its customers and is therefore able to screen transactions flowing in and out of Gaza in the same way it possesses that data for all other customer interface across the globe. *See* "Information we collect from you automatically" under "Browsing Information" at https://www.binance.com/en/privacy (last updated Oct. 7, 2025).

[10]    The wallets | Binance accounts listed in the NBCTF Administrative Seizure Order (ASO 29/23) were all listed as associated with Hezbollah. One was specifically listed as belonging to al-Law; the remaining 50 were identified as belonging to "a designated terrorist organization or used in the perpetration of a severe terror crime." *See* NBCTF Administrative Seizure Order (ASO 29/23) (Isr.), https://nbctf.mod.gov.il/he/PropertyPerceptions/Documents/%D7%A6%D7%95%20%D7%AA%D7%A4%D7%99%D7%A1%D7%94/2029-23.pdf.

a series of brokers likely located in the Gaza Strip[11] ("the Gaza Brokers") that serve as hubs for the flow and conversion of crypto currencies for Hamas and PIJ.

49.     Wallets owned by the Gaza Brokers[12] (not as Binance users) and multiple external wallets, transact with the same parties that Binance users designated by Israel's National Bureau for Counter Terror Financing ("NBCTF") transacted with. Those Binance users include **Binance Account Nos. \*\*\*6082; \*\*\*2659; \*\*\*9079; \*\*\*3382; \*\*\*3901; \*\*\*2283; and \*\*\*9799**.

50.     While the Gaza Brokers also launder cryptocurrencies for Hamas and PIJ *outside* of Binance, they use the accounts of Binance customers to wash those assets and cover their trail. They send cryptocurrency transfers to Binance accounts (some of them designated, the rest at high risk for money laundering) and then those cryptocurrencies are internally "mixed" within Binance's systems ("off chain" activity), and either (1) emerge outside Binance's systems back on the blockchain ("on-chain" activity), concealing their linkage to the Gaza Brokers; or (2) the cryptocurrency transferred is exchanged into a different cryptocurrency or fiat currency (legal tender issued by a government, e.g., U.S. dollars, Euros, Yen).

51.     Despite the fact Binance knew the Gaza Brokers wallets were transacting with government-designated external wallets and designated or high-risk Binance customers, it continued to receive and send crypto currencies to and from the Gaza Brokers until 2025 (for some until November 2025).

52.     The Gaza Brokers are, in turn, part of a larger IRGC financial ecosystem that includes Tawfiq Muhammad Sa'id al-Law's IRGC-Hezbollah network, Alireza Derakhshan and Arash Estaki Alivand's IRGC network, the Sa'id al-Jamal Network that all funds Hezbollah,

---

[11]     The brokers serve Gaza-associated crypto activities, and their hours of general operation are concurrent with Gaza's time zone – 8am-6pm UTC.

[12]     These include at least five identified wallets.

Hamas and PIJ (all proxy groups that belong to what Iran has termed the "Axis of Resistance").

53.     As discussed below, that financial ecosystem also contains smaller, interconnected networks of exchanges and unlicensed brokers who launder cryptocurrencies for the benefit of Hezbollah, Hamas and PIJ. These include BuyCash, Dubai Company for Exchange, and Shamlakh networks (Al-Mutahadun Exchange) – all of them: using Binance, interconnected, and ultimately designated as SDGTs.

54.     Accounting solely for Binance customers publicly identified by the U.S. and Israeli governments as associated with Hamas, the IRGC, Hezbollah, and PIJ, Binance knowingly facilitated the equivalent of more than $700 million in transactions for these FTOs between 2019 and October 7, 2023, on the public blockchains.

55.     Based on an analysis of these terrorist organizations' activities on the blockchain, Binance also knowingly facilitated the equivalent of more than $50 million U.S. dollars in transactions *since* October 7, 2023, for Hamas, the IRGC, Hezbollah, and PIJ on public blockchains.

56.     Binance's own omnibus wallets sent the equivalent of more than $300 million to designated wallets on the blockchain before the October 7 Attacks and more than $115 million after October 7.

57.     However, Hamas, the IRGC, Hezbollah, and PIJ did not transfer money to and from Binance wallets solely on publicly visible blockchains.

58.     Binance operates an exchange for cryptocurrency where transactions can occur either "on-chain" (recorded on a public blockchain ledger) or "off-chain" (transactions that occur outside the blockchain) recorded only on Binance's internal private ledger.

59.     Only transactions validated and recorded on a public blockchain are visible and

traceable to outside observers.

60.     Thus, when a transaction is processed on a public blockchain like the Bitcoin blockchain or the Ethereum blockchain, it is possible to trace the flow of funds from one wallet to another (even if the real identities of the wallet owners are pseudonymous).

61.     However, when a Binance customer transfers assets internally to another Binance customer, that transfer occurs entirely "off-chain," leaves no public trace whatsoever, and exists solely on Binance's books.

62.     In practical terms, when a customer deposits assets into Binance, those assets are moved into Binance-controlled omnibus wallets (visible on the blockchain but owned by Binance).

63.     Thereafter, Binance can transfer value between customer accounts simply by debiting and crediting its internal ledger, just as a bank might internally transfer dollars between two account holders without any external wire transfer.

64.     These internal Binance transfers do not appear on any public blockchain. Only when a customer withdraws funds from Binance does Binance execute a corresponding on-chain blockchain transaction. But even then, the outbound transaction is executed by a Binance-controlled omnibus wallet (that contains assets belonging to multiple customers)—thereby making all outgoing on-chain blockchain transactions effectively anonymous, as transactions are made by Binance wallets on behalf of its customers.

65.     Thus, the structure of Binance's platform was (and is) an ideal vehicle to assist Hamas, the IRGC, Hezbollah, PIJ, and other FTOs to rapidly and clandestinely move funds worth hundreds of millions of U.S. dollars to fund their terrorist operations. Using this internal ledger system—combined with the vast sums Binance knowingly helped these FTOs to move on public blockchains and ultimately cash-out via money service businesses and banks—Binance provided

the financial plumbing that substantially assisted Hamas and other FTOs in perpetrating the October 7 Attacks and the many subsequent terrorist attacks.

## JURISDICTION AND VENUE

66.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. §§2333(a) and (d), which provide for jurisdiction over civil actions brought by citizens of the United States, their estates, and family members who have been killed or injured by reason of acts of international terrorism.

67.     Plaintiffs in this action are U.S. nationals who were injured (or are close family/estates of those killed or injured) by acts of international terrorism as defined in 18 U.S.C. §2331.

68.     This Court has personal jurisdiction over Binance, Zhao and Chen pursuant to FRCP 4(k)(2) because (1) this claim arises under federal law and (2) Binance has sufficient contacts with the United States to justify the exercise of personal jurisdiction under Fifth Amendment due-process principles.

69.     Prior to October 7, 2023, Binance served more than 5 million U.S. customers—in fact, the United States was its single largest market.[13]

70.     Despite presenting itself as a company without any physical address or locus of operations, Binance conducts its internal operations through Palo Alto Networks, a cybersecurity platform based in California.[14]

71.     As the CFTC detailed in a December 2023 Consent Order with Binance and Zhao,

---

[13]     Binance suspended all U.S. dollar deposits for its U.S. arm after October 7, 2023, due to the U.S. criminal and regulatory actions taken against it.

[14]     Binance employees cannot access the platform except by using a "dongle" that plugs into their computers and routes their connection through Palo Alto Networks' security platform.

Binance's largest and most important users included three trading firms in the United States:

- *Trading Firm A.* A quantitative trading firm identified by *The Wall Street Journal* as Radix Trading LLC in a March 28, 2023, article titled "Chicago's Radix Says It Is 'Trading Firm A' in Binance Lawsuit." Radix is a Delaware limited liability company headquartered in Chicago, Illinois. Benjamin Blander, Radix's co-founder, confirmed that his firm "had traded on Binance during the past few years using offshore affiliates and a prime brokerage that provided access to the exchange."

- *Trading Firm B.* A quantitative trading firm—identified by *Bloomberg* as Jane Street Group LLC in an April 5, 2023, article titled "Jane Street, Tower and Radix Are Unnamed 'VIPs' in Binance Case." Jane Street is a Delaware limited liability company headquartered in New York. Jane Street has been among Binance's largest customers and has consistently received reduced trading fees due to its status as a Binance VIP.

- *Trading Firm C.* A quantitative trading firm identified by *Bloomberg* as Tower Research Capital LLC in an April 5, 2023, article titled "Jane Street, Tower and Radix Are Unnamed 'VIPs' in Binance Case." Tower Research is a New York limited liability company headquartered in New York City.

72.    Additionally, Binance and its affiliates utilized U.S. bank accounts to move billions of U.S. dollars through the U.S. banking system.

73.    Notably, Binance (through Zhao-owned entities) maintained accounts at the now-defunct, New York-based Signature Bank through which it transferred billions of U.S. dollars between 2019 and 2022 via banking funds transfer platforms such as Fedwire, SWIFT, and CHIPS.

74.    Signature Bank was a New York-chartered bank with approximately 40 branches across the United States and nearly $100 billion U.S. dollars in assets before its collapse in 2023.

75.    Zhao owned and controlled multiple foreign entities that held accounts at Signature Bank and were the counterparties to many large transfers totaling hundreds of millions of U.S. dollars.

76.    These banking relationships in New York facilitated the flow of U.S. dollar funds integral to Binance's operations (including the "off-ramps" for Binance users, *i.e.*, converting

crypto back to U.S. dollars).

77.     Chen also maintained multiple bank accounts at the now defunct California-based Silvergate Bank that were used by both Binance and its sham U.S. subsidiary.[15]

78.     In addition, as set forth by the U.S. Securities and Exchange Commission ("SEC") in its June 2023 complaint against Binance, Binance also relied on New York-based partners to conduct its business.

79.     For example, Binance worked with Paxos Trust Company LLC ("Paxos"), a New York-chartered limited purpose trust company, to issue a Binance-branded stablecoin[16] called "BUSD" (Binance USD) beginning in September 2019.

80.     BUSD was a U.S. dollar–pegged cryptocurrency that was approved by and operated under the supervision of the New York State Department of Financial Services ("NYDFS").

81.     Paxos and Binance shared in the profits from investing the reserve assets backing BUSD, which grew to over $16 billion U.S. dollars in circulation by early 2023.

82.     BUSD was traded on Binance's platform and provided critical liquidity until February 2023, when NYDFS ordered Paxos to cease issuing new BUSD due to unresolved issues with Binance's oversight of the token.

83.     Venue is proper in this District pursuant to 18 U.S.C. §2334(a) and 28 U.S.C. §§1391(b) and (c)(3).

---

[15]     Chen acted as the "Primary Admin User" for the five bank accounts at Silvergate Bank including a customer deposit account; an account for corporate clients that later sent funds to Merit Peak, a trading firm controlled by Zhao.

[16]     A stablecoin is a type of cryptocurrency designed to maintain a stable value by being pegged to an asset or a basket of assets, such as fiat currencies or commodities. For example, a stablecoin pegged to U.S. dollar derives its value from the value of its underlaying asset—the U.S. dollar.

## **DEFENDANTS**

**Binance**

84.    Binance was founded in Shanghai in 2017 by Zhao, a Chinese-Canadian national, and Yi He, who previously worked together at Chinese cryptocurrency exchange OKCoin.

85.    The company launched through an Initial Coin Offering conducted from June 26 to July 3, 2017, raising $15 million by selling 100 million Binance Coin ("BNB") tokens at approximately $0.15 each.

86.    The exchange went live just 11 days later on July 14, 2017, operating initially from Shanghai, China.

87.    Within six months of launch, Binance became the world's largest cryptocurrency exchange by trading volume in January 2018, achieving $1 billion in daily trading and a $1.3 billion market capitalization.

88.    In September 2017, following China's ban on cryptocurrency exchanges, Binance relocated servers and operations from Shanghai to Japan. This stay proved brief—on March 23, 2018, Japan's Financial Services Agency issued a warning that Binance was operating without required licensure. That same day, Zhao announced Binance would relocate to Malta.

89.    While Binance publicly claimed Malta as its headquarters, the Malta Financial Services Authority ("MFSA") issued a definitive public statement on February 21, 2020, clarifying that Binance "is not authorized by the MFSA to operate in the cryptocurrency sphere and is therefore not subject to regulatory oversight by the MFSA." Binance had never been licensed or regulated in Malta.

90.    Binance was in fact incorporated in the Cayman Islands as a limited liability

company in 2017 and owned by Zhao.[17]

91.    As noted above, Binance's principal servers now run in a server farm in Japan, but Binance's leadership operated from various countries. Zhao himself has been a digital nomad of sorts, at times living in Canada, Singapore, and most recently, the United Arab Emirates.

92.    Binance's internal communications were conducted over U.S-based Gmail and via the Chinese messaging app WeChat.[18]

93.    Customers can, and often do, use Gmail to log into their Binance accounts and to verify internal crypto transactions.[19]

94.    Since at least July 2017, Binance (together with an array of affiliated entities controlled by Zhao) has operated the Binance.com exchange—an international crypto asset trading platform which is currently hosted on servers in Tokyo, Japan (in Amazon Web Services' data centers).

95.    Binance.com, Binance's primary platform, markets its services to customers in more than 100 countries and currently offers trading in over 350 different crypto assets.

96.    Binance operates through a byzantine network of affiliated entities in multiple

---

[17]    Binance Holdings Limited is complemented by several other Binance entities, including, Binance (Services) Holdings Limited (Ireland Company Number 704568), which owns Binance Holdings (IE) Limited and manages matching engines, financial products, and vendor contracts; and, Binance Holdings (IE) Limited (Ireland Company Number 704567), which operates the Binance platform directly. Additional Irish entities include Binance (Ireland) Holdings Co., Limited (Company Number 675947), Binance (APAC) Holdings (Company Number 704567), Binance Technologies (Company Number 704569), and Binance Exchange (IE) Limited (Company Number 707774). All Irish entities share registered addresses in Dublin or Limerick and identify Changpeng Zhao as a Canadian citizen residing in Malta. The CFTC named three entities as defendants in its March 27, 2023, complaint: Binance Holdings Limited (Cayman Islands), Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited. Binance also operates through a web of entities across multiple jurisdictions, including Binance Investments Company (Seychelles Business Registry Number 212603, LEI 254900PAH70HVI8D2Q25) and Nest Services Limited (Seychelles Registration Number 238045), both registered at the same address.

[18]    The company's internal use of WeChat (a particularly unsecure Chinese government-monitored platform) indicates that its other technological choices (such as its 30-day document retention policy) are not predicated on cybersecurity concerns.

[19]    In theory, a single Gmail address is supposed to be used by one customer, but in practice Binance allows multiple users to use the same Gmail account.

jurisdictions; all are ultimately tied to Zhao as the beneficial owner.

97.    Binance has famously claimed that it has no formal corporate headquarters and refuses to disclose the true location of its main Binance.com operations.

98.    As noted above, Zhao has publicly dismissed "traditional" corporate formalities and regulatory requirements, claiming, "Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office."

99.    According to Zhao, the concept of a formal corporate entity with a headquarters and its own bank account is unnecessary: "All of those things doesn't have to exist for blockchain companies."

100.    However, as U.S. regulators later uncovered, billions of dollars from Binance's crypto exchange platforms flowed through dozens of U.S.-based bank accounts owned by Binance and Zhao, belying the notion that Binance is nowhere and everywhere at once.

101.    Binance.com allows users (once their account is funded) to trade in hundreds of cryptocurrencies and related financial instruments, including spot, futures, derivatives, and margin trading.

102.    To onboard, a user opens a Binance account and deposits assets, either by transferring cryptocurrency from an outside wallet or by making a "fiat" currency (legal tender issued by a government, e.g., U.S. dollars, Euros, Yen) deposit by electronic funds transfer from a bank account, credit card, or other payment channel.

103.    Once a deposit is made, Binance moves all customer assets to Binance-owned omnibus wallets (pooled wallets) that are visible on public blockchains but controlled by Binance and only identifiable as Binance wallets. Fiat deposits are kept in Binance bank accounts, visible only to Binance.

104.    Binance acts as custodian of these pooled assets and internally tracks individual users' balances via its own ledger.

105.    Because of this structure, once funds are deposited and pooled into Binance's wallets, external observers can no longer discern which specific customer is moving funds *out* of Binance's wallets or making internal transfers between wallets. All external transfers are identified on the public blockchain only as transfers originating from wallets owned by Binance. Only Binance knows the "real" counterparty to a transfer, i.e. which customers' assets were transferred.

106.    All internal transfers between Binance customer accounts are recorded solely on Binance's internal systems—only when assets completely leave Binance does an on-chain record or bank record become visible to outsiders—and even those transactions lack transparency, as they appear only as transfers made by Binance.

107.    Binance customers may place orders on www.binance.com, through a Binance mobile application, and by direct connection to Binance's matching engines via the Binance application programming interface ("API").

108.    API connections are generally used by more technologically sophisticated customers, such as proprietary trading firms or other institutional market participants.

109.    By design, Binance's cryptocurrency platform was built to facilitate money laundering on a global scale.

110.    It proudly touted itself out as the world's "largest crypto exchange by trade volume" and reportedly captured over half of the global market share for crypto trading by the end of 2022.

111.    Binance revenue comes primarily from fees charged on trades and transactions processed on its exchange.

112.    In 2021 and 2022, Binance reportedly generated approximately $20 billion and $12

billion U.S. dollars in revenue, respectively.

113.    Binance's growth and competitive advantage over other major cryptocurrency platforms were predicated on its conscious decision to do business with criminals and facilitate illicit transactions, including money laundering and terrorism financing.

114.    Unlike law-abiding exchanges, Binance made a conscious decision not to implement standard know-your-customer or anti-money laundering programs for years, thereby attracting volumes of illicit business as a way to generate liquidity that attracted more and more customers (through network effects) and transformed it into a market leader.

115.    Binance went further, not only attracting criminals, including money launderers and customers affiliated with terrorist organizations, but cultivating them and assisting them to launder their money, shield it from seizure, and hide their activities from regulators.

116.    In June 2019, amid concerns about U.S. regulatory exposure, Binance publicly announced the launch of a separate U.S.-only exchange, called Binance.US that would supposedly wall off U.S. customers from Binance.com.

117.    In truth, as described below, this was a sham.

118.    Binance continued to secretly cater to U.S. users on Binance.com—especially its largest U.S. clients—while using Binance.US in an attempt to circumvent U.S. regulatory oversight.

119.    Internally, Zhao described the goal as "reduc[ing] the losses to ourselves" while keeping regulators at bay.

120.    On November 21, 2023, Binance pled guilty to federal charges of conducting an unlicensed money transmitting business ("MTB"), failing to maintain an effective anti-money laundering program, and violations of the Bank Secrecy Act and U.S. counterterrorism sanctions

(in violation of IEEPA, among other laws).

121.    On the same date, Binance and Zhao entered into a comprehensive settlement with the DOJ, FinCEN, OFAC, and the CFTC to resolve years-long investigations into their misconduct.

122.    Binance agreed to pay $4.3 billion U.S. dollars in forfeiture and penalties, the largest such penalties ever imposed by OFAC and FinCEN.

123.    In its OFAC settlement, Binance admitted to egregious violations of U.S. sanctions, including violations of the Iranian Transactions and Sanctions Regulations, the Syrian Sanctions Regulations, and Section 594.201(a) of the Global Terrorism Sanctions Regulations.

124.    Zhao separately pled guilty to willfully violating the Bank Secrecy Act, and he agreed to a fine of $50 million U.S. dollars; he was later sentenced to four months in federal prison (on April 30, 2024).

125.    The CFTC separately entered into a settlement with Lim (for aiding and abetting Binance's violations) that imposed an injunction and a civil fine of $1.5 million U.S. dollars.

**Changpeng Zhao**

126.    Changpeng Zhao is Binance's primary founder, majority owner, and (until recently) its Chief Executive Officer.

127.    Zhao is a Canadian citizen (born in China), who, upon information and belief, presently resides in the United Arab Emirates.

128.    He launched Binance in 2017 and along with a core senior management group (including Defendant Chen and former Chief Compliance Officer Lim), has always exercised near-total control over Binance's strategy, operations, and finances.

129.    Zhao was also a named party with "control person" liability in regulatory

settlements with Binance.

130.    Even after stepping down as CEO, Zhao has retained an overwhelming ownership interest in Binance and, on information and belief, continues to wield significant influence over its business decisions.

**Guangying "Heina" Chen**

131.    Guangying "Heina" Chen is a close associate of Zhao who, despite not holding any formal title visible to the public in the years preceding the October 7 Attack, has long functioned as Binance's *de facto* Chief Financial Officer.[20]

132.    Chen was an early co-founder of Binance and initially held herself out in 2017 as the legal representative and 80 percent shareholder at the firm's original entity in Shanghai, China.

133.    Two years later, when Binance set up its U.S. affiliate (BAM Trading Services, which operates Binance.US), Chen was listed as the signatory on its corporate bank accounts.[21]

134.    According to the SEC, Chen served as Binance's "Back Office Manager" or "finance director," who executed phony "wash trades" to inflate trading volumes on the Binance platform.

135.    Chen has controlled more Binance bank accounts and served as a director of more Binance-related entities than any executive besides Zhao himself.

136.    As of October 2023, the SEC determined that Chen was a director of at least eight key Binance companies and was a signatory for dozens of bank accounts belonging to 27 entities registered in 13 countries.

137.    This included Binance bank accounts at Signature Bank and Silvergate Bank in the

---

[20]    Chen is now listed as "a Senior Executive and Co-Founder" of the company.

[21]    According to the Malta registry, as of June 2023, Chen submitted a Chinese passport. Those filings indicate that she resided in Singapore, but her LinkedIn profile at the time stated that she is based in the United Arab Emirates.

U.S. (both of which collapsed and are now defunct), through which vast sums flowed on Binance's behalf.

138.    Without Chen's active complicity, Binance could not have operated its opaque global network of accounts to launder (fiat) money and cryptocurrency, at scale.

139.    Chen was thus a key enabler of Binance's illicit conduct described herein, including the provision of financial services to Hamas, the IRGC, Hezbollah, PIJ, and other terrorist organizations.

140.    She is jointly responsible with Zhao for building the infrastructure of a money laundering enterprise that served and protected terrorists among its other criminal clientele.

## FACTUAL ALLEGATIONS

### I.    CRYPTOCURRENCIES AND PAYMENT PLATFORMS

141.    For clarity, the terms "crypto asset," "digital asset," or "token" as used herein refer to assets issued or transferred using blockchain or distributed ledger technology.

142.    These terms encompass what are colloquially known as "cryptocurrencies" (or "virtual currencies")—essentially digital "coins" or ledger entries that represent value and can be transferred between users.

143.    Unlike traditional forms of money (which exist as physical cash or as balances recorded in a bank's centralized database), crypto assets exist primarily as entries on a decentralized ledger ("blockchain") maintained by a network of computers.

### A.    Blockchain

144.    A blockchain is essentially a public digital distributed ledger—akin to a globally shared database—that is distributed across a network of computers ("nodes").

145.    It records transactions in batches of data called "blocks," with each new block

cryptographically linked to the previous one, forming a chronological chain.

146.     This design makes the ledger highly tamper-resistant: once a block of transactions is added to the chain, it is computationally not feasible to alter that data without detection, since any modification would break the cryptographic links and be rejected by the network.

147.     Blockchains typically employ a "consensus mechanism"—a protocol that network participants use to agree on the contents of the ledger and validate new transactions.

148.     In simple terms, a consensus mechanism is an automated method for the network's nodes to agree on which pending transactions will be included in the next block, thereby ensuring integrity and synchronization of the ledger without any central authority.

149.     The two major consensus mechanisms in use are "Proof of Work" and "Proof of Stake."

150.     Proof of work (used by the Bitcoin blockchain, among other blockchains) involves specialized computers called "miners" competing to solve a complex mathematical puzzle; the first miner to solve the puzzle earns the right to add the next block of transactions to the chain and is rewarded with newly minted Bitcoins (and transaction fees). This process, while secure, is energy-intensive and slower than credit card transaction processing networks like VISA and MasterCard. To alter the ledger, the miner would need to control most of the computers in the network, a cost-prohibitive effort.

151.     Proof of Stake (used by the Ethereum blockchain among other blockchains) involves the blockchain protocol selecting block validators from crypto asset holders who have committed or "staked" a minimum number of Ether tokens[22] as part of the validation process. The protocol pseudo-randomly selects validators to propose and validate blocks that contain

---

[22]     Ether is the native token of the Ethereum blockchain.

transactions, rewarding them for honest behavior ("staking rewards") and penalizing ("slashing") a portion of their stake for dishonest or errant behavior. Proof of work (used by the Bitcoin blockchain, among other blockchains) involves specialized computers called "miners" competing to solve a complex mathematical puzzle; the first miner to solve the puzzle earns the right to add the next block of transactions to the chain and is rewarded with newly minted Bitcoins (and transaction fees). This process, while secure, is energy-intensive and slower than credit card transaction processing networks like VISA and MasterCard. To alter the ledger, the miner would need to control most of computers in the network, a cost-prohibitive effort.

152.    Both mechanisms aim to make it impractical for any malicious actor to alter the ledger – providing positive and negative financial incentives.

153.    Importantly, transactions that are validated on a public blockchain (like Bitcoin or Ethereum) are visible and traceable by anyone with access to the internet.

154.    In those systems, every transfer between crypto "wallet" addresses is recorded openly or "on-chain" (though the identities of the address owners are pseudonymous).

155.    By contrast, transactions that occur "off-chain" (within an exchange's internal systems) are not visible on a public blockchain. Those transactions occur between customers whose assets are held custodially by the same financial provider. In other words, internal transactions are only recorded on internal ledgers—the asset itself does not move— the only change is the identity of the registered owner.

156.    When, for example, a Binance customer internally transfers crypto assets to another Binance customer, no public blockchain records that movement.

157.    The only record is on Binance's internal ledger.

158.    Thus, as noted, when a Binance customer deposits cryptocurrency into Binance,

that deposit shows up on the blockchain as going into an interim Binance wallet allocated to a specific customer, and then moved to Binance omnibus wallets which aggregates customers' assets.

159.    Subsequent movements of that value between Binance customer accounts occur "off chain" and cannot be seen on the blockchain.

160.    For government regulators, law enforcement and intelligence agencies, this means that once assets enter Binance's platform, they effectively enter a black box: Binance knows whose funds are whose, but outsiders cannot readily trace the internal flow or final destination of those funds.

**B.      Cryptocurrency Wallets**

161.    Owners of crypto assets manage them using "cryptocurrency wallets" (or "digital wallets").

162.    A crypto wallet stores the cryptographic keys necessary to access and transfer the owner's crypto assets.

163.    There are generally two types of keys: a "public key" (often represented as a wallet address) and a "private key."

164.    The public key (wallet address) is akin to a bank account number or email address—it can be shared with others to receive funds.

165.    The private key is analogous to a secret password or PIN code—it confers the ability to control the wallet and, accordingly, to authorize transfers from that wallet.

166.    Whoever possesses the private key controls the crypto assets associated with the corresponding public address.

167.    Crypto wallets can be software-based (for example, mobile apps or desktop

programs) or hardware devices (physical devices that securely store keys offline)

168.    "Hot wallets" are connected to the Internet (more convenient for frequent access but potentially vulnerable to hacking), whereas "cold wallets" are kept offline (more secure from online threats, often used for long-term storage).

169.    Major crypto exchanges like Binance typically keep most user funds in cold storage (cold wallets) for security reasons, while maintaining some portion in hot wallets to facilitate immediate withdrawals.

170.    When Binance customers use the platform, they generally do not handle their own private keys for funds held on Binance.

171.    Instead, Binance holds the keys (and thus custody of the assets), and users have an account with Binance that shows their balance.

172.    In effect, Binance's system pools the crypto deposits of many users into omnibus wallets it controls; Binance's internal ledger keeps track of how much each user is entitled to.

C.    **Categories of Cryptocurrency Assets**

173.    There are many types of crypto assets, but for the purpose of this Complaint, the relevant categories are "native cryptocurrencies" and "stablecoins," which differ in their purpose, price behavior, and underlying design.

174.    Hamas and others have shown willingness to accept volatile native cryptocurrencies like Bitcoin *and* to utilize stablecoins like Tether ("USDT"), likely depending on their needs (stablecoins for quickly converting to fiat or holding value, Bitcoin for broader public donations).

1.  **Native Cryptocurrencies**

175.    Native cryptocurrencies are the fundamental units of value on a given

blockchain network (for example, Bitcoin on the Bitcoin network, Ether on Ethereum, XRP on the XRP Ledger).

176.    They are typically created by the blockchain protocol itself (such as through mining or initial allocation) and are used to pay transaction fees on that network.

177.    The market value of native cryptocurrencies is determined on open markets and is notoriously volatile.

178.    Prices can swing due to factors like the coin's supply and issuance schedule (Bitcoin, for instance, has a fixed supply cap of 21 million BTC, creating a perceived scarcity), network demand and usage, broader economic sentiment, regulatory news, and speculative trading waves.

179.    Double-digit percentage moves in a day are not uncommon in crypto markets.

180.    As of 2025, hundreds of public blockchain networks exist, each with its own native cryptocurrency.

181.    Each network's software dictates how its native coins are created and distributed—some have a fixed supply or diminishing issuance (like Bitcoin), others have no cap (like Ether, which is managed to target a modest annual issuance or even deflation post-upgrade), and others pre-mined a supply for founders.

182.    Below are a few major native cryptocurrencies relevant to this case:

183.    ***Bitcoin***. Bitcoin (asset symbol "BTC") was the first native cryptocurrency, introduced in a 2008 whitepaper titled "Bitcoin: A Peer-to-Peer Electronic Cash System" by the pseudonymous Satoshi Nakamoto.

184.    The Bitcoin blockchain is a proof-of-work network where miners compete to add blocks and are rewarded with newly minted BTC.

185.    The protocol limits the total BTC that will ever exist to 21 million, lending Bitcoin an aspect of digital scarcity (analogous to a finite commodity).[23]

186.    No central bank, government treasury, private company or any other entity controls Bitcoin; its supply is governed by software code and miner participation.

187.    Instead, ownership of each Bitcoin is established purely by the blockchain record and control of the corresponding private keys.

188.    Bitcoin transactions are pseudonymous but fully public on its blockchain ledger.

189.    The Bitcoin mining process running on computers known as "validator nodes" both secures the network and issues new Bitcoin into circulation (as mining rewards, up to the 21 million Bitcoin limit).

190.    Bitcoin's decentralization, permissionless nature and global liquidity made it attractive to various illicit actors (including, as discussed below, Iranian sanction evaders and terrorist donors), despite its volatility and the traceability of its flows, especially because it is impossible to freeze or seize Bitcoin that reside in self-custody wallets.

191.    *XRP*. XRP (asset symbol "XRP") is the native token of the XRP Ledger, a blockchain developed by Ripple Labs INC (a/k/a/ Ripple, f/k/a Open Coin, Inc.), a Delaware corporation founded in September 2012, with its principal place of business in San Francisco, California, and an office in New York City.

192.    The XRP Ledger uses neither proof-of-work nor proof-of-stake, but a unique consensus protocol where a set of trusted validators agree on which transactions to include.

193.    Ripple Labs initially distributed a large supply of XRP to itself and others (such as early investors and contributors); there is no ongoing mining of XRP.

---

[23]    As of September 2025, approximately 19.9 million Bitcoins have been "mined" into existence and each Bitcoin is divisible into 100 million smaller units called "satoshis" (1 satoshi = 0.00000001 BTC).

194.    XRP is known for fast and low-cost transactions, which made it more practical for certain uses like cross-border payments.

195.    However, XRP's supply and governance are more centralized (Ripple itself operates some validators in the United States and holds a significant portion of XRP).

196.    While XRP's price floats in the market, its network's efficiency (seconds to confirm transactions, minimal fees) has led some criminals to launder funds using XRP due to the speed at which they can move large sums.

197.    Law enforcement, however, can and have traced XRP movements on the public ledger.

198.    ***Ether***. Ether (asset code "ETH") is the native cryptocurrency of Ethereum, a blockchain that extends Bitcoin's concept by introducing programmable smart contracts.[24]

199.    Launched in 2015, Ethereum allowed developers to create decentralized applications and tokens on its blockchain.

200.    When using the Ethereum blockchain, users must pay transaction costs to perform actions on the network, such as sending cryptocurrency, and interacting with smart contracts. These costs are known as "gas" fees.

201.    Many other crypto tokens (including USD-pegged stablecoins like USDT and USDC) run on top of Ethereum as ERC–20 tokens.[25]

202.    Because Ethereum is widely used, ETH is very liquid and often used as a bridge or intermediate asset in crypto transfers.

---

[24]    A smart contract is a program written into a blockchain that automatically executes, controls, or documents actions according to agreed-upon rules once specific conditions are fulfilled. In simpler words, it is a code that behaves like a contract.

[25]    ERC-20, short for "Ethereum Request for Comment No. 20," is a technical standard that establishes the rules governing how tokens operate on the Ethereum blockchain. An ERC-20 token refers to any cryptocurrency or digital asset created on the Ethereum network in accordance with this standard.

203.    *Tron*. Tron (asset code "TRX") is the native token of the Tron network, founded by Justin Sun and launched in 2017.

204.    Tron aimed to offer high throughput (many transactions per second) at low cost, making it attractive for everyday payments and especially for moving stablecoins.

205.    Tron has become popular for transferring the Tether ("USDT") stablecoin because transactions are fast and fees are negligible (often less than a penny).

206.    In fact, as noted by *Reuters*, about 75% of the $8 billion in Iran-related crypto transactions on Binance involved Tron's network—likely because Iranian users (and Hamas's networks) favored Tron's low-profile and cheap transactions to mask transfers.[26]

207.    In April 2023, TRM Labs (a crypto analytics firm) noted that Tron allows memo-less transfers that make analysis harder and was explicitly recommended by Iran's Nobitex exchange for anonymity.[27]

### 2. Stablecoins

208.    So-called "stablecoins" are cryptocurrency tokens designed to maintain a stable value, typically by being pegged 1:1 to a major reference asset like the U.S. dollar.

209.    In theory, and to keep the peg, each USD-pegged stablecoin token is backed by reserves of underlying assets such as U.S. dollars, U.S. dollar-denominated banknotes, bank credit balances, or bonds making it redeemable at par.

210.    In practice, users trust the stablecoin issuer's claim of reserves. But the true extent of these reserves may be unknown.

---

[26]    Angus Berwick and Tom Wilson, *Crypto Exchange Binance Helped Iranian Firms Trade $8 Billion Despite Sanctions*, REUTERS (Nov. 7, 2022), https://www.reuters.com/business/finance/exclusive-crypto-exchange-binance-helped-iranian-firms-trade-8-billion-despite-2022-11-04.

[27]    TRM Labs, Inc., *Iran's Crypto Economy*, TRM Blog (Apr. 16, 2023), https://www.trmlabs.com/resources/blog/iran-crypto-economy.

211.    The majority of stablecoins are pegged to the U.S. dollar. These stablecoins enable crypto users to trade and store value in a U.S. dollar-denominated form without exiting the crypto ecosystem.

212.    Stablecoins are extensively used on exchanges like Binance as a substitute for U.S. dollars—for instance traders often convert volatile native cryptocurrencies like Bitcoin into stablecoins during market turbulence, or use stablecoins to send funds globally almost instantly.

213.    Two of the most prominent stablecoins are Tether and Circle USD Coin and are built on existing blockchains like Ethereum and Tron.

214.    *Tether*. Tether (asset symbol "USDT") is a stablecoin issued by Tether Limited Inc., a Hong Kong corporation formed in 2014. USDT is pegged to the U.S. dollar.[28]

215.    USDT became widely used on exchanges worldwide (including Binance) as an unofficial U.S. dollar substitute.

216.    Tether Limited has claimed that USDT is "100% backed" by reserves, and it periodically publishes attestations of its holdings (which include cash, U.S. Treasury bills, commercial paper, loans, even other crypto like Bitcoin).

217.    USDT exists on multiple blockchains (originally on Bitcoin's Omni layer, now predominantly on Ethereum and Tron, among others).

218.    USDT's ubiquity and liquidity has made it a favored tool for moving crypto assets: Hamas-affiliated wallets frequently used USDT (especially on Tron) to receive and send funds, as it allowed them to effectively move dollars without relying on commercial banks.

219.    *Circle*. USD Coin (asset symbol "USDC") is stablecoin issued by Circle Internet Group INC, a Delaware corporation with headquarters in New York City. USDC is another U.S.

---

[28]    Tether International Limited was incorporated in the British Virgin Islands and moved to El Salvador in 2025. Tether Limited, incorporated in Hong Kong, is the entity that actually issues the USDT token.

dollar-pegged stablecoin.

220.    USDC prides itself on regulatory compliance and transparency, with monthly reserve attestations by Deloitte and the majority of reserves held in the Circle Reserve Fund—an SEC-registered government money-market fund run by BlackRock with custody at BNY Mellon.

221.    *BUSD*. In 2018, Binance itself entered the stablecoin business by partnering with Paxos Trust Company LLC ("Paxos") to issue Binance USD ("BUSD"), a dollar-pegged stablecoin.[29]

222.    BUSD was approved by New York's Department of Financial Services and was meant to be fully backed by reserves held by Paxos.

223.    Binance heavily promoted BUSD on its platform (even offering discounts for using it), and at one point, BUSD became one of the top three stablecoins globally (with tokens worth over $16 billion U.S. dollars in circulation).

224.    However, in February 2023, NYDFS ordered Paxos to stop minting new BUSD due to Binance's mishandling of the product's reserves and oversight.

## II.    CRYPTOCURRENCY PLATFORMS ARE SUBJECT TO ANTI-MONEY LAUNDERING AND COUNTER-TERRORISM FINANCING LAWS AND REGULATIONS

### A.    The IGRC, Hamas, Hezbollah, PIJ, and other Terrorist Organizations

225.    It has long been illegal to do business with or provide any support or services to terrorist organizations like the IRGC, Hamas, Hezbollah, and PIJ.

226.    *The IRGC*. Since 1984, the Islamic Republic of Iran ("Iran") has been designated by the United States as a State Sponsor of Terrorism pursuant to what is now Section 1754(c) of

---

[29]    In August 2025, NYDFS found that Paxos failed to maintain effective AML/transaction-monitoring programs, breached a 2020 agreement governing BUSD stablecoin administration, and relied on unverified Binance geofencing while U.S. persons accessed Binance.com. *See* Consent Order, *In re Paxos Tr. Co., LLC*, N.Y. STATE DEP'T OF FIN. SERVS. (Aug. 7, 2025), https://www.dfs.ny.gov/system/files/documents/2025/08/ea20250807-co-paxos-trust-co.pdf.

the John S. McCain National Defense Authorization Act of 2019, *see* 50 U.S.C. §4813, Section 620A of the Foreign Assistance Act, 22 U.S.C. §2371, and Section 40(d) of the Arms Export Control Act, 22 U.S.C. §2780(d), due in large part to its support for groups like Hezbollah, Hamas, and PIJ.[30] A series of laws prohibits performing nearly any services for Iran or Iranian entities without following specific regulations.

227.    At all relevant times, Iran provided Hamas, PIJ, and Hezbollah with substantial material support, including training, weapons, funds, and resources.

228.    The IRGC and its Quds Force are paramilitary forces answerable only to the Supreme Leader of Iran, currently Ayatollah Ali Khamenei.

229.    The IRGC differs from Iran's "regular" armed forces, which ostensibly function under a national command structure answerable to the nominal government rather than the Supreme Leader.

230.    The IRGC is tasked with "protecting the revolution," which it accomplishes by silencing perceived enemies at home through secret police methods and attacking perceived enemies abroad (via its Quds Force) through terrorist tactics.

231.    On October 13, 2017, the United States designated the IRGC as an SDGT under Executive Order 13224, and the IRGC remains so-designated.[31]

---

[30]    Iran was also designated under section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j). This designation continued in effect after the enactment of the John S. McCain National Defense Authorization Act of 2019. *See* 50 U.S.C. § 4826(c)(1).

[31]    Executive Order 13224, as amended, has the effect of blocking the assets of and transactions with certain identified terror groups and individuals. It also provides the Secretary of State with the authority to (1) designate additional individuals or entities that have committed or pose a significant risk of committing terrorist acts and (2) identify individuals or entities controlled or owned by terrorist groups or individuals. An entity or individual designated under E.O. 13224, as amended, is referred to as an SDGT.

232.    On April 15, 2019, the United States designated the IRGC as an FTO pursuant to section 219 of the Antiterrorism and Effective Death Penalty Act, codified at 8 U.S.C. § 1189, and the IRGC remains so-designated.

233.    The Quds Force ("IRGC–QF") is Iran's primary tool for exporting the Iranian Islamic revolution beyond Iran's borders.

234.    The Quds Force does so by setting up and operating armed terrorist cells, establishing educational systems for indoctrination, and subverting pro-Western Arab regimes.

235.    It also provides substantial material support to terrorist organizations, including Hamas, Hezbollah, and PIJ.

236.    On October 25, 2007, the Quds Force was designated an SDGT pursuant to Executive Order 13224 and remains so-designated.

237.    The Quds Force was also included in the April 15, 2019, designation of the entire IRGC as an FTO.

238.    *Hamas*. Hamas was established in 1987 with the stated core purpose of eliminating the State of Israel, and seeks that end through violence and terror—including rocket attacks, bombings, suicide bombings, shootings, stabbings, hostage taking, and more.

239.    On January 23, 1995, pursuant to Executive Order 12947, the United States designated Hamas as a Specially Designated Terrorist ("SDT").[32]

---

[32]    Executive Order 12947 preceded E.O. 13224 and was narrower. It provided the Secretary of the Treasury with the authority to freeze the assets of and prohibit transactions with entities or persons designated as "foreign terrorists that disrupt the Middle East peace process," as opposed to all terrorist entities or individuals. Entities or individuals designated under E.O. 12947, as amended by E.O. 13099, are referred to as SDTs. On September 9, 2019, E.O. 12947 was revoked and replaced by E.O. 13886, which amended E.O. 13224.

240.    On October 8, 1997, Hamas was designated an FTO and remains so-designated. On October 30, 2001, Hamas was also designated as an SDGT under E.O. 13224 and remains so-designated.

241.    *PIJ*. PIJ is another prominent terrorist group operating in Palestinian-controlled territory. It, too, has as its core purpose destroying the State of Israel through terrorism and violence.

242.    PIJ was established in 1981 and has committed numerous acts of terrorism since, including suicide bombings, small arms attacks, and mortar and rocket attacks.

243.    Like Hamas, on January 23, 1995, pursuant to E.O. 12947, the United States designated PIJ as an SDT.

244.    On October 8, 1997, PIJ was also designated an FTO and remains so-designated.

245.    On October 31, 2001, PIJ was designated as an SDGT under E.O. 13224 and remains so-designated.

246.    *Hezbollah*. Hezbollah (Arabic for "the party of God") is one of the world's largest and deadliest terrorist organizations.

247.    Hezbollah first emerged during the Lebanese civil war in the early 1980s as a militia recruited by the IRGC and comprising Shi'a followers of Iran's then-Supreme Leader, Ayatollah Ruhollah Khomeini.

248.    From Hezbollah's inception, it has always served as an instrument of Iran's IRGC.

249.    Indeed, its members have been trained, organized, and funded by a contingent from the IRGC.

250.    In 1985, Hezbollah issued a manifesto describing its objectives to include expelling Western influence from Lebanon and the wider region, destroying the State of Israel, pledging

allegiance to Iran's supreme leader, and establishing an Islamist government influenced by Iran's political ideology.

251.    Since its inception, Hezbollah has committed numerous high-profile and extraordinarily deadly terrorist attacks against U.S. citizens and others, including the Marine barracks bombing in Beirut in 1983, which killed over 300 people. It has also committed hundreds of attacks on U.S. service members in Iraq between 2004 and 2011.

252.    On January 23, 1995, pursuant to E.O. 12947, the United States designated Hezbollah as an SDT.

253.    On October 8, 1997, Hezbollah was designated an FTO and remains so-designated.

254.    On October 30, 2001, Hezbollah was designated as an SDGT under E.O. 13224 and remains so-designated.

255.    In sum, the IRGC, Hamas, PIJ, and Hezbollah have long-been designated under U.S. law as FTOs and SDGTs because they murdered hundreds of U.S. and Israeli citizens, acts for which they are globally infamous.

256.    Accordingly, knowingly providing material support—including financial services—to any of these FTOs is a felony under 28 U.S.C. § 2339B, punishable up to life in prison.

257.    The International Emergency Economic Powers Act ("IEEPA") also gives the Executive Branch authority to impose sanctions to counter threats (including blocking transactions with State Sponsors of Terrorism like Iran).

258.    OFAC regulations implement these sanctions, making it generally illegal for U.S. persons or any person within U.S. jurisdiction to conduct unlicensed transactions with sanctioned countries (like Iran or Syria) or SDGTs.

259.    Separately, the Bank Secrecy Act ("BSA") and its implementing regulations require financial institutions (including money services businesses or "MSBs") to (1) maintain robust anti-money laundering ("AML") and counter-financing of terrorism ("CFT") programs, (2) perform due diligence KYC on customers, (3) monitor transactions for suspicious activity, and (4) file SARs with FinCEN for any transactions suspected to involve criminal or terrorist conduct (or otherwise lack an apparent lawful purpose).

**B.    The Terrorist Organizations' Emerging Use of Cryptocurrency**

260.    In theory, the large body of criminal laws, financial regulations (including economic sanctions on Iran and other State Sponsors of Terrorism)—combined with the implementation of robust AML programs—pose a significant impediment for Hamas, the IRGC, Hezbollah, and PIJ to transfer funds through the global financial system.

261.    But FTOs, like other criminal organizations, constantly adapt and innovate to circumvent safeguards, and they seek new avenues to help them facilitate their illicit methods.

262.    In 2019, FinCEN published guidance titled "Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies," which, among other things, detailed the legal obligations of MSBs involved in the transfer of crypto currencies.[33]

263.    In October 2021, OFAC issued a sanctions compliance guidance publication for the virtual currency industry.

264.    OFAC advised that "[a]n effective sanctions compliance program will include . . . controls to identify, interdict, escalate, report (as appropriate), and maintain records for transactions or activities prohibited by OFAC-administered sanctions" and "will enable a company

---

[33]    Fin. Crimes Enforcement Network, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, U.S. DEP'T. OF TREAS. (May 9, 2019), https://www.fincen.gov/system/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf.

to conduct sufficient due diligence on customers, business partners, and transactions and identify 'red flags.'"

265.    OFAC further noted that "internal controls often involve the use of industry-specific tools, such as screening, investigation, and transaction monitoring," and that third-party service providers such as Elliptic and TRM "can be helpful tools for an effective sanctions compliance program."

266.    As noted by the Global Investigations Review in its *Guide to Anti-Money Laundering*, "[a] critical component of [customer] onboarding and KYC is wallet screening," which is facilitated by using public blockchain information to "pinpoint[] a wallet's source and destination of funds" as well as "making links with other crypto wallets on the network" in order "to detect if a specific crypto exchange, sanctioned entity or darknet market is in control of a wallet."[34]

267.    That same publication also identified transaction monitoring as a key component of an effective anti-money laundering program.

268.    Numerous companies offer blockchain transaction monitoring services expressly for AML compliance.

269.    For example, in November 2019, Elliptic stated that its tools "enable [crypto exchanges and other financial] services to identify whether funds are being laundered through their businesses, by tracing each crypto-asset transaction all the way through the blockchain, to its source ... If this source is one of the illicit wallets we have previously identified, the business is

---

[34]      Mendes, Stella, *et al.*, *Navigating the Regulatory Landscape for Virtual Assets from a Compliance Perspective*, in The Guide to Anti-Money Laundering (Global Investigations Review, May 27, 2025), https://globalinvestigationsreview.com/guide/the-guide-anti-money-laundering/third-edition/article/navigating-the-regulatory-landscape-virtual-assets-compliance-perspective.

alerted and can take steps to prevent the money laundering from taking place."

### C.    Binance in the United States

270.    As an MSB[35] operating in the United States, Binance was (and is) subject to IEEPA, which authorizes the President to declare the existence of an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States. IEEPA is a principal tool used by the U.S. to enforce sanctions against State Sponsors of Terrorism like Iran.

271.    Moreover, as an MSB operating in the United States, Binance was (and is) subject to the BSA which, among other things, require banks and MSBs to adhere to recordkeeping and reporting requirements and to develop, implement, and maintain effective AML programs reasonably designed to prevent them from being used to facilitate money laundering and the financing of terrorism.

272.    The BSA and its implementing regulations also require MSBs like Binance to file SARs with FinCEN as to transactions they "know, suspect, or ha[ve] reason to suspect" are suspicious.

273.    Binance announced in December 2021 that it was using TRM Labs "to screen for high-risk wallets, and monitor and investigate suspicious transactions," touting TRM's "best-in-class" risk assessment, and forensics technology as a mechanism to "manage regulatory and reputational risk related to digital assets."[36]

---

[35]    The term "money services business" is defined in 31 C.F.R. § 1010.100(ff) to include "money transmitters," which are further defined in 31 C.F.R. § 1010.100(ff)(5) as a person who either "provides money transmission services" or who is otherwise "engaged in the transfer of funds." FinCEN regulations define "money transmission services" as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." Foreign-located businesses are considered MSBs if they do business "wholly or in substantial part within the United States." In 2013, FinCEN defined crypto exchanges as MSBs and therefore under its regulatory supervision. *See* Fin. Crimes Enforcement Network, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001, U.S. Dep't of Treas. (Mar. 18, 2013), https://www.fincen.gov/system/files/shared/FIN-2013-G001.pdf.

[36]    TRM Labs provides a helpful summary of U.S. efforts to target Hamas's cryptocurrency money laundering

274.    In June 2023, Binance's website misleadingly described its Transaction Monitoring team (which was purportedly "responsible for auditing transactions for potential money laundering and terrorist financing activities") as "leverag[ing] cutting-edge technology and sophisticated analytical tools to detect suspicious patterns and identify potential risks," explicitly mentioning efforts to prevent "money laundering and terrorist financing."[37]

275.    In truth, however, Binance's guidelines and compliance tools were a sham because it was purpose-built to attract criminals to its platform and it proved to be a perfect fit for the needs of FTOs who needed new ways to move money anonymously across the globe without their transactions being blocked and their assets seized.

276.    For example, Binance would have seen that Hamas-linked accounts exhibited patterns like "peeling chains" (where a large sum is gradually peeled off into smaller transfers across many addresses, a common laundering technique to obscure the origin) and address clustering (transactions with shared characteristics suggesting the same entity is moving funds through intermediate wallets).

277.    Binance instead chose to willfully ignore these patterns and obvious additional risk

---

efforts, including the types of patterns of transactions that alert compliance analysts like TRM Labs to illicit activities. *See* TRM Labs, Inc., *DOJ Targets Hamas-Linked BuyCash Exchange in $2 Million Civil Forfeiture for Terrorist Financing*, TRM Blog (July 24, 2025), https://www.trmlabs.com/resources/blog/doj-targets-hamas-linked-buycash-exchange-in-2-million-civil-forfeiture-for-terrorist-financing.

[37]    Binance identified blockchain analytics firms Chainalysis, TRM, and Elliptic as partners that helped them "arrive at the most comprehensive mapping and identification of potentially illicit activities in the crypto industry." TRM Labs, Inc., *Playing by the Rules: An Overview of Binance's Compliance Program*, TRM Blog (Jun. 29, 2023), https://www.binance.com/en-KZ/blog/compliance/7787599269355947143. In November 2022, Jonathan Levin, Chief Strategy Officer at Chainalysis, submitted formal comments to the U.S. Treasury Department stating that:

> Iran stands out for its embrace of cryptocurrency…. Several generals in the Islamic Revolutionary Guard Corps (IRGC) — which plays an outsize role in Iran's politics and economy and is designated as a Foreign Terrorist Organization — have publicly endorsed the use of cryptocurrency, including the launch of a central bank digital currency, to circumvent sanctions.

Yet, Binance's partnership with Chainalysis did not reduce Binance's appetite for soliciting Iranian customers.

factors (such as customers purportedly located in the Gaza Strip or Lebanon making extensive use of VPNs, using cryptocurrency mixing services, and making withdrawals to exchanges in high-risk jurisdictions).

278.    But Binance went further than merely looking the other way. Binance under Zhao's direction destroyed or withhold documentation of its illicit activities.

279.    It avoided keeping formal records of certain meetings and communications (for instance, Zhao and others often used self-deleting message apps like Telegram and WeChat or communicated verbally for sensitive matters).

## III.    BINANCE STRUCTURED ITS COMPLIANCE TO FACILITATE MONEY LAUNDERING, SANCTIONS EVASION, AND TERROR FINANCING

### A.    Binance Used Binance.US as a Façade to Evade U.S. Oversight

280.    As noted, Binance was (and is) an MSB that conducted substantial business in the United States, thus subjecting it to U.S. laws like the BSA and IEEPA.

281.    To evade regulatory scrutiny of its global money laundering enterprise, Binance devised a scheme to retain its vast number of U.S. customers while pretending to create a parallel U.S. exchange exclusive to those U.S. customers.

282.    Thus, Binance.US was born as a spinoff of Binance.com (Binance Holdings Limited) that would purportedly be the exclusive platform on which U.S. persons could trade on Binance.

283.    In reality, Binance's objective was to retain its over five million U.S. users, who accounted for 15 to 20 percent of Binance's transaction fees and generated billions of dollars in revenue—all while evading U.S. regulatory oversight.

284.    As FinCEN noted in its November 2023 Consent Order, "Binance [] prioritized attracting and maintaining relationships with large U.S. market makers to drive activity on the

platform and increase profits" and "[a]s a result of these actions, Binance now conducts roughly five times the daily trading volume of its next largest competitor" and has "an unfair competitive advantage in the marketplace as compared to other companies offering similar products and services."

285.    When Binance.US launched in late 2019, Binance claimed that U.S. customers would be geo-blocked[38] from the general Binance.com platform and redirected solely to Binance.US.

286.    In fact, Binance did the opposite: it ensured that major U.S. traders never left Binance.com.

287.    As detailed below, Zhao and others privately provided its VIP customers in the U.S. with instructions and workarounds to allow them to access Binance.com via offshore shell companies, VPNs, and alternate documentation.

288.    As the SEC later noted:

> Zhao directed Binance to assist certain high-value U.S. customers in circumventing those controls and to do so surreptitiously because—as Zhao himself acknowledged—**Binance did not want to "be held accountable"** for these actions. As the Binance CCO explained, **"[o]n the surface we cannot be seen to have US users[,] but in reality, we should get them through other creative means."** Indeed, Zhao's stated "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us." (Emphasis added.)

289.    The DOJ later explained:

> Zhao's willful violation of U.S. law was no accident or oversight. He made a business decision that violating U.S. law was the best way to attract users, build his company, and line his pockets. Despite knowing Binance was required to comply with U.S. law, Zhao chose not to register the company

---

[38]    Geo-blocking (also called geofencing) means a website or app restricts access based on the user's apparent geographic location. The service infers location primarily from the user's IP address—the network number assigned by an internet provider—and may corroborate it with other signals (for example, device or GPS settings, payment-method country). If those indicate a prohibited region, the site displays a "not available in your location" message or disables functions such as trading.

with U.S. regulators; he chose not to comply with fundamental U.S. anti-money-laundering (AML) requirements; he chose not to implement and maintain an effective know-your-customer (KYC) system, which prevented effective transaction monitoring and allowed suspicious and criminal users to transact through Binance; and even when Binance employees detected suspicious transactions, Zhao's choices meant those transactions were not reported to U.S. authorities. And when it became clear that Binance had a critical mass of lucrative U.S. customers, Zhao directed Binance employees in a sophisticated scheme to disguise their customers' locations in an effort to deceive regulators about Binance's client base. ***Critically, Zhao knew that his decision not to implement an effective AML program would result in Binance facilitating transactions between U.S. users and users in Iran and other sanctioned countries and regions in violation of U.S. law***. (Emphasis added.)

290.    On a June 2019 Binance conference call, Binance employees and executives confirmed to Zhao that they were implementing his scheme by contacting U.S. VIP users "offline," through direct phone calls, "leav[ing] no trace."

291.    If a U.S. VIP user owned or controlled an offshore entity (located outside of the United States), Binance's VIP team would help the VIP user register a new, separate account for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred its holdings to the new account.

292.    On the same call, an employee described a script that Binance employees could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Binance by falsely suggesting that the user was purportedly "misidentified" in Binance's records as a U.S. customer.

293.    Also, during this June 2019 conference call, a senior employee provided guidance on what Binance should not do: "We cannot advise our users to change their KYC. That's, that's of course against the law…. But what we can tell them is through our internal monitoring, we realize that your account exhibits qualities which makes us believe it is a US account ... if you think we made a wrong judgment, please do the following, you know, and we have a dedicated

customer service VIP service officer."

294.    The senior employee described Binance's plan as "international circumvention of KYC."

295.    Zhao personally authorized and directed Binance's strategy of purportedly "mischaracterizing" its users' locations, explaining on the June 2019 call with Binance employees that "[w]e cannot say they are U.S. users and we want to help them. We say we miscategorized them as U.S. users, but actually they are not."

296.    Likewise, Zhao directed Binance to implement a plan to encourage customers to circumvent geo-blocking controls.

297.    Zhao directed Binance employees to encourage certain U.S.-based VIP customers to circumvent KYC restrictions by submitting updated KYC information that deleted any U.S. nexus.

298.    An internal document titled "VIP handling" makes clear that Zhao directed this scheme.

299.    Some VIP customers were exempted entirely from Binance's compliance monitoring.

300.    Zhao summed up his philosophy regarding compliance with U.S. law, stating that it was "***better to ask for forgiveness than permission***."

301.    But secret access to the Binance.com platform was not even limited to "VIP" customers.

302.    For example, as discussed below, multiple Binance customers affiliated with Hamas, the IRGC, and Hezbollah were permitted to execute transactions from IP addresses in the United States, including transactions executed via IP addresses in Kindred, North Dakota.

**B.    Binance's Anti-Money Laundering and Counter-Financing of Terrorism Efforts Were a Sham**

303.    As Binance grew, it recognized the need to *appear* to develop an AML/CFT program and procedures to comply with U.S. counter-terrorism laws and sanctions.

304.    Thus, in May 2018, Binance updated its Terms of Use to state that by using the platform users declared themselves not to be on "any economic sanctions list."

305.    The Terms of Use also stated that Binance "may restrict or deny its services to sanctioned countries."

306.    In June and July 2018, Binance issued compliance policies, including a Global Compliance Policy, which stated that Binance "adheres to the Sanctions list maintained by the Office of Foreign Assets Control" and that "Binance will not conduct business with any personnel, entities or countries listed in the Sanctions list under any conditions."

307.    At the same time, Binance's Chief Compliance Officer deliberately and affirmatively misled a financial institution by writing in an AML/CFT due diligence questionnaire that "we use IP blocking to deny business from sanctioned countries. It is also clearly written in our Terms and Conditions that we prohibit business with all sanctioned countries."

308.    Per OFAC, Binance's statements "misrepresented Binance's actual compliance procedures and communicated a commitment and practices that did not in fact exist."

309.    In October 2018, Binance updated its stated policy to prohibit new users from sanctioned and other high-risk jurisdictions (including Iran, Syria, North Korea, and Cuba).

310.    All of these public statements and Binance's establishment of internal compliance functions were announced in order to deceive U.S. and foreign regulators and disguise Binance's core business: money laundering.

311.    For example, on August 3, 2018, Binance's then-CCO, Samuel Lim, explained in

a chat message to a Binance employee that "our stance is [n]ot to *openly* do business with Iran due to sanctions. [I]t affects our banking relationships. I understand that we still support [I]ranian customers but that has to be done *non-openly*." (Emphasis added.)

312.    The following month, in response to an inquiry from Binance's newly appointed Deputy Head of Compliance asking if Binance was servicing users from Iran on Binance.com, the then-CCO explained that, with respect to users from sanctioned countries, "[w]e are servicing [them] but non-public."

313.    He further added, "[I] [t]old [yo]u we have [I]ranian customers; [the CEO of Binance] knows also. And allows it."

314.    Binance's then-CCO further explained to the Deputy Head of Compliance that the sanctions restrictions language in Binance's Terms of Use "has to be there to protect us, [it is] protective language. In biz, ceo doesn't want to enforce."

315.    Later, in the same chat, Binance's then-Deputy Head of Compliance stated that Binance's Operations Director said that Binance "can service sanctioned countries" on Binance.com.

316.    In another September 2018 chat, the then-Deputy Head of Compliance noted: "Zhao keeps saying that compliance is here to make Binance APPEAR compliant."

317.    In an October 18, 2018, message regarding the potential blocking of sanctioned country IP addresses, the then-CCO informed Zhao that "we currently have users from sanction[ed] countries on [Binance.com]," adding that the "[d]ownside risk is if fincen or ofac has concrete evidence we have sanction[ed] users, they might try to investigate or blow it up big on worldstage."

318.    Also in 2018, then-CCO Lim said in an internal chat that "there is no fking way we

are clean," admitted that Binance's customer service employees were "teaching ppl how to circumvent sanctions," and openly worried about "land[ing] in jail."

319.    Another compliance employee wrote, "we need a banner '***is washing drug money too hard these days - come to binance we got cake for you***.'" (Emphasis added.)

320.    At the same time, Binance also misled both U.S. regulators and companies that were its business partners about its compliance functions.

321.    For example, in August 2019, Binance's CCO falsely assured a U.S. state regulator that Binance "provides for AML/CFT controls to ensure the safe and legitimate use of our platforms," "screens all its customers prior to the establishment of a business relations or undertaking a transaction against OFAC, EU, UK and Hong Kong sanctions," and performs "customer due diligence," including where "there is suspicion of money laundering or terrorism financing."

322.    All of these assertions were made knowing that they were false at the time.

323.    In fact, in December 2019, that same CCO admitted in a message to a colleague that Binance.com "doesn't even do AML namescreening/sanctions screening."

324.    Similarly, according to the Commodities Futures Trading Commission, when a corporate business partner requested a compliance audit, Binance "purposely engaged a compliance auditor that would 'just do a half assed individual sub audit'" to "'buy us more time.'"

325.    Binance's Money Laundering Reporting Officer ("MLRO") lamented that she "need[ed] to write a fake annual MLRO report," and the CCO assured her "yea its fine I can get mgmt... to sign" off on the fake report.

326.    In another instance, a Binance senior employee noted: "its [sic] challenging to use the aml standards to impose on [Binance].com ***especially when Cz [Mr. Zhao] doesn't see a need***

*to*." (Emphasis added.)

327.    Binance's culture of promoting a platform so that it could provide services to terrorists and criminals continued for years.

328.    In 2020, Binance's CCO, in response to having been presented with evidence of criminal transactions on its exchange, admitted that Binance attracts bad actors to the platform, stating "***Like come on. They are here for crime***."

329.    Binance's comically titled Money Laundering Reporting Officer agreed, commenting "***we see the bad, but we close 2 eyes***." (Emphasis added.)

330.    In late 2022, Binance publicly boasted about its compliance capabilities:

> We invest heavily in KYC (Know Your Customer) and transaction monitoring technology with some of the strictest protocols in the industry. Unlike many other exchanges out there, we do not allow users to trade on our platform without passing KYC checks that include country of residence and personal ID information. One area in particular that we have ramped up is transaction monitoring. This is a dynamic process that utilizes the latest technology to keep an eye on every transaction to ensure that we can, in real-time, discover and halt any illicit transactions and transfers. To achieve this, we work with partners such as Chainalysis, TRM Labs, CipherTrace by Mastercard and Elliptic, as well as a robust suite of internal tools.[39]

331.    Actual, serious transaction monitoring would have routinely detected indicia of money laundering and terror financing used on Binance prior to the October 7 Attacks.

332.    *To this day*, Binance is structured so that its customers can receive assets to their platform accounts, regardless of where those assets came from or whether those assets originate in illicit activities such as transfers from government-designated wallets. None of those assets are monitored or blocked at the time of deposit.

333.    Moreover, even when a Binance customer's crypto wallet or Binance account

---

[39]    Poyraz, Chagri, *On Binance, Iran and Why We Need to Do Better as an Industry*, Binance Blog (Nov. 4, 2022), https://www.binance.com/en/blog/leadership/7764694498135290896.

becomes subject to a seizure or forfeiture order by a government, Binance has allowed at least some of these designated accounts to move their assets into another Binance customer's account ("off-chain"), effectively "mixing" the illicit cryptocurrency and preventing its traceability by law enforcement.

334.    As the CFTC found, Binance and Zhao destroyed documents related to illegal conduct, demonstrating their awareness that their conduct was wrongful and would subject them to legal liability. Even now, after all of Binance's legal difficulties, the company continues to maintain a document retention policy of only 30 days for its communications— a level of data destruction that is unheard of in the financial services industry.

335.    Moreover, even today—after Zhao served time in prison and Binance paid multibillion dollar fines—the company's compliance team does not have direct access to Binance data. Instead, when a customer is brought to the attention of a compliance employee, the employee receives specific data on excel sheets reflecting only the activities Binance determines the employee should review.

### C.    Binance Exempted "Level 1" or "Tier 1" accounts From KYC Requirements

336.    As a result of Binance's scheme, illicit actors including Hamas and PIJ freely transacted on its platform.

337.    Binance knew and affirmatively assisted the use of its platform by illicit actors, including terrorists.

338.    Indeed, Binance intentionally created a financial ecosystem on which it could provide services to illicit actors so they could freely transact without fear that Binance would block their transactions, freeze or seize their assets, and/or report them to authorities.

339.    Binance's creation of a free-for-all financial ecosystem for criminals is reflected by Binance's account levels.

340. As the U.S. Attorney's Office for the Western District of Washington set forth in its criminal information of Binance, prior to August 2021, Binance allowed users to open "Level 1" (or "Tier 1") accounts without submitting any KYC information whatsoever.[40]

341. Instead, users could open Level 1 accounts simply by providing an email address and a password.

342. Binance required no other information (not even the user's name, citizenship, or location).

343. A Level 1 account holder could deposit virtual currency into its account, and then transact in, an unlimited amount of virtual currency.

344. While Level 1 accounts had certain limitations, including a virtual currency withdrawal limit of up to the-value of two Bitcoins ("BTC") per day, Binance allowed users to open multiple Level 1 accounts with different email addresses, which effectively circumvented the withdrawal limit.

345. Even if a user adhered to the daily two BTC withdrawal limit on a single account, for most of Binance's existence, the user could still withdraw thousands—and sometimes many tens of thousands—of U.S. dollar value per day due to the rising value of a single Bitcoin, which increased from approximately $3,000 to $63,000 U.S. dollars in value between December 2018 and April 2021.

346. Level 1 accounts comprised the vast majority of user accounts on Binance.com.

347. These Level 1 accounts were effectively playgrounds for terrorists and criminals to secretly transfer illicit funds.

348. After August 2021 (when Binance first began performing perfunctory customer due

---

[40] Binance's internal terminology has changed since 2021.

diligence), Binance built a compliance program that *by design* still contained massive gaps to allow criminal activity to take place.

349.    Notwithstanding Binance's announcement that it would require all new users to submit full KYC information, Binance allowed existing users who had not previously submitted KYC information—including all Level 1 accounts (which again were the majority of Binance's user accounts)—to trade on the platform without providing full KYC information until May 2022.

350.    In other words, the platform was still usable for terrorist entities with existing Level 1 accounts.

351.    Binance frequently chose not to close the prohibited accounts that it knew about, and blocked users could contact customer support and successfully ask Binance to reactivate their account.

352.    This problem was pervasive.

353.    The government found, for example, that Binance continued to serve thousands of users that its employees had identified as being from comprehensively sanctioned countries—including, for example, more than 7,000 accounts that had submitted KYC documents from a comprehensively sanctioned country and more than 12,500 users who had provided Iranian phone numbers.

354.    Binance did so even though its official stance was that it had blocked all Iranian customers.

355.    Indeed, a year after Binance claimed to have blocked all Iranian accounts, it had approximately 600 "verified level 2" users from Iran (that is, users who had gone through Binance's KYC process but remained on the platform).

356.    As an additional way to attract money launderers, Binance enabled large entity

customers, including exchange brokers, to directly access Binance.com through sub-accounts created by the broker under its own account.

357.    Binance knowingly enabled exchange brokers to create up to 1,000 sub-accounts under their master accounts, and did not subject those sub-account users to any meaningful scrutiny.

358.    This allowed multiple exchange brokers that had been designated by OFAC (and those brokers' users) to access Binance.com and conduct hundreds of millions of dollars in suspicious transactions.

359.    Binance also knowingly processed transactions for cryptocurrency "mixers"—services that deliberately obfuscate the source of funds by pooling crypto from many wallets and redistributing them in a way that breaks the traceable link between sender and receiver (a classic money laundering technique in the crypto realm).

360.    Mixers are an essential tool for money launderers, whose mission is to hide the sources and destination of ill-gotten money.

361.    Binance nonetheless processed tremendous volumes for mixers.

362.    For instance, OFAC found that Binance processed more than $275 million U.S. dollars in deposits and more than $273 million U.S. dollars in withdrawals from February 2018 to May 2019 for a single mixer called BestMixer, a prominent crypto mixing service that was shut down by Dutch authorities in May 2019.

363.    Consistent with this approach, Binance took steps to retain known illicit actors on the platform, particularly if they were VIP users such as Russia's Hydra (a darknet market's associated mixer and well-known haven for dirty crypto).[41]

---

[41]    *See* Press Release, *Treasury Sanctions Russia-Based Hydra, World's Largest Darknet Market, and Ransomware-Enabling Virtual Currency Exchange Garantex*, U.S. DEP'T OF TREAS. (Apr. 5, 2022),

364.    For example, in July 2020, Binance's CFO and others discussed a VIP user who was offboarded after being publicly identified as among the "top contributors to illicit activity."

365.    The CFO wrote that, as a general matter, Binance's compliance and investigation teams should check a user's VIP level before offboarding them, and then Binance could "give them a new account (if they are important/VIP)" with instructions "not to go through XXX channel again."

366.    Binance's willful failure to implement an effective AML program was critical to its ability to attract criminal activity.

367.    As FinCEN concluded in its 2023 Consent Order against Binance, Binance's knowing failure to implement an effective AML program led to the exchange "being used to process transactions related to . . . unregistered convertible virtual currency mixing services used to launder illicit proceeds, high-risk jurisdictions, individuals listed on OFAC's SDN List, *[and] terrorist financing*." (Emphasis added.)

368.    The U.S. Department of Treasury reported in the *2024 National Terrorist Financing Risk Assessment* that terrorist groups like Hamas, Hezbollah, and the IRGC foreseeably finance their operations using "anonymity-enhancing technologies such as anonymity-enhanced virtual assets and techniques, like virtual asset mixing, to obfuscate the source, destination, or movement of virtual assets."

369.    FinCEN determined that Binance's willful failure to report hundreds of thousands of suspicious transactions "inhibited law enforcement's ability to disrupt the illicit actors" and that its conduct "extensively harmed FinCEN's mission to safeguard our financial system from illicit

---

https://home.treasury.gov/news/press-releases/jy0701 ("Hydra's offerings have included ransomware-as-a-service, hacking services and software, stolen personal information, counterfeit currency, stolen virtual currency, and illicit drugs.").

use" and "expos[ed] the U.S. financial system to a significant volume of illicit financial activity."

370.    Similarly, FinCEN concluded that "Binance senior management misled U.S. authorities," and that Binance's "**willful failure to implement an effective [anti-money laundering] program directly led to the platform being used to process transactions related to . . . terrorist financing**," among other illicit activities. (Emphasis added).

371.    Binance's contempt for U.S. regulators was apparent even after the October 7 Attacks (and continues to this day).

372.    In May 2024, *Wall Street Journal* reporting revealed that Binance, despite being in U.S. regulators' crosshairs in 2023, still overrode compliance concerns to retain lucrative clients.

373.    Binance had promised "unceasing efforts to deliver a safe and trusted platform."

374.    However, when confronted by one of its internal investigations with direct evidence of market manipulation conducted by a VIP market-making client, Binance (in late-2023) fired its investigator and retained its market-manipulating VIP client so Binance could continue "generating trading fees from large clients over fixing its practices."

375.    There is no indication Binance has reformed itself or will remediate any of its misconduct.

376.    Rather, Binance continues to conduct business as usual: allowing criminal activity on its platform seemingly contemptuous of U.S. regulators and its violations of U.S. law.

**D.    Binance Knew That Hamas and Other Terrorist Groups Transacted on Its Platform**

377.    In February 2019, after receiving information "regarding HAMAS transactions" on Binance, Lim (Binance's Chief Compliance Officer at the time) explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering."

378.    Lim's colleague replied: "can barely buy an AK47 with 600 bucks."

379.    As noted above, Binance identifying Hamas transactions, processing them and failing to report them to governmental authorities was not a one-time occurrence. Hamas and related entities regularly transacted on Binance with its full knowledge.

380.    In April 2019, Binance received reports from its third-party service provider identifying Hamas-associated transactions and chose not to file any SARs with FinCEN.

381.    Instead, Lim attempted to influence how the third-party service provider reported on Binance's conduct.

382.    Even when Binance was left no choice but to shut down a Hamas-linked account, it went out of its way to protect these users from losing access to their funds.

383.    Specifically, FinCEN concluded in its November 2023 consent order that:

> [I]n July 2020, after a third-party service provider flagged **accounts associated with ISIS and Hamas**, [Binance's] former Chief Compliance Officer [Lin] described it as "[e]xtremely dangerous for our company" and instructed compliance personnel to "[c]heck if he is a VIP account, if yes, to… *[o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him*."

(Emphasis added.)

384.    Beyond Binance's many outright admissions of knowledge, three additional types of evidence demonstrated that it knew it was assisting the IRGC, Hamas, Hezbollah and PIJ (and other terrorists).

385.    First, Binance was directly and explicitly warned by government and third-party compliance/monitoring services that it had specific terrorist customers.

386.    Second, public reporting abounded on Hamas's and other terrorists' use of Binance, from Hamas's own websites to media and trade publications, to government advisories.

387.    Third, the customers' wallets themselves—even with nominal KYC documentation—often provided glaring red flags, including (1) the use of VPNs to disguise

transactions from high-risk locations like Gaza and Lebanon, (2) churning of transactions through specific wallets, (3) receiving and sending cryptocurrency to designated wallets identified with terrorist organizations, and (4) customers transacting in enormous sums of money with no discernible economic basis.

388.    The sheer magnitude of terrorist-associated transactions further confirms Binance's knowledge that terrorists were frequently transacting on its platform.

389.    In addition to wallets listed by governments, third-party institutions also publicly identified Binance wallets associated with Hamas on their websites.

390.    These reports—stemming from industry reporting, intelligence reports, and traditional news media—extend beyond official sanctions lists by identifying crypto wallets published by Hamas and their affiliates on their social media platforms.

391.    Such reporting is exemplified by the following:

- On February 3, 2019, the Meir Amit Intelligence and Terrorism Information Center published a report listing a crypto wallet posted on the Twitter (now X) account of the Hamas-affiliated Popular Resistance Committees.

- On October 10, 2023, TRM Labs published an article including a number of screenshots of crypto wallets posted on Hamas social media accounts.

- On October 23, 2023, the Middle East Media Research Institute published an article detailing Hamas's historical use of cryptocurrency to elicit donations. MEMRI's article identifies an Ethereum e-wallet that had posted to Gaza Now's Telegram channel. Gaza Now allegedly solicited donations to Hamas's military wing, the Qassam Brigades, in the aftermath of October 7, 2023.

## IV.    BINANCE KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC, HAMAS, HEZBOLLAH AND PIJ

392.    Binance knowingly assisted Hamas, the IRGC, Hezbollah, and PIJ to transfer and launder funds on and through its platform for many years prior and subsequent to the October 7

Attacks.

393.    This included both "on-chain" transactions on the (public) blockchains and "off-chain" transactions between Binance customers.

**A.    Binance Knowingly and Willingly Assisted Iran and the IRGC to Evade Sanctions and Finance Terrorism**

394.    Binance knowingly performed vast amounts of illegal services for Iran—Hamas's chief benefactor.

395.    In October 2018, FinCEN issued a detailed Advisory titled *Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System*—targeted to financial institutions, including virtual currency exchanges like Binance.

396.    FinCEN warned that in Iran "virtual currency is an emerging payment system that may provide potential avenues for individuals and entities to evade sanctions."

397.    Iranians could "access virtual currency platforms" through "Iran-located, Internet-based virtual currency exchanges" as well as "U.S.- or other third country-based virtual currency exchanges."

398.    FinCEN thus warned that "[i]nstitutions should consider reviewing blockchain ledgers for activity that may originate or terminate in Iran," and should "have the appropriate systems to comply with all relevant sanctions requirements and AML/CFT obligations."

399.    Binance knew it was violating U.S. laws, including counterterrorism laws designed to prevent Iran from financing terrorist groups: FinCEN underscored that "a non-U.S.-based exchanger or virtual currency provider doing substantial business in the United States is subject to AML/CFT obligations and OFAC jurisdiction."

400.    In January 2020, Yaya Fanusie, an adjunct senior fellow at the Center for a New American Security, published an article in *Forbes* explaining that "[t]he Iranian regime has stepped

up its support for blockchain technology research, particularly after the U.S. reimposed sanctions on many Iranian banks . . . in 2018."

401.    In June 2021, Eric Lorber, of the Foundation for Defense of Democracies, testified before Congress that "Iran has turned to bitcoin mining as one way to mitigate the impact of the restrictions on its oil sector" and "provide[] a way for Iranians to earn revenue"—estimating "that the amount of bitcoin mined in Iran could equal approximately $1 billion annually."

402.    Accordingly, Mr. Lorber warned, "Iranian think tanks have recognized the potential for sanctions evasion, noting that bitcoin may not be traceable and can be used on international exchanges."

403.    In November 2022, similarly, following reports from *Reuters* that "Binance had processed **$7.8 billion** worth of Iranian crypto transactions since 2018 despite extensive US financial sanctions against Tehran," *Arab News* reported that "almost all the funds passed between Binance and Iran's largest crypto exchange, Nobitex, which offers guidance on its website on how to skirt sanctions." (Emphasis added).

404.    Interviewing several scholars, *Arab News* reported:

> Iran has increasingly utilized cryptocurrencies, and crypto mining, in recent years to evade US-imposed sanctions on its economy and to bolster domestic revenue with some success, [Ali Plucinski, a cybersecurity analyst for the risk intelligence company RANE] told Arab News…. 'After four decades of assorted sanctions, the Iranian government has perfected a variety of techniques for evading sanctions, and crypto is certainly one of its tools,' Barbara Slavin, the director of the Future of Iran Initiative and a non-resident senior fellow at the Atlantic Council, told Arab News. "I would bet that the Islamic Revolutionary Guard Corps is behind these 'illegal' mining efforts,' she said…. 'Iran's shift to cryptocurrencies has proven to be quite effective for the regime in evading US sanctions, evidenced by the recent article of Reuters,' Plucinski said.

405.    *Arab News* quoted Mr. Plucinski of RANE as saying "Iran has had significant success in finding alternate ways to bolster its economy through cryptocurrency production in spite

of strong international sanctions," noting the regime's approval of the "use of crypto funds to pay for imports in August 2022, thereby enabl[ed] the regime to circumvent extensive US sanctions imposed on Iran's finance and banking sector."

406.    Indeed, the "Iranian government has announced its intention to bolster foreign trade with specific countries through the use of cryptocurrencies and smart contracts."

407.    In February 2022, Chainalysis issued a public warning: "[s]ome in the Iranian government have called for the country to use cryptocurrency to circumvent [U.S.] sanctions," noting that "Iranian Bitcoin mining is well underway at a surprisingly large scale," and "Iranian state actors are well aware of the opportunity."

408.    Chainalysis also cautioned that this growth in Iranian state crypto activity has "opened up a new avenue of risk for cryptocurrency businesses" that may "face penalties or even criminal prosecution if found in violation of OFAC sanctions."

409.    But this risk did not stop Binance. Binance admitted that between approximately August 2017 and October 2022, it processed at least 1,667,153 virtual currency transactions— totaling approximately $706,068,127—involving sanctioned jurisdictions, including Iran, Syria, and North Korea.

410.    These violations included 1,205,784 trades totaling $599,515,938 U.S. dollars in virtual currency and futures products between U.S. persons and Iranian counterparties.

411.    The U.S. Department of Justice found (and Binance admitted) that Binance "willfully caused transactions between U.S. users and users in comprehensively sanctioned jurisdictions in violation of U.S. law," including "at least 1.1 million transactions" that violated prohibitions on transactions between U.S. users and users residing in Iran, "with an aggregate transaction value of at least $898,618,825 [U.S. dollars]."

412.    For example, one of Binance's users was Ahmad Khatibi Aghada, an Iranian cybercriminal associated with the IRGC who was sanctioned in 2022 by OFAC for ransomware operations.[42]

413.    Binance processed transactions for Aghada's wallets but failed to file any SAR or freeze his funds even after public designations.

414.    Similarly, IranVisaCart (an illicit Iran-based crypto service) maintained Binance accounts that Binance knew about as early as 2019, yet Binance did not report them.

415.    In November 2022, *Reuters* thoroughly investigated and reported on the volume of Iran-affiliated transactions occurring on the Binance exchange.

416.    The *Reuters* investigation found that since 2018 (through November 2022), Binance "processed Iranian transactions with a value of **$8 billion**." (Emphasis added.)

417.    According to Reuters, "almost all the funds, some **$7.8 billion**, flowed between Binance and Iran's largest crypto exchange, Nobitex, according to a review of data from leading U.S. blockchain researcher Chainalysis." (Emphasis added.)

418.    According to *Reuters*, Binance's "popularity in Iran was known inside the company. Senior employees ***knew of, and joked about***, the exchange's growing ranks of Iranian users, according to 10 messages they sent to one another in 2019 and 2020. 'IRAN BOYS,' one of them wrote in response to data showing the popularity of Binance on Instagram in Iran." (Emphasis added.)

419.    OFAC later concluded that Binance's senior management had "encouraged the use of VPNs and surreptitiously allowed U.S. users and sanctioned jurisdiction users to trade even after ostensibly blocking them. For example, Binance continued to allow trades by users who were

---

[42]    Press Release, *Treasury Sanctions IRGC-Affiliated Cyber Actors for Roles in Ransomware Activity*, U.S. DEP'T OF TREAS. (Sept. 14, 2022), https://home.treasury.gov/news/press-releases/jy0948.

logged in from an IP address in a comprehensively sanctioned jurisdiction so long as that user had submitted KYC documents from a non-sanctioned jurisdiction."[43]

420.    Binance's willful decision to violate U.S. sanctions on Iran translated concretely into active facilitation of the IRGC's terrorism financing—evidenced by the fact that Binance knowingly provided illegal services to IRGC-affiliated persons.

421.    As FinCEN identified (and Binance admitted), Binance knowingly processed:

> several transactions with [convertible virtual currency] wallets associated with sanctioned entities and individuals, including … Ahmad Khatibi Aghada, an individual associated with the sanctioned ***Iranian Revolutionary Guard Corps (IRGC)*** that engaged in ransomware activities. Binance failed to file SARs with FinCEN on any of these transactions, ***even after OFAC's designations***. Binance was similarly aware of other Iran-related illicit transactions that occurred on the Binance.com platform but filed no SARs with FinCEN. For example, prior to the institution of full KYC, IranVisaCart, and other illicit actors maintained accounts with Binance, taking advantage of Binance's policies surrounding opening multiple accounts with weak or no KYC. ***Binance was made aware of these accounts and the related illicit transactions as early as 2019***, and filed no SARs with FinCEN. (Emphasis added.)

422.    Binance's knowing assistance to the IRGC also extended to IRGC conduits to Hezbollah, Hamas, and PIJ.

423.    One of these major conduits was the "Sa'id al-Jamal Network" which uses a web of companies and vessels to facilitate shipments of Iranian commodities on behalf of the IRGC-QF through forged shipping documents to the People's Republic of China (PRC) (among others).

424.    Some of the IRGC-QF's illicit commodities sales proceeds are then laundered to Hezbollah, Hamas, and PIJ through Tawfiq Muhammad Sa'id al-Law and several companies in Kuwait and Syria that he controls. As described extensively below, al-Law money laundering network also extended into South America and Hezbollah's gold smuggling operations.

---

[43]    According to *Reuters*, "Binance itself had supported the use of VPNs. Zhao . . . tweeted in June 2019 that VPNs were 'a necessity, not optional.'"

B.     **Tawfiq Muhammad Sa'id al-Law's IRGC/Hezbollah Network**

425.    Binance hosted at least one wallet held by Lebanon-based Syrian money exchanger Tawfiq al-Law directly as well as a network of other Binance accounts and other wallets working under his direction (the "al-Law Network").

426.    On March 26, 2024, the U.S. Department of the Treasury designated al-Law as an SDGT. According to the U.S. Department of the Treasury, Mr. al-Law "provided Hizballah with digital wallets to receive funds from IRGC-QF commodity sales," and "similarly conducted cryptocurrency transfers for sanctioned Hizballah officials."[44]

427.    The Israeli government previously seized cryptocurrency wallets controlled by Mr. al-Law on the grounds that al-Law's "terrorist infrastructure belonging to Hezbollah and the Iranian Quds Force . . . operated to transfer funds through digital currencies for Quds Force and Hezbollah."

428.    Chainalysis similarly reported that "Al-Law . . . worked with senior Hezbollah operators like Muhammad Qasim Al-Bazzal and Muhammad Ja'far Qasir—both of whom are sanctioned by OFAC—to operate Hezbollah's crypto funding infrastructure. Qasir is a critical conduit for financial disbursements from Iran's Quds Force used to fund Hezbollah's activities."

429.    Even after NBTCF issued Administrative Seizure Order (ASO 20/23) for 12 Binance accounts and 25 wallet addresses controlled by al-Law on May 21, 2023 (in order to "thwart the activity of the designated terrorist organization Hezbollah and impair its ability to further its goals" because the "cryptocurrency wallets and customer accounts containing cryptocurrencies [were] used for the perpetration of a severe terror crime"), Binance continued to

---

[44]     *See* Press Release, *Treasury Targets Qods Force, Houthi, and Hizballah Finance and Trade Facilitators*, U.S. DEP'T OF TREAS. (Mar. 26, 2024), https://home.treasury.gov/news/press-releases/jy2209.

provided services to 19 of those listed wallets—facilitating transactions worth more than $53 million U.S. dollars.

430. Nearly half of these transfers occurred three weeks or more *after* those wallets were designated by the NBCTF.[45]

431. A significant aspect of Tawfiq al-Law's money laundering operation for the IRGC and Hezbollah revolves around illegally sending gold from Venezuela to Iran to bypass U.S. sanctions and finance the Hezbollah's and Hamas's terrorist activities. According to published reports, the gold is then sold in Turkey, and other GCC and Middle Eastern countries, to generate funds for the IRGC.

432. Hezbollah's representatives in Iran, Ali Kassir and Muhammad Jaafar Kassir, both SDGTs, help coordinate the flow of gold sales proceeds to the IRGC and then ultimately back to its terror proxies.

433. Muhammad Jaafar Kassir is, in turn, closely tied to Tawfiq al-Law and his money laundering operation which helps launder a portion of the proceeds from the illicit gold smuggling back to Venezuela via cryptocurrency transfers made to Venezuelan and Brazilian operatives belonging to the criminal network. These local (Hezbollah-affiliated) operatives pass the funds through their Binance accounts as set forth below.

434. One of the key players in this transnational money laundering syndicate is Raed Abib Habib (**Binance Account No. ***6571**) who helps run the South American side of the Hezbollah affiliated gold smuggling and money laundering criminal enterprise that is based in Venezuela and conducts gold transactions that exceed the entire volume of gold held by the Venezuelan Central Bank.

---

[45] At all times relevant to this Complaint, Binance Holdings Limited was aware of (and routinely monitored) designations by NBCTF.

435.    Habib's criminal organization has conducted the equivalent of hundreds of millions of dollars-worth of crypto transactions with Tawfiq al-Law (SDGT) and his Lebanese/Syrian money laundering cryptocurrency accounts.

436.    The Venezuelan-based organization conducts extraction operations in the Orinoco Mining Arc of Venezuela where they receive privileged access to freely operate through systemic bribery of public officials and extortion of the local artisanal miners.[46]

437.    Its processing operation is based in the El Callao and Nacupay areas of Bolivar, Venezuela, and their logistics operations are coordinated in Ciudad Bolivar and Puerto Ordaz, Venezuela.

438.    The network was established prior to 2021, and Habib formed an alliance with Phanor Sanclemente – the now deceased former head of powerful Venezuelan gold smuggling gang Tren de Guayana.

439.    Between 2021 and 2023, Habib's organization ramped up its operations to industrial scale and introduced the use of cryptocurrency as means of distributing proceeds from the sale of illicit gold mining.

440.    Tren de Guayana has nearly complete control of the Orinoco Mining Arc of Venezuela. As one local miner in El Callao pointed out: "Tren de Guayana controls everything, and everyone must pay them a 'tax' — an extortion fee — to work."

441.    Smugglers transport the processed gold to commercialization centers where gold-market front companies run by Syrian and Chinese merchants across Venezuela, Ecuador, Panama,

---

[46]    The Orinoco Mining Arc was established by Venezuelan president Nicolas Maduro in 2016 and encompasses about 12% of Venezuelan territory. Mining became a favored state tool to survive U.S. sanctions as oil revenues dwindled. Mining also quickly became a central focus for numerous criminal and terrorist organizations including the FARC *(Fuerzas Armadas Revolucionarias de Colombia),* ELN *(Ejército de Liberación Nacional),* Hezbollah, Tren de Arauga, and Tren de Guayana.

and Peru are utilized to help move their illicit merchandise.

442.    Members of Habib's organization include Gustavo Adolfo Rangel Castro (**Binance Account No. \*\*\*8463**), an operative in El Callao who has two active criminal arrest warrants in place, Antonios Boutros Nehme (**Binance Account No. \*\*\*0785**), a Lebanese-Venezuelan operative, and George Jesus Mardeni Mardeni (**Binance Account No. \*\*\*3848**), a Venezuelan merchant with ties to the local Venezuelan business community of Middle Eastern origin.

443.    Habib's organization collaborates with other cryptocurrency money launderers in central America, Africa, GCC and China—**Binance Account No. \*\*\*9830** (discussed below) and **Binance Account No. \*\*\*9885** are major players in Central America and the United States.

444.    For example, **Binance Account No. \*\*\*9694**, owned by a Chinese counterpart, is linked to Tawfiq al-Law's network of wallets,[47] and **Binance Account No. \*\*\*3951**, owned by a Republic of Niger national (operating from the UAE), is linked by transaction with both al-Law and the same Chinese counterparty using **Binance Account No. \*\*\*9694**.

445.    Venezuelan intelligence services and law enforcement are aware of the Hezbollah gold smuggling operation and actively monitor it.

1.    **Binance Account No. \*\*\*6571 (Raed Abib Habib)**

446.    **Binance Account No. \*\*\*6571** was nominally opened by Raed Abib Habib, a 34-year-old Syrian national with Venezuelan identification papers.

447.    The account was accessed from multiple locations outside of Venezuela, including Lebanon, Türkiye, Khartoum in Sudan, Medellin and Bogota in Colombia, Ecuador, Spain,

---

[47]    **Binance Account No. \*\*\*9694** received USDT valued at $300,000 from a wallet identified by NBCTF as a Hezbollah affiliated wallet belonging to Tawfiq al-Law's network. The account converted the equivalent of more than $3.7 million USDT to Chinese Yuan. The account is also linked to the U.S. designated IRGC money launderer, Alireza Derakhsahn (discussed below) through a Tron wallet that sent him the equivalent of $1 million and *also* sent **Binance Account No. \*\*\*9694** almost $1m.

Germany, Switzerland, and the United States.

448.    The account remains active as of November 2025.

449.    It has received more than 50 million USDT, nearly half of which was transferred off-chain to other Binance customers.

450.    In August 2022, **Binance Account No. ***6571** received the equivalent of more than $100,000 in a single transaction from **Tron Address ***XY9D** which served as a central hub in the IRGC-Hezbollah cryptocurrency laundering network and transferred and received (within a course of less than two years) USDT equivalent to more than $1.2 billion (including to and from addresses that were later blacklisted by Tether itself).

451.    In the same month of August 2022, **Binance Account No. ***6571** received $400,000 in one transaction directly from the NBCTF designated (ASO 29/23) **Tron Address ***odDd** controlled by Hezbollah money launderer Tawfiq al-Law (SDGT).

452.    NBCTF identified Tawfiq al-Law and numerous wallets and Binance accounts as affiliated with Hezbollah in May 2023 (ASO 29/23),[48] but Binance did not take any action against **Binance Account No. ***6571.**

453.    In fact, from the date of al-Law's designation until the October 7 Attacks, **Binance Account No. ***6571** received and transferred more that $17 million in USDT.

454.    **Binance Account No. ***6571** received an equivalent of $390,000 from the NBCTF designated **Tron Address ***tKvi** that was also transacting with **Binance Account Nos. ***0785** and ***9408** mentioned below.

455.    Habib—using **Binance Account No. ***6571**— sent the equivalent of more than

---

[48]    The U.S. Department of the Treasury subsequently designated Tawfiq al-Law as an SDGT in March 2024. *See* Press Release, *Treasury Targets Qods Force, Houthi, and Hizballah Finance and Trade Facilitators*, U.S. DEP'T OF TREAS. (Mar. 26, 2024), https://home.treasury.gov/news/press-releases/jy2209.

$328,000 off-chain through the Binance internal ledger to other nodes of his Hezbollah money laundering network, including the Binance account of the 26-year-old Venezuelan woman discussed below (**Binance Account ***9830)** as well as the equivalent of more than $1.9 million to **Binance Account No. ***0785**.

456.     Not only were the transactions flowing through Habib's account alone extremely suspicious, but Habib's public profile itself raised glaring red flags. A search of his name on the social media platform X (previously Twitter) brings up a post from a Venezuelan blogger that warns (in Spanish) "Raed Abib Habib" is a criminal known by the alias "el turco Raed" who is among those who controls the Orinoco Mining Arc and is responsible for laundering money through various commercial establishments and smuggling gold.



457.     Official Venezuelan government databases confirm these money laundering activities and further identify Habib (and his alias, "El Turco") as affiliated with Hezbollah and an associate of Phanor Vladimir Sanclemente Ojeda, a deceased former leader of a Venezuelan gold

smuggling criminal organization known as Tren de Guayana.[49]



458.    Habib is associated with numerous companies. For example, he is listed as the manager of EBS Supply Company (EBS) and Suministros Liccioni LLC (SL). Both companies are listed as limited liability companies (LLCs) in Wyoming.

459.    EBS controls entities in Cyprus (EBS Supply Limited—where Habib and his brother Amer Adrian Abib Habib are both listed as directors) and Dubai (EBS Supply FZCO, where Habib is listed as a manager).

460.    EBS's website lists its activities as "Powering Industries Worldwide with Reliable Equipment & Global Reach" and "Importing and exporting high-quality machinery and parts from

---

[49]    An article published in a Latin American online periodical details the arrest in Florida of two Venezuelan nationals named Victor Manuel Fossi Greico and Jean Carlos Sánchez by the FBI. They had entered the United States on a private Venezuelan aircraft transporting 209 kilograms of gold secreted in the nose of the plane. The article indicates that the Venezuelan "Public Ministry" issued 18 arrest warrants of the Venezuelan organization behind this gold smuggling operation. Raed Abib Habib is listed as one of those 18 individuals for whom an arrest warrant was reportedly issued. *See* https://www.laiguana.tv/articulos/1327805-mafia-sacaba-oro-vendian-extranjero-nombres-cargos/ (last visited Nov. 17, 2025).

the UAE to the world."

461.    The website details its offices in the Dubai, UAE; Sheridan, Wyoming; and Nicosia, Cyprus.

462.    SL's website advertises that "At Suministros Limited LLC, we provide a full spectrum of industrial supplies tailored to meet the demands of construction, metalworking, and heavy-duty operations." It lists the same address in Wyoming as EBS: 30 N Gould Street, Suite R, Sheridan, Wyoming, 82801, USA.

463.    Habib is also listed as the manager of another Dubai based company named Big Ocean Trading LLC, which advertises itself as dealing in precious metals. It specifically advertises its sourcing of "scrap gold, mining gold and other non-manufactured precious metals."

## 2.    Binance Account No. ***9799 (Ali Alawieh)

464.    **Binance Account No. ***9799** was registered by Ali Mohammad Alawieh, the son of Hezbollah commander Muhammad Abd al-Rasul Alawieh, whose death was publicly announced in early 2024. At the time of his death, Muhammad Alawieh was reportedly one of the most senior Hezbollah commanders killed after the October 7 Attacks.

465.    The phone number listed by NBCTF ASO 5/24 linked to **Binance Account No. ***9799** (+96138----) links to a Facebook with user id 64244---- and URL https://www.facebook.com/ali1.alawieh.

466.    It displays multiple images honoring Hezbollah commander Muhammad Abd al-Rasul Alawieh:



467.    Ali Mohammad Alawieh himself was photographed at a Hezbollah funeral procession for Ahmed Shehimi who was killed in Syria.



468.    **Binance Account No. ***9799** transacted with numerous designated wallets and Binance customers.

469.    For example, it sent an equivalent of more than $75,000 to **Tron Address ***HE2q**, a node in the IRGC-Hamas-Hezbollah network, designated by NBCTF (ASO 5/24).

470.    Immediately after the October 7 Attacks, **Binance Account No. ***9799** transferred cryptocurrency to **Binance Account No. ***0190**–belonging to an individual identified as Ayman Khalel. On October 17, 2023, it sent to Ayman Khalel's account the equivalent of $51 and once receipt was confirmed, it sent the same account the equivalent of $9,950 the next day. Thus, by structuring the transaction, the two accounts stayed under the $10,000 threshold and remained off-chain, using Binance alone to facilitate the transfer. During the time it was active, **Binance Account No. ***9799** received an equivalent of more than $680,000 and withdrew more than $645,000. Most of that cryptocurrency was transferred off-chain using the Binance internal transfer system.

471.    On one occasion, Ali Mohammad Alawieh also tried to send the equivalent of $4,949 to another (later designated) Tron address—**Tron address ***wtmZ**—but Binance rejected this transaction. Despite rejecting this specific transaction, Binance took no action with respect to the account generally, which continued to further process Hezbollah transactions (incoming and outgoing) worth more than $500,000.

### 3.    <u>Binance Account No. ***0785 (Antonios Boutros Nehme)</u>

472.    **Binance Account No. ***0785** was nominally opened by a Lebanese and Venezuelan dual national named Antonios Boutros Nehme who was part of the IRGC's cryptocurrency financing network with Hezbollah. For example, on one occasion, he received the U.S. dollar equivalent of $500,000 in a single cryptocurrency transfer from Tawfiq Muhammad

Sa'id al-Law (who had been designated as an SDGT). Two weeks later, he received another $250,000 deposit of cryptocurrency from a different al-Law address.

473.    **Binance Account No. ***0785** transacted directly with other terrorist financiers as well. For example, on February 8, 2022, it received the U.S. dollar equivalent of $50,000 from **Tron Address ***tKvi**, later designated by NBCTF (ASO 53/23) as being "property used for perpetration of severe terror crime."

474.    Engaging with the BuyCash network, **Binance Account No. ***0785** sent the U.S. Dollar equivalent of $495,000 in a single transaction to **Tron Address ***ihmS**.

475.    **Tron Address ***ihmS**, in turn, transferred the U.S. Dollar equivalent of $885,000 to BuyCash.

476.    **Tron Address ***ihmS** also received the U.S. Dollar equivalent of $3.7 million from wallets belonging to the Hezbollah-IRGC-al-Law cryptocurrency laundering network and transferred the U.S. Dollar equivalent of more than $9.4 million from these wallets and those of other designated terrorists.[50]

477.    Between January and October 2022, **Binance Account No. ***0785** received 120.7 million in USDT deposits and 121.0 million in withdrawals. The transactions followed a consistent structure of round-number entries, mainly between 100,000 and 1,000,000 USDT, repeating across several months (another indicium of money laundering). The largest single transfer was 3,999,900 USDT on June 1, 2022, followed within minutes by multiple withdrawals of similar size.

478.    Deposit and withdrawal timings frequently match within the same hour, producing near flat end-of-day balances. Internal (off-chain) transfers included a 1,000,000 USDT transfer

---

[50]    For example, **Tron Address ***ihmS** received $165,000 from **Tron Address ***foQF** (discussed above and designated for its affiliation with PIJ).

and a 20.25 BTC refund in February 2023, demonstrating that funds moved inside Binance's ledger during the same periods. **Binance Account No. ***0785** utilized additional cryptocurrencies including the U.S. Dollar equivalent of $2.5 million in XRP.

479.     **Binance Account No. ***0785** also received 14 transfers totaling the equivalent of more than $1.9 million from Raed Abib Habib's **Binance Account No. ***6571**— all of them off-chain— using Binance's architecture to conceal the transfers on its internal ledger.

480.     Despite all of the foregoing, Binance even provided Antonios Boutros Nehme a loan (in USDT) in February 2023 for the U.S. Dollar equivalent of more than $300,000.

481.     Nehme also occasionally deposited U.S. dollars (Fiat) into his account or converted USDT in his account into dollars using eight Mastercard and Visa credit cards issued in Panama and associated with his bank account at Banesco Panama. He also made direct transfers from his Binance account to this bank.

482.     **Binance Account No. ***0785** was primarily accessed from Caracas Venezuela throughout 2022, but transactions were also initiated that year from Lebanon, Turkey, Southern France, and Florida.

### 4.  <u>Binance Account No. ***9408 (Mohamad Said El Okdi)</u>

483.     **Binance Account No. ***9408** was nominally registered by a Brazilian resident named Mohamad Said El Okdi with the email address ███████ saidsaid0317@hotmail.com.

484.     The account did not pass the "enhanced" due diligence process and was marked Refused.[51] Nevertheless, Binance permitted it to operate for five months between April and September 2022, despite Okdi's involvement in a gold smuggling enterprise in Venezuela and Brazil.

---

[51]     Okdi provided a 20-year-old ID and Binance registered a date of birth that made him 20 years younger than he is.

485.    During that time, **Binance Account No. \*\*\*9408** received the U.S. dollar equivalent of more than $5.2 million in cryptocurrency transfers from Hezbollah money launderer Tawfiq al-Law (SDGT) during a two-month period.

486.    It also received the equivalent of more than $2.2 million from **Tron Address \*\*\*sMUj**, which itself heavily transacted with the al-Law Hezbollah-IRGC Network (receiving from his designated wallets more than $7 million and sending to those wallets more than $13 million).[52]

487.    **Binance Account No. \*\*\*9408** was also linked to Alireza Derakhshan (SDGT), an IRGC money launderer (see below) through a Tron address that sent Derakhshan's Tron wallet the equivalent of $350,000 and **Binance Account No. \*\*\*9408** the equivalent of $50,000.

488.    Over the course of the five months, it was active—between April and September 2022—**Binance Account No. \*\*\*9408** received the U.S. dollar equivalent of more than $12 million in USDT. More than half of that cryptocurrency was converted into fiat currencies— Brazilian Real and Venezuelan Bolívar.

489.    Had Binance not been designed to facilitate money laundering, the transactional patterns in the account would have easily confirmed what a basic open-source search would have revealed: that Yehia Said Okdi, Youseff Said Okdi, and Mohamad Said Okdi were implicated in a 2022 criminal investigation in Brazil for operating a gold smuggling business. The Okdi brothers' partner in the operation was further charged in a sister case for overseeing a money laundering operation for the benefit of organized crime.

### 5.    Binance Account No. \*\*\*9885

490.    **Binance Account No. \*\*\*9885** was registered in December 2017 by a Venezuelan

---

[52]    It also received the equivalent of $56,400 from the NBCTF-designated **Tron Address \*\*\*tKvi**, which was transacting with **Binance Account No. \*\*\*0785** mentioned above.

passport holder, but was almost dormant for four years.

491.    The account started sending and receiving cryptocurrencies (mainly USDT) in 2021, and within two years of operation, moved the equivalent of more than $150 million.

492.    Within one day in June 2022, **Binance Account No. \*\*\*9885** received the U.S. dollar equivalent of $500,000 from two different Hezbollah-affiliated wallets belonging to Tawfiq al-Law's network.

493.    In that same month, it also received the U.S. dollar equivalent of more than $390,000 from Raed Abib Habib's organization via **Binance Account No. \*\*\*0785**.

**6.    Binance Account No. \*\*\*8463 (Gustavo Castro)**

494.    **Binance Account No. \*\*\*8463** was registered to a 26-year-old Venezuelan national named Gustavo Adolfo Rangel Castro, a member of Raed Abib Habib's Hezbollah gold smuggling organization.

495.    **Castro** has two active Venezuelan criminal arrest warrants out for him.



496.    **Binance Account No. \*\*\*8463** was active for 9 months—until the end of 2022.

497.    During that time, it moved the U.S. dollar equivalent of $30 million (deposits and

withdrawals)—millions of it off-chain on Binance's internal ledger.

498.    Within a span of 9 days in August 2022, **Binance Account No. \*\*\*8463** received the U.S. dollar equivalent of more than $2.9 million from three different Hezbollah-affiliated al-Law related wallets.

### 7.  Binance Account No. \*\*\*3848

499.    **Binance Account No. \*\*\*3848** was registered on May 2021, by a then 22-year-old Venezuelan resident who proceeded to transfer the equivalent of more than $60 million in cryptocurrency on behalf of Raed Abib Habib's Hezbollah gold smuggling network — approximately a third of those funds moving off-chain through Binance's internal ledger.

500.    The account also received the U.S. dollar equivalent of more than $3.1 million from three different wallets controlled by Tawfiq al-Law that were all designated in the May 21, 2023, NBCTF Seizure Order.

501.    Nevertheless, Binance allowed **Binance Account No. \*\*\*3848** to launder funds for at least two years after those Tawfiq al-Law wallets were known to it to be acting on behalf of Hezbollah.

### 8.  Binance Account No. \*\*\*3951

502.    **Binance Account No. \*\*\*3951** was registered in August 2021, to a then 23-year-old Republic of Niger national, residing in the UAE.

503.    Within a three-and-a-half-year period of activity, the account received deposits in the cryptocurrency equivalent of more than $62 million and withdrew almost the same amount (moving the equivalent of more than $120,000,000) — more than the U.S. dollar equivalent of $28 million of these withdrawals were off-chain, visible only inside Binance's internal ledger

504.    Within a two-day period in March 2023, **Binance Account No. \*\*\*3951** received

the equivalent of almost $1 million from two wallets identified by NBCTF in May 2023 as associated with Tawfiq al-Law and Hezbollah, but Binance permitted the account to nevertheless remained active for at least 18 months after NBCTF issued its Administrative Seizure Order identifying these wallets.

### 9. Binance Customer A-1

505.    A Tron wallet owned by **"Binance Customer A-1"** received USDT in a total amount equivalent to more than $28 million up until October 2025.

506.    The equivalent of more than $2 million in deposits into the account of **Binance Customer A-1** were made from only 3 other Tron addresses—all held by Hezbollah,[53] and associated with Tawfiq al-Law (SDGT).

507.    Even after these Hezbollah-affiliated addresses were targeted by a NBCTF Seizure Order, Binance continued to process the equivalent of hundreds of thousands of dollars for **Binance Customer A-1**'s account.

508.    For example, on June 13, 2023, **Binance Customer A-1** received the equivalent of more than $145,000 from a Hezbollah-affiliated **Tron Address \*\*\*gmJr**—an address that had been identified in an NBCTF Administrative Seizure Order three weeks earlier.

509.    For 29 months after Binance was alerted to the fact that **Binance Customer A-1**'s account had received the equivalent of more than $2 million from Hezbollah addresses, it nevertheless continued to service the account.

### 10. Binance Customer A-2

510.    A Tron wallet owned by "**Binance Customer A-2**" is an important node in the IRGC's cryptocurrency money laundering network which received USDT in a total amount

---

[53]    All three addresses were subject to NBCTF Administrative Seizure Orders (ASO 29/23) on May 21, 2023.

equivalent to more than $53 million up until October 2025.

511.    More than $40 million of those USDT deposits were transferred from only eight other Tron addresses—all controlled by the IRGC.[54]

512.    Even after NBCTF identified all eight of those Tron addresses in an Administrative Seizure Order (ASO 43/25) on September 1, 2025, Binance still deposited the equivalent of $600,000 on October 9, 2025, into wallet **Binance Customer** A-2.

### 11. <u>Binance Customer A-3</u>

513.    A Tron wallet owned by "**Binance Customer A-3**" received USDT in a total amount equivalent to more than $27 million up through October 2025.

514.    **Binance Customer A-3** received the equivalent of more than $2.3 million in deposits from three other Tron addresses associated with Tawfiq al-Law (SDGT) who was first designated by NBCTF in June 2023 (ASO 29/23).

515.    Even after the Hezbollah-affiliated addresses were targeted by a NBCTF Seizure Order, Binance continued to process the equivalent of millions of dollars for **Binance Customer A-3**.

516.    For more than two years after Binance was alerted to the fact that **Binance Customer A-3**'s account had received the equivalent of more than $2.3 million from Hezbollah-affiliated addresses, Binance took no steps to prevent the account from continuing to launder cryptocurrency.

### 12. <u>Binance Customer A-4</u>

517.    A Tron wallet owned by "**Binance Customer A-4"** received USDT in a total amount equivalent to more than $10 million up through October 28, 2025.

---

[54]    *See* NBCTF Administrative Seizure Order (ASO 43/25) (Isr. Sept. 1, 2025).

518.    Nearly all deposits into **Binance Customer A-4**'s account were made from three other Tron addresses that were all designated by NBCTF on September 1, 2025, as property of IRGC and used to perpetrate severe crime (ASO 43/25).

### 13. <u>Binance Customer A-5</u>

519.    A Tron wallet owned by "**Binance Customer A-5**" received USDT in a total amount equivalent to more than $31 million up through October 22, 2025.

520.    The equivalent of $6.7 million in deposits were transferred into **Binance Customer A-5** from a single Tron address that has been reported to be part of Hezbollah and the IRGC-QF money laundering network.

521.    An equivalent of $2.6 million deposits arrived from two other Hezbollah designated wallets addresses associated with al-Law (NBCTF ASO 29/23).

522.    More than $713,000 arrived from another Hezbollah-IRGC-Quds Force Tron associated address.

523.    For more than 29 months after Binance was alerted to the fact that **Binance Customer A-5**'s account had received the equivalent of more than $2.6 million from Hezbollah addresses, it nevertheless continued to service the account.

### 14. <u>Binance Account No. ***9830</u>

524.    **Binance Account No. ***9830** was nominally registered[55] by a then-26-year-old Venezuelan woman in April 2022. It was accessed from Venezuela, Brazil, and the United States.

525.    The named account holder resides in San Félix de Guayana, Bolivar, Venezuela and appears to operate a livestock/agriculture-related company in Roraima, Brazil, called Seu

---

[55]    As used in this Complaint, the term "nominally registered" indicates the scant KYC information provided to Binance to operate the account. It is likely that in many cases, accounts were actually operated by one or more persons who did not provide any KYC documentation and that the person whose KYC information was provided was simply a front for the real owners of the account.

Humilde Vendedor, a/k/a Fazenda Amazônia Ltda. ("Amazonia Farm" in English).

526.    She serves as a front for Hezbollah's gold smuggling network and by May 2023, she had moved the U.S. dollar equivalent of $40 million in and out of the account and received the equivalent of over $6.7 million from the al-Law (SDGT) wallets.

527.    Then, on May 21, 2023, NBCTF designated al-Law for his role as a money launderer for the IRGC and Hezbollah. **Binance Account No. \*\*\*9830** suddenly received the equivalent of more than $116 million and transferred out more than $110 million—all of this after it was already clear she had previously received more than $6.7 million from al-Law, a money launderer for the IRGC and Hezbollah.

528.    **Binance Account No. \*\*\*9830** received off-chain transfers equivalent to more than $320,000 from Raed Abib Habib's **Binance Account No. \*\*\*6571**.

529.    **Binance Account No. \*\*\*9830** remained active in 2024.

530.    Over the lifespan of the account, **Binance Account No. \*\*\*9830** received deposit of cryptocurrency equivalent to more than $177 million with more than $50 million received off-chain from other Binance accounts and only appearing on Binance's internal ledger. Withdrawals in cryptocurrency totaled more than USDT 130 million with the equivalent of approximately $43 million transferred off-chain on Binance's internal ledger.

531.    Binance facilitated the off-ramping (the conversion of cryptocurrency to fiat currency) of the balance of the account—the equivalent of approximately $45.5 million—in fiat money (U.S. dollars through Bank of America, Zelle and a Panamanian digital payment system called Zinli, Brazilian Real, Colombian Peso and Venezuelan Bolívar via the Pix Payment system, Banco De Venezuela and Banco Colombia SA).

532.    From May 21, 2023, when al-Law was publicly identified as a terror financier for

the IRGC and Hezbollah until August 2024, Binance allowed **Account No. \*\*\*9830** to double the number of deposits and increase withdrawals six-fold.

533.    In fact, between al-Law's designation and the October 7 Attacks, the account received the equivalent of more than $97 million and withdrew the equivalent of $38 million.

534.    During a six-week window of time in July-August 2023 (preceding the October 7 Attacks), **Binance Account No. \*\*\*9830** received the equivalent of $1.7 million (USDT) from BuyCash—a Gaza-based entity whose crypto wallet was first designated by NBCTF in June 2021 for assisting Hamas's Qassam Brigades (with the first transaction two months after al-Law's designation).[56]

535.    **Binance Account No. \*\*\*9830** is also linked to the IRGC through the U.S. designated Iranian money launderers, Derakhshan and Alivand (discussed below) and the Sa'id al-Jamal Network (discussed above).

536.    Alivand received the equivalent of more than $7 million from two Tron wallets. One of those Tron wallets sent the equivalent of more than $1.5 million to **Binance Account No. \*\*\*9830**. The other Tron wallet received the equivalent of $90,000 from **Binance Account No. \*\*\*9830**—demonstrating that **Binance Account No. \*\*\*9830** was part of the larger IRGC/Hezbollah money laundering ecosystem.

537.    Derakhshan received the equivalent of $350,000 from a Tron wallet that also sent the equivalent of more than $1.5 million to **Binance Account No. \*\*\*9830**.

538.    Sa'id al-Jamal's designated Tron wallet likewise received the equivalent of $1

---

[56]     BuyCash was designated an SDGT by the U.S. Department of Treasury on October 18, 2023, "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Hamas." *See* Press Release, *Following Terrorist Attack on Israel, Treasury Sanctions Hamas Operatives and Financial Facilitators*, U.S. DEP'T OF TREAS. (Oct. 18, 2023), https://home.treasury.gov/news/press-releases/jy1816.

million from another Tron wallet that sent **Binance Account No. \*\*\*9830** the equivalent of little more than $1 million.

### 15. Binance Account No. \*\*\*7790

539.    **Binance Account No. \*\*\*7790** was opened in 2021, nominally by a Lebanese national with Brazilian identification using a Hotmail e-mail address.

540.    The account was accessed more than 200 times from Lebanon and more than 300 times from Hezbollah's South American money laundering hub, the notorious "Tri-Border Area," as well as from Brazil, Paraguay, Turkey, and Qatar.

541.    Between 2022 and 2023, Binance received more than 200 cryptocurrency deposits into **Binance Account No. \*\*\*7790**, totaling more than $8 million in USDT, with an average deposit of over 35,000 and individual transactions ranging from hundreds of dollars to $200,000. This took place in less than a year.

542.    Notably, the account received the U.S. dollar equivalent of $1.5 million in cryptocurrency transfers from Hezbollah Super Facilitator al-Law during a six-month period.[57]

543.    For example, **Binance Account No. \*\*\*7790** received four deposits totaling almost $180,000 during a three-day period directly from cryptocurrency wallet address \*\*\*vpab, controlled by al-Law.

544.    The final deposit from al-Law into this account was on May 15, 2023.

545.    Six days later, on May 21, 2023, NBTCF issued Administrative Seizure Order (ASO 20/23) identifying Tawfiq al-Law as affiliated with Hezbollah and a list of Binance accounts and wallet addresses as "containing cryptocurrencies used for the perpetration of a severe terror

---

[57]    For a discussion of the role played by Hezbollah's "super facilitators," *see, e.g.,* Matthew Levitt, *Attacking Hezbollah's Financial Network: Policy Options*, Wash. Inst. for Near E. Pol'y (June 8, 2017), https://www.washingtoninstitute.org/policy-analysis/attacking-hezbollahs-financial-network-policy-options.

crime." Despite knowing about NBTCF's Administrative Seizure Order on May 21, 2023, Binance permitted **Binance Account No. \*\*\*7790** to continue withdrawing funds from the account until October 20, 2023—both inside the platform (to other Binance customers) and to external wallets outside the platform.

546.    In total, **Binance Account No. \*\*\*7790** processed nearly $17.8 million in combined deposits and withdrawals in less than two years while receiving funds directly from a designated Hezbollah financier and exhibiting textbook money laundering patterns, including rapid deposit-to-withdrawal cycling of cryptocurrency through the account, with same-day deposits and withdrawals often involving hundreds of thousands of dollars.

547.    For example, on February 15, 2023, **Binance Account No. \*\*\*7790** received deposits of $376,970 and executed withdrawals of $352,625 *on the same day*—a 93% same-day turnover rate indicating funds deposited were being quickly moved to break audit trails.

548.    **Binance Account No. \*\*\*7790** exhibited multiple money laundering patterns, including the rapid cycling of transfer (with same-day deposits and withdrawals often involving the equivalent of hundreds of thousands of dollars), high-value transactions of sums equivalent to $50,000 or more, and minimal retention of account balances (maintaining a net balance of approximately $25,000 but processing the equivalent of almost $9 million through the account).

C.    **Other Examples of Designated IRGC Binance Customers**

1.    <u>**Ahmad Khatibi Aghada**</u>

549.    Ahmad Khatibi Aghada is an Iranian cybercriminal who served as managing director of Afkar System Yazd Company, an IRGC-affiliated cyber threat company that conducted ransomware operations targeting critical infrastructure on behalf of the IRGC.

550.    In September 2022, OFAC designated Mr. Aghada as a an SDGT pursuant to

Executive Order 13224, publicly identifying him as "an individual associated with the sanctioned Iranian Revolutionary Guard Corps (IRGC) that engaged in ransomware activities."[58]

551.    As part of Aghada's designation, OFAC listed three Bitcoin wallet addresses that Aghada had used to receive ransomware proceeds and conduct IRGC-affiliated financial operations:

- **Bitcoin Address \*\*\*RzgL**
- **Bitcoin Address \*\*\*ws6s**
- **Bitcoin Address \*\*\*8ngk**

552.    Binance had processed cryptocurrency transactions for Aghada's designated wallet addresses through the Binance platform, enabling him to move IRGC ransomware proceeds through the international financial system.

553.    As FinCEN documented in its November 2023 Consent Order, Binance knowingly "processed several transactions with [convertible virtual currency] wallets associated with sanctioned entities and individuals, including … Ahmad Khatibi Aghada, an individual associated with the sanctioned Iranian Revolutionary Guard Corps (IRGC) that engaged in ransomware activities," yet "Binance failed to file SARs with FinCEN on any of these transactions, even after OFAC's designations."

554.    The FBI subsequently offered a reward of $10 million U.S. dollars for information leading to Aghada's arrest, reflecting the severity of his IRGC-affiliated ransomware operations that Binance had knowingly facilitated through their platform.

555.    Blockchain analysis firms documented that Aghada moved funds through Nobitex, Iran's largest cryptocurrency exchange, which then channeled those funds through Binance—establishing that Binance served as the critical international gateway enabling IRGC operatives

---

[58]    Press Release, *Treasury Sanctions IRGC-Affiliated Cyber Actors for Roles in Ransomware Activity*, U.S. DEP'T OF TREAS. (Sept. 14, 2022), https://home.treasury.gov/news/press-releases/jy0948.

like Aghada to convert Iranian-sourced ransomware proceeds into globally fungible cryptocurrency.

### 2. **Amir Hossein Nikaeen Ravari**

556.    Amir Hossein Nikaeen Ravari is an Iranian cybercriminal who worked as an employee of IRGC-affiliated Afkar System from 2015 through 2019, conducting cyber operations on behalf of the IRGC alongside Aghada.

557.    In September 2022, OFAC designated Ravari in the same enforcement action that designated Aghada, identifying Ravari as an IRGC operative who "leased and registered network infrastructure used in furtherance of this malicious cyber group's activities and participated in compromising victims' networks."

558.    OFAC's designation identified four Bitcoin cryptocurrency wallet addresses that Ravari had used to receive payments for his IRGC ransomware operations, with blockchain records showing that these wallets had transacted through Binance.

559.    These designated Bitcoin wallet addresses are:

- **Bitcoin Address \*\*\*RzgL**
- **Bitcoin Address \*\*\*mwuc**
- **Bitcoin Address \*\*\*3zty**
- **Bitcoin Address \*\*\*ys3s**

560.    Binance knowingly processed transactions for Ravari's designated wallets but, as with Aghada, deliberately chose not to file SARs with FinCEN—even after OFAC's public designation identified these wallets as instruments of IRGC terrorist financing operations.

561.    Ravari's use of Binance to move IRGC ransomware proceeds demonstrates that Binance served as essential financial infrastructure for a coordinated IRGC cyber operations cell, knowingly enabling multiple designated terrorists to launder funds through their exchange.

### D.    Nobitex Exchange Network

#### 1.    Iranian sanctions evasion platform

562.    Nobitex (website nobitex.ir), founded in 2017 by CEO Amirhosein Rad and headquartered in Tehran, operates as Iran's largest cryptocurrency exchange.

563.    By 2021, Nobitex claimed to support more than 11 million registered users and processed 70 percent of all Iranian cryptocurrency transactions.

564.    Nobitex serves as the primary Iranian platform for converting Iranian rials (the official currency of the Islamic Republic of Iran) into Bitcoin, Ethereum, USDT, and other cryptocurrencies—functioning as what blockchain intelligence firm Elliptic described as "a critical piece of infrastructure within Iran's cross-border sanctions evasion apparatus."

565.    Nobitex's website explicitly instructed Iranian users on circumventing U.S. sanctions, advising customers to avoid "direct transfers" of cryptocurrency between Iranian and foreign platforms, recommending the use of Tron for anonymous trading, and identifying Binance as "the best option for Iranians."

566.    As described above, on September 14, 2022, OFAC designated Aghada and Ravari—two IRGC-affiliated operatives responsible for distributing BitLocker ransomware and targeting critical infrastructure through the cyber threat-facilitating Afkar System Yazd Company.

567.    OFAC's designation identified six cryptocurrency addresses through which both individuals sent over $110,000 U.S. dollars to Nobitex during 2022, documenting that IRGC operatives used Nobitex to monetize ransomware proceeds and fund critical infrastructure attacks.

568.    TRM Labs and Elliptic subsequently documented direct on-chain transactions between Nobitex omnibus wallets and wallets controlled by Aghada and Ravari, establishing Nobitex's operational role as IRGC cryptocurrency processing infrastructure.

## 2.  Binance's $7.8 billion Nobitex transaction processing

569.     Between 2018 and November 2022, Binance processed approximately $7.8 billion in cryptocurrency transactions flowing between Binance and Nobitex—representing 97.5 percent of Binance's $8 billion total Iranian transaction volume during this period, according to *Reuters*'s investigation using blockchain data from Chainalysis.

570.     Approximately 75% of the $7.8 billion Binance-Nobitex transactions were denominated in Tron (TRX)—the cryptocurrency that Nobitex specifically recommended for anonymous trading to evade sanctions detection.

571.     Between April 2020 and November 2022, Binance and Nobitex processed more than 1.15 million direct transactions in Tron, establishing systematic high-volume processing through the cryptocurrency network Nobitex had identified as optimal for sanctions evasion.

572.     Even after Binance announced in 2019 that it would voluntarily cut off Iranian transactions, Binance continued processing over $1 billion U.S. dollars in trades from Nobitex through 2022.

573.     This sustained processing occurred despite the fact that Nobitex's public website openly instructed its Iranian customers to create "multiple digital wallets to facilitate funds movement in discrete stages" specifically to improve access to Binance's platform.

574.     Binance's sustained provision of liquidity, omnibus wallet integration, and Tron cryptocurrency processing gave Nobitex the transactional capacity to operate as Iran's largest cryptocurrency exchange, processing 70% of Iranian cryptocurrency transactions while serving as what blockchain intelligence firm Elliptic described as "a critical piece of infrastructure within Iran's cross-border sanctions evasion apparatus."[59]

---

[59]     *See* Elliptic, Inside Nobitex: *How Iran's Largest Crypto Exchange Fuels Sanctions Evasion and Illicit Finance*, Elliptic Blog (June 30, 2025), https://www.elliptic.co/blog/inside-nobitex-how-irans-largest-crypto-exch

### 3. NBCTF designation and leaked Nobitex source code analysis

575.    On September 1, 2025, NBCTF designated 187 cryptocurrency wallet addresses as property of the IRGC "used for the perpetration of a severe terror crime."

576.    The designated wallets had collectively received $1.5 billion U.S. dollars in Tether's USDT stablecoin over time.

577.    TRM Labs and Elliptic documented that more than half of the 187 NBCTF-designated IRGC wallets were linked to Nobitex, establishing Nobitex's systematic operation as IRGC cryptocurrency infrastructure.

578.    Tether subsequently blacklisted 39 of the 187 addresses on September 13, 2025, freezing $1.5 million in USDT held in those wallets.

579.    In June 2025, the hacking group Gonjeshke Darande ("Predatory Sparrow") conducted a cyberattack on Nobitex, releasing Nobitex's complete source code through its Telegram channel.

580.    Blockchain intelligence firms TRM Labs, Elliptic, and Chainanalysis subsequently analyzed the leaked materials.

### 4. Nobitex's direct on-chain interactions with FTO wallets

581.    Nobitex serves as a key vehicle for the IRGC's financing of its proxy Foreign Terrorist Organizations, including Hamas.

582.    Chainalysis documented through on-chain analysis[60] that Nobitex "facilitated transactions with entities tied to Houthi and Hamas-affiliated networks as identified by the

---

ange-fuels-sanctions-evasion-and-illicit-finance.

[60]    On-chain analysis refers to the examination of publicly available data recorded on a blockchain (such as Bitcoin or Ethereum) to derive insights regarding transactional patterns, user behavior, and overall financial activity.

[NBCTF] of Israel," establishing Nobitex's systematic operation as terrorist financing infrastructure connecting Iranian state actors to designated Foreign Terrorist Organizations.

583.    Elliptic's blockchain forensic analysis identified direct on-chain interactions between Nobitex omnibus wallets and cryptocurrency addresses associated with:

- Hamas-affiliated wallets that NBCTF had designated as terrorist property
- PIJ wallets designated by NBCTF
- Houthi militant group (Ansarallah) cryptocurrency addresses
- OFAC-sanctioned pro-Hamas media outlet *Gaza Now* (SDGT)
- Pro-al-Qaeda propaganda channels, and sanctioned Russian cryptocurrency exchanges Garantex and Bitpapa

584.    Elliptic published an Investigator graph depicting "a non-exhaustive selection of on-chain interactions between Nobitex and wallets associated with Hamas, the Palestinian Islamic Jihad and the Houthis," documenting direct blockchain transactions between Nobitex-controlled addresses and FTO-designated wallets.



585.    Elliptic's investigation identified ownership connections establishing that "relatives of the Supreme Leader Ali Khamenei and IRGC-linked business partners" were connected to Nobitex's ownership and operations, documenting the exchange's direct ties to Iran's highest political and military leadership.

586.    The ownership structure revealed that Nobitex functioned not merely as a commercial cryptocurrency exchange but as state-controlled financial infrastructure operated by and for the benefit of the IRGC.

### 5.    Qatar–Nobitex database

587.    Nobitex maintained systematic customer databases for its Qatari cryptocurrency market.

588.    Qatar serves as the primary host for Hamas's political leadership and has provided billions in financial support to Hamas and other designated terrorist organizations, making Qatar–Iran cryptocurrency flows particularly significant for Hamas financing operations.

589.    Nobitex customers included more than 25,000 Qatar-connected individuals, including 10 Qatar government officials with official government email addresses (@gov.qa domains) spanning multiple ministries and 9 employees of four major Qatari banks.

590.    The Qatar government officials identified in the Nobitex database included personnel from Qatar's Ministry of Finance, Ministry of Energy (oil sector), Civil Aviation Authority, Primary Health Care Corporation, Ministry of Municipality and Environment, Ministry of Labour and Social Affairs, Supreme Council for Health, Ashghal (Public Works Authority), and Securities/Economic Council.

591.    Qatar Government Officials with Nobitex Accounts included:

| Name | Email Address | Mobile Number | Ministry/Agency |
|---|---|---|---|
| Alim Shan Abdulhai | ███ @phcc.gov.qa | +974 3076 ██ | Primary Health Care Corporation |
| M. Khalaf | ███ @ashghal.gov.qa | +974 3335 ██ | Ashghal (Public Works Authority) |
| Naseem Ahmed Rafiq | ███ @mmaa.gov.qa | +974 4426 ██ | Ministry of Municipality & Environment |
| Abdulrahman | ███████ @ | +974 4455 ██ | Civil Aviation Authority |

| Ahmed Abu Baker | caa.gov.qa | | |
|---|---|---|---|
| A. Abedli | @mlsa.gov.qa | +974 4468 | Ministry of Labour & Social Affairs |
| Abdullah Allangawi | @sch.gov.qa | +974 5513 | Supreme Council for Health |
| A. Taan | @sec.gov.qa | +974 5527 | Securities/Economic Council |
| Shaikha Almannai | @mof.gov.qa | +974 5584 | Ministry of Finance |
| Muneera Almesaifri | @adlsa.gov.qa | +974 6666 | Ministry of Labour & Social Affairs |
| Pervez Akhtar Sharif | @mme.gov.qa | +974 7799 | Ministry of Energy (Oil & Gas) |

592.    Qatar Bank Employees with Nobitex Accounts included:

| Name | Email Address | Phone Number | Bank |
|---|---|---|---|
| Sultan Al-Qarata | @qnb.com.qa | +974 3318 | Qatar National Bank |
| Hamad Al-Shahri | @cbq.com.qa | +974 5549 | Commercial Bank of Qatar |
| Jamla Mubarak al Khayareen | @qnb.com | +974 5551 | Qatar National Bank |
| Hadi Bou Khuzam | @cbq.com.qa | +974 5574 | Commercial Bank of Qatar |
| Syed Rashid Mahdi | @cbq.com.qa | +974 5580 | Commercial Bank of Qatar |
| Mohamed El Sharkawy | @ahlibank.com.qa | +974 5584 | Ahli Bank Qatar |
| John Hackwood | @dohabank.com.qa | +974 6634 | Doha Bank[61] |
| Ahmed Al-Moaaz | @dohabank.com.qa | +974 6657 | Doha Bank |
| Laurence Black | @standardbank.com | +974 4330 | Standard Bank |

---

[61]    In April 2009, FinCEN and the Office of the Comptroller of the Currency ("OCC") imposed a $5 million fine on Doha Bank's New York branch for "fail[ing] to file suspicious activity reports (SARs) more than 500 times" involving "transactions potentially tied to terrorism." FinCEN's enforcement order documented that Doha Bank "filed 610 late suspicious activity reports involving suspicious transactions totaling approximately $7.4 billion," with the bank having "processed a substantial volume of funds transfers that should have been identified as suspicious transactions including transactions involving entities with potential connections to terrorist financing and/or in jurisdictions that posed heightened risk of terrorist financing."

593.    The presence of Qatar Ministry of Finance and Ministry of Energy officials in Nobitex's customer database—alongside Qatar bank employees from major financial institutions including Ahli Bank Qatar, Doha Bank, Qatar National Bank, and Commercial Bank of Qatar—suggests that the IRGC-controlled exchange served as institutional infrastructure for Qatar-Iran financial flows.

594.    This created a cryptocurrency financing network in which Qatari banks and government entities provided entry points, IRGC-controlled Nobitex served as the intermediary sanctions evasion mechanism, and Binance provided the international liquidity and reach necessary to sustain the system—as evidenced by the $7.8 billion in transactions between Nobitex and Binance.

595.    The use of Nobitex by Qatari government officials, bank employees, and tens of thousands of Qatari cryptocurrency transactions enabled the IRGC to identify potential intermediaries for sanctions evasion. Without Binance's systematic processing of Nobitex transactions—including over $1 billion U.S. dollars processed *after* September 2022 when OFAC designated IRGC operatives who used Nobitex for ransomware operations—this institutional terrorist financing infrastructure could not have operated at organizational scale.

### 6. OFAC-designated Bitcoin addresses sending ransomware proceeds to Nobitex

596.    Chainalysis documented that six Bitcoin addresses designated by OFAC in September 2022 for their use by IRGC-affiliated ransomware operatives Aghda and Ravari sent over $230,000 U.S. dollars in ransomware extortion proceeds directly to Nobitex, establishing Nobitex as a documented recipient of proceeds from OFAC-designated cryptocurrency addresses.

597.    The six OFAC-designated Bitcoin addresses that sent ransomware proceeds to Nobitex were:

- **Bitcoin Address *** RzgL (used by both operatives)**
- **Bitcoin Address ***ws6s (Aghda)**
- **Bitcoin Address ***8ngk (Aghda)**
- **Bitcoin Address ***mwuc (Ravari)**
- **Bitcoin Address ***xzty (Ravari)**
- **Bitcoin Address ***ys3s (Ravari).**

598.   Binance's continued processing of over $1 billion U.S. dollars in Nobitex transactions *after* OFAC's September 2022 designation—despite knowing that designated IRGC ransomware operatives were using Nobitex to monetize attacks on U.S. critical infrastructure—demonstrates Binance's deliberate maintenance of an IRGC cryptocurrency processing relationship that directly facilitated terrorist financing operations.

### 7. Binance's Knowledge and Deliberate Maintenance of Nobitex Relationship

599.   As described above, Binance and Binance's senior management were aware of and celebrated Binance's integration with Nobitex and its popularity among Iranian users.

600.   Despite OFAC's September 2022 designation of IRGC-affiliated operatives who used Nobitex for ransomware operations, and despite Binance's 2019 announcement that it would cut off Iranian transactions, Binance continued processing over $1 billion U.S. dollars in Nobitex trades through 2022.

601.   Binance made a deliberate business decision to service Iran's cryptocurrency market through its largest exchange even after learning that IRGC operatives were using Nobitex to fund ransomware operations and critical infrastructure attacks.

### E.   IranVisaCart

602.   IranVisaCart is an Iran-based illicit cryptocurrency service that maintained multiple accounts on Binance's platform, using Binance as the international exchange gateway for Iranian customers seeking to evade sanctions and move funds out of Iran.

603.    Binance's compliance personnel identified IranVisaCart's accounts and their use in suspicious Iran-related transactions as early as 2019, yet Binance deliberately chose not to file SARs with FinCEN or take any action to freeze their assets or off-board these accounts.

604.    As FinCEN documented in its November 2023 Consent Order, "IranVisaCart, and other illicit actors maintained accounts with Binance, taking advantage of Binance's policies surrounding opening multiple accounts with weak or no KYC," and critically, "Binance was made aware of these accounts and the related illicit transactions as early as 2019, and filed no SARs with FinCEN."

605.    Binance's deliberate decision not to report IranVisaCart despite having actual knowledge of the accounts' illicit Iranian activities since 2019 demonstrates a pattern of knowingly retaining Iranian customers engaged in sanctions evasion rather than reporting them to authorities as required by U.S. law.

606.    IranVisaCart's ability to maintain multiple Binance accounts for years after being flagged by Binance's own compliance personnel illustrates how Binance's AML/CFT program was deliberately structured to attract criminal users, allowing sanctioned-jurisdiction customers to continue operating even after internal identification.

**F.    Alireza Derakhshan & Arash Estaki Alivand Network**

607.    Alireza Derakhshan and Arash Estaki Alivand operated a sophisticated cryptocurrency-based sanctions evasion network that facilitated the purchase of over $100 million U.S. dollars in cryptocurrency for Iranian government oil sales between 2023 and 2025, directly benefiting Iran's IRGC-QF and Ministry of Defense.

608.    In September 2025, OFAC designated both Derakhshan and Alivand, along with multiple front companies they controlled, for "facilitat[ing] the purchase of over $100 million worth of cryptocurrency for oil sales for the Iranian government" and for working directly with

previously designated Hezbollah financial facilitator Tawfiq Muhammad Sa'id al-Law.[62]

609.    OFAC also designated five wallets (three belonging to Alivand and two belonging to Derakhshan) that received the equivalent of over $25 million from Binance accounts and sent the equivalent of more than $8 million to other Binance accounts.

610.    As described above, Derakhshan and Alivand were also linked via intermediary Tron wallets to Raed Habib's gold smuggling network through several Tron wallets that transferred the equivalent of millions of dollars to Binance accounts such as Mohamad Okdi's **Binance Account No. ***9408** and **Binance Account No. ***9830**.

611.    The Derakhshan–Alivand network utilized a complex web of front companies in Hong Kong, UAE, and other jurisdictions to obscure the Iranian government's beneficial ownership of cryptocurrency transactions, with the designated cryptocurrency wallet addresses showing "over $600 million in total inflows" according to blockchain analysis firm Chainalysis.

612.    Alivand specifically "conducted cryptocurrency transfers on behalf of the Al-Qatirji Company"—a Syrian conglomerate that OFAC designated in November 2024 for materially assisting the IRGC–QF—establishing that this network served as a critical financial conduit channeling hundreds of millions of dollars from Iranian oil sales to IRGC terrorist financing operations.

613.    The U.S. Department of Treasury identified this network as part of Iran's "shadow banking" infrastructure that "abuse[s] the international financial system, and evade[s] sanctions by laundering money through overseas front companies and cryptocurrency," with Binance' platform serving as the essential international exchange enabling this shadow banking system to function.

---

[62]    Press Release, *Treasury Targets Financial Network Supporting Iran's Military*, U.S. DEP'T OF TREAS. (Sept. 16, 2025), https://home.treasury.gov/news/press-releases/sb0248.

614.    The Derakhshan–Alivand network's $100 million in cryptocurrency purchases for Iranian oil proceeds and their work with designated Hezbollah financier al-Law demonstrates that Binance's platform functioned as critical infrastructure connecting multiple nodes of IRGC–QF terrorist financing—enabling Iranian regime oil revenues to flow through cryptocurrency to Hezbollah and other designated terrorist organizations where it was ultimately used to facilitate terrorist attacks.

### G.    NBCTF's September 2025 Designation of IRGC Wallets

615.    In September 2025, NBCTF designated a list of 187 cryptocurrency wallet addresses that Israeli intelligence had identified as linked to Iran's IRGC, documenting that these IRGC-controlled wallets had collectively received approximately $1.5 billion U.S. dollars in Tether's USDT stablecoin.[63]

616.    Israel's designation identified these wallets as part of the IRGC's systematic use of cryptocurrency to evade international sanctions and finance terrorist operations, with the wallet addresses representing active IRGC cryptocurrency holdings at the time of designation.

617.    Blockchain analysis of these 187 designated wallets shows that many had conducted transactions through Binance's platform, utilizing Binance as the international exchange for converting between different cryptocurrencies and moving funds across borders while evading traditional banking system scrutiny.

618.    The scale of IRGC cryptocurrency holdings identified by Israel—$1.5 billion in Tether's USDT stablecoin across 187 wallets—demonstrates that Iran's use of cryptocurrency for sanctions evasion and terrorist financing has become a multi-billion-dollar operation,[64] with

---

[63]    NAT'L BUREAU FOR COUNTER TERROR FIN., Administrative Seizure Order 43/25 (Isr. Sept. 1, 2025), https://nbctf.mod.gov.il/he/Announcements/Documents/%D7%A6%D7%AA%2043-25.pdf.

[64]    *See* Tom Robinson, *Israel Links Crypto Wallets That Received $1.5 Billion to Iran's Revolutionary Guard,*

Binance serving as essential infrastructure facilitating this operation.

619.    NBCTF's September 2025 Administrative Seizure Order for these wallets and its call to cryptocurrency platforms—including Binance—to freeze them illustrates that Binance has been repeatedly notified by Israeli authorities about specific IRGC-linked accounts, yet Binance has systematically prioritized retention of this lucrative IRGC business over compliance with international counter-terrorism efforts.

### H.    Binance Knowingly and Willingly Assisted Hamas

620.    Since at least early 2019, Hamas's Qassam Brigades has used cryptocurrency as a fundraising method to support its terror operations.

621.    In January 2019, a spokesman for the Qassam Brigades announced on the group's official Telegram channel that its supporters should use Bitcoin to finance "the resistance," stating:

> The Zionist enemy combats the resistance [i.e., Hamas] by attempting to stop the support [it receives] by any means, but the supporters of the resistance in the entire world are fighting these Zionist's attempts and are seeking to find all possible means to support it... We call upon all supporters of the resistance and aides of our just cause to support the resistance financially through Bitcoin using mechanisms that we will soon publish.

622.    Hamas specifically publicized its use of Binance.

623.    A video published on the Qassam Brigades' website in 2019 (soliciting donations), provided a public explanation of cryptocurrency and how it could be used for donations, advising viewers to "create a new account on one of the trading platforms" in order to deposit donations.[65]

---

ELLIPTIC ENTERPRISES LTD (Sept. 14, 2025), https://www.elliptic.co/blog/israel-links-crypto-wallets-handling-billions-to-irans-revolutionary-guard; *Israel Claims Iran's Revolutionary Guard Holds $1.5B in Stablecoins*, Coindesk (Sept. 15, 2025), https://www.coindesk.com/business/2025/09/16/israel-claims-iran-s-revolutionary-guard-holds-usd1-5b-in-stablecoins.

[65]    *See* MEMRI, *Hamas Military Wing Al-Qassam Brigades Releases Video of How to Send Secure Donations via Bitcoin*, MEMRI CJ Lab (Mar. 26, 2019), https://www.memri.org/cjlab/hamas-military-wing-al-qassam-brigades-releases-video-of-how-to-send-secure-donations-via-bitcoin; Al-Qassam Brigades Funding Page, archived at https://web.archive.org/web/20190606050636/http://fund.alqassam.ps/0 (last visited Nov. 17, 2025).

624.    Notably, one of the crypto platforms shown was Binance, as reflected in the below screenshot of a donation page on the Qassam Brigades' website (archived on June 6, 2019):



*Figure 1: Screenshot of archived video tutorial instructing users to create accounts on one of the trading platforms.*

625.    In February 2019, the Israeli business publication *Globes* reported that Hamas had "received donations from wallets of U.S. trading platforms from Bittrex and Coinbase, ***from Binance … wallets*** ..." (Emphasis added.)

626.    That same month, an Israeli blockchain analysis group, Whitestream, flagged on Twitter (now X) that Binance was involved in Hamas's crypto donation chain:



*Figure 2: Screenshot of Whitestream's February 16, 2019, tweet flagging Hamas's*

99

*cryptocurrency fundraising campaign on Twitter.*[66]

627.    Following a July 2021 seizure of crypto wallets by the Israeli government, the blockchain analysis firm Elliptic (which Binance "partnered" with for AML and counter terror financing compliance) published a report outlining the seized wallets, noting that Hamas used a variety of crypto assets including Dogecoin, Ether, and Tether—all available on the Binance exchange.

628.    In September 2021, Coinbase (a U.S. based cryptocurrency exchange and a business competitor of Binance), published a report noting an escalation in Hamas's cryptocurrency fundraising efforts.

629.    Coinbase concluded the report by pledging to "take three critical steps" to minimize the ability of Hamas and other insurgent groups to use crypto:[67]

   1.  Blocklist[68] any crypto addresses associated with such organizations to prevent users from sending funds to them.

   2.  Leverage Coinbase Analytics to detect wider terror organization campaign efforts and identify possible participants and accessories.

   3.  Coordinate with law enforcement and regulatory agencies, such as FinCEN, the FBI, and others.

630.    Binance, however, deliberately chose not to take any of these steps.

631.    In August 2023, Elliptic found that "major terrorist groups such as al-Qaeda, Hamas's al-Qassam Brigades and the Islamic State have been using crypto assets for an ever-growing range of objectives"—that is, not just public fundraising, but also sanctions evasion,

---

[66]        https://x.com/whitestream5/status/1096886501898633218.

[67]        Coinbase, *An Overview of the Use of Cryptocurrencies in Terrorist Financing*, Coinbase Blog (Sept. 21, 2021), https://www.coinbase.com/blog/an-overview-of-the-use-of-cryptocurrencies-in-terrorist-financing.

[68]        A crypto term equivalent to "blacklist." *See* Elliptic, Blocklists, https://www.elliptic.co/platform/blocklists (last visited Nov. 17, 2025).

cybercrime, extortion, investment trading, and internal value transfers.

632.     Elliptic identified wallets, including Hamas-affiliated wallets, receiving proceeds from sources including stolen credit card vendors, dark web markets, Ponzi schemes, and crypto investment scams.

### 1.   Dubai [Money] Company for Exchange ("Dubai Co.")

633.     Dubai Co. is a Gaza-based currency exchange and money services business that operates to facilitate financial transactions for Hamas.

634.     Dubai Co. operates as one of several Gaza-based money exchanges that provide customers with currency conversion, remittance services, and cryptocurrency exchange capabilities—including the ability to convert between fiat currency and digital assets such as Bitcoin, Tether (USDT), and other cryptocurrencies.

635.     Dubai Co. maintained dozens of cryptocurrency accounts on the Binance exchange platform, which it used to facilitate digital asset transactions for its customers and to transfer funds internationally through blockchain networks.

636.     On March 7, 2022, NBCTF designated Dubai Co. as a terrorist organization, finding that it was:

> [A]n exchange platform located in the Gaza Strip and has for years been a significant part of Hamas' economic infrastructure for laundering and transferring capital from sources of funding abroad to Hamas in the West Bank and Gaza Strip. Khader Dan—who is the owner and manager of the exchange, is a prominent money exchanger in the service of Hamas and is a key figure in Hamas' economic infrastructure.[69]

637.     According to NBCTF, Khader Dan operated Dubai Co. in coordination with his brother Khaldoun Dan, who lived in Turkey for years. Together with another Hamas operative

---

[69]     *See* NAT'L BUREAU FOR COUNTER TERROR FIN., *Designation No. 377 - Dubai Co. for Exchange* (Isr.), https://nbctf.mod.gov.il/he/Announcements/Documents/Designation%20No.%20377%20-%20DUBAI%20Co.%20forExchange(2).pdf (updated June 4, 2022).

named Farid Abu Daher, the brothers operated Dubai Co. as a money changing service for Hamas.

638.    NBCTF documented that "[o]ver the past few years they have been involved in transferring millions of dollars to Hamas through money laundering offenses, systematically evading law enforcement, and circumventing the international banking system."

639.    Between 2018 and 2022, Iranian firms and IRGC-affiliated entities used the Tron blockchain network to conduct cryptocurrency transactions worth $8 billion U.S. dollars, leading NBCTF to identify and seize 56 Tron wallet addresses that it determined were linked to Hamas terror financing operations.

640.    Of these 56 Hamas-linked Tron wallets identified and seized by NBCTF, 46 wallets (82%) were **directly connected to Dubai Co.'s money laundering network**, establishing Dubai Co. as a primary cryptocurrency exchange facilitating Hamas's use of the Tron blockchain for terrorist financing.

641.    As noted above, Binance facilitated cryptocurrency transactions worth at least $22 million U.S. dollars between Dubai Co. and Binance accounts in the years leading up to October 7, 2023. Dubai Co. received the equivalent of more than $12 million from Binance customer accounts and sent the equivalent of more than $10 million to Binance customer accounts.

642.    The value of Dubai Co. cryptocurrency transactions through Binance increased significantly *after* October 7. The cryptocurrency transaction flow was worth at least $26 million U.S. dollars, with Dubai Co. sending the equivalent of more than $15 million to Binance customer accounts and receiving the equivalent of more than $11 million from Binance customer accounts.

**a**.    **Binance Account No. ***3866 (Khaled A. S. Alhaddad)**

643.    Khaled A. S. Alhaddad registered **Binance Account No. ***3866** which was subject to NBCTF Administrative Seizure Order (ASO 19/23) on April 23, 2023.

644.    **Binance Account No. \*\*\*3866** received approximately $33,000 in USDT from a Dubai Co. Tron address, **Tron Address \*\*\*GUdC**, already subject to an Administrative Seizure Order (ASO 15/22) almost a year earlier on March 7, 2022.

645.    **Nevertheless, despite this glaring red flag, over the next full year** Alhaddad's **Binance Account No. \*\*\*3866** continued to trade extensively, including receiving approximately $80,000.00 in USDT from an address later subject to an Administrative Seizure Order on July 4, 2023 (ASO 34/23) as property of PIJ (that sent BuyCash more than $1.5 million and also transacted with **Binance Account No. \*\*\*3382**, discussed below).[70]

### b.    Binance Account No. \*\*\*6645 (Ayman Z. M. Albarbari)

646.    Ayman Z. M. Albarbari registered **Binance Account No. \*\*\*6645** which was subject to NBCTF Administrative Seizure Order (ASO 19/23) on April 23, 2023.

647.    Between October and December 2021, Albarbari's account received the equivalent of more than $550,000.00 from a Dubai Co. address[71] which was subject to NBCTF Administrative Seizure Order on March 7, 2022 (ASO 15/22).

648.    **Binance Account No. \*\*\*6645** also received the equivalent of $96,000.00 from another Dubai Co. address[72] which was subject to NBCTF Administrative Seizure Order on March 7, 2022 (ASO 15/22).

649.    Yet the account was permitted to continue operating for a full year, and until three months after NBCTF Administrative Seizure Order (ASO 15/22) was issued on March

---

[70]    NAT'L BUREAU FOR COUNTER TERROR FIN., *Seizures of Cryptocurrency*, https://nbctf.mod.gov.il/en/Ministe r%20Sanctions/PropertyPerceptions/Pages/Blockchain1.aspx (Address: DAegnxRRBVuRFJ1tkpmignshcu12nfoQF) (last visited Nov. 17, 2025).

[71]    **TRX address \*\*\*cME5**.

[72]    **Tron Address \*\*\*GUdC** sent the equivalent of approximately $600,000 to Dubai Co., BuyCash and other wallets associated with Hezbollah and PIJ and also received the equivalent of more than $1.6 million from them.

7, 2022, **Binance Account No. ***6645** was able to receive the equivalent of $30,000 from a PIJ address that traded extensively with other BuyCash, Dubai Co., PIJ, and Hezbollah wallets.

### 2. Buy Cash Money and Money Transfer Company ("BuyCash")

650. Since 2014, BuyCash operated as a Gaza-based remittance company, currency exchanger, money transfer service, and electronic payment processor that served as a critical financial node for channeling funds to Hamas operations in Gaza.

651. BuyCash and its owner, Ahmed M. M. Alaqad, who is also based in Gaza, were designated for providing material support to Hamas on October 18, 2023.[73]

652. As noted above, BuyCash received the equivalent of more than $22 million from Binance wallets prior to the October 7 Attacks and sent more than $218 million to Binance customers prior to the October 7 Attacks.

653. The temporal pattern of these BuyCash-to-Binance transfers shows marked concentration immediately preceding the October 7 Attacks: the largest of these transactions, ranging from $150,000 to $230,000 U.S. dollars, occurred during July, August, and September 2023.

654. After October 7, 2023, the pace and value of cryptocurrency transaction between BuyCash and Binance declined to the equivalent of approximately $1.3 million.

655. Examples of BuyCash accounts linked to Hamas include:

> **Binance Account No. ***1098:**
> BuyCash marketed its money transfer services through the website buy-cash.com and various social media platforms. The buy-cash.com website listed buycash0@gmail.com as an official contact email address. Binance's records show that a closely related address—buycash222@gmail.com—was used to register **Binance Account No. ***1098**, which Defendants

---

[73] Press Release, *Following Terrorist Attack on Israel, Treasury Sanctions Hamas Operatives and Financial Facilitators,* U.S. Dep't of Treas. (Oct. 18, 2023), https://home.treasury.gov/news/press-releases /jy18_16 #:~: text=WASHINGTON%20%E2%80%94%20Today%2C%20the%20U.S.%20Department,T%C3%BCrkiye%2_ C% 20Algeria%2C%20and%20Qatar.

opened under the name Ahmed Y.A. Abughali and funded through Abughali's U.S. bank account.

Between April 2018 and January 2022, Binance processed transactions through Abughali's **Binance Account No. ***1098** that received cryptocurrency with the aggregate value of approximately $145,680 U.S. dollars from a BuyCash-controlled address. OFAC's October 18, 2023, designation order specifically identified this BuyCash address as "a wallet that has been used to facilitate the transfer of virtual currency in support of known affiliates supporting terrorism financiers."

**Binance Account No. ***0091:**
That same email address (buycash222@gmail.com) was used to register a second Binance account, **Binance Account No. ***0091**, which Binance opened under the name Nirmeen Kimal Hasni Mousa. This account used the identical mobile telephone number that Abughali had listed as BuyCash's contact number for **Binance Account No. ***1098**.

Binance processed U.S. dollar deposits into **Binance Account No. ***0091** through a U.S. correspondent bank and facilitated the conversion of approximately $258,433 from Tether (USDT) stablecoin into U.S. dollars via Tether Limited's relationships with the U.S. correspondent banks.

Between January 2022 and June 2023, Binance processed transactions through **Binance Account No. ***0091** that received cryptocurrency with an aggregate value of approximately $508,000 U.S. dollars from **Tron Address ***znVF**.

In September 2023—the month immediately before the October 7 Attacks—Binance processed an additional $13,227 U.S. dollars into **Binance Account No. ***0091** from **Tron Address ***sWGy**.

Analysis of Binance access logs shows that the same mobile phone accessed **Binance Account Nos. ***1098** and ***0091** from IP addresses resoling to various locations—including the Palestinian Territories and Turkey—establishing coordinated operational control of both accounts.

**Binance Account Nos. ***8922 and ***46855:**
Binance opened two additional accounts—**Binance Account Nos. 28568922** and ***36855**—also registered to Abughali using email addresses and telephone numbers associated with BuyCash operations. The same mobile device was used to access both **Binance Account Nos. ***8922** and ***46855** from various locations including the Palestinian Territories and Turkey.

656.    In the years leading up to October 7, 2023, BuyCash received the equivalent of more than $22 million from Binance customer accounts and sent the equivalent of more than $200 million to Binance customer accounts.

657.    The volume of cryptocurrency dropped significantly after October 7 (likely due to the U.S. government designation of BuyCash a few days after the Attacks) but did not cease altogether. After October 7, BuyCash sent the equivalent of more than $450,000 to Binance customer accounts and received the equivalent of more than $800,000 from Binance customer accounts.

658.    FinCEN, in its November 2023 Consent Order found that: "Binance also failed to file a SAR with FinCEN on its connections to BuyCash … Prior to OFAC's designation of BuyCash, ***Binance was aware of extensive suspicious activity involving this entity—including connections related to terrorist organizations—but failed to file a SAR with FinCEN***." (Emphasis added.)

659.    A review of public blockchain data between March 29, 2021, and September 1, 2025, shows that Binance was responsible for 90% of the funds sent by BuyCash to crypto exchanges (the equivalent of over $250 million U.S. dollars).



### 3. Gaza Now

660.    On January 21, 2024, NBCTF identified Gaza Now as an organization "affiliated with the military arm of Hamas," seizing its **Binance Account No. \*\*\*1732** (determined to be controlled by Mustafa Ayash).[74]

661.    On March 27, 2024, Gaza Now and its founder Ayash were designated by the U.S. Treasury Department as SDGTs, finding them to be "key financial facilitators involved in fundraising for Hamas."[75]

---

[74]    *See* NAT'L BUREAU FOR COUNTER TERROR FIN., Administrative Seizure Order 2/24 (Isr.), https://nbctf.mod.gov.il/he/PropertyPerceptions/Documents/%D7%A6%D7%95%20%D7%AA%D7%A4%D7%99%D7%A1%D7%94%202-24.pdf. Ayash is a 33-year-old Palestinian resident of Austria.

[75]    *See* Press Release, *Treasury Sanctions Hamas-Aligned Terrorist Fundraising Network*, U.S. DEP'T OF TREAS. (Mar. 27, 2024), https://home.treasury.gov/news/press-releases/jy2213.

662.    Gaza Now posed as a media organization focused on reporting about Gaza, but OFAC's investigation established that the entity operated as a fundraising vehicle (and propaganda tool) for Hamas operations.

663.    One of the crypto addresses identified by OFAC as Gaza Now wallets, was a Binance customer deposit **Tron Address ***aVNU**, which reportedly was first published by Gaza Now in August 2021. Over the period in question $769,531 was collected in **Tron Address ***aVNU**, with funds arriving, *inter alia*, from three different (later designated) PIJ addresses. **Tron Address ***aVNU** was active until two days after the October 7, 2023. The account processed donations equivalent to approximately $5,000 into this wallet between that day and October 9.

664.    Prior to the October 7 Attacks, Gaza Now operated a Hamas-affiliated Telegram channel with approximately 350,000 subscribers, which the organization used to disseminate Hamas propaganda and solicit cryptocurrency donations that were channeled through Binance's platform.

### 4.  Al Wefaq Co. for Exchange (a/k/a Hamed Co. for Exchange)

665.    Al Wefaq Co. for Exchange was designated a terrorist organization by Israel on June 21, 2018.

666.    Hamed Ahmad Abed al-Khudry, who founded the Al Wefaq Co. for Exchange, was killed in a targeted airstrike conducted by the Israel Defense Forces ("IDF") in May 2019, following Israeli intelligence establishing his role in Hamas terrorist financing operations and money laundering activities.

667.    Following Khudry's death, his brother, Saeed Ahmad Abed al-Khudry (a/k/a Saeid Alhkudri), took over the family's terror financing business, continuing Al Wefaq's operations

under family control.[76]

### a.  Binance Account No. ***2283 (Saeed al-Khudry)

668.    Saeed Ahmad Abed al-Khudry registered **Binance Account No. ***2283** in April 2021, using the e-mail account ████████████ and a Palestinian mobile phone number.

669.    According to the documentation he provided, he was 29 years old at the time and was born in the Gaza Strip.

670.    Despite Saeed being the brother of a known Hamas facilitator, Binance accepted him as a client and on-boarded him—about two years after his brother was killed in an airstrike.

671.    The account was most frequently accessed by IP addresses located in Khan Yunis in the Gaza Strip.

672.    NBCTF seized this account on April 23, 2023 (ASO 19/23), determining it constituted "property belonging to designated terrorist organization" Al Wefaq Co. for Exchange. Crucially, Binance had processed transactions through this account for over two years following the initial 2018 NBCTF designation of Al Wefaq as a terrorist organization.

673.    Saeed Ahmad Abed al-Khudry was the successor to his brother's terror financing and money laundering business. Between April 2021 and January 2022, **Binance Account No. ***2283** received deposits from five other Binance accounts that have been identified by NBCTF as associated with terror financing. Accounts seized or designated by NBCTF accounted for more than 60% of the cryptocurrency deposited into al-Khudry's account.

674.    Between April 2021 and May 2022, **Binance Account No. ***2283** withdrew and transferred cryptocurrency to four Binance accounts that have been identified by NBCTF as associated with terror financing.

---

[76]    Basic open-source search would have revealed the familial connection between the brothers.

675.    The account continued receiving and sending funds for months after Binance knew that some of **Binance Account No. \*\*\*2283's** counterparties had been designated by NBCTF as early as December 29, 2021.

676.    On the account's very first operational day (April 6, 2021), it received its first deposit from **Binance Account No. \*\*\*7729** (later identified by NBCTF as belonging to Al Mutahadun For Exchange "or property used for the perpetration of a severe terror crime"), and, within less than three hours, sent its first withdrawal to another Binance account identified by NBCTF as associated with the same network of terror financing (**Binance Account No. \*\*\*9834**).

677.    Saeed Ahmad Abed al-Khudry also transacted with PIJ nodes on the network. He sent the equivalent of $2,944 to **Tron Address \*\*\*rCR7** that in turn sent almost the exact same amount in cryptocurrency to **Tron Address \*\*\*wirR**, and the equivalent of $100 to **Tron Address \*\*\*E1fd**, both designated by NBCTF on July 4, 2023, and identified as PIJ property (ASO 34/23).

678.    **Binance Account No. \*\*\*2283** worked with the Gaza Brokers network using Binance's IT architecture. For example, on November 13, 2021, it sent the equivalent of $1,693 to another designated Binance customer—Bahaa Kasco (**Binance Account No. \*\*\*0941**, designated April 21, 2023, and identified as being part of the al-Wefaq and Al-Mutahadun networks). Seventeen days before that transfer, Kasco received the equivalent of $1,199 from **Gaza Broker Tron Address B-1**.

679.    Most of the cryptocurrency deposited into **Binance Account No. \*\*\*2283** originated off-chain from other Binance customers.

### 5.  Shamlakh Hamas Network

680.    The Shamlakh family operates a Gaza-based money exchange and money laundering network that, according to the U.S. Department of the Treasury, serves as "the main

end point for funds transferred from the IRGC–QF to Hamas and PIJ in Gaza," channeling tens of millions of dollars annually from the IRGC–QF to designated terrorist organizations.

681.    The Shamlakh family's primary money exchange business is known as Al-Markaziya (formerly Al-Mutahadun for Exchange). It controlled and operated dozens of Binance accounts under a variety of names.[77]

682.    As the *Times of Israel* reported, in February 2022, 18 months before the October 7 Attacks, Israel seized 12 Binance accounts linked to Al-Mutahadun Exchange, which "assist[ed] the Hamas terror group, and especially its military wing, by transferring funds."

683.    The operational characteristics of the Shamlakh network's Binance accounts included 100% internal funding through Binance's off-chain transfer architecture, operation from Gaza IP addresses, complete absence of KYC verification, and processing of funds through complex layering transactions.

684.    When the U.S. Department of Treasury designated the Shamlakh network on January 22, 2024, it found:

> Over the last several years, members of the Shamlakh family have become the main end point for funds transferred from the IRGC-QF to Hamas and PIJ in Gaza. Gaza-based financial facilitator Zuhair Shamlakh (Zuhair) is a Gaza-based moneychanger who facilitates funds transfers in the tens of millions of dollars from Iran to Hamas. Zuhair has used his companies Al-Markaziya Li-Siarafa (Al-Markaziya) and Arab China Trading Company to channel funds for the Izz al-Din al Qassam Brigades (al-Qassam Brigades), the military wing of Hamas. Zuhair has been facilitating funds transfers to terrorist groups in Gaza since at least 2017, when he worked with Muhammad Kamal al-Ayy to coordinate the transfer of millions from Lebanon to Gaza. Al-Ayy was designated in August 2019 for providing financial, material, technological support, financial or other services to or in support of Hamas.
>
> Gaza- and Türkiye-based Al-Markaziya is owned by Zuhair and managed

---

[77]    *See, e.g.,* **Binance Account Nos. ***4716, ***6569, ***0699, ***0337, ***7300, ***2525, ***0534, ***4344, ***4636, ***7515, ***9055, ***1743, ***7522, ***3901, ***7402, ***0519, ***6716, ***7729, ***1236** and ***6281.**

by his family members. Formerly known as Al-Mutahadun for Exchange, it has been directly involved in facilitating tens of millions of dollars from IRGC-QF to Hamas and PIJ. In April 2023, the Israeli Defense Ministry's National Bureau for Counter Terror Financing (NBCTF) seized 189 cryptocurrency accounts associated with three Palestinian currency exchanges, one of which was Al-Markaziya. Arab China Trading Company is also based in Gaza and Türkiye and is owned by Zuhair. Israel designated both Arab China Trading Company and Al-Markaziya for their support to Hamas.

Gaza-based financial facilitators Ahmed Shamlakh (Ahmed), Alaa Shamlakh (Alaa), and Imad Shamlakh (Imad), serve as key players in the financial flow from Iran to Hamas and PIJ using their ties to money changing companies, including Al-Markaziya. Ahmed is one of the owners or directors of Al-Markaziya and Alaa is the sole employee and officer of Al-Markaziya's branch in Türkiye. Both Ahmed and Alaa have been involved in transferring money to Hamas. Imad has directly facilitated the transfer of Chinese yuan from bank accounts in China to accounts controlled by Hamas in Gaza. Imad has also facilitated multiple transfers, worth approximately 50,000 Chinese yuan, to accounts in China likely for the benefit of Hamas. Additionally, Imad has smuggled cash from Egypt to Gaza on behalf of the Islamic State of Iraq and Syria in the Sinai (ISIS-Sinai).

Zuhair Shamlakh, Ahmed Shamlakh, Alaa Shamlakh, and Imad Shamlakh are being designated pursuant to E.O.13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or good or services to Hamas.

Al-Markaziya and Arab China Trading Company are being designated pursuant to E.O.13224, as amended, for being owned, controlled or directed by Zuhair Shamlakh.

### a. Binance Account No. ***3593

685.     Ahmad Shamlakh registered **Binance Account No. ***3593** on May 2021, using email address ███atshwsh@gmail.com and mobile number +972–59–990███ (Jawwal Mobile).

686.     Nevertheless, it was a *multi-user account* jointly held with Sharif Turkmani, a 32-year-old Palestinian team leader in the Hamas elite Nukhba forces—later eliminated by the IDF—and Rajaa Shamlakh, a 53-year-old Palestinian woman.[78]

---

[78]     These were the ages of Turkmani and Shamallakh when the account was opened.

687.    Even apart from the account facially appearing to be used by three separate individuals simultaneously, the account would have been obvious to Binance as linked to terrorism due to the Shamlakh family's prominent role in terrorist activities. For example, a Muhammed Shamlakh served as a senior Hamas commander in southern Gaza until his death in 2012. Another Muhammed Shamlakh served as a commander of Hamas southern Gaza brigade before his death in 2014.

688.    Yet, Binance never completed Know-Your-Customer verification on this account, allowing it to process 20 transactions worth the equivalent of almost $35,000 in deposits and $20,000 in withdrawals over its operational period.

689.    The account received 85% of its deposits from other Binance users, and 100% of the withdrawals from the account were transferred to other Binance customers. All these transactions were done off-chain, visible only to Binance.

690.    Tellingly, *all* Binance customers that transacted with **Binance Account No. ***3593** have been designated by NBCTF.

691.    For example, **Binance Account No. ***3593** sent USDT worth of $10,000 to **Binance Account No. ***6082** (an additional Binance account held by Sharif Turkmani, that was designated under the same Seizure Order (ASO 10/22) dated February 2022, as part of al-Mutahadun Exchange) and received USDT worth of $1,810 from the same account. Other designated Binance users that received or sent USDT to **Binance Account No. ***3593**, include **Binance Account No. ***5990** (Ahmed Altorok), **Binance Account No. ***1466** (Alaa Barassi), **Binance Account No. ***7635** (Abdelrahman Murjata)—all designated by NBCTF under ASO 10/22 as being part of al-Mutahadun Exchange network.

692.    **Binance Account No. ***3593** also interacted with PIJ's cryptocurrency financing

network. For example, it received a small USDT transfer from **Tron Address \*\*\*nheb** which itself received the equivalent of close to $30,000 from a Tron address—**Tron Address \*\*\*GS63**— that was designated by NBCTF pursuant to Administrative Seizure Order ASO 34/23 on July 4, 2023, as PIJ property.

693.    OFAC designated Ahmad Shamlakh as an SDGT on January 22, 2024, pursuant to Executive Order 13224, for materially assisting, sponsoring, or providing financial, material, or technological support for, or goods or services to or in support of, Hamas.[79]

694.    NBCTF issued Administrative Seizure Order (ASO 10/22) that identified **Binance Account No. 141143593** on February 22, 2022.

695.    Access logs show over 100 entries spanning from June 2021 to September 2021, with operations including withdrawal applications, SMS verification code sends, security checks, and dribblet conversions, all from Palestinian IP addresses.

### b.  Binance Account No. \*\*\*9428

696.    **Binance Account No. \*\*\*9428** was first registered with Binance in 2021, using email address ▮▮▮▮▮▮hhany@gmail.com and operated for over five months without ever completing KYC verification.

697.    The KYC documents used to register this account belonged to Mohammed A.A. Shamallakh, a then-20-year-old resident of the Gaza Strip.

698.    As noted above, the same name belonged to two senior Hamas commanders in Gaza, but there is no indication that Binance attempted to perform any due diligence on this account.

---

[79]    Press Release, *U.S., UK, and Australia Target Additional Hamas Financial Networks and Facilitators of Virtual Currency Transfers*, U.S. DEP'T OF TREAS. (Jan. 22, 2024), https://home.treasury.gov/news/press-releases/jy2036.

699. **Binance Account No. \*\*\*9428** received 100% of its funding through internal Binance transfers.

700. The account was primarily accessed from Gaza but was also accessed from Singapore and Colombia.

701. **Binance Account No. \*\*\*9428's** largest withdrawal was sent to **Binance Account No. \*\*\*6082** (which, as discussed below, belonged to a Hamas Nukhba operative), which also previously funded both **Binance Account No. \*\*\*9428** and the NBCTF-seized **Binance Account No. \*\*\*3593** (also discussed below). This demonstrates circular fund flows within the interconnected terrorist financing network.

### c. Binance Account No. \*\*\*5910

702. **Binance Account No. \*\*\*5910** was nominally opened by Mohammed Shamalakh on November 10, 2021.

703. The identification provided to Binance indicates a Palestinian from Gaza who was 34 years old when he opened the account.

704. As noted above, the same name belonged to two senior Hamas commanders in Gaza, but there is no indication that Binance attempted to perform any due diligence on this account.

705. The sole transactions that this account performed were a deposit from another (designated) al-Mutahadun Binance account (**Binance Account No. \*\*\*4404**) and a withdrawal to a (designated) Tron wallet associated with PIJ.

706. NBCTF designated **Binance Account No. \*\*\*5910** on January 12, 2023 (ASO5/23), as "property of the designated terror organization Al Mutahadun for Exchange or used for the perpetration of a severe terror crime…."

**d.  Binance Account No. \*\*\*6082**

707.    **Binance Account No. \*\*\*6082** was registered in September 2021 for an individual presenting Israeli identification documents under the name Sharif Turkmani, providing mobile phone number +972–56–7788099, email address shareif.tuorkmani@gmail.com.

708.    The identification document indicates that he was 36 years old when he opened the account. Turkmani served as a squad leader for Hamas's elite Nukhba Forces that led the October 7 Attacks. He was subsequently eliminated by the IDF.

709.    Sharif Turkmani, **Binance Account No. \*\*\*6082**, and the e-mail address indicated above, were all identified by NBCTF in its Forfeiture Order (FO 42/22) on December 29, 2022, based on Administrative Seizure Order ASO 10/22 dated February 22, 2022, identifying the account and cryptocurrency address as "the property of the designated terrorist organization Dubai Co. for Exchange or property used for the perpetration of a severe terror crime."

710.    This same individual was registered on **Binance Account No. \*\*\*3593** together with Ahmad Shamallakh (SDGT). That account was subject to the same February 2022 ASO 10/22 by NBCTF.

711.    **Binance Account No. \*\*\*6082** was active for only 135 days—from September 8, 2021, through January 22, 2022—depositing and withdrawing the equivalent of more than $100,000 in USDT via more than 120 transactions.

712.    A plurality of access activity for the account came from IP addresses in the Gaza Strip, but the account was also accessed from Jerusalem and cities in the eastern part of the Palestinian Territories (Nablus, Hebron, and Tulkarem).

713.    Most notably, **Binance Account No. \*\*\*6082** was accessed six times from Kindred, North Dakota, to initiate transactions.

116

714.    As evidenced by the NBCTF Forfeiture Order and Turkmani's shared use of another designated Binance account with Ahmad Shamallakh (SDGT), **Binance Account No. \*\*\*6082** was operated for the benefit of Hamas, including from the United States.

715.    More than 70% of the deposits into, and withdrawals from, **Binance Account No. \*\*\*6082** were off-chain. Nearly a quarter of those off-chain deposits and 50% of the off-chain withdrawals involved counterparties designated by NBCTF.

716.    These internal transfers to and from other designated Binance customers included:

- **Binance Account No. \*\*\*8133:** Al-Mutahadun for Exchange (ASO 79/21 dated December 29, 2021).

- **Binance Account No. \*\*\*7379:** Al-Mutahadun for Exchange (ASO 79/21 dated December 29, 2021).

- **Binance Account No. \*\*\*9428:** Al-Mutahadun for Exchange or Dubai Co. or Al Wafeq Co. (ASO 19/23 dated April 21, 2023).

- **Binance Account No. \*\*\*5549:** Al-Mutahadun for Exchange or Dubai Co. or Al Wafeq Co. (ASO 19/23 dated April 21, 2023).

- **Binance Account No. \*\*\*3593:** Al-Mutahadun for Exchange (ASO 10/22 dated February 22, 2022).

- **Binance Account No. \*\*\*6981:** Al-Mutahadun for Exchange (ASO 5/23 dated January 12, 2023).

- **Binance Account No. \*\*\*7635:** Al Mutahadun for Exchange or Dubai Co. or Al Wafeq Co (ASO 10/22 dated February 22, 2022).

717.    In December 2021, **Binance Account No. \*\*\*6082** sent the equivalent of almost $2,000 to **Tron Address \*\*\*AkxE**.

718.    **Tron Address \*\*\*AkxE** sent and received large sums from BuyCash and sent the equivalent of over $1.5 million to a crypto address associated with Hezbollah money launderer Tawfiq al-Law, who was designated as an SDGT.

719.    **Binance Account No. \*\*\*6082** also sent and received nearly 30 transfers from the

117

Gaza Brokers—related addresses that facilitated Hamas's cryptocurrency money laundering infrastructure.

720.    That Hamas money laundering infrastructure continues to operate and there are no signs that Binance has attempted to disrupt its operations.

721.    Even when Binance rejected a blockchain transfer from **Binance Account No. ***6082** to an external address, within ten minutes it allowed Turkmani to retransmit the same transfer to the same counterparty—but this time off-chain to that counterparty's Binance account.

### e.    Binance Account No. ***3901

722.    **Binance Account No. ***3901** was registered in January 2021 using the email address ██████████████ and was at least nominally operated in the name of Yazan Khalil.

723.    Despite having KYC status "REFUSED" for ID verification with the rejection reason "Photos of IDs displayed on a screen are not accepted," Binance permitted the account to retain full operational capability. The account passed only "Basic" verification but was nevertheless able to process total volume equivalent to more than $600,000 through the account in under a year. This was a result of Binance's special treatment and solicitude for terrorist-related accounts.

724.    **Binance Account No. ***3901** received more than 500 deposits worth the equivalent of more than $300,000 in cryptocurrencies; 24 of them (worth the equivalent of more than $60,000) were from sources designated by NBCTF.[80]

725.    The account executed over 915 withdrawal transactions worth the equivalent of more than $330,000.

726.    **Binance Account No. ***3901** also sent and received dozens of transfers from the

---

[80]    *See, e.g.,* **Binance Account Nos. ***2525, ***9055 and ***7729** – all designated as part of Al Mutahadun for Exchange.

Gaza Brokers–related addresses that facilitated Hamas's cryptocurrency money laundering infrastructure. For example, **Binance Account No. \*\*\*3901** transacted with **Gaza Broker Tron Address B-2**.

727.     **Gaza Broker Tron Wallet B-2** received the equivalent of over $2,000 from a BuyCash address.

728.     This Hamas money laundering infrastructure continues to operate even after the events of October 7—in 2025, **Gaza Broker Tron Wallet B-2** continued to receive and send the cryptocurrency equivalent of millions of U.S. dollars from and to Binance customers.

729.     Like many accounts associated with the Al-Mutahadun Exchange and the Shamlakh network, cryptocurrency flowed in and out of **Binance Account No. \*\*\*3901** rapidly, consistent with the account's role as a transit hub or layering mechanism rather than an accumulation point.

730.     For example, on June 8, 2021, Binance processed two sequential transfers from **Binance Account No. \*\*\*9055** to **Binance Account No. \*\*\*3901**—$5,029 in USDT at 11:11:06 UTC, followed just five minutes later by $5,031 in USDT at 11:16:23 UTC. Binance recorded both nearly identical amounts (differing by only $2, or 0.04%) and the five-minute interval between them.

731.     A few weeks later Binance processed three additional carefully calibrated transfers from **Binance Account No. \*\*\*9055** to **Binance Account No. \*\*\*3901**: $1,999 (12:57:22 UTC), $3,999 (14:48:42 UTC), and $3,099 (18:53:06 UTC)—totaling $9,097 in USDT. Each amount was structured to avoid round numbers and remain below common reporting thresholds, spaced at intervals of 111 and 244 minutes.

732.     This sequencing is suggestive of automated structuring scripts.

733.    Over 400 deposits into the account were received from other Binance customers and were therefore off-chain. Over 600 withdrawals resulted from off-chain Binance transfers.

734.    **Binance Account No. \*\*\*3901** accessed Binance services from the Palestinian Territories (Gaza, Nablus, Ramallah, Hebron, Tulkarem) as well as from foreign jurisdictions including Botswana (Gaborone) and the United States, totaling more than 3,000 login sessions from 175 unique IP addresses across 11 distinct geographic locations.[81] That includes accessing the account from Kindred, North Dakota.

735.    **Binance Account No. \*\*\*3901** was subject to an Administrative Seizure Order by NBCTF in December 2021 and identified as part of Al Mutahadun for Exchange.

### 6.  Other Hamas Binance Customers

### a.  Binance Account No. \*\*\*3382 (Hanad Adam)

736.    **Binance Account No. \*\*\*3382** was registered under the name Hanad Adam in December 2017, at the time a twenty-three-year-old, using the email address: hanad.████@gmail.com. KYC verification was completed for the account four-and-half years later in mid-2022, after years of high-volume activity. Thus, Binance enabled the account to transact for years without any meaningful identity verification, source-of-funds documentation, or enhanced due diligence.[82]

737.    **Binance Account No. \*\*\*3382** was accessed nearly 4,000 times events from more than 200 unique IP addresses, with access overwhelmingly concentrated in Canadian cities including Montreal, Ottawa, Edmonton, and the Toronto metropolitan area, as well as from

---

[81]    The account was almost exclusively accessed by a single iPhone 11, strongly suggesting it was operated by a single person periodically using VPN services to disguise his/her location.

[82]    Adam finally submitted for verification an Alberta, Canada, driver's license issued just nine days earlier (June 14, 2022) and a Telus utility bill (May 11, 2022), both showing an address in Edmonton — with KYC verification completed at the end of June 2022.

jurisdictions including Algeria, Saudi Arabia, China and Singapore. This indicates either the use of VPN services to mask true geographic locations or the account's use by multiple individuals across different jurisdictions—both patterns consistent with coordinated money laundering networks.

738.    **Binance Account No. ***3382** displayed many indicia of being involved in money laundering and terror financing.

739.    For example, **Binance Account No. ***3382** made only two blockchain deposits totaling $6,144.11 in USDT equivalent (one deposit in REQ tokens and one in XRP) yet subsequently executed 89 blockchain withdrawals totaling the equivalent of almost $1.5 million.

740.    This massive imbalance—withdrawing $1.47 million from an account that received only $6,144 in traceable blockchain deposits—indicates that **Binance Account No. ***3382** functioned as a money laundering conduit, with the true source of the withdrawn funds deliberately obscured through Binance's off-chain internal transfer architecture.

741.    *One* off-chain funding source for **Binance Account No. ***3382**'s $1.47 million in withdrawals was Binance's internal "Binance Pay" transfer system, which enables cryptocurrency transfers between Binance customers that occur entirely off-chain and are therefore invisible on public blockchains and untraceable to law enforcement and regulatory authorities without Binance's cooperation.

742.    The account was dormant for an extended period of time after it was first opened, then exhibited explosive withdrawal activity during the six-month period immediately preceding the October 7 Attacks, with July 2023 (the equivalent of more than $400,000 in transactions) and August 2023 (the equivalent of almost $400,000 in transactions) accounting for more than half of all-time withdrawals.

743.    In January 2021, Adam withdrew 16,974 REQ tokens (Request Network) from Binance to an external Ethereum address. One week later, the exact same amount was re-deposited from that same external address back into Adam's account. Such cycling of funds is not typical for legitimate counterparties.

744.    Adam's account primarily bought USDT for Canadian dollars from various sellers of USDT, converting mass amounts of fiat currency (Canadian dollars) via Interac e-Transfer (a Canadian bank transfer method) to cryptocurrency —USDT coins.

745.    By structuring hundreds of small trades, the account effectively converted large amounts of cash collected (in fiat) into cryptocurrency.[83] Individual trade sizes were often just below reporting thresholds suggesting structuring (or "smurfing") to avoid detection by banks.[84]

746.    The accumulated USDT cryptocurrency was then distributed both on-chain and – off-chain under the auspices of Binance's money laundering architecture.

747.    **Binance Account No. ***3382** was an important node in the Hamas – PIJ - BuyCash network. It converted collected Canadian dollars into USDT and then distributed the equivalent of millions of dollars in cryptocurrency to multiple BuyCash wallets.

748.    For example, **Tron Address ***66NL** received more than the equivalent of $350,000 in USDT from **Binance Account No. ***3382** that was converted from Canadian dollars.

749.    **Tron Address ***66NL** sent the equivalent of more than $750,000 to three BuyCash addresses.

---

[83]    For example, Canadian dollars flowed into the account equivalent to almost $2 million (USD) and were primarily used to purchase USDT. Most of that fiat currency left via Binance's own accounts, transferring USDT anonymously on the public blockchain.

[84]    Binance's systems did flag certain withdrawal attempts from this account (or a closely related one). For example, from November 19–21, 2021, a series of 10 attempted withdrawals to external (on-chain) wallets were rejected by Binance. Nevertheless, no lasting account suspension followed—the account remained active into 2023.

750. **Tron Address ***foQF**, controlled by PIJ, received the equivalent of $8,000 from **Binance Account No. ***3382**, while also sending the equivalent of more than $1.5 million to **BuyCash Wallet ***znVF**, and the equivalent of almost $350,000 to **BuyCash Wallet ***zt5t**.

751. **Tron Address ***foQF** was designated by NBCTF on July 4, 2023 (ASO 34/23) as property of PIJ – more than two months before **Binance Account No. ***3382** became inactive. Had Binance frozen **Binance Account No. ***3382** once **Tron Address ***foQF** was designated, more than $950,000 in terror financing funds would not have been transferred—some of it right before the October 7 Attacks.

752. **Binance Account No. ***3382** also transacted with the Hezbollah–IRGC's cryptocurrency network. For example, on May 29, 2023, after NBCTF's designation of several wallets belonging to the Hezbollah-IRGC money launderer—Tawfiq al-Law, **Binance Account No. ***3382** was permitted to send the equivalent of more than $18,000 to **Tron Address ***gLrd**, which sent the equivalent of more than $3 million to various al-Law designated wallets. **Tron Address ***gLrd** also sent the equivalent of more than $75,000 to various Nobitex addresses.

753. While on-ramping Canadian dollars and converting them into USDT (and vice versa), Hanad Adam also used his Visa credit card number ***7865, issued by Toronto Dominion Bank. **Binance Account No. ***3382** was accessed from across Canada, in Saudi Arabia, Turkey, Algeria, China, and Secaucus, New Jersey.

754. In November 2023, NBCTF designated **Binance Account No. ***3382 (**ASO 56/23) and identified it as part of Dubai Co and Hamas.

## I.    Binance Knowingly and Willingly Assisted PIJ

### 1.    <u>Binance Account No. \*\*\*5345</u>

755.    **Binance Account No. \*\*\*5345** belonged to a 25-year-old PIJ operative in Khan Yunis (Gaza) who opened his account in October 2020 when he was 20 years old.[85]

756.    The operative took an active part in the May 2021 funeral of a Hamas operative killed by Israeli forces. Photographs released at the time by *Reuters* and *Agence France-Presse* show him serving as "pallbearer" during the funeral procession:



757.    Full Know-Your-Customer (KYC) verification on this account was never completed.

---

[85]    Although the accountholder appears to have been a resident of Gaza, Binance actively processed 792 distinct IP address logins for this account over a 4-year period (October 6, 2020 through February 17, 2025)—spanning the October 7 Attacks—including logins that were physically impossible without VPN masking. Binance's authentication systems recorded logins from at least 11 distinct geographic locations (France, UK, Netherlands, Germany, and various cities in the Palestinian Territories.) Critically, all 18 European VPN sessions involved financial transactions. Since the same physical device was used to log in from Paris, London, Amsterdam, and Gaza in alternating sessions, the PIJ operative using this account displayed operational security sophistication.

758.    Binance listed the account's KYC Status as "REFUSED"–meaning an attempted identity verification was rejected or not approved. But Binance's tiered verification system affirmatively allowed the account to operate unimpeded with only "Basic" verification (email and phone confirmation), processing the equivalent of $768,993 in deposits and $776,416 in withdrawals over three years.

759.    The account was one (relatively small) node in a network of Hamas and PIJ accounts and crypto wallets.

760.    The many glaring indicia of money laundering and terror financing exhibited by the account confirm that these criminal activities were perfectly suited to Binance's IT architecture.

761.    **Binance Account No. ***5345** received funds from 403 unique source addresses in less than three years.

762.    However, critically, a small subset of those addresses contributed most of the deposits, and the account rarely held onto funds for long.[86] For example, deposits made into the account often left within hours via corresponding withdrawals.

763.    On July 30, 2023, four deposits totaling the equivalent of $4,202 arrived between 12:20 and 14:12 UTC, and Binance's platform facilitated three cryptocurrency withdrawals totaling $1,877 during this same two-hour window (occurring at 13:21, 13:28, and 14:17 UTC), demonstrating the rapid movement of funds characteristic of this account.

764.    Moreover, one of these four deposits, 1,000.00 USDT credited at 14:08:04 UTC on July 30th—originated from **Tron Address ***YKUq**, which had been designated 26 days earlier

---

[86]    Critically, 277 source addresses (68.7 percent) were used only once—a single-use rate indicating systematic fragmentation designed to obscure fund origins rather than organic transaction patterns and suggesting multi-user operational control characteristic of organizational rather than individual account usage.

under NBCTF Administrative Seizure Order 34/23 (effective July 4, 2023) as associated with terrorist financing.

765.    In another instance, on February 18, 2021, **Binance Account No. ***5345** attempted to send 435 USDT to an "on-chain" crypto wallet three times within an hour, but all three transactions were rejected.

766.    Within minutes after the rejection, Binance's internal transfer system provided an alternative pathway: the account executed a withdrawal for the same amount of 435 USDT to a single **Binance Account No. ***7896**–off-chain.

767.    This circular flow (in and out of the account for almost the exact same amount) was used to "cycle" funds through Binance to break the visible link to the wallet's prior transactions.[87]

768.    One Tron address, **Tron Address ***diSX** sent funds to this account 118 times, totaling the equivalent of over $100,000 in USDT.

769.    That same address also was the *recipient* of 86 withdrawals from the account, totaling almost the exact equivalent in USDT.[88]

770.    This Tron address is notorious as a temporary holding vault rather than an independent recipient, referred to by a blockchain intelligence firm as serving a "crucial role in the cryptocurrency laundering scheme"[89] and served as the "safe harbor" for **Binance Account No. ***5345's** last and ultimate withdrawal of assets from the account.

771.    As of November 4, 2025, the same Tron address (which remains active) received

---

[87]    As noted above, Binance collects all data on its customer accounts and is able to run highly sophisticated algorithms to detect fraud, money laundering, and other transactional anomalies.

[88]    On July 30, 2023, **Binance Account No. ***5345** also received the equivalent of $1,000 from a designated PIJ wallet – **Tron Address ***YKUq**.

[89]    *See* Bit OK Inc., *Uncovering a $10 Billion Scheme: BitOK Analysts Investigated Addresses Linked to Hezbollah and Quds Force*, Bit OK Blog (2023), https://bitok.org/blog/hezbollah-quds-crypto-financing (last visited Nov. 17, 2025).

from all its counterparties a total value equivalent to $5,609,316.05 (and transferred out almost the same amount). Notably, 38% of all its deposits (the equivalent of more than $2 million U.S. dollars), came from Binance-controlled omnibus wallets, with at least two transactions coming from Binance as late as November 4, 2025.

772.    Since all outgoing transactions from Binance that are "on-chain" are routed through these Binance wallets that pool customer crypto assets, blockchain withdrawals of funds deposited into **Binance Account No. ***5345** were effectively untraceable–except to Binance itself. The same is true for Binance-originating transfers (equivalent of more than $2 million) into **Tron Address ***diSX**.

773.    In fact, on July 30, 2023, when **Binance Account No. ***5345** received the equivalent of $1,000 from a PIJ wallet already designated by NBCTF (Seizure Order 34/23), it withdrew almost the exact same amount (within 14 hours) and sent the cryptocurrency to the Tron address **Tron Address ***diSX** (which, again, played a "crucial role in the cryptocurrency laundering scheme"). The transfer was sent through a Binance-controlled omnibus wallet.

774.    Of course, **Binance Account No. ***5345** also used Binance's internal transfer features (including Binance Pay) extensively, which the account used to interact with dozens of other Binance accounts. Instead of sending a large sum from one Binance account to another, smaller amounts were passed among many accounts. For example, **Binance Account No. ***5345** engaged in 79 transfers with one particular Binance user (**Binance Account No. ***6133**) and over 40 transfers each with several other Binance customers, indicating repeated cyclical movement of funds internal to Binance's ledger.

775.    In fact, approximately 70% of USDT deposits into **Binance Account No. ***5345** (U.S. Dollar equivalent of $558,000 in USDT out of a total of approximately $768,000) were made

using internal Binance transfers and therefore not visible on public blockchain. The same pattern persisted with the account's withdrawals, where 71% of the account's USDT withdrawals were executed "off-chain" to other Binance users.

776.    Between 2021 and 2023, another Tron address—**Tron Address \*\*\*YKUq**—made 17 transfers into **Binance Account No. \*\*\*5345**, totaling the equivalent of $25,283 and received 9 withdrawals totaling $14,384.

777.    NBCTF designated this Tron wallet on July 4, 2023, and identified it as belonging to PIJ.

778.    The last transaction from **Binance Account No. \*\*\*5345** occurred on July 30, 2023—only 26 days after NBCTF's designation—indicating coordination within PIJ's network to avoid further use of the account recently tied to the publicly-identified Tron address.

779.    **Binance Account No. \*\*\*5345** also received an internal transfer on March 20, 2021, of 10,000 USDT (the account's single largest deposit) from **Binance Account No. \*\*\*6569**, which was designated by Israel's NBCTF on December 29, 2021 (ASO 79/21) as belonging to Al-Markaziya (formerly Al-Mutahadun for Exchange).[90]

780.    **Binance Account No. \*\*\*5345** remained active for an additional 20 months without freezing or even enhanced monitoring after **Binance Account No. \*\*\*6569** was designated in December 2021.

781.    All told, approximately 15% of funds received into **Binance Account No. \*\*\*5345** originated from other Binance accounts designated by NBCTF.

---

[90]    The U.S. Department of the Treasury also designated Al-Markaziya (formerly Al-Mutahadun for Exchange) as an SDGT in January 2024 for being "directly involved in facilitating tens of millions of dollars from IRGC-QF to Hamas and PIJ." Press Release, *U.S., UK, and Australia Target Additional Hamas Financial Networks and Facilitators of Virtual Currency Transfers*, U.S. DEP'T OF TREAS. (Jan. 22, 2024), https://home.treasury.gov/news/press-releases/jy2036.

782.    At the end of July 2023, Binance's compliance function finally instituted a "live monitoring asset freeze" and placed a 24-hour hold on approximately 1000 USDT.

783.    The freeze notation indicated the case would be transferred to Binance's compliance help desk because a transaction was flagged as suspicious by its automated monitoring system and sent to Binance's compliance team for investigation.

784.    However, less than one hour after the freeze was activated, Binance processed a withdrawal request by **Binance Account No. \*\*\*5345** for 999.77 USDT, effectively emptying the account.

785.    After July 2023, **Binance Account No. \*\*\*5345** stopped making withdrawals to crypto wallets on the blockchain, but made withdrawals to internal transfers to other Binance accounts in August.

786.    The account was primarily accessed from Gaza, but was also accessed from London, Paris, and Frankfurt, Germany.

**2.  Binance Account No. \*\*\*2659**

787.    Another example of an account held for the benefit of PIJ was **Binance Account No. \*\*\*2659**. This account belonged to a 22-year-old Palestinian national from Gaza, Mohammad Rafat Abu Kwaik, who opened his account in February 2020.

788.    Binance never completed KYC verification for this account.

789.    It listed the account's KYC Status as "REFUSED"—meaning an attempted identity verification was rejected or not approved. Yet Binance's tiered verification system affirmatively allowed the account to operate unimpeded with only "Basic" verification (email and phone confirmation), processing the equivalent of $33,582 in deposits and $25,738 in withdrawals over 38 months.

790.    One (subsequently designated) Tron address, **Tron Address ***GS63**,[91] contributed nearly one-third of all deposits into **Binance Account No. ***2659**. This address sent the equivalent of $11,059 to the account through 13 separate deposits between October 2021 and February 2023.

791.    Approximately 43.3% of the account's deposits ($14,543 of $33,582) and 32.9% of withdrawals ($8,477 of $25,738) were "off-chain" (internal to Binance's platform and internal ledger).

792.    For example, **Binance Account No. ***2659** engaged in eight deposit transfers (totaling $5,814) and five withdrawal transfers (totaling $2,815) with **Binance Account No. ***6569.** The latter was a hub account within an IRGC–Hamas financing network (subject to NBCTF Administrative Seizure Order—ASO 79/21—on December 29, 2021) that provided hundreds of thousands of dollars to multiple suspicious accounts across Binance's platform and was owned by Mahmoud Mohammed Mahmoud Ayesh.

793.    According to NBCTF, **Binance Account No. ***6569** was one node in a broader IRGC-Hamas financing network.

794.    Binance processed 54 internal transfers involving **Binance Account No. ***2659** across 14 unique accounts, 33 deposits from 10 sending accounts, and 21 withdrawals to nine receiving accounts. This hub-and-spoke network utilized: (a) internal transfer functionality bypassing blockchain transparency; (b) unique Counter Party IDs for proprietary ledger routing; (c) continued processing for 16 months after NBCTF's December 2021 terrorist financing designation; and (d) systematic transactions with **Binance Account No. ***6569**.

---

[91]    This wallet was designated by Israel's NBCTF on July 4, 2023 (ASO 34-23). *See* NAT'L BUREAU FOR COUNTER TERROR FIN., Administrative Seizure Order No. 34/23, (Isr. Jul. 4, 2023), https://nbctf.mod.gov.il /he/Announcements/Documents/%d7%a6%d7%aa%2034-23.pdf.

795.    NBCTF issued an Administrative Seizure Order for **Binance Account No. ***2659** and identified the email address of account holder (abukwaik██████████@gmail.com) on April 21, 2023 (ASO19/23), as "Property used for the perpetration of severe terror crime" related to the operations of the designated terrorist organizations—Al Mutahadun for Exchange or Dubai Company for Exchange or Al Wefaq Co. for Exchange.

796.    **Binance Account No. ***5345** and **Binance Account No. ***2659** were but two small examples of what the U.S. government would later conclude—that Binance processed the equivalent of tens of millions of dollars for PIJ and other terrorist organizations.

797.    FinCEN, in a consent order signed by Binance, concluded that Binance had processed "significant sums" on behalf of Hamas, PIJ, and other terror groups:

> ***Binance failed to file SARs with FinCEN on significant sums being transmitted to and from entities officially designated as terrorist organizations by the United States and United Nations***, as well as high-risk exchanges associated with terrorist financing activity. Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), ***Hamas' Al-Qassam Brigades***, Al Qaeda, and the ***Palestine Islamic Jihad (PIJ).***

(Emphasis added.)

798.    FinCEN's investigation **"identified dozens of former Binance users with tens of millions of dollars in transactions with an identified [Palestinian Islamic Jihad] network**." (Emphasis added.)

799.    FinCEN noted that Binance did not file any SARs on the activity (some of which occurred between July 14, 2017, and July 30, 2023), a precautionary step which might have helped insulate Binance from prosecution—but at the risk of diminishing its usefulness to terrorist organizations.

## V.    THE FOREIGN TERRORIST ORGANIZATIONS RESPONSIBLE FOR THE OCTOBER 7 TERROR OFFENSIVE

800.    According to the U.S. State Department, "In 2023, Iran remained the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities in the United States and globally."[92]

801.    Iran's support, provided primarily through the IRGC, has facilitated the violence committed by Hamas, which spearheaded the October 7 Attacks. It has also made possible the violence committed by PIJ and other Gaza-based terrorist groups, which joined the October 7 Attacks, and Hezbollah, which attacked Israel on October 8 in solidarity with the October 7 Attacks after initially planning and coordinating what was intended to be a coordinated attack on multiple fronts.

802.    Since 2016, the U.S. State Department's *Country Reports on Terrorism* contained the following materially identical statement regarding Iran's support for terrorism. This example is from the most recent 2023 report:

> Designated as a State Sponsor of Terrorism in 1984, Iran continued its support for terrorist activity in 2023, including support for Hizballah, U.S.-designated Palestinian terrorist groups in the West Bank and Gaza including Hamas, the Houthis in Yemen, and Iran-aligned militia groups (IAMGs) in Iraq and Syria. After the October 7 Hamas attacks on Israel, Iran-backed groups took advantage of the regional conflict to further their objectives. Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region. The IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad.[93]

---

[92]    U.S. DEP'T OF STATE, *Country Reports on Terrorism 2023* at 4 (2023), https://www.state.gov/reports/country-reports-on-terrorism-2023/.

[93]    *Id.*

## A.    The IRGC and Its Quds Force Form the "Axis of Resistance"

803.    The IRGC was established in the immediate wake of the 1979 Iranian revolution. The IRGC defines itself as an agent of the Supreme Leader, to whom it pledges its unflinching loyalty. The IRGC leadership and the Supreme Leader both frequently speak about the IRGC as the guardian of the principles of the revolution. The IRGC is dedicated to spreading fundamentalist (Shi'a) Islamist principles throughout the world and establishing fundamentalist Islamist governments in nations other than Iran.

804.    The IRGC has its own military branches—an army, air force, and navy—the purposes of which are not to defend Iran's borders, but to protect and advance the Islamic revolution, including through paramilitary operations in the Middle East.

805.    The IRGC also has a domestic militia, the Basij paramilitary force, with approximately 600,000 members.

806.    The IRGC also holds a controlling number of positions in the Iranian government and its economy. IRGC veterans have served as governors of many of Iran's 31 provinces.

807.    The IRGC also controls many companies, spanning a wide range of industries, including petroleum production, construction, nuclear power, banking, and others. The IRGC uses a significant percentage of the proceeds from these ventures to fund terrorism.

808.    By one U.S. government estimate, the IRGC has between 150,000 and 190,000 personnel—not including the domestic militia.

809.    The IRGC-QF is also one of the IRGC's branches. Among its roles are to establish, fund, equip, and train foreign Islamic revolutionary groups, including Hezbollah, Hamas, PIJ, and others.

810.     In essence, the IRGC-QF is charged with cultivating and supporting pro-Iran proxies in foreign countries and coordinating with these groups to conduct terrorist attacks.

811.     According to the U.S. State Department's most recent *Country Reports on Terrorism*, "the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and the Ministry of Intelligence and Security remained Iran's primary actors involved in supporting terrorist recruitment, financing, and plotting across Africa, Asia, Europe, and the Americas."[94]

812.     By using groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously, if implausibly, denying responsibility for their actions.

813.     The leader of the IRGC-QF reports directly to the Supreme Leader.

814.     General Qasem Soleimani was the leader of the IRGC-QF from 1998 until January 2020, when he was eliminated by the United States. He was succeeded by the current leader, Esmail Qaani (a/k/a Ismail Ghaani).

815.     The IRGC-QF is responsible for providing material support to terrorist organizations around the world. For example, the IRGC-QF provided the Taliban with small arms, ammunition, rocket-propelled grenades, mortars, plastic explosives, and more, intending to kill and wound U.S. and NATO forces in Afghanistan.

816.     The IRGC-QF also supplied weapons and training to Iraqi militias for use against U.S. and Coalition Forces following the U.S.-led invasion of Iraq in 2003, including the use of explosively formed penetrators, improvised rocket assisted munitions, rocket-propelled grenades, sniper fire, and mortars. The IRGC-QF also provided training in operational and computer security.

---

[94]     *Id.*

134

817.    The IRGC-QF also provided training and weapons to the Syrian military and pro-Assad forces, and IRGC-QF troops and paramilitary volunteers fought on behalf of the Assad regime.

818.    The IRGC-QF has also operated in Nigeria and Venezuela, and it has attempted assassinations in the United States.

819.    Most relevant here, the IRGC-QF is the primary conduit through which Iran provides Hamas, PIJ, Hezbollah, the Popular Front for the Liberation of Palestine ("PFLP"), and the Houthis with material support in the form of weapons, training, logistics, intelligence, and financing.

820.    The IRGC-QF also manages the above-mentioned "Axis of Resistance"—a semi-formal alliance among and between Iran, Syria, Hezbollah, Palestinian terror groups (*e.g.*, Hamas, PIJ, and the PFLP), Iraqi Shi'a militias, and the Houthis.

821.    Although the members of the Axis of Resistance have their own interests, they work together (under the direction of the IRGC-QF, with its coordination and material support) toward the shared goals of weakening and, ultimately, destroying Israel and imposing costs on the United States (including killing and injuring U.S. citizens) for seeking to maintain its influence in the region—with the goal of spreading the Iranian revolution across the Middle East.

822.    From the time the Syrian civil war broke out in 2011-2012 until the Assad regime fell in December 2024, the IRGC-QF engaged in a massive effort to support the Assad regime by providing weapons, financing, and logistics, training Syrian forces, recruiting and training foreign fighters, and conducting military operations against anti-Assad (mostly Sunni) forces.

823.    Since the U.S.-led invasion of Iraq in 2003, the IRGC-QF has established, trained, armed, and funded various Shi'a militia to attack U.S. and Coalition Forces operating in Iraq and,

later, to subvert and subsume the Iraqi government and complete Iraq's transformation into an Iranian client state.

824.    And as described further below, the IRGC-QF is also the primary conduit through which Hamas, PIJ, Hezbollah, the PFLP, and the Houthis receive Iranian financing, weapons, equipment, training, and logistics support.

825.    In October 2007, the U.S. State Department designated the IRGC-QF under E.O. 13224, noting its material support to Hamas, PIJ, the PFLP, and "a long history of supporting Hizballah's military, paramilitary, and terrorist activities" among other terrorist groups.[95]

826.    In 2017, Congress reaffirmed these findings in the Countering America's Adversaries Through Sanctions Act, Pub. L. 115-44, § 105(a), 131 Stat. 886, 892 (2017):

> The Iranian Revolutionary Guard Corps-Quds Force (in this section referred to as the "IRGC-QF") is the primary arm of the Government of Iran for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia and was designated for the imposition of sanctions ... in October 2007 for its support of terrorism.

As part of the same Act, Congress also extended these findings to the IRGC itself:

> The IRGC, not just the IRGC-QF, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program.

827.    In April 2019, the U.S. State Department designated the IRGC in its entirety (including the IRGC-QF) as an FTO stating that "the designation highlights that Iran is an outlaw regime that uses terrorism as a key tool of statecraft and that the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago."[96]

---

[95]    Fact Sheet, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. DEP'T OF STATE (Oct. 25, 2007), https://2001-2009.state.gov/r/pa/prs/ps/2007/ oct/94193.htm.

[96]    Fact Sheet, *Designation of the Islamic Revolutionary Guard Corps*, U.S. DEP'T OF STATE (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

B.    **Hamas**

828.    Hamas is the most significant and deadly Palestinian terror organization.

829.    Hamas was formed in the Gaza Strip in December 1987 by Sheikh Ahmed Yassin and six others as an outgrowth of the Muslim Brotherhood and has the declared goals of globalizing Islam through violent jihad (holy war), eliminating Israel, and establishing an Islamist state that covers present-day Israel, the Gaza Strip, and the West Bank.

830.    For example, Hamas's original 1988 charter states that "[t]here is no solution to the Palestinian problem except by Jihad." The document is also replete with xenophobic, antisemitic references and openly calls for a genocidal war of ethnic cleansing against Jews in "Palestine." In October 1988, in an interview with the Kuwaiti newspaper *al-Anbaa*, Khalil al-Quqa, who was a close associate of Sheikh Yassin, said: "Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it will become their mass grave." On October 12, 1997, the *Jordan Times* quoted Yassin as saying, "Hamas's goal is to establish an Islamic state on the ruins of Israel."

831.    Because of Hamas's history of conducting terror attacks, as noted above, the United States designated Hamas as a Specially Designated Terrorist ("SDT") in 1995, under E.O. 12947; an FTO in 1997, under 8 U.S.C. § 1189; and an SDGT in 2001, under E.O. 13224. In addition, the United States has designated numerous Hamas leaders and fundraisers as Specially Designated Nationals ("SDNs"), thereby freezing their assets, as a result of their activities for Hamas.

832.    Since its inception, Hamas has seen itself as a direct competitor to the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA"), which the PLO established as part of the Oslo Peace Accords in the early 1990s.

833.    Even before the Oslo Peace Accords, Hamas made great (and largely successful) efforts to take over the student councils at universities throughout the West Bank and Gaza by developing its student organization, the "Islamic Bloc" (*Al-Kutla al-Islamiya*). Hamas also prioritized taking over trade unions, commercial organizations, and the bureaucracies that control Palestinian communications institutions (such as the Palestinian Journalists' Syndicate). It also took control of the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA"), a United Nations agency intended to provide support and relief for Palestinian civilians in Gaza, as well as various purported charitable societies and so-called "zakat" (tithing) committees in the West Bank.

834.    Hamas historically operated in the Palestinian Territories (the Gaza Strip and the West Bank), Lebanon, and Syria. It was formally pushed out of Jordan in 1999 (but continues to operate clandestinely there) and currently maintains significant operations in Turkey, Qatar, and Algeria.

835.    In 2006, Hamas won the general PA elections, attaining a parliamentary majority, and in 2007 it seized power in Gaza after a violent coup (it has held no elections since). Its takeover of Gaza resulted in the expulsion of the PA security services from the Gaza Strip in May-June 2007. From that time forward, Hamas has maintained absolute political and military control of the Gaza Strip.

836.    Since 2007, when Hamas first seized control of the Gaza Strip, it has successfully subordinated the other prominent terrorist organizations that operate in its territory.

837.    Politically, Hamas was historically governed by a main Political Bureau (or Politburo) of approximately 15 members. But after many of its top leaders were assassinated in 2024, it shifted to a temporary five-person committee. From 1996 until May 2017, the Chairman

was Khaled Mashal. Ismail Haniyeh then served as Chairman from May 2017 until his death in July 2024. In August 2024, Yahya Sinwar was selected as Chairman, and he served until he was killed in October 2024.

838.    Hamas's main Political Bureau is elected by a Shura Council, which comprises members from the four local political bureaus, one each for Gaza, the West Bank, prisoners in Israel, and the diaspora.

839.    Yahya Sinwar led the Gaza Political Bureau (replacing Ismail Haniyeh) from February 2017 until he was chosen as head of Hamas's main Political Bureau in August 2024 after Haniyeh's death. Following Sinwar's death in October 2024, Hamas formed a five-person temporary committee to govern. Leadership elections originally scheduled for March 2025 were postponed, and Hamas has since maintained collective leadership while not publicly disclosing the identities of its new leadership roster.

840.    Hamas's social network raises funds through "charitable" contributions. It attained its widespread power in the Palestinian Territories by providing social services to Palestinian communities while also providing regular employment for Hamas leaders and field commanders.

841.    Moreover, Hamas has strategically used the mosques, schools, orphanages, medical clinics, sports leagues, and summer camps under its control to: indoctrinate Palestinians in the Muslim Brotherhood's ideology; recruit young Palestinians into the ranks of Hamas; incite violence against Israelis (and Jews specifically); and provide logistical and operational support for its core terror apparatus, the Qassam Brigades.

842.    The Qassam Brigades commits murderous attacks within Israel, the West Bank, and Gaza. The Qassam Brigades was founded at the start of the 1990s and, before the October 7

Attacks, numbered more than 30,000 terrorists. It was directly subordinate to the top Hamas leadership, particularly in the Gaza Strip.

843.    It was (and is) responsible for perpetrating terror attacks for Hamas, and it has murdered thousands of Israeli civilians and numerous U.S. citizens.

844.    Hamas proudly proclaims its strategies of using violent attacks to terrorize the civilian Israeli population and to influence government officials in Israel and the United States. Since its founding, Hamas has launched numerous violent attacks, including bombings, suicide attacks, rocket attacks, shootings, stabbings, and vehicular attacks, in support of that aim.

845.    The Qassam Brigades is infamous for its suicide terror attacks. To take just a small set of examples: in 1996, Hamas suicide bombers killed 45 people in two separate bombings of buses on Jaffa Road in Jerusalem. In June 2001, a Hamas suicide bomber attacked the Dolphinarium disco in Tel Aviv, killing 21, the majority of whom were teenagers, and wounding more than 100. In August 2001, a Hamas suicide bombing of a Sbarro pizzeria in Jerusalem killed 16 people, including three Americans, and wounded approximately 130. In December 2001, two Hamas suicide bombers perpetrated an attack on Ben Yehuda Street in Jerusalem killing 11 and wounding approximately 188. In March 2002, a Hamas suicide bomber attacked a Passover seder at a hotel in Netanya, which included many elderly survivors of the Holocaust, killing 30 people and wounding approximately 140. In June 2002, a Hamas suicide bomber blew up bus 32A in Jerusalem killing 19 and wounding approximately 50. In March 2003, a Hamas suicide bomber blew up bus 37 in Haifa, killing 17 and wounding approximately 53. In June 2003, a Hamas suicide bomber blew up bus 14A in Jerusalem killing 17 and wounding approximately 100.

846.    From 2007 through the October 7 Attacks, Hamas also fired thousands of rockets at Israeli civilian targets, killing and wounding scores of civilians, some of whom were U.S. citizens.

847.    In the years leading up to the October 7 Attacks, Hamas also expanded its efforts at hostage-taking to gain leverage in negotiations with the Israeli government. Infamously, Hamas held kidnapped IDF soldier Gilad Shalit hostage for more than five years, until his release in October 2011, in exchange for 1,027 terrorists held by Israel. One of those exchanged terrorists was Yahya Sinwar, who would go on to lead Hamas and mastermind the October 7 Attacks. In 2014, Hamas also kidnapped and murdered, three teenagers, including a U.S. citizen.

848.    In 2013, Hamas established a unit—the Nukhba ("elite") Force built in the image of Hezbollah's Radwan Force—to commit attacks in Israeli territory through the attack tunnels (discussed further below). The force, which originally numbered 5,000 operatives, would later lead the assault on Israel on October 7.

849.    The Nukhba Force trained intensively, and its recruits underwent religious indoctrination. Many of its commanders trained in Iran or in Hezbollah camps in Lebanon under the supervision of Qasem Soleimani and, after his death in 2020, under his replacement, Esmail Qaani.

850.    On February 13, 2017, Yahya Sinwar was elected head of Hamas's Political Bureau in Gaza (and re-elected in March 2021), effectively becoming Hamas's supreme leader in Gaza.

851.    Shortly thereafter, in May 2017, Ismail Haniyeh was elected chairman of Hamas's Political Bureau and then relocated to Qatar, the site of Hamas's most important headquarters outside of Gaza. He replaced Khaled Mashal (longtime chairman of Hamas's Political Bureau).

852.    In August 2017, Yahya Sinwar, until his death in 2024 Hamas's most senior leader in the Gaza Strip, stated: "Hamas continues to train its people for the mission of liberated Palestine, and the Iranian Islamic Republic plays a central role in all that's related to this goal through financial and military aid and providing training for the Izz al-Din al-Qassam Brigades."

853.    Sinwar also declared, in August 2017, that "[r]elations with Iran are excellent and Iran is the largest supporter of the Izz [a]l-D[i]n al-Qassam Brigades with money and arms."

854.    In July 2018, Hamas established a "Joint Operations Room" in Gaza which effectively placed PIJ and other terrorist organizations under its operational control in the Gaza Strip.

855.    As a result, both during the October 7 Attacks and in the months of conflict in Gaza that followed, PIJ (and other Gaza-based terrorist organizations) largely acted under the direction and command of Hamas's Qassam Brigades while maintaining its unique organizational identity.

856.    Since at least 2021, the IRGC-QF also oversaw the creation of a "Joint Operations Room" in Lebanon, where senior Hezbollah, Hamas, PIJ, and IRGC officials met and coordinated their efforts against Israel, often under the auspices of Muhammad Izadi, the IRGC-QF official who served as the head of the Palestinian Office of the IRGC-QF in Lebanon.

857.    At a press conference held on May 26, 2021, following a relatively contained confrontation with Israel in May 2021 (referred to by Israel as "Operation Guardian of the Walls," and by Hamas as "Operation Sword of Jerusalem"), Sinwar expressly and directly disclosed collaboration among the Axis of Resistance:

> During the war we were in continuous contact with our brothers in the field, and in some of the special areas with the brothers in Lebanon [Hezbollah], and there was a high level of coordination, and we made it clear to our brothers in Lebanon, in Hezbollah and in the Guards [of Iran's Revolution] and other factors, that this [the round of confrontation in May 2021 was] only a message we are sending to the enemy, and this is not a real campaign,

and we are sure that if this campaign develops, it will grow and strengthen, we are sure that there will be a real and active intervention of the resistance on all fronts.

We emphasize, I attended the meeting last night [May 25, 2021] and I was completely satisfied with this decision of Sheikh Hassan Nasrallah [the then-leader of Hezbollah], may our Lord protect him by the will of Allah, the Sovereign of the Worlds, and we are fully certain that any attack on the holy places will be a real regional war against it [against Israel], and I have already described it [this scenario], by the will of Allah, the Sovereign of the Worlds, and we are sure that all of us, our entire [Palestinian] nation, our entire [Arab and Islamic] nation, all the active forces of our [Arab and Islamic] nation, all our resistance forces, and all the struggle and resistance forces will be [active] in the next campaign [against Israel] if Al-Aqsa Mosque will call us [for help] … and if the enemy behaves stupidly, then he will find that things will get significantly worse... the barrages [rockets] launched [from Lebanon] and the [unmanned] aircraft that was launched [from Lebanon] were *in full coordination between the resistance in Lebanon [Hezbollah] and between the resistance in the Gaza Strip [Hamas] and in joint action*.

There was also a high level of intelligence coordination, and we passed on to our brothers in Lebanon, in the Lebanese resistance and others [information that was] very useful in the intelligence effort and which also served the resistance [Hamas] in its tactical moves in the Gaza Strip. The activity was a very good activity, and we have a very good horizon for the development of this activity. We clearly warned, we said that this was only a short promo, and if [a significant event] happens, by the will of Allah, the Sovereign of the Worlds, and Al-Sayed Nasrallah was honored and declared, *there will be a regional war* if our holy places are harmed, and this will lead to an open conflict, by the will of Allah.[97]

858.    By this time, Hamas was preparing for Sinwar's "Big Project"—a multi-prong attack, coordinated with Hezbollah, PIJ and the IRGC-QF, to annihilate the State of Israel.

859.    To this end, Hamas held a conference in Gaza on September 30, 2021, under the banner "Ensuring the End of Days—Palestine After Liberation." Its participants included senior Hamas leaders such as Yahya Sinwar, whose opening remarks to the conference explained:

---

[97]    For more details *see* Jonathan D. Halevi, *From Hamas's Point of View: This is How the October 7 Attack Unfolded*, Jerusalem Ctr. for Sec. & Foreign Aff., https://jcpa.org.il/article/from-the-point-of-view-of-hamas-october/ (last visited Nov. 17, 2025). [Arabic text translated into Hebrew, then English.]

143

> The conference's activities are in accord with our assessment that victory is near. The liberation of Palestine from the sea to the river is at the heart of our strategic vision, it is now closer than ever before. Towards that goal, we are hard at work and are making great efforts both above and below the ground, out at sea and in the skies.... [W]e can see our independence flourishing and are therefore preparing for what will follow.[98]

860.    On January 5, 2023, an article published in *Palestine*, the official Hamas newspaper, *explicitly mentions the Joint Operations Rooms in Lebanon*, stating that "the people believe in the need to go to war in defense of the Al-Aqsa Mosque and its sanctity" and "have full and complete trust in the wisdom of the resistance leadership and its spearhead, the Al-Qassam Brigades and the joint [operations] room, in determining the nature of the response, its timing and place. There is no doubt that the response will be on the scale of the crime. The campaign may be close, very close."

861.    On March 19, 2023, two months after publication of the article, Hezbollah Leader Hassan Nasrallah met with Saleh al-Arouri, the deputy leader of Hamas in Lebanon, further drawing attention to the close ties between Hamas and Hezbollah.

862.    A month later, on April 23, 2023, Azat Jamal (Ezzat Jamal), published an article on the official website of the Qassam Brigades stating that not only does the Israeli deterrence (against Hamas) no longer exist, but it will not be able to be restored in the foreseeable future in view of the strengthening of the "Axis of Resistance," which consists of Iran, Hezbollah, the military coalition in the Gaza Strip led by Hamas, the Houthi regime in Yemen, and the military militias in Iraq and Syria.

863.    From April to June 2023, Iranian leaders—including Ayatollah Ali Khamenei and then-President Ebrahim Raisi—met publicly with Hamas and PIJ leaders in Iran and Syria to encourage further acts of terrorism against Israel.

---

[98]    *See* text reported by THE PALESTINIAN PRESS AGENCY (Sept. 30, 2021), https://safa.ps/post/313372.

864.    On June 19, 2023, Haniyeh also met with a delegation of high-level Iranian security and military officials.[99] Haniyeh, accompanied by al-Arouri and other Hamas figures, also met with the IRGC chief, Hossein Salami, and a number of his aides over a period of three days.

865.    On June 21, 2023, Haniyeh publicly met with Iranian Supreme Leader Ayatollah Khamenei.[100]

866.    Starting no later than August 2023, IRGC-QF commanders used the Joint Operations Room in Beirut to conduct biweekly planning meetings with Hamas, PIJ, Hezbollah, and other Iranian-backed terror groups. Iran's foreign minister Hossein Amir-Abdollahian attended at least two of these meetings.[101]

867.    On August 13, 2023, Nasrallah met publicly with Hamas and PIJ officials.

868.    Hamas published an article in *Palestine* on August 19, 2023, warning:

> The total war and the concerns of the occupation. With the passage of time, the dangers and threats in the environment of the Israeli occupation entity have intensified and the concerns become visible about the outbreak of a conflict or a total war... against the background the rapid changes in this arena, and the unprecedented developments in the various arenas in Palestine, Lebanon, Syria, Iraq, Yemen, and Iran, which became more capable of creating a deterrence equation in a confrontation with the enemy, after these fronts succeeded in developing capabilities in the field of training, arming, and intelligence effort... the timing and circumstances of this campaign depends on the leadership of the resistance, which is prepared to choose the timing and the circumstances that serve the great goals that the resistance seeks to achieve, first of all the inflicting the greatest defeat

---

[99]    *See Haniyeh meets with the Secretary General of the Supreme National Security Council in Iran*, AL QUDS (June 19, 2023), https://www.alquds.com/en/posts/76699.

[100]    *See Iranian state media confirm meeting between Khamenei, Hamas' Haniyeh in Tehran*, REUTERS (Nov. 5, 2023), https://www.reuters.com/world/middle-east/iranian-state-media-confirms-meeting-between-khamenei-hamas-haniyeh-tehran-2023-11-05.

[101]    *See* Summer Said, *Iran Helped Plot Attack on Israel Over Several Weeks*, WALL STREET JOURNAL (Oct. 8, 2023), https://www.wsj.com/world/middle-east/iran-israel-hamas-strike-planning-bbe07b25; *see also 500 Hamas, PIJ terrorists trained for October 7 attack in Iran last month – report*, TIMES OF ISRAEL (Oct. 25, 2023), https://www.timesofisrael.com/500-hamas-pij-terrorists-trained-for-october-7-attack-in-iran-last-month-report/; Emanuel Fabian, *IDF says Iran directly aided Hamas before assault*, TIMES OF ISRAEL (Oct. 25, 2023), https://www.timesofisrael.com/liveblog_entry/idf-says-iran-directly-aided-hamas-before-assault.

on the Israeli enemy, which will push him to stop his occupation of Palestine in the Arab lands once and for all.[102]

869.     On August 25, 2023, Hezbollah's *Al-Mayadeen* television channel broadcasted an extensive interview with al-Arouri, the deputy leader of Hamas, where he presented his assessment of Hamas's relations with Israel, the preparations for an all-out confrontation against Israel in coordination with the Axis of Resistance, and the expected nature of the campaign:

> ***The all-out war has become an unavoidable issue, and we believe it is necessary, we want it.*** We, the resistance, the axis of the resistance, [Arab and Islamic] peoples, the Palestinian people, the [Islamic] nation want this all-out campaign. We do not talk about it [about the war] in public. We discuss it in closed rooms.

> ***We meet with everyone. The components [partners to] the overall campaign, and we all discuss it.*** We discuss its scenarios and its potential, and we are convinced that we can … for sure, defeat them... We are convinced that this [Israeli] entity, honestly, if it starts an all-out conflict, its airspace will be closed, and it will not be able to live without electricity, the sea will be closed to it, without communication, [and in a state of] curfew, the wheels of the economy will stop in an open campaign whose end is unknown. We can do all this [mentioned above]. All resistance forces can do this to change this situation, a real change.[103]

870.     Nasrallah met with al-Arouri again on September 2, 2023. Four days later, al-Arouri gave an interview to *Al Jazeera* again expressing the view that a decisive confrontation with the enemy was imminent.

871.     On September 2, 2023, Hamas also published an article on the official website of the Qassam Brigades warning of "the possibility that the enemy will launch a new aggression, one of the manifestations of which will be the assassination of the leaders of the resistance [Hamas] inside [Palestine] or outside [Palestine]" and warning that this would lead to "a severe reaction on

---

[102]     *See* Jonathan D. Halevi, *From Hamas's Point of View*, Jerusalem Ctr. for Sec. & Foreign Aff., *available at* https://jcpa.org.il/article/from-the-point-of-view-of-hamas-october/.

[103]     *Id*.

the part of the Palestinian resistance, and may develop into the entry of other fronts into the front line, such as (Syria, Lebanon), and it is possible that other fronts will join in their wake."

872.    *The Wall Street Journal* has reported that meetings in the Joint Operations Room in Beirut culminated with an October 2 meeting in which Iran provided the green light for Hamas, PIJ, and the other Iran-backed groups to launch the pre-planned attack against Israel, using Iranian intelligence, training, and military supplies.[104]

873.    On October 2, 2023, PIJ publicly mounted a training exercise on the occasion of "Martyrs are the Harbingers of Victory" day, followed two days later by a military parade in commemoration of its 36th anniversary as a terrorist organization in the Gaza Strip. Whether intentionally or not, the flurry of PIJ activity in the days before the October 7 Attack likely served as a smokescreen concealing Hamas's final preparations for the assault.

874.    When, in the early morning of October 7, 2023, Hamas led the Iranian-financed-and-approved attack against Israel, murdering, kidnapping, and injuring Plaintiffs, among hundreds of others, Hamas apparently did not fully follow the agreed-upon coordinated plan approved by the IRGC because neither Hezbollah nor the IRGC-armed-and-trained Qassam Brigades operatives in Lebanon infiltrated northern Israel in force on October 7 as "the Big Project" had envisioned.

875.    Hezbollah ultimately did attack northern Israel with rockets, mortars and other weapons and forced the dislocation of much of Israel's civilian population in the northern part of

---

[104]    *See* Summer Said, *Iran Helped Plot Attack on Israel Over Several Weeks*, WALL STREET JOURNAL (Oct. 8, 2023), https://www.wsj.com/world/middle-east/iran-israel-hamas-strike-planning-bbe07b25; *see also* Jonathan Schanzer, *Iran-Hezbollah Intelligence Center May Help Hamas Target Israel*, FOREIGN POLICY (Sept. 13, 2022), https://foreignpolicy.com/2022/09/13/iran-hezbollah-hamas-israel-beirut-lebanon-intelligence-sha_ring-center; Paul Kirby, *Israel faces 'long, difficult war' after Hamas attack from Gaza*, BBC (Oct. 8, 2023), https://www.bbc.com/news/world-middle-east-67044182; Shay Khatiri, *Why It's Obvious Iran Approved Hamas Attack*, WALL STREET JOURNAL (Oct. 17, 2023), https://www.wsj.com/articles/why-its-obvious-iran-approved-hamas-attack-khamenei-nuclear-deal-f394c477.

the country, but its failure to cross the Israeli border in force on October 7 proved fatal to the success of the overall operation, which was designed to ultimately destroy the State of Israel in a *coordinated* multi-front attack.

### C.    Palestinian Islamic Jihad (PIJ)

876.    PIJ was founded in 1981 by Fathi Shiqaqi and Abd al-Aziz Awda (also known as Sheikh Obdeh).

877.    PIJ seeks "the establishment of an Islamist Palestinian state and the destruction of the state of Israel. The Islamic Jihad believes Palestinian liberation and the seizure of Jerusalem for the Islamic world would serve as a catalyst for a wider Islamic revolution across the Arab and Muslim world."

878.    PIJ has long been known for executing terrorist attacks targeting Israeli civilians.

879.    For example, in 1995, PIJ claimed responsibility for a deadly string of terrorist attacks, including twin suicide bombings in January that killed 21 people in Beit-Lid, an attack in April that killed eight people in Kfar Darom, and a suicide bombing in August that killed five people in Jerusalem.

880.    As noted above, because of PIJ's history of conducting terror attacks, the United States designated PIJ as an SDT in 1995 under E.O. 12947; an FTO in 1997 under 8 U.S.C. § 1189; and an SDGT in 2001 under E.O. 13224.

881.    In the past 15 years, PIJ's forces in Gaza have focused on developing capabilities for rocket attacks. By one estimate, between 2005 and 2015, Hamas, PIJ, and other Gaza-based terrorists fired more than 12,000 rockets into Israel, killing at least 10 Israelis, injuring more than 1,100, and causing more than $50 million in property damage.

882.    From February 23-24, 2020, PIJ fired nearly 100 rockets toward Israel causing at least a dozen injuries. And from May 10-21, 2021, PIJ, together with Hamas, fired more than 4,000 rockets toward Israel, killing 11 civilians and one soldier.

883.    From August 5-7, 2022, PIJ fired approximately 1,100 additional rockets at Israel.

884.    As part of the "Axis of Resistance" and under Hamas's direction as part of the Joint Operations Room in Gaza, PIJ actively participated in the October 7 Attacks and the subsequent attacks on Israeli soldiers in the Gaza Strip in the two years that followed.

**D.    Hezbollah**

885.    Hezbollah is the dominant political and military power in Lebanon, and one of the world's deadliest terrorist organizations, as well as the world's most heavily-armed non-state actor.

886.    Hezbollah first emerged during the Lebanese civil war in the early 1980s as a militia comprising Shi'a followers of Ayatollah Ruhollah Khomeini.

887.    Hezbollah's aims and goals were published in February 1985 in a letter entitled "The Hezbollah Program."

888.    The Hezbollah Program states: "We are the sons of the umma–the party of God the vanguard of which was made victorious by God in Iran.…We obey the orders of one leader, wise and just, that of our tutor and *faqih* who fulfills all the necessary conditions: Ruhollah Musawi Khomeini," who was the Supreme Leader of Iran at the time. With respect to the United States, the Hezbollah Program states:

> The US has tried, through its local agents, to persuade the people that those who crushed their arrogance in Lebanon and frustrated their conspiracy against the oppressed (mustad'afin) were nothing but a bunch of fanatic terrorists whose sole aim is to dynamite bars and destroy slot machines. Such suggestions cannot and will not mislead our umma, for the whole world knows that whoever wishes to oppose the US, that arrogant superpower, cannot indulge in marginal acts which may make it deviate from its major objective. ***We combat abomination and we shall tear out its***

*very roots, its primary roots, which are the US. All attempts made to drive us into marginal actions will fail, especially as our determination to fight the US is solid.*[105]

889.    Hezbollah pursues those objectives through violent terrorist activity including suicide bombings, assassinations, hostage takings, hijackings, and, more recently, firing rockets, mortars, and missiles.

890.    For example, Hezbollah committed infamous and deadly attacks on U.S. citizens in Beirut including the April 18, 1983, car bomb attack on the U.S. Embassy, which killed 63 Americans; the October 23, 1983, truck bomb attack on the U.S. Marine barracks, which killed 241 Americans; and the September 20, 1984, car bomb attack on the U.S. Embassy annex, which killed 24 Americans.

891.    Hezbollah is also responsible for the 1996 bombing of the Khobar Towers in Saudi Arabia, which killed 19 U.S. service members, and wounded 498.

892.    Hezbollah also assists the IRGC and the IRGC-QF in their terror operations outside of Lebanon.

893.    While the IRGC–QF is responsible for managing Iran's terror campaigns abroad, it has lacked Hezbollah's operational and tactical experience in developing terrorist capabilities and performing terrorist attacks against a modern military force.

894.    Moreover, as an ethnically Persian, Farsi-speaking entity, the IRGC-QF was at a disadvantage in recruiting and training Arabic-speaking recruits, whether Shi'a Iraqis, Yemeni Houthis, or Palestinians.

895.    For that purpose, the IRGC–QF has long turned to Hezbollah, Iran's most important terror proxy, which has hard-earned experience in running terror campaigns against the IDF in

---

[105]    *Doctrine of Hezbollah*, Wilson Ctr. (Oct. 20, 2023), https://www.wilsoncenter.org/article/doctrine-hezbollah.

Lebanon, and which shares ethnic and cultural connections with Iraqis and to a lesser extent Palestinians.

896.    At the IRGC's direction, Hezbollah and the IRGC–QF have worked symbiotically for decades to develop Iran's proxy capabilities throughout the region—with a special emphasis on creating and strengthening Iran's "Ring of Fire" enveloping Israel.

897.    After the 2003 U.S. invasion and overthrow of Saddam Hussein's regime in Iraq, Iran directed Hezbollah to create "Unit 3800" and began devoting increasing financial resources to gain influence in Iraq and inflict casualties on American service members in Iraq.

898.    Hezbollah's Unit 3800 was established by Hassan Nasrallah, Hezbollah's then-leader (he was assassinated by Israel in 2024), at Iran's direction to support Iraqi Shi'a terrorist groups targeting Multi-National Forces in Iraq.

899.    Unit 3800 trained and advised various Shi'a militias in Iraq, later termed "Special Groups."

900.    Hezbollah training camps in southern Lebanon and Iran, as well as Hezbollah's expertise in the use of military-grade roadside Improvised Explosive Devices (IEDs), kidnapping, communications, and small-unit operations, were critical to the IRGC's operations in Iraq between 2004 and 2011.

901.    According to U.S. intelligence estimates, following the 2007 arrest of Hezbollah's senior operative in Iraq, the IRGC-QF provided Hezbollah and one of its local trainers up to $3 million in U.S. currency every *month*.

902.    As noted above, Hezbollah was designated as an SDT in 1995 under E.O. 12947; an FTO in 1997 under 8 U.S.C. § 1189; and an SDGT in 2001 under E.O. 13224.

903.    In addition, the United States has designated numerous Hezbollah leaders and fundraisers as SDNs, thereby freezing their assets, as a result of their activities for Hezbollah.

## VI.    ZERO HOUR: OCTOBER 7, 2023[106]

904.    The massacres of October 7, 2023, and the ensuing conflict between the State of Israel and Iran's "Axis of Resistance," were the culmination of a multigenerational terror campaign sponsored by Iran, implemented by the IRGC, and spearheaded by Hamas. They were intended as a first salvo in a final campaign to destroy the State of Israel.

905.    As noted above, in July 2018, Hamas established a Joint Operations Room in Gaza to coordinate with 12 "resistance factions" active in Gaza, including PIJ, PFLP, Al-Aqsa Martyrs Brigades ("AAMB") and Popular Resistance Committees ("PRC"). The Joint Operations Room united the disparate terrorist organizations operating in the Gaza Strip under one command and worked to coordinate their activities.

906.    As stated above, since at least 2021, senior officials from Hezbollah, Hamas, PIJ, and the IRGC have gathered at the "Joint Operations Room" in Beirut, Lebanon, to plan coordinated attacks against Israel. Muhammad Izadi, who headed the IRGC-QF's Palestinian Office in Lebanon, frequently oversaw these meetings.

907.    As Hamas regrouped after its latest round of fighting with Israel in May 2021, the broad outlines of its "Big Project" came into sharper focus, and Hamas's relationship with Iran took on even greater importance.

908.    According to a report by *The New York Times*, on October 12, 2024, Hamas documents recovered by the IDF first hint at the October 7 Attack in January 2022, "when the

---

[106]    A significant portion of the summary of the events of October 7 described in this Section is derived from the published 7 October Parliamentary Commission Report, chaired by Lord Andrew Roberts and compiled by the UK-Israel All Party Parliamentary Group. The Report is available at https://www.7octparliamentarycommission.co.uk/ (last visited Nov. 17, 2025).

minutes [of the meeting] show that Hamas leaders discussed the need to avoid getting dragged into minor skirmishes to focus on 'the big project.' Israeli intelligence officers found that Hamas leaders repeatedly used the same phrase in similar contexts …."

909.    According to *The New York Times*, at a meeting in May 2023, Hamas leaders said that they wanted to commit the October 7 Attacks by the end of 2023 because Israel had announced that it was developing a new type of laser that could destroy Hamas rockets more effectively than its current air defense system (the Iron Dome and David Slingshot).

910.    On June 19, 2023, Hamas leader Ismail Haniyeh also met with a delegation of high-level Iranian security and military officials. Haniyeh, accompanied by his deputy Saleh al-Arouri and other Hamas figures, also met with the IRGC chief, Hossein Salami, and a number of his aides over a period of three days.

911.    As stated above, by August 2023, IRGC-QF commanders established a pattern of biweekly coordination sessions in the Lebanon Joint Operations Room, bringing together representatives from Hamas, PIJ, Hezbollah, and additional Iranian-backed terror groups. Iranian foreign minister Hossein Amir-Abdollahian participated in no fewer than two of these meetings.

912.    Hezbollah's Hassan Nasrallah held a public meeting with representatives from Hamas and PIJ on August 13, 2023.

913.    Saleh al-Arouri appeared in a comprehensive interview on Hezbollah's Al-Mayadeen television channel on August 25, 2023, in which he articulated Hamas's view of its relationship with Israel, outlined preparations for a coordinated large-scale confrontation involving the Axis of Resistance, and described the anticipated character of such a campaign.

914.    Al-Arouri met with Nasrallah again on September 2, 2023. Within four days, al-Arouri spoke to *Al Jazeera*, reiterating his position that a final confrontation with the enemy was

approaching.

915.    Hamas posted an article to the Qassam Brigades' official website on September 2, 2023, cautioning about the likelihood that "the enemy will launch a new aggression, one of the manifestations of which will be the assassination of the leaders of the resistance [Hamas] inside [Palestine] or outside [Palestine]" and warning that such action would trigger "a severe reaction on the part of the Palestinian resistance, and may develop into the entry of other fronts into the front line, such as (Syria, Lebanon), and it is possible that other fronts will join in their wake."

916.    According to reporting by *The Wall Street Journal*, the coordination sessions in the Joint Operations Room in Beirut reached a critical point with an October 2 meeting at which Iran authorized Hamas, PIJ, and the other Iran-backed groups to execute their pre-arranged assault on Israel, supported by Iranian intelligence, training programs, and military equipment.

**A.    Saturday, October 7**

917.    Saturday, October 7, 2023, was the Jewish holiday of Simchat Torah, often celebrated in Israel by families spending time together at home, including IDF personnel who often received a "weekend pass" to go home for the holiday weekend.

918.    It was also the 50th anniversary of the Yom Kippur War, the most devastating war in Israel's history—itself a surprise attack intentionally launched on a Jewish holiday.

919.    It was on this day that Hamas shattered the dawn with its brutal invasion of southern Israel, resulting in the single deadliest day for the Jewish people since the Holocaust. More than 1,200 men, women, and children were brutally murdered. Many victims were raped, and 251 were taken hostage.

**B.    Geography of the Attack**

920.    The attack on Israel started with combined air, sea, and land incursions from the

Gaza Strip into the Gaza border communities in Israel, collectively known as the "Gaza Envelope."

921.    The Gaza Envelope stretches along Israel's southwestern border, with communities situated primarily along Route 232, the main north-south highway that runs parallel to the Gaza border. This area includes "kibbutzim," collectivist communities such as Be'eri, Kfar Aza, Nir Oz, Nirim, Re'im, Nahal Oz, and Mefalsim; "moshavim," cooperative agricultural communities like Netiv HaAsara, Mivtahim, and Yesha; development towns like Sderot, built to provide permanent housing for large influxes of Jewish immigrants expelled from Arab countries and Holocaust survivors from Europe who arrived to the newly established State of Israel; and Bedouin communities (the Bedouin are Muslim Arabs; those living in Israel are generally Israeli citizens and many serve in the IDF).

922.    These communities have experienced decades of security threats due to their proximity to Gaza, and yet many advocated for peace.

923.    Kfar Aza was particularly prominent for the peace activism of its residents and hosted an annual festival during which kites were sent to Gaza with messages of peace (Hamas previously launched incendiary kites and balloons over the Gazan border to start fires in Israel).

924.    Some of Israel's most prominent peace activists lived at Kibbutz Be'eri, and many residents were volunteers with organizations such as "The Road to Recovery," which took cancer patients from Gaza to Israeli hospitals. After the Second Intifada prompted the Israeli government to halve Palestinian work permits, Kibbutz Be'eri established a pool of money to support its former employees from Gaza, one that donated thousands of shekels per month to Gazan families. The night before the attack, the community celebrated its 77th anniversary. The party brought former residents and other guests to the kibbutz for the weekend. That kibbutz had the second largest casualty count from the October 7 Attack.

925.    Kibbutz Nir Oz was home to several prominent peace activists, including Oded and Yocheved Lifshitz, who were both kidnapped to Gaza. Oded was a human rights journalist and volunteered in an organization that drives Gazans to medical treatment in Israel. He was held for 503 days in Gaza before his body was returned for burial in Israel. The kibbutz also employed more than 100 Gazans. Nir Oz had the third highest number of civilian deaths of any community attacked on October 7, 2023, and the highest number of people kidnapped to Gaza—including 15 children and 21 people over 70. People from Nir Oz made up a third of the 251 hostages taken on October 7, 2023.

926.    Hamas targeted these specific towns and villages in the Gaza Envelope: Holit, Sufa, Nir Yitzhak, Pri Gan, Talmei Yosef, Mivtachim, Yesha, Amioz, Magen, Nir Oz, Nirim, Ein Hashlosha, Kissufim, Re'im, Be'eri, Alumim, Nahal Oz, Kfar Aza, Mefalsim, Yachini, Nir Am, Sderot, Netiv HaAsara, Karmia, Zikim Beach, and Ofakim, as well as public spaces and outdoor festivals, such as the Nova Music Festival near Kibbutz Re'im and the Psyduck music festival located between Nirim and Nir Oz. Ofakim was the easternmost town attacked on the ground that day.

### C.    Hamas's Rocket Barrage Overwhelms Israel's Defense Systems

927.    The October 7 Attacks began with a first phase of infiltration that Hamas called the "blinding plan" to ensure minimum resistance to infiltration. This phase involved a coordinated rocket bombardment of unprecedented size, aimed in the direction of civilian targets in the Gaza Envelope and elsewhere in Israel, including the cities of Ashkelon, Tel Aviv, and Jerusalem.

928.    Hamas terrorists began heading toward the border fence at roughly 6:15 a.m.

929.    At 6:29 a.m., rocket alerts sounded in over 30 Israeli communities as rockets were launched from Gaza toward Israel. The rockets were primarily short-range unguided "Qassam"

and "Quds" rockets manufactured in Gaza, along with (1) Russian-designed BM-21 "Grad" 122mm rockets, with Chinese-made extended-range versions, (2) Iranian Fajr-5 derivatives (M75) with 75 km range, (3) long-range rockets including Syrian-made "Khaybar" rockets (100 km range) and A-120 missiles (120 km range), and (4) SH-85/Ayyash 250 rockets with 220 km range. Hamas forces also fired hundreds of Katyusha-style 107mm unguided rockets from multi-launch rocket systems at the communities and army bases around Gaza, together with 120mm mortar rounds, many of which landed on and around Route 232 throughout the day.

930.    Nearly 4,000 rockets and mortars were fired on Saturday, followed by further barrages on October 8 and 9.

931.    The Iron Dome intercepted missiles, unintentionally masking the sound of snipers systematically eliminating cameras along the border fence. Simultaneously, 100 remotely operated drones targeted watchtowers equipped with machine guns and cameras that are connected to the border's thermal imaging sensors and to optical and radar detection systems. Hamas also dropped incendiary explosives from drones, fired rocket-propelled grenades ("RPGs"), and used sniper fire to attack several Sentry Tech systems along the border.

### D.    Hamas Attacks by Ground, Air, and Sea

932.    Thus began the first wave of the ground attack, during which approximately 30 breach points in the security fence were assaulted simultaneously. Trained terrorists began blowing holes in the security fence using a wide range of explosives and munitions. Video footage from a fence infiltration near Kibbutz Be'eri captured terrorists fixing explosives and propping an anti-tank mine against the fence. Other methods to breach the fence included detonating a strip-and-frame charge explosive; this was one of the many weapons Hamas specially created for the attack and was also designed to be affixed to home saferoom doors in Israeli border communities. IEDs

were used to target and breach both wire fences and concrete walls. Tractors were deployed to dismantle sections of the barrier. Cutting charges and shaped explosives were used to sever metal beams and posts.

933.    With the surveillance systems around the border down, and Israel's defenses blinded, it took mere minutes for Hamas terrorists to cross into Israel. Specialized engineering teams were dedicated to breaking through barriers using tools like Bangalore Torpedo-type charges, linear shaped charges, and other explosives. Folding bridges were prepared to overcome obstacles, like concrete walls, enabling motorcycles and vehicles to cross.

934.    Most Hamas Nukhba commandos and regular Qassam Brigades troops crossed the border and drove to targeted communities in white Toyota pick-up trucks and on motorcycles. At Sderot and a few other places they also arrived in Israel in cars stolen or hijacked that morning. Advance teams of Hamas commandos arrived at some targets in powered two-man paragliders. At Zikim, north of the Gaza Strip, they came by sea in rigid inflatable boats. A small number of Hamas vehicles used in the October 7 Attacks were "technicals"–pickup trucks mounted with heavier weapons.

935.    Some terrorists wore fatigues to resemble Israeli army uniforms or were dressed like Israeli police to confuse Israeli security forces and civilians. Some carried radios for communication and zip ties to restrain hostages. Some wore "Go-Pro" or other body cameras that allowed them to capture video footage of the horrific acts they committed that day.

936.    The thousands of Gazan civilians who followed Hamas troops through the border breaches and joined in the attacks on nearby communities came in every kind of vehicle: in pick-up trucks, in private cars, on all-terrain vehicles, on motorcycles, on bicycles—especially the teenage and pre-teenage boys who joined in the looting of Be'eri and other kibbutzim—and on

foot. Many returned to Gaza in stolen vehicles, including golf carts and tractors.

937.    By the end of the day, the border had been breached in 119 locations – equivalent to nearly three breaches per mile. Breaches were as big as bulldozed holes in the fence and as small as a gap between two concrete slabs.

938.    The ground invasion was accompanied by airborne and naval breaches. Video footage of the early morning rocket attacks shows motorized paragliders crossing into Israel above the fence and below the rocket fire. In addition, photos captured paragliders over Kfar Aza airspace at 6:32 a.m. and Moshav Netiv HaAsara at 6:34 a.m. At approximately 6:40 a.m., motorized paragliders could be seen airborne in the distance from the Nova Music Festival site.

939.    During the morning's first rocket attacks, which also targeted Israeli naval facilities, four dinghies with 35 armed terrorists exited the Gaza fishing zone and entered Israeli coastal waters. Four fast boats of Hamas naval commandos approached, carrying 35 terrorists of the Naval Nukhba. At the same time, Hamas terrorists fired anti-tank missiles at the Israeli Navy's observation posts. The Israeli Navy's 916th Patrol Squadron sunk three of the approaching Hamas vessels. The fourth landed on Zikim Beach at about 6:45 a.m., offboarding an estimated 11 terrorists. The Israeli Navy alerted the rapid response unit of Kibbutz Zikim that there was an active infiltration situation at 6:34 a.m. Hamas frogmen found in the area were neutralized by the Navy's Snapir unit–the harbor security force.

**E.    Hamas Infiltrates Civilian Communities, IDF Outposts, and Highways**

940.    Kibbutz Kfar Aza was the first civilian community Hamas infiltrated, with motorized paragliders entering the airspace of the community at 6:32 a.m.; the last of these communities Hamas infiltrated was Moshav Yated, which Hamas reached at approximately 9:15 a.m.

941.    In the communities where the attackers were able to breach the fences and overwhelm any organized internal defense, the terrorists went from house to house killing civilians who hid in the bomb shelters and "safe rooms" Israel requires for private buildings and newer family homes, respectively. These safe rooms are designed solely to protect against rockets, mortars, or aerial bombardment. They are not secure rooms intended to keep intruders out. In fact, they are meant to allow rescuers access in the event of a bombing and, therefore, do not have locks on the doors.

942.    Over the course of the day, many residents fought to keep the door handles of their safe rooms closed from terrorists, and many were killed after being shot through the door or after the terrorists threw grenades inside. Other residents were burnt alive or died from smoke inhalation when terrorists purposely set fire to the houses, knowing that civilians were hiding in their safe rooms.

943.    Additionally, buildings built before 1992 were not legally required to include internal shelters. Therefore, residents living in those pre-1992 buildings were forced to run to community shelters. In Ofakim, terrorists specifically targeted older neighborhoods, knowing that residents would be running from their homes to these shelters. Many were killed while attempting to reach or return from the shelter.

944.    The Israeli villages that were under the control of the terrorists for several hours experienced high numbers of atrocities, such as torture, rape, and the mutilation of the dead. There was widescale damage from the attacks and purposeful destruction of property, including arson attacks.

945.    According to the U.S. Secretary of State, after reviewing some of the footage and pictures from the day: "It's hard to find the right words. It's beyond what anyone would ever want

to imagine, much less, God forbid, experience…. A baby, an infant, riddled with bullets. Soldiers beheaded. Young people burned alive. I could go on, but it's simply depravity in the worst imaginable way."[107]

946.    The worst affected communities were Kibbutz Kfar Aza, Kibbutz Be'eri, and Kibbutz Nir Oz. At Be'eri over 100 civilians were killed, and 62 at Kfar Aza.

947.    231 of the 251 hostages were taken from these communities. Nir Oz suffered the most kidnappings with 75 hostages taken alive to Gaza and a further seven bodies kidnapped.

948.    The attacks on the kibbutzim and moshavim were aided by the simultaneous attack on the IDF outposts and bases in the area, which as part of their official functions act as a first line of defense in the area. This prevented Israeli forces from coming to the aid of the civilian communities.

949.    Terrorists attacked the Re'im army base, which is the headquarters of the IDF's Gaza Division, taking control of the base before the IDF repelled them later in the day on October 7. They also attacked the army base at Nahal Oz, killing more than 60 Israeli soldiers and taking six as hostages.

950.    Hamas also attacked military posts at key crossing sites, including at the Erez checkpoint, in the north of Gaza, and the Kerem Shalom crossing, located near Israel's border with Egypt. They attempted to take over the base in Zikim, the site of the amphibious landing.

951.    Further adding to the chaos of the day was the deliberate sabotage of communication networks by the terrorists as part of the border breach and hits on observation outposts. It took hours for the Israeli response units to fully understand what was happening.

---

[107]    Shannon C. Crawford, *Blinken describes images of Hamas attack victims, pledges US support on trip to Israel*, ABC NEWS (Oct. 12, 2023), https://abcnews.go.com/International/blinken-meets-hamas-attacksurvivors-pledges-us-support/story?id=103925374.

952.    Hamas also took strategic control of the main highway, Route 232. Route 232 is the main north-south highway in the Gaza Envelope, running parallel to the Gaza border and connecting over 20 rural communities. On October 7, 2023, Hamas strategically seized control of this critical artery, murdering nearly 300 people along a 33-mile stretch. The highway became a killing zone as Hamas set up ambushes at 37 separate locations along the road, targeted civilians at major intersections and junctions, attacked roadside rocket shelters filled with Nova festival escapees, and ambushed responding security forces and medical personnel.

953.    By 7:30 a.m., Shahar HaNegev junction (the intersection between Route 232 and Highway 34) was under full terrorist control. The main intersections along Route 232, including the Re'im intersection and Gamma Junction, were taken in the next 10 minutes. This created chokepoints which prevented the entry of security and emergency services who tried to respond to the attack, as well as preventing civilians from escaping. By doing so, the terrorists effectively created a confined killing zone, which enabled maximum bloodshed.

### F.    The Terrorists Committed Successive Waves of Attacks on Compromised Communities

954.    The first wave of attacks was led by Hamas's elite Nukhba Forces, followed over the next two to three hours by Hamas "regular" corps of terrorists, the Qassam Brigades, together with other Palestinian militias and terror groups, including Al-Quds Brigades (Palestinian Islamic Jihad), the Abu Ali Mustafa Brigades (Popular Front for the Liberation of Palestine), the Jihad Jibril Brigades (Popular Front for the Liberation of Palestine-General Command), the National Resistance Brigades (Democratic Front for the Liberation of Palestine), the Nassar Salah Al-Din Battalions (Popular Resistance Committees), the Al-Aqsa Martyrs Brigades, the Holy Warriors' Battalions (Mujahideen), and the Al-Ansar Brigades (Al-Ansar Movement).

955.    Then, in midmorning, there was a third invasion from Gaza by several thousand

Gazan civilians instructed or encouraged by Hamas officials to engage in looting and kidnapping.

G.    **Attack on the Nova Music Festival**

956.    In the early morning hours of October 7, 2023, between 3,000-4,000 young people were celebrating at the Nova Music Festival in Kibbutz Re'im in southern Israel. The event, scheduled to coincide with the end of the Sukkot holiday, was in full swing—DJs played electronic music on two stages as attendees danced under colorful tarpaulins or rested in tented camping areas.

957.    At approximately 6:29 a.m., the sky filled with rockets launched from Gaza. The music initially drowned out the sound of incoming fire.

958.    Festival organizers quickly cut the music. A producer shouted "Tseva Adom" (Red Alert) through the speakers, ordering everyone to lie on the ground. Shortly afterward, police ordered a complete evacuation of the site. In the confusion, thousands rushed to their vehicles, creating traffic jams at the exits.

959.    What no one at the festival realized yet was that this was not just a rocket attack. Hamas fighters had breached the Gaza border and were systematically setting up ambush points along Route 232, the main escape route from the festival. By 8:00 a.m., pickup trucks carrying Hamas Nukhba commandos arrived at the festival grounds from both the north and south. The small contingent of police officers, armed only with pistols, were quickly overwhelmed by terrorists with assault rifles, machine guns, and RPGs.

960.    With the site under their control, Hamas gunmen began methodically hunting for survivors, targeting those trying to flee. Some attendees abandoned cars and ran across open fields, where they were pursued by gunmen on motorcycles and in trucks. Others hid under festival stages, inside portable toilets and in trash containers. Many fled to nearby concrete rocket shelters along

Route 232, which became death traps when terrorists threw grenades inside.

961.    About 20 people crowded into an ambulance for protection. Hamas terrorists discovered them, fired at the vehicle, and then launched a thermobaric RPG inside, killing 18 of the 20 people.

962.    Those who managed to escape the festival tried to take refuge in roadside concrete shelters along Route 232. At the Be'eri shelter, with its distinctive mural of a girl blowing bubbles, Hamas terrorists fired hundreds of rounds into the crowded space and tossed grenades inside.

963.    At the Re'im west shelter, Hersh Goldberg-Polin lost part of his arm to a grenade explosion and was later taken hostage, dragged by his hair into a pickup truck while bleeding heavily.

964.    Military and police reinforcements arrived only around noon, about four hours after the initial assault began. By then, the terrorists had killed 375 people, making it the deadliest concert attack in history.

965.    First responders discovered scenes of unimaginable brutality. Bodies were strewn across the festival grounds—in the bar, medical tent, camping area, dancing space, parking lots, and portable toilets. Evidence indicated many victims had been raped and sexually assaulted before being killed, with women found tied to trees and stripped of clothing. Many bodies showed signs of deliberate mutilation or had been intentionally burned.

966.    The 375 victims represented a cross-section of Israeli society: young people from cities and kibbutzim, Arab Israelis, Bedouins, foreign nationals, security guards, and first responders.

H.    **Hostage-Taking into Gaza**

967.    Hamas abducted 251 hostages on October 7, 2023, into Gaza. Of these, 210 people

were taken alive; 41 bodies were abducted after they had been killed. Their families were placed in a nightmarish state of limbo, not knowing the fates of their loved ones, what they were experiencing, or whether they would ever see them again. The hostages simply vanished.

968.    Evidence indicates that hostage-taking was a premeditated part of the attack plan, with Hamas having prepared a manual titled "How to take captives" that included instructions on separating hostage groups and methods of controlling them.

969.    Among the 210 living hostages, 176 held Israeli nationality (51 with dual citizenship from 14 different countries), while others were Thai, Philippine, Nepalese, and U.S. nationals. The vast majority (197) were civilians, while 13 were military personnel. Nearly half of those taken (102) were women and children, including 35 children under 18 years old. The youngest hostage was Kfir Bibas, only nine months old, and the oldest was 85-year-old Shlomo Mantzour.

970.    The hostages were taken from multiple locations, with the largest numbers coming from Kibbutz Nir Oz (75), the Nova Music Festival (34), Kibbutz Be'eri (27), and Kibbutz Kfar Aza (20). The abductions involved breaking into family homes across seven kibbutz communities, impacting 44 families. Many hostages were forced to witness their family members being murdered before they were taken.

971.    Documentation through videos, CCTV footage, and bodycams worn by terrorists revealed that many hostages suffered abuse during their abduction, including physical assault, verbal abuse, sexual assault, and degrading treatment. Footage showed hostages bound, partially undressed, beaten, and threatened. According to testimony from released hostages, this abuse continued during captivity and included sunlight deprivation, starvation, binding, beatings, sexual abuse, and other degrading and terrorizing treatment.

## I.    The Tunnel System

972.    Hamas used the Gaza tunnel system that it built beneath, into, and through various properties to transport and hide many of the hostages they captured during the October 7 Attacks.

973.    In the days leading up to October 7, Yahya Sinwar was seen fleeing into the tunnels with his family. It is from there that Sinwar ordered the October 7 Attacks to begin.

974.    Yocheved Lifshitz, an 85-year-old hostage who was released after several weeks in captivity, described the vast network of tunnels as looking like a spider web.

975.    Aviva Siegel, a resident of Kfar Aza who was taken hostage in Gaza for 51 days, described being pushed down into a tunnel during the October 7 Attacks. She described being locked in a tunnel with another hostage and left for days on end without food.

976.    Sapir Cohen, a young woman taken hostage in Gaza for 55 days, recalled being moved from homes above-ground to the tunnels, which were filled with mold, lice, and bed bugs.

977.    Qaid Farhan Alkadi, a Bedouin Arab Israeli, was rescued by the IDF from a tunnel under southern Gaza after 326 days in captivity.

978.    In July 2024, the bodies of five hostages—Ravid Katz, Oren Goldin, Maya Goren, Sgt. Kiril Brodski, and Staff Sgt. Tomer Yaakov Ahimas—were recovered from a tunnel located underneath an Israeli-designated humanitarian zone in the southern Gaza city of Khan Yunis.

979.    In August 2024, the bodies of six hostages—Israeli American Hersh Goldberg-Polin, Ori Danino, Eden Yerushalmi, Almog Sarusi, Alexander Lobanov, and Carmel Gat—were recovered by the IDF in a tunnel underneath the southern Gaza city of Rafah after having been executed at close range. The IDF reported that the hostages had been held there for days prior to their murders.

**J.**    **Hamas's Use of Hostages as Bargaining Chips**

980.    Hamas used the hostages to effect multiple goals. It placed them as human shields—for example, Israel located members of Hamas's leadership in Gaza but could not strike without risking injury to the hostages they kept with them as personal shields.

981.    Through the kidnappings, Hamas also attempted to influence Israeli and U.S. policy in other ways by presenting taped messages by hostages to the media to intimidate and demoralize the Israeli government and civilian population and to affect the conduct of both the Israeli and American governments in the way they approached the conflict.

982.    Most critically, Hamas used the hostages as bargaining chips. As noted above, Hamas has a history of this strategy, releasing Israeli soldier Gilad Shalit in 2011 in exchange for over 1,000 Palestinian prisoners (including Sinwar) after holding him for over five years.

983.    During the weeklong truce in late November 2023, 105 hostages were released (and four were released before that) in exchange for hundreds of Palestinian terrorists held in Israeli prisons.

984.    Hamas then released 33 Israeli women, children, civilian men over 50, and those deemed "humanitarian cases" during the hostages-for-terrorists exchange and ceasefire which took effect from January 19 to March 18, 2025. Eight more hostages were returned dead, including Ariel and Kfir Bibas, aged four and nine months, respectively, as well as their mother Shiri. During the first phase, Hamas also released five Thai nationals.

985.    On October 13, 2025, the final 20 living hostages held by Hamas were released from Gaza after 737 days in captivity. This release occurred under the first phase of a ceasefire agreement brokered by the United States between Israel and Hamas. One additional living hostage, Edan Alexander, an American-Israeli citizen who served in the IDF, had been released separately

in May 2025 following negotiations between Hamas and the Trump administration, after 583 days in captivity.

986.    In total, 168 hostages returned alive to Israel, including eight rescued by Israeli security forces and numerous others released through negotiated exchanges and ceasefire agreements.

987.    Additionally, the bodies of 57 hostages have been recovered through Israeli military operations, including three hostages who were mistakenly killed by Israeli troops after escaping captivity, and one soldier whose body Hamas had held since 2014.

988.    However, a handful of hostage bodies still remain in Gaza as of this date, despite the ceasefire agreement requiring Hamas to return all deceased hostages.

### K.    Israel's Response to October 7 in Gaza

989.    In response to the October 7 Attacks, Israeli ground operations in the northern Gaza Strip began on October 27, 2023, with advances along three axes: a southward drive along the western coast toward al Shati camp, a southwestward drive into Beit Hanoun, and a westward drive from Juhor ad Dik to the western coast, thereby cutting the Gaza Strip in half and isolating the northern Strip from the southern Strip.

990.    Over approximately 22 months of active combat operations (interrupted by temporary ceasefires in late 2023 and early 2025), the IDF engaged in violent confrontations with Hamas and other terrorist groups seeking to inflict casualties on Israeli forces in the Gaza Strip.

991.    To date, more than 900 IDF soldiers, including several dual U.S.-Israeli citizens, have been killed and many more injured (often severely). As described above, many of those held by Hamas and its co-conspirators, some of them U.S. citizens, were murdered by their captors.

992.    Hamas specifically prepared for the IDF's incursions, and ambushing and killing

as many IDF soldiers as possible was part of the larger October 7 plan.

993.    Hamas used its attack tunnels to evade capture and ambush Israeli forces.

994.    During the IDF's counterstrikes, Hamas leaders took refuge in their tunnels to hide from the attacks, regroup, and rearm.

## VII.    PLAINTIFFS

### A.    The Balva Family

995.    Omer Balva was a citizen of the United States and a resident of Montgomery County, Maryland, when he was murdered by Hezbollah on October 20, 2023. He was 22 years old.

996.    Omer returned to Israel from his home in Maryland, shortly after the October 7 Attacks. Omer and his childhood friend spent Omer's last night in Maryland packing a duffel bag.

997.    On Friday, October 20, 2023, Omer was killed at Netu'a, a moshav[108] in northern Israel near the Lebanese border, after being struck by an antitank missile fired by Hezbollah from Lebanon.

998.    Omer's parents, Eyal Balva and Sigalit Balva, bring this action on behalf of the Estate of Omer Balva.

999.    Plaintiff Eyal Balva also brings this action individually. He is a citizen of the United States and is a resident of the State of Maryland. He is the father of Omer Balva.

1000.    Plaintiff Sigalit Balva also brings this action individually. She is a citizen of the United States and is a resident of the State of Maryland. She is the mother of Omer Balva.

1001.    Plaintiff Shahar Balva is an Israeli citizen and a resident of the State of Maryland. She is the sister of Omer Balva.

---

[108]    A moshav refers to an Israeli cooperative farming village.

1002.   Plaintiff Itai Haim Balva is a citizen of the United States and is a resident of the State of Maryland. He is the brother of Omer Balva.

1003.   Plaintiff Barak Balva is a citizen of the United States and is a resident of the State of Maryland. He is the brother of Omer Balva.

1004.   As a direct and foreseeable result of the October 20, 2023, attack, the Plaintiff Estate of Omer Balva suffered conscious pain and suffering and economic loss.

1005.   Plaintiffs Eyal Balva, Sigalit Balva, Shahar Balva, Itai Haim Balva, and Barak Balva have experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on and death of Omer Balva.

**B.    The Shalom Family**

1006.   Ram Shalom was a citizen of the State of Israel when he was murdered by Hamas on October 7, 2023. He was 24 years old.

1007.   Ram was attending the Nova Music Festival near Kibbutz Re'im in Israel. He was there with 10 friends when the festival was overrun by Hamas terrorists, who proceeded to massacre more than 350 civilians.

1008.   At 6:30 a.m. on October 7, Ram and his friends fled the festival at the sight and sounds of rockets.

1009.   By around 8:00 a.m. on October 7, Ram had escaped the Nova festival by car. An hour or two later, he and his friend left the car to hide and shelter by the side of the road. As shooting erupted around them, they remained quiet. In a surviving video taken from where Ram was sheltering among vehicles to the side of the road, automatic gunfire can be heard, followed by Ram observing: "these are not soldiers, they are terrorists."

1010.   Shortly thereafter, the terrorists approached Ram's hiding spot. Ram was determined not to allow himself and those around him to be executed. He attacked one of the

terrorists, but other terrorists fired an RPG at Ram's position, murdering Ram, and most of those hiding with him.

1011.   For the next few hours, Ram's mother, Nurit, and his brother, Plaintiff Tom Shalom, made every call and inquiry they could to locate Ram. For hours and then days, they heard nothing.

1012.   On October 9, 2023, Tom flew to Israel. No news of Ram arrived for two more days.

1013.   On October 12, 2023, two army officers knocked on Nurit Shalom's door. They informed Nurit and Tom that Ram had been murdered on October 7.

1014.   Thousands attended Ram's funeral and visited during the shiva period. Tom stayed in Israel for weeks trying to piece together Ram's final moments.

1015.   Plaintiff Tom Shalom is a citizen of the United States. He is the brother of Ram Shalom.

1016.   As a direct and foreseeable result of the October 7 Attacks and the death of Ram Shalom, Plaintiff Tom Shalom has suffered severe mental anguish and extreme emotional distress, and economic loss.

### C.    The Sasi Family

1017.   Plaintiff Avraham Sasi was a citizen of the United States and a resident of the State of California when he was murdered by Hamas on October 7, 2023. He was 64 years old.

1018.   Avraham was the fourth of 12 siblings in a close-knit family. He married Plaintiff Ester Sasi in 1982, and the couple raised three daughters – Plaintiffs Moran Sasi, Danielle Sasi, and Natalie Sasi – in Woodland Hills, California.

1019.   Plaintiff Ester Sasi is a citizen of the United States and a resident of the State of California. She is the wife of Avraham Sasi.

1020.   Plaintiff Moran Sasi is a citizen of the United States and a resident of the State of California. She is the daughter of Avraham Sasi.

1021.   Plaintiff Danielle Sasi is a citizen of the United States and a resident of the State of California. She is the daughter of Avraham Sasi.

1022.   Plaintiff Natalie Sasi is a citizen of the United States and a resident of the State of California. She is the daughter of Avraham Sasi.

1023.   In September 2023, Avraham and Ester traveled to Israel for the Jewish holidays with their daughter Danielle to visit Natalie, who was living in Israel at the time (after the October 7 Attacks, Natalie moved back to California from Israel), along with various siblings, nieces, and nephews. During that trip, Avraham's niece, Plaintiff Lee Meltz Sasi, got engaged.

1024.   During that trip, Avraham attended the Nova Music Festival with his daughter, Plaintiff Danielle Sasi, her husband, Maor, and Plaintiff Lee Meltz Sasi. Alex, a longtime family friend who traveled with them, also joined, along with Nitzan, another one of Avraham's nieces, and her boyfriend, Lidor.

1025.   Danielle was dancing with her father at the festival when air raid sirens started, followed by incoming rockets and mortar fire. Avraham instructed everyone in the Sasi family group to run to their cars, and the group divided up into two and drove to two separate roadside shelters. Nitzan and Lidor took refuge inside the same shelter that U.S. citizen Hersh Goldberg-Polin hid in before his arm was shot off and he was taken hostage into Gaza. Nitzan and Lidor were both murdered at the scene.

1026.   Avraham, Danielle, Maor, Lee, and Alex arrived at a shelter at 7:06 a.m., which was already packed with young people fleeing from the Hamas terrorists attacking at the Nova Music Festival. Avraham, a former high-ranking service member in the IDF during the First

Lebanon War, positioned himself at the shelter entrance, assembled men with him, and told them not to let any of the terrorists enter.

1027.   Hamas gunmen approached the shelter, shot Alex, and then lobbed a grenade into the shelter, murdering Avraham. The terrorists then threw an explosive into the shelter and stepped inside, walking over the bodies of the people that they had just murdered. The Hamas gunmen, wielding AK-47 rifles, fired into the bodies huddled in the shelter. Danielle was shot in the leg and her elbow was fractured. A young woman in front of her was shot in her torso and screamed and cried. Danielle and her husband Maor tried to help the injured woman, but she died of her wounds.

1028.   Lee was sheltered by the bodies of the people in front of her who had been killed. Black smoke filled the shelter and began to suffocate Lee. She put her jacket over her mouth but blacked out. When she opened her eyes to check on whether her uncle Avraham was okay, she saw that he was dead. All but 13 of those inside the shelter were killed in the initial attack, including Avraham and Alex. Five more were killed over the course of the next few hours.

1029.   After the initial assault, the terrorists remained positioned around the shelter, shooting at cars and passersby on the road. About every 15 to 20 minutes, they returned to shoot and throw stun grenades and hand grenades into the shelter. It seemed to Danielle and Lee that another survivor in the shelter was killed in each new assault. Danielle covered her face with blood from her leg wound to appear to the terrorists to have already been killed. Maor sheltered Danielle beneath the just-murdered bodies of fellow Nova Music Festival attendees. The body of a third person fell on Danielle's legs. She started counting the seconds between explosions to estimate whether the terrorists had retreated far enough for the survivors to try to escape.

1030.   Lee spent time in between waves of attacks encouraging survivors to stay positive and stay alive, while she texted their location to others. She also called her mother, Plaintiff Samantha Meltz, to say goodbye.

1031.   Shrapnel had embedded itself all over Danielle's body and had entered her lungs. Lee felt the blast of each grenade and sensed a strange taste on her tongue. It was the taste of someone else's flesh that had been blown into her mouth.

1032.   After a few hours of these attacks, Hamas terrorists fired an RPG at the back of the structure. The resulting explosion was so powerful that it lifted Lee off the ground.

1033.   More than seven hours after the Sasi family arrived at the shelter, the father of a young woman in the shelter arrived with a car at about 2:30 p.m., escorted by soldiers. He sped the survivors away—there were only eight.

1034.   Avraham's daughters Moran and Natalie, his wife Ester, and his niece Gital had heard from Lee that Avraham had been murdered earlier that day, but they refused to believe it. As she was being evacuated, Danielle called and confirmed that her father Avraham had been murdered in front of her at the roadside shelter near Be'eri and that his body was still there.

1035.   Moran, her husband, and their three young children flew from California to Israel that day (most airlines canceled flights to and from Israel immediately following the October 7 Attacks, and just two airlines were offering emergency flights).

1036.   Danielle, Maor, and Lee went to Soroka Hospital where, at about 3:30 p.m. on October 7, they joined the throng of horrifically injured people emerging from the Hamas-perpetrated massacre. All around them, people were missing limbs, bloodied, and dead. The doctors advised Danielle to wash her bullet wound with soap and water, explaining that they would not be able to operate on her that day.

1037.   Danielle was then taken to a hospital further north in Netanya. The doctors there removed the bullet from her leg. She was hospitalized for two weeks.

1038.   Avraham's body was not found for over a week. His funeral was held on October 15. Thousands of mourners attended.

1039.   Plaintiff Danielle Sasi lived near her parents. She has struggled to return to life after witnessing the murder of her father and so many others. In addition to the pain and suffering from the bullet wound, Danielle has pain and ongoing medical needs resulting from the shrapnel embedded throughout her body, including in her lungs. She has undergone further surgery for her leg and suffers from tinnitus. She has seen specialists for damage sustained to her nervous system.

1040.   Plaintiff Lee Meltz Sasi is a citizen of the United States and a resident of the State of California.

1041.   She has not been the same since the October 7 Attacks. She has had difficulty eating, working, and engaging in ordinary tasks. Formerly social, she now wants only to be alone.

1042.   Lee's parents, Plaintiffs Samantha Meltz and Eli Sasi (who is Avraham's brother), and siblings, Plaintiffs Daniel Lawrence Sasi, Elin Levy Sasi, and Tal Meltz Sasi, are all citizens of the United States. They are suffering extreme emotional distress from Lee's trauma and worry deeply about her. Despite everything they have been doing to help her recover, she continues to struggle.

1043.   Avraham's siblings have suffered extreme emotional distress in the aftermath of his murder. Plaintiffs Shulamith Zani, Ronit Rahoum (Nitzan's mother), Ester Halif, Yosef Sasi, Vito Sasy, and Izhak Sasi are citizens of the State of Israel; Plaintiffs Bekhor Sassi and Meir Sasy are citizens of the United States and residents of the State of Israel; and Plaintiffs Eli Sasi (Lee's father) and Yaaqov Sasi are citizens of the United States and residents of the State of California.

1044.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs Danielle Sasi and Lee Meltz Sasi have suffered severe physical injuries and mental anguish and extreme emotional distress, and economic loss.

1045.   Danielle Sasi also brings this action on behalf of her minor son R.P.

1046.   R.P. is a citizen of the United States and a resident of the State of California.

1047.   As a direct and foreseeable result of the October 7 Attacks and the injuries to his mother, Danielle Sasi, R.P. has suffered severe mental anguish and extreme emotional distress.

1048.   As a direct and foreseeable result of the October 7 Attacks and the death of their brother, Avraham Sasi, Plaintiffs Shulamith Zani, Ronit Rahoum, Ester Halif, Yosef Sasi, Vito Sasy, Izhak Sasi, Bekhor Sassi, Meir Sasy, Eli Sasi, and Yaaqov Sasi have suffered severe mental anguish and extreme emotional distress, and economic loss.

1049.   As a direct and foreseeable result of the October 7 Attacks and the injuries to his daughter, Lee Meltz Sasi, Plaintiff Eli Sasi has also suffered severe mental anguish and extreme emotional distress, and economic loss.

1050.   As a direct and foreseeable result of the October 7 Attacks and the injuries to her daughter, Lee Meltz Sasi, Plaintiff Samantha Meltz has suffered severe mental anguish and extreme emotional distress, and economic loss.

1051.   As a direct and foreseeable result of the October 7 Attacks and the injuries to their sister, Lee Meltz Sasi, Plaintiffs Daniel Lawrence Sasi, Elin Levy Sasi, and Tal Meltz Sasi have suffered severe mental anguish and extreme emotional distress, and economic loss.

1052.   Plaintiff Ester Sasi brings this action individually and on behalf of the Estate of Avraham Sasi.

1053.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Avraham Sasi experienced conscious pain and suffering and suffered economic loss.

1054.   As a direct and foreseeable result of the October 7 Attacks and the death of her husband, Avraham Sasi, and the injuries to her daughter, Danielle Sasi, Plaintiff Ester Sasi has suffered severe mental anguish and extreme emotional distress, and economic loss.

1055.   As a direct and foreseeable result of the October 7 Attacks and the death of their father, Avraham Sasi, Plaintiffs Moran Sasi, Danielle Sasi, and Natalie Sasi have suffered severe mental anguish and extreme emotional distress, and economic loss.

1056.   Plaintiffs Moran Sasi and Natalie Sasi have also suffered economic loss and severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attacks and the injuries to their sister, Danielle Sasi.

**D.    The Goldberg-Polin Family**

1057.   Hersh Goldberg-Polin was a dual citizen of the United States and the State of Israel when he was murdered by Hamas in August 2024. He was 23 years old.

1058.   Hersh was born in Berkeley, California, and then moved to Israel with his family when he was eight years old.

1059.   Hersh attended high school and completed his mandatory IDF service in April 2023. He planned to travel through Asia before attending college and was scheduled to begin his trip during the last week of December 2023.

1060.   Hersh had a deep passion for music, which is what brought him to the Nova festival on the Saturday morning of October 7, 2023. He had turned 23 on October 3 and wanted to celebrate his birthday there with his childhood friend, Aner Shapira.

1061.   The Goldberg-Polin family had been at the home of their friends for Shabbat dinner the night before the festival. At about 11:00 p.m., Hersh picked up the backpack he had brought with him to dinner and left to meet Aner and go to the festival. On his way out, Hersh kissed his mother goodbye.

1062.   The next morning, sirens blared across Jerusalem, where the Goldberg-Polins live, starting at about 8:00 a.m. Plaintiff Rachel Goldberg, Hersh's mother, woke up her two daughters and they went to the safe room in their apartment. She turned on her phone at about 8:20 a.m. to make sure Hersh was safe and saw two messages from him at 8:11 a.m. The first said "I love you," and the second said "I'm sorry."

1063.   Rachel immediately knew something terrible was happening. She responded at 8:23 a.m., "Are you okay?" Receiving no response, Rachel sent another message at 8:29 a.m.: "Please let me know you are okay." At 8:36 a.m., Rachel wrote: "I'm leaving my phone on. Let us know you are okay."

1064.   Hersh's parents later found out that he and his friend had tried to escape from the massacre that was taking place at the Nova festival by hiding with approximately 30 others in a roadside bomb shelter. Hamas terrorists threw grenades inside, and Hersh's friend managed to pick up seven and throw them back out. The eighth exploded in his hands, killing him. Two more detonated inside. The terrorists then fired an RPG into the shelter and sprayed the room with gunfire.

1065.   The dust settled, and the Hamas terrorists entered the shelter. Most of the fleeing festivalgoers inside were dead, and some hid under bodies pretending to be dead. Those are the witnesses who described to Hersh's parents how the terrorists ordered Hersh and a few other young men to stand. They did so, and it was apparent that Hersh's left arm had been blown off below the

elbow. He had managed to fashion a tourniquet for himself to stop the bleeding and was able to walk outside, where he and the other men were loaded onto a pickup truck.

1066.   Hersh's last cellphone signal was at 10:25 a.m., from inside Gaza.

1067.   On April 24, 2024, Hamas released a video of Hersh, the first proof that he survived his capture on October 7 despite being badly wounded. The video showed Hersh sitting in a chair, addressing the camera. Gesturing occasionally with his injured arm, he identifies himself and gives his date of birth and parents' names. He states that he had been "here for almost 200 days" (April 24, 2024, was the 201st day since his abduction).

1068.   In the video, Hersh appeared significantly thinner than before his capture. He was missing most of his left arm, and it was apparent that he had not received proper medical treatment for the severe injuries he sustained during the initial attack.

1069.   On August 31, 2024, Israeli forces recovered Hersh's body along with five other hostages from a tunnel beneath Rafah in southern Gaza. Medical examinations indicated they had been executed one by one shortly before Israeli forces reached them.

1070.   The two hostages who had been loaded onto the pickup truck with Hersh have since been released. One of these two hostages, Or Levy, described how, on their 52nd day of captivity, Hersh told him: "He who has a 'why' can bear with any 'how.'" Levy tattooed the quote onto his arm after his release. Levy learned from Hersh's parents that the line is from Nietzsche and was cited in Viktor Frankl's "Man's Search for Meaning" to describe the mental strength required of him to survive the Holocaust.

1071.   Hersh's funeral was held on September 2, 2024, and was attended by tens of thousands of mourners.

1072.   Plaintiffs Rachel Goldberg and Jon Polin bring this action on behalf of the Estate of Hersh Goldberg-Polin.

1073.   Plaintiffs Rachel Goldberg and Jon Polin also bring this action individually. They are dual citizens of the United States and the State of Israel and the parents of Hersh Goldberg-Polin. They were prominent advocates for hostage families, having traveled extensively to meet with political leaders worldwide, including former President Biden and the late Pope Francis.

1074.   Plaintiff Leebie Goldberg-Polin is a dual citizen of the United States and the State of Israel. She is the younger sister of Hersh Goldberg-Polin.

1075.   Plaintiff Orly Goldberg-Polin is a dual citizen of the United States and the State of Israel. She is the younger sister of Hersh Goldberg-Polin.

1076.   As a direct and foreseeable result of the October 7 Attacks and 330 days in captivity, the Plaintiff Estate of Hersh Goldberg-Polin experienced conscious pain and suffering and suffered economic loss.

1077.   As a direct and foreseeable result of the October 7 Attacks, and the abduction, captivity, and murder of Hersh Goldberg-Polin, Plaintiffs Rachel Goldberg, Jon Polin, Leebie Goldberg-Polin, and Orly Goldberg-Polin have suffered severe mental anguish and extreme emotional distress, and economic loss.

###   E.    The Beniashvili / Ben Zvi Family

1078.   Sagiv Baylin Ben Zvi was murdered by Hamas on October 7, 2023. He was 24 years old and a citizen of the State of Israel at the time of his death.

1079.   Sagiv is the son of Plaintiff Guram Beniashvili, a citizen of the United States.

1080.   At around 2:00 a.m. on October 7, Sagiv returned home from work and then drove with a friend to attend the Nova Music Festival. The last thing he said to his mother was that she should not worry and that he would be back home in a few hours.

1081.   At around 6:30 a.m., as alarms blared around the music festival, Sagiv had just left the festival, driving home in his friend's car. Between 6:55 and 7:00 a.m., Sagiv reached the road into the town of Mefalsim in search of a place to shelter.

1082.   As Sagiv drove to the entrance of Mefalsim, he encountered a contingent of Hamas-led terrorists ambushing cars and murdering civilians. One terrorist launched an RPG at Sagiv's car. Sagiv swerved, avoided the grenade, and took a hard right turn.

1083.   The Mefalsim town gates were closed, as Mefalsim's residents were fighting off the attack.

1084.   A group of terrorists executed an assault on Sagiv's car: a terrorist approached the car and shot Sagiv in the head and then murdered his friend, Roni Petrovski, who died next to Sagiv in the passenger seat.

1085.   At 9:18 a.m. on October 7, Sagiv's mother filed a missing person report with the Israeli police.

1086.   Sagiv's relatives in Israel began scouring hospitals, going room to room and then car to car, looking for him among the wounded victims and hoping that he had been brought in for medical treatment. They posted to Facebook, Instagram, and Twitter seeking any news of Sagiv.

1087.   At 9:41 a.m., Sagiv's phone tracked to the Indonesian Hospital in Gaza.

1088.   For three days after October 7, there was no news of Sagiv. His parents spent those days in agony, calling hospitals for any sign of Sagiv and not getting any sleep. Then, on October 11, 2023, security personnel from Mefalsim informed Sagiv's parents that the car he was driving had been found outside Mefalsim, bullet-ridden, blood-soaked, but with no sign of Sagiv. The seatbelts had been cut.

1089.   On October 15, 2023, Israeli authorities informed Sagiv's parents that he had been kidnapped by Hamas and taken to Gaza.

1090.   His family joined a group advocating for hostages; they printed posters. New York newspapers covered Guram's search for his missing son.

1091.   The *New York Daily News* quoted Guram Beniashvili: "I am trying everything, with everyone, to try to find my son…. I called everyone…. You sit down and wait and wait and wait and you don't know what you are waiting for."

1092.   For 19 days, Sagiv's parents experienced extreme emotional agony, believing that their son was not only missing and injured, but also being held captive under the Hamas-controlled Indonesian Hospital in Gaza, where his phone was last located online.

1093.   On October 25, 2023, Israeli authorities recovered Sagiv's body and informed his parents. The next day, Sagiv's funeral was held in Israel.

1094.   As a direct and foreseeable result of the October 7 Attacks and the death of Sagiv Baylin Ben Zvi, Plaintiff Guram Beniasvhili has experienced severe mental anguish and extreme emotional distress, and economic loss.

**F.      The Elmalem Family**

1095.   Matan Elmalem, also known as "Kido," was a citizen and resident of the State of Israel when he was murdered by Hamas on October 7, 2023. He was 42 years old.

1096.   Matan was a renowned DJ who had traveled the world performing at top music festivals and events in Europe, India, South America, and Japan. He was at the height of his career and beloved in the international "trance" music scene, a subgenre of electronic dance music aiming to induce a euphoric, trance-like state in listeners.

1097.   On October 7, 2023, Matan was performing as a DJ at the Nova Music Festival when Hamas terrorists attacked the festival. He had just finished what would be his final set on the DJ stage when the massacre began.

1098.   During the attack, Matan demonstrated extraordinary heroism by leading festival attendees to safety, calming them down, and helping them leave the area. He then returned to help more people.

1099.   After the attack ended, Matan was initially listed as missing. His friends conducted an extensive search for him, crawling on the ground for miles at night searching for him. They found his bag, car, and personal equipment, but not his phone. The next day they returned and searched the entire area again and finally located his body.

1100.   It took five days from October 7 until Matan's family was officially notified that his body had been found. During those five agonizing days, the family endured tremendous uncertainty and anguish not knowing his fate.

1101.   Matan's funeral was held on October 15, 2023, and drew hundreds of mourners who came to pay their respects to the beloved DJ and humanitarian.

1102.   Plaintiff Omri Elmalem is a citizen of the United States and resident of the State of New York. He is the younger brother of Matan Elmalem.

1103.   As a direct and foreseeable result of the October 7 Attacks and the death of his brother Matan Elmalem, Plaintiff Omri Elmalem has suffered severe mental anguish and extreme emotional distress, and economic loss.

### G.    The Waldman Family

1104.   Danielle Waldman was a citizen of the United States and a resident of the State of Israel when she was murdered by Hamas on October 7, 2023. She was 24 years old.

1105.   Danielle was attending the Nova Music Festival near Kibbutz Re'im in Israel. She was there with her boyfriend of six years, Noam Shay, when the festival was infiltrated by Hamas terrorists, who proceeded to massacre more than 350 civilians.

1106.   The morning of October 7, Danielle's brother Guy wrote in the family group chat to ask where everyone was. Danielle responded that everything was fine, and that the family should not worry. That was the last time Danielle's family heard from her.

1107.   Upon learning of the October 7 Attacks, and that Danielle was missing, Danielle's father, Eyal, rushed home from a trip outside of Israel. The morning of October 9, 2023, Eyal traveled south, to the site of the massacre, using the emergency tracking features on Danielle's phone to search for Danielle and Noam. Making his way in a Jeep through an ongoing combat zone, Eyal eventually came upon Danielle's car, riddled with bullet holes, and stained with blood. Eyal found shells from a Kalashnikov rifle near the car.

1108.   It was evident that the car had been attacked by Hamas terrorists. But the family hoped that Danielle had not been in the car, or perhaps that she was only wounded and had escaped, or even that she had been taken hostage and was still alive.

1109.   But on October 11, 2023, the family's worst fears were confirmed. They learned that Danielle's body had been found in the car and had been taken away from the scene by first responders. The family later received a video of some of Danielle's final moments, recorded in her car on the phone of someone who had been with her and Noam.

1110.   Danielle's parents, Eyal and Ella Waldman, bring this action on behalf of the Estate of Danielle Waldman.

1111.   Plaintiff Eyal Waldman also brings this action individually. He is a citizen of the State of Israel. He is the father of Danielle Waldman.

1112.   Plaintiff Ella Waldman also brings this action individually. She is a citizen of the State of Israel. She is the mother of Danielle Waldman.

1113.   Plaintiff Guy Waldman is a citizen of the State of Israel. He is the brother of Danielle Waldman.

1114.   Plaintiff Sharon Waldman is a citizen of the State of Israel. She is the sister of Danielle Waldman.

1115.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Danielle Waldman experienced conscious pain and suffering and suffered economic loss.

1116.   As a direct and foreseeable result of the October 7 Attacks and the death of Danielle Waldman, Plaintiffs Eyal Waldman, Ella Waldman, Guy Waldman, and Sharon Waldman have suffered severe mental anguish and extreme emotional distress, and economic loss.

### H.    The Newman Family

1117.   David Newman was a citizen and resident of the State of Israel when he was murdered by Hamas on October 7, 2023. He was 21 years old.

1118.   On October 7, 2023, David was attending the Nova Music Festival in Kibbutz Re'im when terrorists invaded Israel and began attacking the people at the festival.

1119.   David was with his girlfriend at a party at the festival when they heard what they thought were fireworks, but what turned out to be missiles. David remained calm and started to leave the festival with his girlfriend. David and his girlfriend realized the terrorists were inside the festival, wearing Israeli military uniforms, so David told his girlfriend to lie down with her hands covering her head. They would remain like that until the shooting subsided before trying to flee.

1120.   David and his girlfriend got to a large metal dumpster and climbed inside of it, with anywhere between 10 to 15 other people. They hid in the dumpster, underneath garbage bags, for

approximately four hours. During their time hiding in the dumpster, David remained calm and tried to keep the others calm as well.

1121.   David texted a friend who was a high-level official within the IDF asking to be rescued. Unfortunately, David's phone died before his location could be shared with the friend.

1122.   At some point, the group heard people outside the dumpster speaking in Arabic.

1123.   The terrorists came right up to the dumpster, and with David on top, began shooting. Only four of the people hiding in the dumpster came out alive. David was shot dead.

1124.   Plaintiff Mitchel Newman is a citizen of the United States and is a resident of the State of Israel. He is the father of David Newman.

1125.   Plaintiff Noach Newman is a citizen of the United States and is a resident of the State of Israel. He is the brother of David Newman.

1126.   Plaintiff Gavriel Newman is a citizen of the United States and is a resident of the State of Israel. He is the brother of David Newman.

1127.   Plaintiff Dvir Tuvia Newman is a citizen of the United States and is a resident of the State of Israel. He is the brother of David Newman.

1128.   Plaintiff Batya Leah Sprei is a citizen of the United States and is a resident of the State of Israel. She is the sister of David Newman.

1129.   As a direct and foreseeable result of the October 7 Attacks and the death of David Newman, Plaintiffs Mitchel Newman, Noach Newman, Gavriel Newman, Dvir Tuvia Newman, and Batya Leah Sprei have suffered severe mental anguish and extreme emotional distress, and economic loss.

## I.    The Vardi Family

1130.    Laurie Vardi was a citizen and resident of the State of Israel when she was murdered by Hamas on October 7, 2023. She was 24 years old.

1131.    Laurie was at the Nova Music Festival on October 7, 2023, when rockets began to fall in the vicinity of the festival. She and her boyfriend got into their car and attempted to leave but then took shelter in a concrete bomb shelter near Kibbutz Alumim. Hamas terrorists threw a grenade at the bomb shelter, and Laurie went outside for air because of the smoke and was shot and killed immediately outside the bomb shelter.

1132.    Plaintiff Ariel Vardi is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Laurie Vardi.

1133.    As a direct and foreseeable result of the October 7 Attacks and the death of Laurie Vardi, Plaintiff Ariel Vardi has suffered severe mental anguish and extreme emotional distress, and economic loss.

## J.    The Zafrani Family

1134.    Itay Zafrani was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas on October 7, 2023. He was 35 years old.

1135.    Itay was attending the Nova Music Festival in Re'im, Israel, on October 7, 2023. Itay left the festival immediately by car when the rockets started at approximately 6:35 a.m. and drove toward the Mefalsim junction where he first encountered Hamas terrorists. He tried to make a U-turn but was shot and killed there at 6:52 a.m. The terrorists then pulled Itay out of the car to see what they could steal from him, taking his iPhone and Apple Watch.

1136.    Plaintiff Michal Zipporah Zafrani is a citizen of the United States and is a resident of the State of Israel. She is the mother of Itay Zafrani. She brings this action individually, and on behalf of the Estate of Itay Zafrani.

1137.   Plaintiff Inbal Chen is a citizen and resident of the State of Israel. She brings this action individually, as the surviving spouse of Itay Zafrani, and as the legal guardian of A.Z., the surviving child of Itay Zafrani.

1138.   Plaintiff David Zafrani is a citizen and resident of the State of Israel. He is the father of Itay Zafrani.

1139.   Plaintiff Ori Zafrani is a citizen of the United States and is a resident of the State of Israel. He is the brother of Itay Zafrani.

1140.   Plaintiff Osnat Tal Zafrani is a citizen and resident of the State of Israel. She is the sister of Itay Zafrani.

1141.   Plaintiff Roni Zafrani is a citizen of the United States and is a resident of the State of Israel. She is the sister of Itay Zafrani.

1142.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Itay Zafrani experienced conscious pain and suffering and suffered economic loss.

1143.   As a direct and foreseeable result of the October 7 Attacks and the death of Itay Zafrani, Plaintiffs Inbal Chen, A.Z., David Zafrani, Michal Zipporah Zafrani, Ori Zafrani, Osnat Tal Zafrani, and Roni Zafrani have suffered severe mental anguish and extreme emotional distress, and economic loss.

### K.      The Ziering Family

1144.   Aryeh Ziering was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 27 years old.

1145.   Aryeh was a member of the IDF's Oketz (canine) unit. He was at his parents' home for the Jewish holiday when he was called to duty in southern Israel to respond to the October 7 Attacks.

1146.   He went to his base to meet other members of his unit and get his combat gear and headed to defend an instillation near Zikim, which had been attacked by Hamas.

1147.   Aryeh was killed sometime around midday on October 7 during a firefight with Hamas terrorists.

1148.   Aryeh's parents, Mark and Deborah Ziering, bring this action on behalf of the Estate of Aryeh Ziering.

1149.   Plaintiff Mark Ziering also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Aryeh Ziering.

1150.   Plaintiff Deborah Ziering also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Aryeh Ziering.

1151.   After Aryeh left home that Saturday morning, Mark and Deborah did not hear from him and assumed he and his unit were engaging the terrorists. Because Aryeh was an experienced soldier and a strong, confident, and seemingly indestructible young man, even though they worried about him, his parents assumed he would be okay. Around 11:30 p.m. on Saturday night, after some confusion in the notification, Mark and Deborah received a knock on the door from IDF representatives notifying them of Aryeh's death.

1152.   Plaintiff Eliana Ziering is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Ziering.

1153.   On October 7, Eliana was in her apartment in Jerusalem which she shared with her roommates. Like most people in Israel that day, Eliana learned of the attack that morning, but unlike her siblings, she had completed her army service so when IDF representatives knocked on her apartment door in the middle of the night (during the early hours of October 8), she assumed they had come to summon her roommate (who was still doing her military service) to report for

emergency duty. Unfortunately, the knock on the door was for her and she was notified of her brother's death.

1154.   Plaintiff Yonatan Ziering is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Ziering.

1155.   Like his brothers, Yonatan was called back to active duty in the IDF on the morning of October 7 to respond to the attack. At some point during the day, he learned from a fellow soldier that Aryeh had been shot, but he did not assume the worst because he could not imagine his older brother would fall in the battle. He was later informed by his commanding officer that Aryeh had been killed and was sent home to join his family.

1156.   Plaintiff Tal Ziering is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Ziering.

1157.   Tal was also at home with her parents on October 7 but left to go back to the army that morning once she was notified that she was needed. She was later informed by her commanding officer that Aryeh had been killed and was sent home to join her family.

1158.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Aryeh Ziering experienced conscious pain and suffering and suffered economic loss.

1159.   As a direct and foreseeable result of the October 7 Attacks and the death of Aryeh Ziering, Plaintiffs Mark Ziering, Deborah Ziering, Eliana Ziering, Yonatan Ziering, and Tal Ziering have experienced severe mental anguish and extreme emotional distress, and economic loss.

## L.    The Shay Family

1160.   Yaron Oree Shay was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 21 years old.

1161.   Yaron was the youngest child of Plaintiffs Izhar and Hilla Shay and the younger brother of Plaintiffs Shir, Lior, and Ophir Shay.

1162.   Yaron was born in New Jersey on December 13, 2001, and moved to Israel with his family when he turned four. He attended the American School in Israel for four years and was a proud dual American-Israeli citizen.

1163.   For several weeks prior to October 7, Yaron was serving on active duty within a special unit of the Nahal Brigade of the IDF that was stationed at the Gaza border at the Kerem Shalom military base, guarding the southern end of the Gaza Strip around the Kerem Shalom border crossing between Israel and Gaza.

1164.   His parents had planned to travel to Yaron's base on the Gaza border as part of a pre-planned visit with their son on October 7.

1165.   Yaron messaged his parents by WhatsApp at 6:29 a.m. on October 7 to tell them that Israel had been attacked, they should not come to visit, and he would update them later in the day.

1166.   He subsequently sent a message via WhatsApp to his uncle who lived in another kibbutz within the Gaza Envelope warning him of the attack. It was the only warning that kibbutz received that morning.

1167.   Yaron and two other soldiers from his unit drove to the entrance of the nearby kibbutz at Kerem Shalom and held off dozens of Hamas Nukhba terrorists for more than an hour.

1168.   Their heroic battle saved the lives of hundreds of civilians at the kibbutz and the adjacent military base. Sometime between 8 and 9 a.m., Yaron was severely wounded and eventually airlifted to a hospital in Jerusalem where he was pronounced dead. His two comrades were both wounded in the same firefight but survived.

1169.   Yaron's parents lost contact with him after his initial message to them at 6:29 a.m., and they called various military personnel during the following 24 hours trying to obtain information about him, to no avail.

1170.   The October 7 Attacks caused confusion and chaos inside Israel, and reliable information was difficult to obtain. On Sunday morning of October 8, Plaintiffs Izhar and Hilla Shay received news that a number of Yaron's fellow soldiers had been wounded, and that one of them had been airlifted to Hadassah Ein Kerem Hospital in Jerusalem. Later that afternoon, they decided to make their way to the hospital.

1171.   They arrived there on Sunday afternoon and encountered masses of other families who were also looking for their loved ones.

1172.   Amid the chaos, Yaron's mother stopped a female military officer tasked with updating the families about the conditions and whereabouts of their relatives, asking if she had any news about their son. The officer assured her that if something had happened to Yaron, the family would have been notified by that point. Hilla pressed the officer and gave her Yaron's full name – Yaron Oree Shay.

1173.   The officer immediately recognized the unusual middle name and decided to inform them that Yaron had been pronounced dead at the hospital the day before rather than force them to wait for an official notification.

1174.   Plaintiff Izhar Shay immediately called his three surviving children to break the news to them that their brother had died so they would hear it first from him before the media announced it. Izhar had been a minister in the Israeli government, and as a public figure, the media would have been keen to report this tragic news about his family. Indeed, moments after Izhar

finished relaying the terrible news to his children, Yaron's death was made public and reported on widely.

1175.   Izhar called his oldest son Lior first. Lior had been on his honeymoon in the south of Argentina and was on the second leg of his flight back to Israel after being called back to emergency duty by his unit. Izhar then called Ophir, his middle son, who was also boarding a plane back to Israel after cutting short a vacation in the Philippines. Lastly, Izhar called his daughter Shir, who was at home with her husband and their then-two-month-old child.

1176.   There are special procedures for the delivery of tragic news about the death of a soldier in the IDF which have been developed over many years and many thousands of cases. Dedicated professionals are trained for a number of years before they are allowed to deliver news of death to a victim's family members, and there is a strict protocol which has to be followed. The delivery of the tragic news about Yaron's death to his parents by non-professionals at the hospital and to his siblings by phone broke with this protocol and added significant mental anguish and extreme emotional distress to them.

1177.   All five surviving relatives of Yaron (Hilla, Izhar, Shir, Lior, and Ophir) required emotional support counseling, and some continue to receive treatment.

1178.   Yaron's parents, Hilla Shay and Izhar Shay, bring this action on behalf of the Plaintiff Estate of Yaron Oree Shay.

1179.   Plaintiff Hilla Shay also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Yaron Oree Shay.

1180.   Plaintiff Izhar Shay also brings this action individually. He is a citizen and resident of the State of Israel. He is the father of Yaron Oree Shay.

1181.   Plaintiff Shir Shay is a citizen of the United States and is a resident of the State of Israel. She is the sister of Yaron Oree Shay.

1182.   Plaintiff Lior Shay is a citizen of the United States and is a resident of the State of Israel. He is the brother of Yaron Oree Shay.

1183.   Plaintiff Ophir Shay is a citizen of the United States and is a resident of the State of Israel. He is the brother of Yaron Oree Shay.

1184.   Hilla Shay quit her job as an interior designer as a result of her son's murder. Ophir Shay was only able to resume his professional career three months after October 7, 2023, and worked part-time until June 2024.

1185.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Yaron Oree Shay experienced conscious pain and suffering and suffered economic loss.

1186.   As a direct and foreseeable result of the October 7 Attacks and the death of Yaron Oree Shay, Plaintiffs Hilla Shay, Izhar Shay, Shir Shay, Lior Shay, and Ophir Shay have suffered severe mental anguish and extreme emotional distress, and economic loss.

**M.    The Rousso Family**

1187.   Ofek Rousso was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas. He was 21 years old.

1188.   Just months before, Ofek had completed the grueling training course of Shayetet 13, an elite IDF combat unit that is often analogized to the U.S. Navy SEALs. Within his unit, he was selected to serve as a combat medic and trained to provide first aid to his fellow soldiers.

1189.   On October 7, 2023, Ofek was on routine standby duty at his base. Early in the morning, when reports of the ongoing terror attacks started to surface, Ofek and several other soldiers from his unit were called to respond.

1190.   They first set out for Ofakim, one of the towns that had been infiltrated by Hamas terrorists. By the time Ofek and his fellow soldiers arrived there, no terrorists remained, and Ofek provided medical treatment to several civilians.

1191.   At 4:15 p.m., Ofek arrived at Kibbutz Be'eri, along with several dozen soldiers from Shayetet 13. They rushed into the kibbutz. For many hours, under the harshest of conditions, Ofek and his comrades went from house to house, fighting Hamas terrorists and rescuing civilians.

1192.   Ofek provided medical attention to both civilians and soldiers, including a family with four children that his team had saved.

1193.   Ofek and his fellow soldiers took their first break around 1:45 a.m. in the early hours of October 8, 2023. His unit had been fighting all day without food or water, wearing heavy combat gear, and bearing witness to horrific atrocities against the residents of Kibbutz Be'eri. But the shooting soon resumed, and Ofek immediately responded.

1194.   At 2:15 a.m., Ofek heard the shout of a fellow soldier who had been hit by gunfire and needed a medic. Ofek was lying in a cover position about ten meters away. Ofek was the only medic in the group. He signaled to his commander that he was going to the wounded soldier, got approval, and immediately rushed toward him. Just as Ofek began treating his wounded comrade, he was attacked by a burst of gunfire from Hamas terrorists. One of the bullets struck Ofek's right temple, killing him.

1195.   Ofek died on Sunday, October 8, 2023, at 2:15 a.m. His final messages to his father, Yaniv, read "Go to sleep, everything's fine, we'll talk tomorrow. Goodnight."

1196.   On the afternoon of October 8, Yaniv first learned from a father of one of the soldiers in Ofek's unit that Ofek had been hurt. Yaniv began contacting anyone he could who might provide him with more information about Ofek. No one gave him any answers. Yaniv did

not know if his difficulty in gathering information was a product of the chaos unfolding in southern Israel or if something had happened to Ofek and the army was withholding information.

1197.   Days went by without any contact from Ofek. The Rousso family experienced tremendous stress as they awaited any word about their son's fate. It was not until 3:40 a.m. on October 11, 2023, that the doorbell rang. Two IDF officers had arrived to deliver the worst possible news to Ofek's parents, Yaniv and Fanny, and his sister, Inbar.

1198.   Ofek's parents, Yaniv and Fanny Rousso, bring this action on behalf of the Estate of Ofek Rousso.

1199.   Plaintiff Yaniv Rousso also brings this action individually. He is a citizen and resident of the State of Israel. He is the father of Ofek Rousso.

1200.   Plaintiff Fanny Rousso also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Ofek Rousso.

1201.   Plaintiff Inbar Rousso is a citizen of the United States and is a resident of the State of Israel. She is the sister of Ofek Rousso.

1202.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on October 8, 2023, the Plaintiff Estate of Ofek Rousso experienced conscious pain and suffering and suffered economic loss.

1203.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on October 8, 2023, in which Ofek Rousso was killed, Plaintiffs Yaniv Rousso, Fanny Rousso, and Inbar Rousso have suffered severe mental anguish and extreme emotional distress, and economic loss.

### N.    The Katsman Family

1204.   Hayim Katsman was a dual citizen of the United States and the State of Israel when he was murdered by Hamas on October 7, 2023. He was 32 years old.

1205.   Hayim was one of six children born to Hannah Wacholder Katsman, a writer and women's rights activist, and Daniel Katsman. The couple moved to Israel in 1990, and Hayim was born there a year later.

1206.   Hayim was a peace activist who studied philosophy and earned a PhD in political science from the University of Washington's Henry M. Jackson School of International Studies.

1207.   When Hamas struck on October 7, Hayim lived in Kibbutz Holit, where he worked as a gardener, landscaper, and deejay. Hayim also taught at various colleges and pre-army programs.

1208.   On the morning of October 7, 2023, Hayim was awoken by the sounds of sirens and gunshots. He sent his mother a message letting her know he was okay at about 7:15 a.m.

1209.   He ran to his safe room but could not lock it from the inside. He then left to go to his neighbor's house, where he hid with a neighbor in the closet within their safe room.

1210.   For a time, Hayim stayed on the phone with his friend until he heard terrorists nearby. He hung up and continued texting.

1211.   Terrorists then attacked the safe room in which he was hiding. Hayim shielded his neighbor by placing himself closest to the door of the closet. He absorbed the bullets fired into the closet, thereby saving his neighbor's life.

1212.   Hayim's mother initially thought he had been taken hostage into Gaza. His body was later identified and his family notified early the next day, Sunday, October 8.

1213.   Hannah Wacholder Katsman brings this action on behalf of the Plaintiff Estate of Hayim Katsman.

1214.   Plaintiff Hannah Wacholder Katsman also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Hayim Katsman.

1215.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Hayim Katsman experienced conscious pain and suffering and suffered economic loss.

1216.   As a direct and foreseeable result of the October 7 Attacks and the death of Hayim Katsman, Plaintiff Hannah Wacholder Katsman has suffered severe mental anguish and extreme emotional distress, and economic loss.

**O.    The Levy Family**

1217.   Roy Joseph Levy was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 44 years old.

1218.   Roy moved from Massachusetts to Israel as a child with his family and spent his career in the IDF. He had achieved the rank of colonel at the time of his death.

1219.   On the morning of October 7, Roy received a call informing him of the unfolding attacks in southern Israel. He left his house by 7:45 a.m. after warning his wife, Yael Levy Oppenheimer, that it would be a long day.

1220.   Roy drove south and headed straight into the battle – a highly unusual move for a colonel. Around this time, Roy spoke to his brother Iddo, instructing Iddo to shelter in place and telling him that he was on a mission to save lives. These were the last words that Roy's family ever heard from him.

1221.   At approximately 10:30 a.m., Roy arrived in the vicinity of Re'im (near the Gaza border), where he encountered heavy gunfire from Hamas terrorists who had infiltrated the area. Roy engaged the terrorists. Advancing from home to home, under heavy gunfire and massively

outnumbered by terrorists, Roy liberated captives and saved families. Many lived to tell how Roy personally saved them from captivity, torture, and death.

1222.    In the course of battle, Roy was shot in his wrist. He paused to bandage the wound and kept fighting. He then took another more serious wound to his torso. Nonetheless, Roy pushed through the pain to pick up his rifle and continue fighting.

1223.    At about 1:30 p.m., as Roy was attempting to stop further murder and kidnapping of civilians in Re'im, a Hamas terrorist shot Roy in the heart.

1224.    At about 5 p.m., Roy's brother Iddo received a call from a friend, asking about Roy because of something the friend had heard about Roy having been shot, and possibly killed. Roy had not answered any calls or messages from his family, who were anxiously checking on his well-being. Nor did he return home that night.

1225.    At about 12:30 a.m. on October 8, two officers appeared on Yael Levy Oppenheimer's doorstep to deliver the tragic news of Roy's death.

1226.    The Plaintiff Estate of Roy Joseph Levy is represented here by his wife, Yael Levy Oppenheimer.

1227.    Plaintiff Yael Levy Oppenheimer also brings this action individually. She is a citizen and resident of the State of Israel.

1228.    Plaintiff Yael Levy Oppenheimer also brings this action on behalf of her three minor children, Plaintiffs I.O., Y.L., and J.L. They are citizens and residents of the State of Israel. I.O. is Roy's stepson. Y.L. and J.L. are Roy's sons.

1229.    Plaintiff Tzuria Levy is a citizen and resident of the State of Israel. She is Roy Joseph Levy's daughter.

1230.  Plaintiff Zohar Levy is a citizen and resident of the State of Israel. She is Roy Joseph Levy's daughter.

1231.  Naomi Kahana brings this action on behalf of Plaintiff A.L., who is a citizen and resident of the State of Israel. A.L. is Roy Joseph Levy's minor daughter.

1232.  Plaintiff Judith Levy is a citizen and resident of the State of Israel. She is Roy Joseph Levy's mother.

1233.  Plaintiff Shlomo Levy is a citizen and resident of the State of Israel. He is Roy Joseph Levy's father.

1234.  Plaintiff Eliyahu Levy is a citizen and resident of the State of Israel. He is Roy Joseph Levy's brother.

1235.  Plaintiff Iddo Moshe Levy is a citizen of the United States and is a resident of the State of Israel. He is Roy Joseph Levy's brother.

1236.  Plaintiff Nir Yehezkel Levy is a citizen and resident of the State of Israel. He is Roy Joseph Levy's brother.

1237.  As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Roy Joseph Levy experienced conscious pain and suffering and suffered economic loss.

1238.  As a direct and foreseeable result of the October 7 Attacks and the death of Roy Joseph Levy, Plaintiffs Yael Levy Oppenheimer, I.O., Y.L., J.L., Tzuria Levy, Zohar Levy, A.L., Judith Levy, Shlomo Levy, Eliyahu Levy, Iddo Moshe Levy, and Nir Yehezkel Levy have suffered severe mental anguish and extreme emotional distress, and economic loss.

### P.    The Rosenfeld Family

1239.  Maya Treger Rosenfeld was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas on October 7, 2023.

1240.   Maya and her husband, Dvir Rosenfeld, lived in Kfar Aza with their then-11 months old son, Z.R. On the morning of October 7, Z.R. woke his parents up early. Soon after, at about 6:00 a.m., they heard loud explosions, so the family headed into their safe room, which was their baby's room.

1241.   Dvir left the house briefly to bring the family's dogs inside. He returned without the dogs but left the door open for them. The Rosenfelds were later told by a neighbor that five terrorists passed by their house right after Dvir went back inside, and likely did not enter because the door was open and they assumed that the house was already under attack.

1242.   The Rosenfeld family hid in their safe room for the next 24 hours, hearing terrorists roaming outside and explosions periodically throughout the ordeal. They had lost electricity and were without air conditioning, water or food throughout the extremely hot day and night. Dvir held the door closed the entire time, and Maya held the baby and kept him quiet, which sometimes meant covering his mouth with her hand.

1243.   Maya and Dvir received constant WhatsApp messages about neighbors and other people they knew who had been murdered as well as people who were injured and needed help. They felt helpless; they knew if they went out to try to assist others, they would likely be killed.

1244.   For example, Dvir's sister messaged Maya at about 6:55 a.m. to tell her that she and her twin babies were safe.

1245.   Hours later, at about noon, Maya and Dvir received a message that the twins needed to be rescued. Dvir wanted to go, but Maya begged him not to. She continues to feel guilty for not letting him go.

1246.   That night, while still barricaded in their safe room, Maya and Dvir were told that Dvir's sister and brother-in-law had been killed. They found out later that Dvir's sister was shot

through a window and then shot a second time when the terrorists entered the house. After the terrorists shot Dvir's brother-in-law, they left the twin babies in the house as bait and shot at anyone who tried to rescue them. The babies were left in the safe room with their dead father for 14 hours.

1247.   Maya and Dvir received messages during the ordeal that they needed to stay in their safe room and could not be rescued yet. They heard that terrorists were burning down houses, and so they kept feeling the walls of their room to see if their own house was on fire. At some point that night, their mobile phones died.

1248.   At about 5:30 a.m. on October 8, Maya and Dvir woke up to guns in their faces. The IDF had come to evacuate them, and warned them that terrorists were still outside, and they had just minutes to pack and leave.

1249.   The soldiers took them to another building within the kibbutz, where they joined 19 other civilians who had also been evacuated from their homes. The building had no electricity, water, or food. The group stayed there for almost five more hours while the IDF fought off the terrorists that continued to attack the kibbutz. Maya, Dvir, and their son were released at about 10:00 a.m., and learned more about the devastation that had taken place. More than 60 residents of their kibbutz had been murdered, among them Dvir's sister, brother-in-law, and cousin. The family's babysitter was kidnapped into Gaza along with 17 others.

1250.   Maya and Dvir attend therapy together and individually; they've lost weight from not eating and suffer from nightmares. It took each of them months to return to work; Maya currently works on a part-time schedule. She misses her sister-in-law immensely; the two had babies at the same time and were in the maternity ward together. Maya suffered a miscarriage recently, and attributes her loss to the stress and grief the attack caused her.

1251. As a direct and foreseeable result of the October 7 Attacks, Plaintiff Maya Treger Rosenfeld has suffered physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

**Q.    The Rothner Family**

1252. Avraham Rothner was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas on October 7, 2023. He was 22 years old at the time of the attack.

1253. On October 7, 2023, Avraham was in Kfar Aza Kibbutz. He saw the brutality of the Hamas terrorists firsthand and witnessed the murders of countless innocent Israeli civilians.

1254. During the attack, he made great efforts to help the wounded, but many of those died before Avraham's eyes.

1255. Avraham is suffering from severe PTSD and other mental and emotional trauma as a result of the events of October 7, 2023.

1256. As a direct and foreseeable result of the October 7 Attacks, Plaintiff Avraham Rothner has suffered severe mental anguish and extreme emotional distress, and economic loss.

**R.    The Edan Family**

1257. Smadar Mor was a citizen of the United States and a resident of the State of Israel when she was murdered by Hamas. She was 38 years old.

1258. Roee Edan was a citizen and resident of the State of Israel when he was murdered by Hamas. He was 43 years old. He was Smadar's husband.

1259. A.E. was a dual U.S.-Israeli citizen when she was kidnapped by Hamas on October 7, 2023. She was three years old when she was kidnapped.

1260. M.E. was a dual U.S.-Israeli citizen when he saw his parents murdered and his sister kidnapped by Hamas on October 7, 2023. He was nine years old.

1261.   Am.E. was a dual U.S.-Israeli citizen when she saw her parents murdered and her sister kidnapped by Hamas on October 7, 2023. She was six years old.

1262.   On October 7, 2023, the family was at home in Kibbutz Kfar Aza, just a few miles from the Gaza border.

1263.   After infiltrating the kibbutz, Hamas terrorists came into the home and shot and killed Smadar in front of A.E., M.E., and Am.E. The three children ran outside and saw their father, a newspaper photographer, running toward the house. Roee took A.E. into his arms with his other children beside him.

1264.   Roee was shot from behind and fell with A.E. in his arms. M.E. and Am.E. thought both their father and youngest sister were dead. They immediately ran back into their house and hid on shelves in a closet next to where their mother's body lay.

1265.   Roee collapsed on top of A.E., but his body had shielded her from the bullets. She managed to free herself and ran, covered in her father's blood, to a neighbor's house where she took shelter with Avihai and Hagar Brodetz and their children.

1266.   Avihai went outside to defend the kibbutz while A.E. stayed with Hagar and her children. A.E., Hagar Brodetz, and the Brodetz children were taken hostage into Gaza.

1267.   A.E. was held in Gaza for 50 days before being released as part of a 4-day ceasefire between Israel and Hamas on November 26, 2023. She celebrated her fourth birthday in captivity in Gaza.

1268.   M.E. and Am.E. hid in the closet next to where their mother's body lay for nearly 14 hours. They had a phone and spoke with a social worker for a long part of this time, but it was not clear if it was safe for them to come out of hiding until soldiers with the IDF came to rescue them.

1269.   Smadar's parents, Eitan Mor and Shlomit Miriam Mor, bring this action on behalf of the Estate of Smadar Mor Edan.

1270.   Plaintiff Eitan Mor also brings this action individually. He is a citizen and resident of the State of Israel. He is the father of Smadar Mor Edan.

1271.   Plaintiff Shlomit Miriam Mor also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Smadar Mor Edan.

1272.   Leron Mor and Zoltan Ivan Gyongyosi bring this action on behalf of minor Plaintiffs, A.E., M.E., and Am.E., as their legal guardians.

1273.   Leron Mor also brings this action individually. She is a citizen and resident of the State of Israel. She is the sister of Smadar Mor Edan.

1274.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Smadar Edan experienced conscious pain and suffering and suffered economic loss.

1275.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff A.E. suffered physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

1276.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs M.E. and Am.E. suffered severe mental anguish and extreme emotional distress, and economic loss.

1277.   As a direct and foreseeable result of the October 7 Attacks, the murder of Smadar Mor Edan, and A.E. being taken hostage, Plaintiffs Eitan Mor, Shlomit Miriam Mor, Leron Mor, A.E., M.E., and Am.E. have suffered severe mental anguish and extreme emotional distress, and economic loss.

1278.   As a direct and foreseeable result of the October 7 Attacks and the murder of their father Roee Edan, Plaintiffs A.E., M.E., and Am.E. have also suffered severe mental anguish and extreme emotional distress, and economic loss.

### S.    The Bomflek Family

1279.    Sarah Bomflek is a dual citizen of the United States and the State of Israel, and a resident of the State of Israel.

1280.    Sarah is the wife of Nir Bomflek and the mother of their two young children.

1281.    In the early hours of October 7, Hamas overran the IDF military base at Nahal Oz where Nir served as the deputy battalion commander and the base's highest-ranking officer.

1282.    Nir was shot in the head before 7:00 a.m. by Hamas terrorists. His soldiers managed to drag him away from the firefight, and for the next eight hours, kept him alive without proper medical equipment, ensuring that Nir remained conscious by talking to him and preventing him from lying down.

1283.    At about 3:00 p.m., a rescue unit transported Nir to a makeshift field hospital, where he was intubated and then subsequently transported by helicopter to Sheba Medical Center about two to three hours later.

1284.    It was during that helicopter ride on the late afternoon of October 7 that Sarah, Nir's wife, finally received notification of her husband's whereabouts and condition; she had been trying to reach him unsuccessfully since 6:30 a.m. when the sirens first sounded.

1285.    A casualty officer informed Sarah that her husband was in critical condition and was in the midst of transport. In the chaos, the officer told Sarah that Nir was being taken to Soroka Medical Center, Israel's trauma center in the South. Sarah traveled there amidst the continuing attacks and arrived to find out that Nir was not there.

1286.    She started to return home in order not to miss a call regarding Nir's location, and while on the road, her support network of family and friends was able to finally reach a doctor at Sheba Medical Center, who confirmed that Nir had been brought there.

1287.   Upon arrival at Sheba Medical Center, Nir was immediately taken into surgery in critical condition, unresponsive, and with life-threatening injuries. Sarah raced to his side immediately, leaving her baby daughter and toddler son with family members.

1288.   Nir remained in intensive care for approximately five weeks, following which he underwent months of pulmonary rehabilitation for breathing difficulties and for traumatic brain injury.

1289.   Nir's recovery has been arduous. As a result of the gunshot wound, he has suffered catastrophic brain injuries, including damage to the right side of his brain, aphasia (speech impairment), immobility of his left leg and left hand, and significant cognitive impairment.

1290.   Nir continues to suffer from severe communication deficits, currently able to speak only one or two words at a time and struggling to form basic three-word sentences.

1291.   He continues to require ongoing daily rehabilitation treatment and intensive therapy, including speech therapy, physical therapy, and occupational therapy.

1292.   Plaintiff Sarah Bomflek has been forced to simultaneously navigate her own trauma, become her husband's primary caregiver, and help their young children process complex emotions about their father's drastically altered condition. The family attends various forms of counseling.

1293.   As a direct and foreseeable result of the October 7 Attacks and the serious injury to her husband, Plaintiff Sarah Bomflek has experienced severe mental anguish and extreme emotional distress, and economic loss.

**T.    The Goodman Family**

1294.   Donald R. Goodman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 70 years old at the time.

1295.   On October 7, 2023, Donald was at home in Kibbutz Nir Yitzhak, with his wife and granddaughter. They were asleep at 6:30 a.m., when Donald and his family heard the alarm in their community instructing them to take cover within 15 seconds. They heard booming sounds and 50-60 rocket attacks.

1296.   Donald and his family got into their safe room with water and crackers and attempted to get information on their cell phones.

1297.   Hamas terrorists invaded Donald's home, smashed windows, destroyed his computer, and stole money and kitchen appliances from his home.

1298.   Donald and his family were also displaced from their home. When the IDF released the alarm, the Goodmans were told to relocate into four shelters, each housing 120 people. Donald and his family slept on the floor and had no accessible bathroom.

1299.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Donald Goodman has suffered severe mental anguish and extreme emotional distress, and economic loss.

### U.    The Cherney Family

1300.   Plaintiff Noa Morgan Cherney was a citizen of the United States and a resident of Israel when she was injured by Hamas.

1301.   Noa was a naval combatant in the IDF from January 2022 through January 2024.

1302.   On October 7, 2023, Noa was in Kibbutz Erez, when, at 6:30 a.m., rockets began to fall. Noa experienced rocket fire in the shelter she was in and buildings shaking before being called to her IDF base 20 minutes after the attack began. There were 40 terrorists outside of Kibbutz Erez, with just seven kibbutz members trying to fight them off. The kibbutz members were able to hold off the terrorists for three hours.

1303.   During the crossfire, Noa's mentor was killed, and her host family was injured.

1304.  Hamas cut the Wi-Fi on Kibbutz Erez, so Noa had to leave her safe room to contact her base. She was receiving alerts on her phone, which provided her with the details of the attack, the number of dead, etc. Throughout the day, Noa experienced constant booms, and she had no food. Noa volunteered to join the security team guarding the kibbutz, but there were not enough weapons for her to do so.

1305.  On the evening of October 7 into October 8, Noa was placed under an evacuation order, which was subsequently canceled.

1306.  At 10:00 a.m. on October 8, she left Kibbutz Erez in the direction of Ashkelon, in order to make it to Haifa to join her ship. On the ride to her ship, she encountered rockets, rocket alerts, UAVs, and other threats.

1307.  Once on her IDF ship, Noa sailed to every border, guarding oil rigs. While at sea, she was under constant threat from Hamas via the air.

1308.  As a direct and foreseeable result of the October 7 Attacks and her subsequent deployment to fight against Hamas, Plaintiff Noa Morgan Cherney has experienced severe mental anguish and extreme emotional distress, and economic loss.

## V.    The Daniels Family

1309.  Plaintiff Gil Boaz Daniels was a citizen of the United States and a resident of Israel when he was injured by Hamas.

1310.  Gil was at home in Kibbutz Nir Erez, which borders Gaza, on October 7 when Hamas attacked. Gil spent most of October 7 on the phone calling his family, his IDF unit, and his IDF unit commander. The Army did not arrive until very late in the day. There was almost constant gunfire and explosions from the terrorists outside his home.

1311.  Gil was sheltered with other people from his kibbutz throughout the day, and they were crying as they learned of the deaths of family and friends.

1312.   Upon leaving the shelter, Gil and the others had to walk through the devastation caused by the terrorists outside the shelter.

1313.   As an IDF soldier, Gil entered Gaza after the attacks and spent 45 days there. His direct commander and deputy commander were killed serving alongside him.

1314.   Gil's father suffered a heart attack due to the stress of the situation.

1315.   As a direct and foreseeable result of the October 7 Attacks and his subsequent deployment to Gaza to fight against Hamas, Plaintiff Gil Boaz Daniels has experienced severe mental anguish and extreme emotional distress, and economic loss.

**W.    The Davidovich Family**

1316.   Rivka Davidovich was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 33 years old at the time of the attack.

1317.   Rivka was at home in Ofakim, Israel, with her children on October 7, 2023. Her husband and oldest son were at the synagogue from 6:00 a.m. until approximately 12:00 p.m. because it was the Jewish holiday of Simchat Torah.

1318.   Rivka reports hearing many alarms and feeling a great deal of fear on October 7, 2023.

1319.   In the first week following October 7, 2023, neither Rivka nor her family left their home, even to buy bread and milk, due to the intense fear and trauma. Remaining shut in her home was extremely difficult because two of her children were diagnosed with ADHD and were intensely affected by the atmosphere both inside and outside of the house.

1320.   Once the family was able to leave their home, the entire family, including Rivka, received emotional and art therapy to process their trauma.

1321.   Plaintiff A.D. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of A.D., brings this claim on behalf of A.D., a minor child.

1322.   Plaintiff H.M.D. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of H.M.D., brings this claim on behalf of H.M.D., a minor child.

1323.   Plaintiff M.D. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of M.D., brings this claim on behalf of M.D., a minor child.

1324.   Plaintiff Mi.D. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of Mi.D., brings this claim on behalf of Mi.D., a minor child.

1325.   Plaintiff S.E.D. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of S.E.D., brings this claim on behalf of S.E.D., a minor child.

1326.   Plaintiff Y.D. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of Y.D., brings this claim on behalf of Y.D., a minor child.

1327.   Plaintiff A.E.D. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of A.E.D., brings this claim on behalf of A.E.D., a minor child.

1328.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Rivka Davidovich has suffered severe mental anguish and extreme emotional distress, and economic loss.

1329.   As a direct and foreseeable result of the October 7 Attacks on and the injuries of Rivka Davidovich, Plaintiffs A.D., H.M.D., M.D., Mi.D., S.E.D., Y.D. and A.E.D. have experienced severe mental anguish and extreme emotional distress, and economic loss.

### X.    The Ben Zaken Family

1330.    Chana Sarah Ben Zaken was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 31 years old at the time.

1331.    Chana was at home with her family in Ofakim, Israel, on October 7, 2023.

1332.    When the terrorists invaded Ofakim, Chana and her children hid in the safe room in their home. Her husband, who was outside, saw the terrorists shooting in the vicinity of their home.

1333.    Following the October 7 Attacks, Chana and her family were displaced until December 2023 from their home in Ofakim to Hever, a villa donated to refugees from the South.

1334.    Chana Sarah Ben Zaken suffers from anxiety, panic attacks, insomnia, and paranoia as a result of the October 7 Attacks.

1335.    Plaintiff S.L. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of S.L., brings this claim on behalf of S.L., a minor child.

1336.    Plaintiff A.L. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of A.L., brings this claim on behalf of A.L., a minor child.

1337.    Plaintiff Ay.BZ. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of Ay.BZ., brings this claim on behalf of Ay.BZ., a minor child.

1338.    Plaintiff Av.BZ. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of Av.BZ., brings this claim on behalf of Av.BZ., a minor child.

1339.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Chana Sarah Ben Zaken has suffered severe mental anguish and extreme emotional distress, and economic loss.

1340.   As a direct and foreseeable result of the October 7 Attacks on and the injuries of Plaintiff Chana Sarah Ben Zaken, Plaintiffs S.L., A.L., Ay.BZ., and Av.BZ. have experienced severe mental anguish and extreme emotional distress, and economic loss.

### Y.    The Hamo Family

1341.   Hadas Pnina Saffer Ben Hamo was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 31 years old at the time.

1342.   On October 7, 2023, Hadas was at home in Ofakim with her three young children, ranging in age from five years old to less than a year old, when the terrorists invaded. Her husband was in synagogue for the Jewish holiday of Simchat Torah, unaware of what was happening in town.

1343.   Hadas's next-door neighbors were shot by the terrorists, causing Hadas intense fear.

1344.   Hadas and her children were stuck in their home for two days.

1345.   Hadas suffers from psychological trauma, insomnia, and inability to readjust to normal life.

1346.   Plaintiff N.B.H. is a citizen of the United States and a resident of Israel. Plaintiff Hadas Pnina Saffer Ben Hamo, as guardian of N.B.H., brings this claim on behalf of N.B.H., a minor child.

1347.   Plaintiff R.B.H. is a citizen of the United States and a resident of Israel. Plaintiff Hadas Pnina Saffer Ben Hamo, as guardian of R.B.H., brings this claim on behalf of R.B.H., a minor child.

1348.    Plaintiff M.B.H. is a citizen of the United States and a resident of Israel. Plaintiff Hadas Pnina Saffer Ben Hamo, as guardian of M.B.H., brings this claim on behalf of M.B.H., a minor child.

1349.    As a direct and foreseeable result of the October 7 Attacks, Plaintiff Hadas Pnina Saffer Ben Hamo has suffered severe mental anguish and extreme emotional distress, and economic loss.

1350.    As a direct and foreseeable result of the October 7 Attacks and the injuries of Hadas Pnina Saffer Ben Hamo, Plaintiffs N.B.H., R.B.H., and M.B.H. have experienced severe mental anguish and extreme emotional distress, and economic loss.

## Z.    The Amar Family

1351.    Naama Saffer Amar was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 34 years old at the time.

1352.    Naama was at home in Ofakim on October 7, 2023, when Hamas terrorists invaded. Terrorists surrounded Naama's house shooting, prohibiting her and her family from leaving their building for two days. There were 50 deaths in the neighborhood, with many, if not all, of her neighbors dying, leaving her to fear for her safety.

1353.    Naama was displaced from her home for two weeks.

1354.    Plaintiff A.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of A.A., brings this claim on behalf of A.A., a minor child.

1355.    Plaintiff G.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of G.A., brings this claim on behalf of G.A., a minor child.

1356.   Plaintiff O.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of O.A., brings this claim on behalf of O.A., a minor child.

1357.   Plaintiff A.M.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of A.M.A., brings this claim on behalf of A.M.A., a minor child.

1358.   Plaintiff A.E.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of A.E.A., brings this claim on behalf of A.E.A., a minor child.

1359.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Naama Saffer Amar has suffered economic loss and severe mental anguish and extreme emotional distress while also being forced to relocate from her home.

1360.   As a direct and foreseeable result of the October 7 Attacks on and the injuries of Naama Saffer Amar, Plaintiffs A.A., G.A., O.A., A.M.A., and A.E.A. have experienced severe mental anguish and extreme emotional distress, and economic loss.

**AA.    The Goodman Family**

1361.   Yehoshua Goodman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 43 years old at the time.

1362.   Plaintiff Shira Goodman was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She is the wife of Yehoshua Goodman.

1363.   On October 7, 2023, Yehoshua and Shira were in Tifrach, Israel, unable to get back to their home in Ofakim. Rockets fell two houses away from, and shattered windows in, the house where they were staying, causing them to fear for their safety.

1364.   When Yehoshua and Shira were able to return home to Okafim, they were afraid to leave their house.

1365.   Plaintiff A.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of A.G., brings this claim on behalf of A.G., a minor child.

1366.   Plaintiff B.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of B.G., brings this claim on behalf of B.G., a minor child.

1367.   Plaintiff Y.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of Y.G., brings this claim on behalf of Y.G., a minor child.

1368.   Plaintiff B.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of B.G., brings this claim on behalf of B.G., a minor child.

1369.   Plaintiff M.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of M.G., brings this claim on behalf of M.G., a minor child.

1370.   Plaintiff N.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of N.G., brings this claim on behalf of N.G., a minor child.

1371.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs Yehoshua Goodman and Shira Goodman suffered severe mental anguish and extreme emotional distress, and economic loss.

1372.   As a direct and foreseeable result of the October 7 Attacks on and the injuries of Yehoshua Goodman and Shira Goodman, Plaintiffs A.G., B.G., Y.G., B.G., M.G. and N.G. have experienced severe mental anguish and extreme emotional distress, and economic loss.

**BB.    The Zer-Chen Family**

1373.   Leor Zer-Chen was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 25 years old at the time.

1374.   On October 7, 2023, Leor was in synagogue services in Ashkelon, Israel, when the attacks began. Though Israeli security forces set up protection in the vicinity of the synagogue, Leor was compelled to reach his family. It took him thirty minutes to reach his family by foot.

1375.   There were rockets landing in the streets near him, and armed people were all over. Leor feared for his safety because he did not know if the gunmen he saw were Israeli security forces or terrorists, and he worried that his family would never see him again.

1376.   He was finally able to obtain a ride in an ambulance to reach his wife and son.

1377.   Leor has been diagnosed with depression caused by the October 7 Attacks.

1378.   Plaintiff Yaakov Zer-Chen is a citizen of the United States and is a resident of the State of Israel. He is the son of Leor Zer-Chen.

1379.   Plaintiff Yael Zer-Chen is a citizen of the United States and is a resident of the State of Israel. She is the spouse of Leor Zer-Chen.

1380.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Leor Zer-Chen has suffered severe mental anguish and extreme emotional distress, and economic loss.

1381.   As a direct and foreseeable result of the October 7 Attacks and the injuries of Leor Zer-Chen, Plaintiffs Yaakov Zer-Chen and Yael Zer-Chen have suffered severe mental anguish and extreme emotional distress, and economic loss.

CC.    **The Gutstein Family**

1382.    Avraham Gutstein was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 43 years old at the time.

1383.    On October 7, 2023, Avraham was in Ashkelon when rockets began falling in the area where he had been attending synagogue. A rocket fell in a nearby parking lot, shattering windows, and causing him to fear for his safety.

1384.    Avraham owns two kindergarten centers in Ashkelon, and these locations were damaged by rockets, resulting in collapsed walls and damage to the buildings.

1385.    Avraham is also a volunteer with an organization known as "Zaka," which provides first-responder and search-and-rescue operations, among other activities, in the aftermath of mass-casualty events. In this capacity, Avraham was stationed at the hospital where he saw the casualties, including dead bodies, coming from various locations as a result of the October 7 Attacks.

1386.    Avraham suffers from emotional trauma, sleep disturbances, endless thoughts of mortality, and PTSD.

1387.    Plaintiff Miriam Gutstein is a citizen of the United States and is a resident of the State of Israel. She is the spouse of Avraham Gutstein.

1388.    Plaintiff Z.C.G. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Miriam Gutstein, as next-of-kin of Z.C.G., brings this claim for Z.C.G. as the minor child of Avraham Gutstein.

1389.    Plaintiff Yitshak Yisachar Gutstein is a citizen of the United States and is a resident of the State of Israel. He is the son of Avraham Gutstein.

1390.    Plaintiff Tamar Gutstein is a citizen of the United States and a resident of the State of Israel. She is the daughter of Avraham Gutstein.

1391.   Plaintiff S.G. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Miriam Gutstein, as next-of-kin of S.G., brings this claim for S.G. as the minor child of Avraham Gutstein.

1392.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Avraham Gutstein has suffered severe mental anguish and extreme emotional distress, and economic loss.

1393.   As a direct and foreseeable result of the October 7 Attacks and the injuries to Avraham Gutstein, Plaintiffs Miriam Gutstein, Tamar Gutstein, Z.C.G., Yitshak Yisachar Gutstein, and S.G. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**DD.    The Natan Family**

1394.   Odeya Chen Natan, a/k/a Odeya Chen Teicher, was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 30 years old at the time.

1395.   Odeya was at home in Sderot on October 7, 2023. She heard the events of October 7, 2023, unfolding outside her home and took her children, father-in-law, and brother-in-law to their safe room to hide. They barricaded themselves in the safe room for 48 hours until the IDF was able to rescue them. They heard non-stop rockets as well as the gunfire all around them from the terrorists who were lurking on the streets of Sderot.

1396.   While Odeya, her father-in-law, brother-in-law, and her children were hiding in the safe room in her home, her husband Eitan had heard the rocket sirens going off in Sderot and proceeded in his vehicle to the entrance to Sderot where he was attacked by a pickup truck filled with terrorists who were infiltrating Sderot.

1397.   Eitan was shot in the arm, but he continued to drive until his vehicle could no longer move after continuing to be hit with gunfire. He got into another resident's vehicle who had also

been shot. Eitan plugged the other individual's gunshot wound with his finger, and the two were able to get north of Sderot where they found an ambulance to receive care.

1398.   Odeya did not know what happened to her husband as she was holed up in the safe room for 48 hours. She believed him to be among the dead or captured and, aside from the emotional distress she endured because of her own personal ordeal within the safe room, she also suffered severe emotional distress from the belief that her husband had been killed.

1399.   While Eitan survived, he has undergone multiple surgeries, physical therapy, and severe emotional trauma that has caused additional severe emotional distress for Odeya.

1400.   Plaintiff Naomi Teicher is a citizen of the United States and a resident of the State of Israel. She is the mother of Odeya Chen Natan, a/k/a Odeya Chen Teicher.

1401.   Plaintiff Michael Jay Teicher is a citizen of the United States and a resident of the State of Israel. He is the father of Odeya Chen Natan, a/k/a Odeya Chen Teicher.

1402.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Odeya Chen Natan, a/k/a Odeya Chen Teicher, has suffered severe mental anguish and extreme emotional distress, and economic loss.

1403.   As a direct and foreseeable result of the October 7 Attacks and the injuries of Odeya Chen Natan, a/k/a Odeya Chen Teicher, Plaintiffs Naomi Teicher and Michael Jay Teicher have suffered severe mental anguish and extreme emotional distress, and economic loss.

### EE.    The Revivo Family

1404.   Shlomi Revivo is a dual citizen of the United States and Israel, and a resident of the State of Florida. At the time of the attack, he was 32 years old, newly married, and a self-employed business owner.

1405.   Shlomi and his wife traveled to Israel to be married in mid-September 2023 and remained in Israel after their wedding to spend time with family.

1406.   On October 7, 2023, Shlomi was staying with family at their home in Sderot when the city came under terrorist attack by Hamas.

1407.   Shlomi, along with his wife, younger sister and brother, pregnant sister-in-law, nephew, and dog, were forced to hide in a safe room.

1408.   As the morning of October 7th unfolded, Shlomi received devastating news via WhatsApp that terrorists had set fire to his relatives' house in nearby Kibbutz Be'eri. Shlomi's cousin pleaded with him for help, but all Shlomi could do was call the police. No assistance arrived, as emergency services were overwhelmed or had been targeted themselves. Shlomi soon learned that his cousin's husband and son had been murdered.

1409.   Shlomi and his family members stayed in their safe room for approximately 10 hours. All the while, they heard intense gunfire and explosions outside. Their only protection was a single kitchen knife Shlomi had grabbed on their way into the room.

1410.   The family made the decision to attempt an escape at about 4:00 p.m., sure that staying in the room would mean certain death.

1411.   With both family cars nearly empty of fuel, Shlomi volunteered to make the dangerous trip to find gasoline. During this journey, he witnessed stranded and abandoned vehicles, some containing dead bodies. The first gas station he went to was unmanned and inoperable, so he had to find another one. His prolonged absence caused his family to become frantic with worry; cell phone service in the area had been shut down by the Israeli military in order to prevent further terrorist coordination, leaving his family unable to contact him and fearing for his life.

1412.   He eventually returned to the apartment where his family members were sheltering, and they began their escape from Sderot.

1413.   During that escape, Shlomi and his family encountered scenes of unprecedented horror, including cars on fire, multiple shooting victims visible on the streets, destroyed buildings, and bodies strewn along their escape route. Shlomi saw the bodies of five women murdered at a bus station, a motorcycle with a body beside it later identified as a friend, and a grocery store riddled with bullets.

1414.   Shlomi's family decided to attempt to drive to Shlomi's wife's family in Eilat at the southern-most tip of the State of Israel. They also made the heartbreaking decision not to pick up Shlomi's mother in Sderot, because she insisted that they not risk their lives to reach her in her safe room. Fortunately, she survived without physical injury.

1415.   Shlomi and his wife, younger sister and brother, pregnant sister-in-law and nephew reached Eilat safely and remained there for a week, unable to leave the house during their entire stay.

1416.   Approximately two weeks after October 7, Shlomi secured flights back to the United States. Upon his insistence, his family whom he had driven to Eilat accompanied him to Florida, where they stayed for six months, attempting to recuperate from the shock and displacement.

1417.   As a direct result of the trauma from the October 7 Attacks, Shlomi's marriage deteriorated beyond repair. The couple separated six months after returning to the United States, and their divorce was finalized in August 2024.

1418.   Shlomi has been officially diagnosed with PTSD and has been recognized as a terror victim by the Government of Israel. He suffers from severe and debilitating symptoms consistent with his PTSD diagnosis.

1419.   Shlomi has been deemed unable to work at full capacity since October 7, 2023.

1420.  As a direct and foreseeable result of the October 7 Attacks, Plaintiff Shlomi Revivo has suffered severe mental anguish and extreme emotional distress, and economic loss.

**FF.    The Weiser Family**

1421.  Roey Weiser was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 21 years old.

1422.  Roey was on his base guarding the Erez Crossing into Gaza. The Erez Crossing is a border crossing between the Gaza Strip and Israel, located at the northern end of the Gaza Strip between the Israeli kibbutz of Erez and the Palestinian town of Beit Hanoun. That crossing is a place where food and goods are regularly transported into Gaza, and where thousands of Gazans come and go to work in Israel or for medical care.

1423.  Early in the morning of October 7, 2023, Hamas terrorists breached the Erez Crossing.

1424.  Although Roey was not on guard at the time, he leapt into action. One of two commanders at the outpost, he assigned soldiers to positions, provided updates on the situation, and ensured that as many non-combatant soldiers as possible reached the security room.

1425.  Seeing that his comrades were not reaching the security room because they were pinned down by attacking Hamas terrorists, he conceived of a daring maneuver to outflank the terrorists.

1426.  He led three soldiers out of cover and traveled under fire to join additional soldiers to draw fire away from their other comrades.

1427.  For more than one hour, Roey and his comrades fought a fierce battle against Hamas terrorists, killing dozens of them.

1428.  Running low on ammunition, Roey and his comrades decided to retreat to the safe room area, but Hamas terrorists ambushed them along the way, killing Roey.

1429.   Thanks to Roey's tactical thinking and his heroism, at least 12 of his fellow soldiers were saved.

1430.   Roey's parents, Naomi Feifer-Weiser and Yisrael Weiser, bring this action on behalf of the Estate of Roey Weiser.

1431.   Plaintiff Naomi Feifer-Weiser also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Roey Weiser.

1432.   Plaintiff Yisrael Weiser also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Roey Weiser.

1433.   Plaintiff Shani Weiser is a citizen of the United States and is a resident of the State of Israel. She is the sister of Roey Weiser.

1434.   Plaintiff Nadav Weiser is a citizen of the United States and is a resident of the State of Israel. He is the brother of Roey Weiser.

1435.   As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Roey Weiser experienced conscious pain and suffering and suffered economic loss.

1436.   As a direct and foreseeable result of the October 7 Attacks and the death of Roey Weiser, Plaintiffs Naomi Feifer-Weiser, Yisrael Weiser, Shani Weiser, and Nadav Weiser have suffered severe mental anguish and extreme emotional distress, and economic loss.

### GG.   The Chen Family

1437.   Itay Chen was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 19 years old.

1438.   On October 7, 2023, Itay was serving on the Israel-Gaza border with his tank unit, the Seventh Armored Brigade's 75th Battalion. Itay was killed during an intense battle with Hamas terrorists following their breach of Israel's borders, and he was taken to Gaza.

1439.   Itay's family last heard from him early that morning. Two days later, the Chen family learned that the IDF considered Itay to be missing in action, and that he was likely being held captive by Hamas.

1440.   For months, Itay's family believed that Itay was being held alive as a hostage in Gaza. The Chen family became outspoken advocates for the families of hostages being held by Hamas until the last hostages were released.

1441.   In March 2024, five months after the October 7 Attacks, Itay's family received word that Itay had in fact been killed on October 7, 2023. The IDF was able to confirm his death based on intelligence and findings it had obtained from troops operating in Gaza.

1442.   Then-President Joe Biden released a statement on March 12, 2024, recalling when "Itay's father and brother joined me at the White House, to share the agony and uncertainty they've faced as they prayed for the safe return of their loved one. No one should have to endure even one day of what they have gone through."

1443.   The body of Itay Chen, the last remaining American held hostage Gaza, was only returned on November 4, 2025.

1444.   Itay's parents, Ruby and Hagit Chen, bring this action on behalf of the Estate of Itay Chen.

1445.   Plaintiff Ruby Chen also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Itay Chen.

1446.   Plaintiff Hagit Chen also brings this action individually. She is a citizen and resident of the State of Israel. She is the mother of Itay Chen.

1447.   Plaintiff Roy Chen is a citizen of the United States and is a resident of the State of Israel. He is the brother of Itay Chen.

1448.  Ruby and Hagit Chen also bring this action on behalf of their minor child A.C. A.C. is a citizen of the United States and is a resident of the State of Israel. He is the brother of Itay Chen.

1449.  As a direct and foreseeable result of the October 7 Attacks, the Plaintiff Estate of Itay Chen experienced conscious pain and suffering and suffered economic loss.

1450.  As a direct and foreseeable result of the October 7 Attacks and the death of Itay Chen, Plaintiffs Ruby Chen, Hagit Chen, Roy Chen, and A.C. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### HH.    The Libin Family

1451.  Plaintiff Ethan Libin was a citizen of the United States and a resident of Israel when he was injured by Hamas.

1452.  Ethan was a member of the IDF on October 7, 2023.

1453.  As a member of the IDF, Ethan had to fight his way past the terrorists into Gaza. He saw hundreds of burned cars, and bodies injured and dismembered, shot and killed by explosions.

1454.  Ethan was present at a grenade attack and had to evacuate injured civilians.

1455.  Because of the attacks, Ethan did not sleep for months, experienced night terrors, flashbacks, and PTSD.

1456.  As a direct and foreseeable result of the October 7 Attacks and his subsequent deployment to Gaza to fight against Hamas, Plaintiff Ethan Libin has experienced severe mental anguish and extreme emotional distress, and economic loss.

### II.    The Werde Family

1457.  Plaintiff Shlome Werde was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

226

1458.   Shlome has been a soldier in the IDF since August 2022. On October 7, 2023, he was at the training base in the vicinity of the Gaza Envelope when he heard and saw rockets overhead. Many of his friends died that day as a result of the attack.

1459.   In January 2024, Shlome entered Gaza with his IDF unit where he encountered RPGs, gunfire, and grenades. Later, he was sent to Lebanon. Shlomo continued to face heavy gunfire and bombings.

1460.   As a result of the Hamas terrorist attacks, Shlomo has suffered both physical and mental injuries. He has a back injury, as well as sensitivity to noise. Psychologically, he suffers from trauma due to the violence he has witnessed as a soldier in the IDF.

1461.   As a direct and foreseeable result of the October 7 Attacks and continued violence perpetrated by Hamas and Hezbollah, Plaintiff Shlome Werde has suffered physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

**JJ.    The Engle Family**

1462.   Plaintiff Reut Engle was a citizen of the United States and a resident of Israel when she was injured by Hamas.

1463.   Reut was a physician's assistant with the IDF from 2023, continuing to the present. She was at the Gaza border on October 7, 2023. She was part of the field surgery unit in Gaza in November 2023 and was responsible for evacuating the injured and performing field treatment.

1464.   As a result of this physician's assistant work, as well as being in the combat zone, Reut has experienced burst eardrums, scratched corneas, three herniated disks, trench foot/fungal infections, and psychological trauma.

1465.   As a direct and foreseeable result of the October 7 Attacks and her subsequent deployment to Gaza to fight against Hamas, Plaintiff Reut Engle has experienced severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

**KK.    The Leiter Family**

1466.    Moshe Yedidyah Leiter was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on November 10, 2023. He was 39 years old.

1467.    Moshe Leiter was a father of six children. He served in the IDF until he was 33, when he retired from active duty as a Major. He then entered medical school and completed his studies in August 2023, and was scheduled to begin hospital residency on October 8, 2023, the day after the October 7 Attacks. At the time of his death, he was serving as a company commander in the reserves.

1468.    Moshe Leiter and three other IDF reservists were killed by a Hamas booby trap in the Beit Hanoun area of Gaza while inspecting a tunnel entrance.

1469.    Plaintiff Jay Michael (Yechiel) Leiter was a citizen of the United States at the time Moshe Leiter was killed. He is currently serving as Israel's ambassador to the United States and, as a result, relinquished his U.S. citizenship. He is a resident of the State of Israel. He is the father of Moshe Leiter.

1470.    Plaintiff Chana Leiter is a citizen of the United States and is a resident of the State of Israel. She is the mother of Moshe Leiter.

1471.    Plaintiff Neriya Dov Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1472.    Plaintiff Sara Bracha (Leiter) Attias is a citizen of the United States and is a resident of the State of Israel. She is the sister of Moshe Leiter.

1473.    Plaintiff David Elimelech Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1474.    Plaintiff Sophia (Leiter) Redler is a citizen of the United States and is a resident of the State of Israel. She is the sister of Moshe Leiter.

1475.   Plaintiff Samuel Yair Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1476.   Plaintiff Noam Elisha Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1477.   Plaintiff Amikam Tzion Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1478.   As a direct and foreseeable result of the November 10, 2023, attack on and the death of Moshe Leiter, Plaintiffs Jay Michael (Yechiel) Leiter, Chana Leiter, Neriya Dov Leiter, Sara Bracha (Leiter) Attias, David Elimelech Leiter, Sophia (Leiter) Redler, Samuel Yair Leiter, Noam Elisha Leiter, and Amikam Tzion Leiter have experienced severe mental anguish and extreme emotional distress, and economic loss.

**LL.    The Bours Family**

1479.   Aaron Bours was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 33 years old at the time.

1480.   Aaron was in the United States, en route to a conference in Las Vegas on October 7, 2023. When he landed in Las Vegas, he had 20 messages from his wife trying to reach him to inform him of the invasion of Israel by Hamas.

1481.   Aaron was called up to his IDF reserve unit, the Givati Brigade serving under the Southern Command, almost immediately following the events of October 7, 2023.

1482.   Aaron was part of the ground invasion into Gaza. He went house-to-house looking for Hamas terrorists and Hamas tunnels for the combat engineers to destroy.

1483.   He was in Gaza for two weeks before he was injured.

1484.   On November 14, 2023, Aaron was with his unit heading toward a home in Beit Hanoun in the Gaza Strip. His unit was the last to cross the street in open view of a school that was

affiliated with the United Nations Relief and Works Agency. As is protocol, Aaron's commander stopped to ask permission to enter the house, and Aaron felt like someone was watching him. When he arrived at the house, he turned back to see if his officer was behind him, but at that same time, Aaron heard two gunshots and saw his officer and a communications person fall to the ground. Aaron saw at least two, and as many as four, Hamas terrorists with AK-47s and a sniper shooting at them.

1485.   Aaron began to shoot back at the school. He stopped to look at his officer, who according to Aaron, "looked terrible." Aaron decided to attempt to rescue his officer to try to save his life. Aaron ran to grab his officer but was only able to travel a few feet before he was shot in the right leg, shattering his bone. He was crawling back to the safety of the house when he was shot in the left leg. He continued to crawl to the house and was rescued by the Unit 669 rescue team.

1486.   He was brought to Sheba Medical Center, where he underwent three surgeries to his right leg, including a bone graft. Aaron spent five months in recovery and underwent months of intensive rehabilitation afterward. In addition to the injuries to his legs, Aaron currently suffers from difficulty concentrating and sleeping.

1487.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on November 14, 2023, Plaintiff Aaron Bours has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

### MM.   The Airley Family

1488.   Benyamin Airley was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas. He was 21 years old.

1489.   Benyamin was a member of the Paratroopers Brigade's 101st Battalion in the IDF.

1490.  On November 18, 2023, Benyamin was fighting Hamas terrorists in the northern Gaza Strip when he was killed. Benyamin was deployed to the Gaza Strip as a direct result of the October 7 Attacks.

1491.  Benyamin and fellow soldiers were staying in a beach house in Gaza. They were eating breakfast, when at 7:30 a.m., they were called to the scene of a house that had been invaded by Hamas terrorists.

1492.  Benyamin insisted on joining his fellow soldiers on this mission, believing his Negev gun would keep him safe. He and two other soldiers entered the house and began scouting rooms. They saw a terrorist on the floor and assumed he was alone, but there was another hiding behind a couch. That terrorist shot and killed all three of the soldiers.

1493.  Benyamin's parents, Robert and Jennifer Airley, bring this action on behalf of the Estate of Benyamin Airley.

1494.  Plaintiff Robert Airley also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Benyamin Airley.

1495.  Plaintiff Jennifer Airley also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Benyamin Airley.

1496.  Plaintiff Robert Airley also brings this action as parent and natural guardian of minors A.A., C.A., and Y.A. A.A., C.A., and Y.A. are all citizens of the United States and residents of the State of Israel. They are siblings of Benyamin Airley.

1497.  Plaintiff Sarah Airley is a citizen of the United States and a resident of the State of Israel. She is the sister of Benyamin Airley.

1498.  Plaintiff Yehuda Airley is a citizen of the United States and a resident of the State of Israel. He is the brother of Benyamin Airley.

1499.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on November 18, 2023, the Plaintiff Estate of Benyamin Airley experienced conscious pain and suffering and suffered economic loss.

1500.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on November 18, 2023, during which Benyamin Airley was killed, Plaintiffs Robert Airley, Jennifer Airley, Sarah Airley, Yehuda Airley, A.A., C.A., and Y.A. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**NN.    The Shafer Family**

1501.   Plaintiff Shoshana Bracha Shafer was a citizen of the United States when she was injured by Hamas on November 30, 2023. She was 22 years old.

1502.   Shoshana Bracha was waiting at a bus stop on David Ben Gurion Boulevard in Jerusalem when two Hamas gunmen got out of a vehicle and opened fire on civilians at approximately 7:40 a.m. Three people were killed in the attack.

1503.   The attack was carried out by brothers Murad Namr, 38, and Ibrahim Namr, 30, both Hamas operatives who had previously been jailed for terror activities. Murad was jailed between 2010 and 2020 for planning terror attacks under directions from the Qassam Brigades in the Gaza Strip, and Ibrahim was jailed in 2014 for undisclosed terror activity.

1504.   The terrorists were armed with an M-16 assault rifle and a handgun. Police found large amounts of ammunition in their vehicle.

1505.   Two off-duty soldiers and an armed civilian in the area returned fire, killing the two terrorists.

1506.   Hamas claimed responsibility for the attack that afternoon, hailing the perpetrators as "jihad-waging martyrs."

1507.   Shoshana Bracha sustained a bullet entry wound in her back and an exit wound through her lower abdomen, leaving nine holes in her body. She has undergone three surgeries to repair severe injuries to multiple internal organs, as well as broken bones. She has yet to return to her beloved job as a teacher for middle school students and is still in outpatient rehabilitation in the hospital.

1508.   Shoshana Bracha's parents, Plaintiffs Michael Martin Shafer and Rivka Yehudis Shafer, were both in the United States at the time of the attack. It was very rare for them both to have traveled abroad at the same time, but they had been invited to celebrate a family wedding. Shoshana Bracha was on the phone with her grandmother, Rivka's mother with whom Rivka was staying in the U.S., when the shooting started. Shoshana Bracha hung up the phone quickly, and Rivka's mother commented to Rivka that she heard a lot of commotion.

1509.   Rivka called her daughter twice with no answer, and after Shoshana Bracha called back to tell her she had been in an attack and was bleeding, Rivka called her older children in Israel and instructed them to go find their sister immediately. In fact, Plaintiff Nechama Sorah Gove, Shoshana Bracha's oldest sister, met Shoshana Bracha in the hospital as she was being wheeled to a pre-surgery CT scan. She had rushed to the attack scene, and one of the emergency responders there drove her to the hospital right away.

1510.   Rivka and Michael made immediate arrangements to fly back to Israel and arrived at about 11:00 a.m. the next day. They rushed straight from the airport to the hospital, and have stayed by Shoshana Bracha's side since, remaining with her during her inpatient stays in the hospital and at rehab.

1511.   Shoshana Bracha's nine brothers and sisters have also been a tremendous source of support, while each, like their parents, has experienced the anguish of witnessing their sister's prolonged pain. The family has experienced newfound fears and anxiety since the terrorist attack.

1512.   Plaintiffs Michael Martin Shafer and Rivka Yehudis Shafer, both of whom are citizens of the United States, bring this action individually and on behalf of their minor children, Plaintiff A.S., Plaintiff E.L.S., and Plaintiff E.P.S., who are all citizens of the United States.

1513.   Plaintiff Yehuda Shafer is a citizen of the United States. He is the brother of Shoshana Bracha Shafer.

1514.   Plaintiff Yisroel Meir Shafer is a citizen of the United States. He is the brother of Shoshana Bracha Shafer.

1515.   Plaintiff Yitzchok Shafer is a citizen of the United States. He is the brother of Shoshana Bracha Shafer.

1516.   Plaintiff Nechama Sorah Gove, née Shafer, is a citizen of the United States. She is the sister of Shoshana Bracha Shafer.

1517.   Plaintiff Chana Shira Abraham, née Shafer, is a citizen of the United States. She is the sister of Shoshana Bracha Shafer.

1518.   Plaintiff Chaim Shafer is a citizen of the United States. He is the brother of Shoshana Bracha Shafer.

1519.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on November 30, 2023, Plaintiff Shoshana Bracha Shafer suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

1520.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on November 30, 2023, during which Shoshana Bracha Shafer was injured, Plaintiffs

Michael Martin Shafer, Rivka Yehudis Shafer, Yehuda Shafer, Yisroel Meir Shafer, Yitzchok Shafer, Nechama Sorah Gove, née Shafer, Chana Shira Abraham, née Shafer, Chaim Shafer, A.S., E.L.S., and E.P.S. have experienced severe mental anguish and extreme emotional distress, and economic loss.

### OO.    The Moses Family

1521.    Elitzur Moses was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 42 years old at the time.

1522.    On December 2, 2023, Elitzur was serving as a member of the IDF in Gaza when he was wounded by an RPG that was shot at him by a terrorist, injuring his left hand.

1523.    Elitzur wrapped his injured hand and tried to continue fighting, but he was told he had to leave battle and was sent to Barzillai Hospital. He had a 90% tear to the tendon in his hand, which had to be surgically repaired at Sheba Hospital.

1524.    Plaintiff Dafna Moses is a citizen of the United States and a resident of the State of Israel. She is the wife of Elitzur Moses.

1525.    Plaintiff Elitzur Moses brings this action on behalf of Plaintiff Y.M., a minor child, as their legal guardian. Y.M. is a citizen of the United States and is a resident of the State of Israel. Y.M. is the child of Elitzur Moses.

1526.    Plaintiff Elitzur Moses brings this action on behalf of Plaintiff Ei.M., a minor child, as their legal guardian. Ei.M. is a citizen of the United States and is a resident of the State of Israel. Ei.M. is the child of Elitzur Moses.

1527.    Plaintiff Elitzur Moses brings this action on behalf of Plaintiff Ey.M., a minor child, as their legal guardian. Ey.M. is a citizen of the United States and is a resident of the State of Israel. Ey.M. is the child of Elitzur Moses.

1528.   Plaintiff Elitzur Moses brings this action on behalf of Plaintiff T.M., a minor child, as their legal guardian. T.M. is a citizen of the United States and is a resident of the State of Israel. T.M. is the child of Elitzur Moses.

1529.   Plaintiff Elitzur Moses brings this action on behalf of Plaintiff C.M., a minor child, as their legal guardian. C.M. is a citizen of the United States and is a resident of the State of Israel. C.M. is the child of Elitzur Moses.

1530.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on December 2, 2023, Plaintiff Elitzur Moses has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

1531.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on December 2, 2023, and the injuries of Elitzur Moses, Plaintiffs Dafna Moses, Y.M., Ei.M., Ey.M., T.M., and C.M. have experienced severe mental anguish and extreme emotional distress, and economic loss.

**PP.    The Schenkolewski Family**

1532.   Yakir Schenkolewski was 21 years old when he was killed by Hamas.

1533.   Yakir was the second youngest child of Plaintiff Tova Schenkolewski and her husband Ariel Schenkolewski, and the brother of Yehuda, Aviraz, Ofer, and Renana.

1534.   Yakir was born in Israel and lived with his parents and siblings in Kibbutz Migdal Oz. He enlisted in the IDF and was proud of his service with the 188th Armored Brigade's 53rd Battalion. Just before he enlisted, Yakir learned that he had a medical issue with his foot that would prevent him from becoming a combat soldier candidate. He delayed his enlistment by four months in order to complete physical therapy and thus be eligible to become a combat soldier.

1535.   Prior to October 7, 2023, Yakir was serving on active duty with his tank unit.

1536.   On the morning of October 7, Yakir's parents and eldest brother, Yehuda, with his wife and children, were at the family home. They were woken up by Ariel's phone, which was receiving calls and messages alerting the family that Israel had been attacked.

1537.   The family went to their synagogue, where they saw many people outside, including the rabbi and security forces. The family learned that war had broken out, and everyone in the kibbutz was instructed to shelter in place because the fighting could reach them.

1538.   Later in the evening of October 7, Yakir called his parents to tell them that his unit had been called up to go south and assist with efforts to repel the attack. Within 24 hours, Yakir's three older brothers had been drafted into service as well: Yehuda as a tank commander, Aviraz as part of a special army ranger unit, and Ofer as security for Kibbutz Migdal Oz.

1539.   For the next two months, Yakir was on the front lines of Israel's war against Hamas in the south of Israel and Gaza. He had intermittent access to his cell phone, and his family waited anxiously to hear from him during periods when he could not be in contact.

1540.   On two occasions during this time, Yakir was allowed to visit his family for short periods of leave.

1541.   On November 29, 2023, Yakir's parents and younger sister Renana came to visit him in the south. On the morning of December 1, 2023, he called to tell his family that his unit was preparing to go back into Gaza. Yakir's parents lost contact with him before he entered Gaza and waited anxiously for his next call.

1542.   On December 4, 2023, Yakir's tank came under fire by Hamas terrorists from short range. Yakir and two other soldiers in his tank were killed in the blast. The tank driver was badly wounded but survived.

1543.   That day, three officers knocked on the door of the Schenkolewski family home. Tova was home alone and opened the door. As soon as she saw the officers, she knew her son had been killed.

1544.   Her husband Ariel and son Ofer returned home from synagogue a few minutes later. Tova and Ariel immediately broke the news that Yakir had been killed to their other children so that they would hear of their brother's death from their family before the media announced it. Shortly thereafter, Yakir's death was made public.

1545.   Plaintiff Tova Schenkolewski is a citizen of the United States and is a resident of the State of Israel. She is the mother of Yakir Schenkolewski.

1546.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on December 4, 2023, in which Yakir Schenkolewski was killed, Plaintiff Tova Schenkolewski has suffered severe mental anguish and extreme emotional distress, and economic loss.

### QQ.   The Klughaupt Family

1547.   Amichay Klughaupt was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 19 years old at the time.

1548.   Amichay was a member of the IDF when he was injured by Hamas terrorists on December 8, 2023. Amichay's commander was standing outside the door of their tank when terrorists ambushed them. The commander was shot and fell into the tank, where Amichay attempted, unsuccessfully, to resuscitate him by administering CPR.

1549.   The tank was bombarded by so many RPGs that it flipped over, landing upside down in a ditch on the side of the road. For the next six hours before Amichay and his team were evacuated, Amichay believed he would die.

1550.   As a result of the attack, two fingers from Amichay's hands detached and he incurred shrapnel to his thigh, back and hands.

1551.   Amichay has already undergone multiple surgeries thus far to attempt to restore feeling and function to the re-attached fingers. The likelihood of success from these surgeries is very low.

1552.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on December 8, 2023, Plaintiff Amichay Klughaupt has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

**RR.    The Thaler Family**

1553.   Aryeh Thaler was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 23 years old at the time of the attack.

1554.   Aryeh was a graduate of the ultra-Orthodox Netzah Yehuda Battalion and an officer in the IDF.

1555.   On December 8, 2023, Aryeh was fighting in Gaza when an IED exploded and a large piece of shrapnel entered his lower abdomen, causing severe damage to his lower internal organs and intense bleeding. He survived by being airlifted to Ashdod Hospital, while receiving blood transfusions. He was on the operating table within an hour of being attacked. He spent 2.5 weeks in the hospital and is currently still in rehab.

1556.   Plaintiff Jeffrey Thaler is a citizen of the United States and is a resident of the State of Israel. He is the father of Aryeh Thaler.

1557.   Plaintiff Karen Thaler is a citizen of the United States and is a resident of the State of Israel. She is the mother of Aryeh Thaler.

1558.   Plaintiff Zev Thaler is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Thaler.

1559.   Plaintiff Eliyahu Thaler is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Thaler.

1560.   Plaintiff Yosef Thaler is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Thaler.

1561.   Plaintiff Pesha Thaler is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1562.   Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff A.T., a minor child, as his legal guardians. A.T. is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Thaler.

1563.   Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff L.T., a minor child, as her legal guardians. L.T. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1564.   Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff R.T., a minor child, as her legal guardians. R.T. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1565.   Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff H.T., a minor child, as her legal guardians. H.T. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1566.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on December 8, 2023, Plaintiff Aryeh Thaler has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

1567.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on December 8, 2023, during which Aryeh Thaler was injured, Plaintiffs Jeffrey Thaler,

Karen Thaler, Zev Thaler, Eliyahu Thaler, Yosef Thaler, Pesha Thaler, A.T., L.T., R.T., and H.T. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### SS.    The Morell Family

1568.   Maoz Morell was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas. He was 21 years old.

1569.   In April 2022, Maoz was drafted into the IDF's elite Paratroopers Brigade's reconnaissance unit.

1570.   On October 7, 2023, Maoz was on holiday from the IDF. As soon as he learned of Hamas's attack on Israel, he collected his army equipment and rushed to the fighting underway in Re'im—the site of the Nova Music Festival and a kibbutz of the same name, both of which were under heavy attack from Hamas terrorists.

1571.   Maoz was relocated to Gaza, where he fought for seven weeks. During that time, he was only able to call home once. The voicemail he left for his mother spanned 11 seconds, and said: "Hi Mommy, it's Maoz. Everything is sababa [Hebrew slang for great]. That's it. I've updated you."

1572.   Maoz was injured on February 15, 2024, while fighting in the southern Gaza Strip. He and his unit were positioned in an evacuated house when Hamas terrorists threw a grenade inside one of the rooms, injuring many of the soldiers situated there. Maoz, who was in a different room, immediately entered the room under attack and started administering medical support to the wounded.

1573.   Once Maoz provided whatever support he could, he went up to the roof to assist those engaged in active combat with the Hamas terrorists on the ground who were continuing to attack.

1574.   An IDF tank providing cover fired at one of the buildings where the Hamas terrorists were located. The blast dispersed fragmentation, a large piece of which struck Maoz in his head, critically injuring him.

1575.   While Maoz was in the hospital, hundreds of his friends came to visit him. His parents were told there was no hope for his recovery, but Maoz lived until February 19, 2024, when he succumbed to his wounds.

1576.   Maoz's parents, Varda and Eitan Morell, bring this action on behalf of the Estate of Maoz Morell.

1577.   Plaintiff Varda Morell also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Maoz Morell.

1578.   Plaintiff Eitan Morell also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Maoz Morell.

1579.   Varda and Eitan Morell also bring this action on behalf of their minor child, E.E.M. E.E.M. is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1580.   Varda and Eitan Morell also bring this action on behalf of their minor child, C.M. C.M. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Maoz Morell.

1581.   Plaintiff Shachar Yehuda Morell is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1582.   Plaintiff Mordechai Eliezer Menachem Morell is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1583.   Plaintiff Dov Yerachmiel Morell is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1584.   As a direct and foreseeable result of the October 7 Attacks and the attack which followed on February 15, 2024, the Plaintiff Estate of Maoz Morell experienced conscious pain and suffering and suffered economic loss.

1585.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on February 15, 2024, in which Maoz Morell was killed, Plaintiffs Varda and Eitan Morell, E.E.M., C.M., Shachar Yehuda Morell, Mordechai Eliezer Menachem Morell, and Dov Yerachmiel Morell have suffered severe mental anguish and extreme emotional distress, and economic loss.

## TT.    The Spitz Family

1586.   Aaron Moshe Spitz was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 21 years old at the time.

1587.   Aaron was a combat soldier in the Givati Brigade.

1588.   Aaron was severely injured on February 27, 2024, while serving as an IDF soldier in the northern Gaza Strip. Aaron lost both of his legs and his right hand due to an explosion and was thought to be dead by fellow soldiers who observed the attack. Aaron had a weak pulse and was quickly evacuated and then air-lifted to Soroka Medical Center.

1589.   He underwent a complex and prolonged surgery while there. In total, Aaron received over 30 blood transfusions to save his life and was unconscious for 41 days before waking up.

1590.   Plaintiff Leah Spitz is a citizen of the United States and is a resident of the State of Israel. She is the mother of Aaron Moshe Spitz.

1591.   Plaintiff Gavriel Binyamin Spitz is a citizen of the United States and is a resident of the State of Israel. He is the father of Aaron Moshe Spitz.

1592.   Plaintiff Avital Miriam Spitz is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aaron Moshe Spitz.

1593.   Plaintiff Leah Spitz also brings this action on behalf of Plaintiffs A.H.S., a minor child, as her legal guardian. A.H.S. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aaron Moshe Spitz.

1594.   Plaintiff Leah Spitz also brings this action on behalf of Plaintiff A.S.S., a minor child, as her legal guardian. A.S.S. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aaron Moshe Spitz.

1595.   Plaintiff Leah Spitz also brings this action on behalf of Plaintiff I.J.S., a minor child, as his legal guardian. I.J.S. is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aaron Moshe Spitz.

1596.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on February 27, 2024, Plaintiff Aaron Moshe Spitz has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

1597.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on February 27, 2024, during which Aaron Moshe Spitz was injured, Plaintiffs Leah Spitz, Gavriel Binyamin Spitz, Avital Miriam Spitz, A.H.S., A.S.S., and I.J.S. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**UU.    The Shindman Family**

1598.   Nadav Benjamin Shindman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 21 years old at the time.

1599.   Nadav was a member of the IDF on March 31, 2024.

1600.   On March 31, 2024, Nadav and his unit were in an armored IDF vehicle evacuating the wounded when they were injured by an RPG. Nadav was injured by shrapnel and the shockwave of the RPG.

1601.   Nadav still has three pieces of shrapnel in his throat, four in his arm, and one in his knee. Nadav lives in constant pain, making daily tasks a challenge.

1602.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on March 31, 2024, Plaintiff Nadav Benjamin Shindman has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

**VV.    The Zimbalist Family**

1603.   Eliyahu Moshe Zimbalist, nicknamed "Eli Mo," was a citizen of the United States born in Silver Spring, Maryland, who was murdered by Hamas. He was 21 years old.

1604.   Eliyahu was the fourth of seven children. His family moved to Israel in 2005 when he was two years old.

1605.   A member of the IDF's Combat Engineering Battalion 601, Eliyahu was killed by Hamas alongside seven fellow soldiers on June 15, 2024.

1606.   They were engaged in an operation targeting Hamas terrorist infrastructure in Rafah (in the southernmost part of the Gaza Strip) when their armored personnel carrier was hit by an anti-tank missile launched from a few meters away by Hamas terrorists. The missile hit the back section of their vehicle which held ammunition and caused a massive explosion.

1607.   As a member of the IDF's Combat Engineering Corps, Eliyahu's responsibilities included locating and destroying Hamas terrorist infrastructure such as tunnels and buildings used by terrorists.

1608.   On Saturday morning June 15, 2024, three IDF soldiers came to Eliyahu's home to inform his family of his death. One of Eliyahu's sisters, Plaintiff Nechama Zimbalist, was in her

own home about 25 miles away. Eliyahu's parents, Plaintiffs Simeon and Sara Zimbalist, did not want to send the soldiers to their daughter's house, fearing it would cause unnecessary panic among the residents in her community. Instead, Eliyahu's parents contacted their daughter's father-in-law, asking him to break the news to her personally. They also ensured that the news did not become public until the entire family had been informed.

1609.    Plaintiffs Simeon and Sara Zimbalist, both of whom are citizens of the United States, bring this action individually as Eliyahu's parents and on behalf of the Estate of Eliyahu Moshe Zimbalist.

1610.    Plaintiffs Simeon and Sara Zimbalist also bring this action on behalf of their minor daughters, Plaintiff S.Z. and Plaintiff B.Z., who are both citizens of the United States.

1611.    Plaintiffs Simeon and Sara Zimbalist also bring this action as legal guardians of their son, Plaintiff A.Z., who is a citizen of the United States.

1612.    Plaintiff Nechama Zimbalist is a citizen of the United States. She is the sister of Eliyahu Moshe Zimbalist.

1613.    Plaintiff Aviva Zimbalist is a citizen of the United States. She is the sister of Eliyahu Moshe Zimbalist.

1614.    Plaintiff Shira Zimbalist is a citizen of the United States. She is the sister of Eliyahu Moshe Zimbalist.

1615.    As a direct and foreseeable result of the October 7 Attacks and the attack that followed on June 15, 2024, the Plaintiff Estate of Eliyahu Moshe Zimbalist experienced conscious pain and suffering and suffered economic loss.

1616.    As a direct and foreseeable result of the October 7 Attacks and the attack that followed on June 15, 2024, in which Eliyahu Moshe Zimbalist was killed, Plaintiffs Simeon

Zimbalist, Sara Zimbalist, Nechama Zimbalist, Aviva Zimbalist, Shira Zimbalist, A.Z., S.Z., and B.Z. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### WW.  The Susskind Family

1617.  Plaintiff Nathan Susskind was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1618.  Nathan was a soldier in the IDF on October 7, 2023, when he was called up to Kibbutz Reim near Gaza. Once there, he encountered dead bodies everywhere. He then had to move on to Be'eri where he sought out Hamas terrorists and their entrapments. Nathan was tasked with looking for Hamas terrorists; Hamas booby traps, weaponry, and explosives; and corpses.

1619.  On or about July 9, 2024, Nathan sustained a shrapnel wound during one of his many encounters with Hamas terrorists in Gaza.

1620.  He was redeployed to Gaza in November 2024, where he has lost five comrades, and he himself has been shot at by Hamas and had near-misses with Hamas explosives on numerous occasions.

1621.  As a direct and foreseeable result of the October 7 Attacks and continued violence perpetrated by Hamas, Plaintiff Nathan Susskind has experienced severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

### XX.  The Tawil Family

1622.  Shelomo Tawil was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 27 years old at the time.

1623.  On October 7, 2023, Shelomo was an IDF reservist. Following Hamas's invasion into Israel, Shelomo was called up to serve in the 646th Brigade.

1624.   Shelomo served in Gaza and Lebanon for over 170 days, from October 7, 2023, through March 29, 2024. He was part of the 646th Brigade's evacuation squad, clearing out damaged homes and bodies, including the bodies of dead friends.

1625.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Shelomo Tawil has suffered severe mental anguish and extreme emotional distress, and economic loss.

**YY.    The Benzakein Family**

1626.   Plaintiff Eliezer Benzakein was a citizen of the United States and a resident of Israel when he was injured by Hamas.

1627.   Eliezer enlisted in the IDF in 2018.

1628.   On October 7, 2023, Eliezer was called into service with the IDF primarily along the border between Egypt and the southern portion of the Gaza Strip. While in Gaza, he was involved in firefights in which his fellow soldiers were killed or severely injured.

1629.   Since the attacks, Eliezer has sought help from a mental health professional, attending therapy weekly due to his experiences of seeing dead bodies, entering blood-soaked and ransacked homes, and being in combat with Hamas terrorists. He has been diagnosed with PTSD, for which he takes medication. He constantly suffers from night terrors because of his experiences.

1630.   As a direct and foreseeable result of the October 7 Attacks and continued violence perpetrated by Hamas, Plaintiff Eliezer Benzakein has experienced severe mental anguish and extreme emotional distress, and economic loss.

**ZZ.    The Apelbaum Family**

1631.   Plaintiff David Apelbaum is a citizen of the United States and a resident of the State of Israel.

1632.   Plaintiff Nechama Apelbaum is a citizen of the United States and a resident of the State of Israel. She is the wife of David Apelbaum.

1633.   David and Nechama resided in Okafim, Israel; however, on the night of October 6 into the morning of October 7, 2023, they were visiting friends in nearby Moshav Tifrach when rockets began to fall in the direct vicinity of Tifrach.

1634.   With rockets falling nearby and learning of the devastation occurring elsewhere in the Gaza Envelope and in their home of Okafim, the Apelbaums were overwhelmed with fear for their safety as they feared the terrorists would move from Okafim to Tifrach while rockets would continue to fall in Tifrach.

1635.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs David and Nechama Apelbaum have suffered severe mental anguish and extreme emotional distress, and economic loss.

### AAA.  The Bing Family

1636.   Plaintiff Michal Berger Bing was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1637.   Michal resided in Moshav Tifrach and was at her home on October 7, 2023, when the attack began.

1638.   When the attack began, rockets began to fall in the direct vicinity of Tifrach.

1639.   With rockets falling nearby and learning of the devastation occurring elsewhere in the Gaza Envelope, Michal feared the terrorists would continue their march to Tifrach.

1640.   Since October 7, 2023, Michal has sought assistance through one-on-one counseling, art therapy, play therapy, and support groups to address her fear and emotional trauma.

1641.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Michal Berger Bing has suffered severe mental anguish and extreme emotional distress, and economic loss.

### BBB.  The Biton Family

1642.   Plaintiff Elior Biton was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1643.   Plaintiff Elior Biton brings this action individually and on behalf of Plaintiffs E.S.N. and R.N., his minor children. Both E.S.N. and R.N. are citizens of the United States and residents of the State of Israel.

1644.   On October 7, 2023, Elior Biton and his two daughters were at home in Ashkelon when sirens began to go off indicating a barrage of rocket fire from Gaza.

1645.   Since October 7, Elior Biton and his two daughters have suffered from tightness in the chest, anxiety, panic, loss of security, and difficulty sleeping. They have sought psychiatric treatment.

1646.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs Elior Biton, E.S.N. and R.N. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### CCC.  The Kama Family

1647.   Plaintiff Shachar Hanna Kama was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1648.   As part of her national service, Shachar was working as a teacher in Ofakim during the Jewish holiday of Simchat Torah.

1649.   As the terrorists infiltrated portions of Okafim, Shachar could hear the gunshots and screaming, but she found herself stranded and alone on the road outside of Ofakim without a phone to call for help.

1650.   Knowing what was likely taking place not far from her location, and recognizing that she was a young female walking alone on the road, has resulted in psychological trauma.

1651.    As a direct and foreseeable result of the October 7 Attacks, Plaintiff Shachar Hanna Kama has suffered severe mental health anguish and extreme emotional distress, and economic loss.

**DDD.  The Kassel Family**

1652.    Plaintiff Chana Rachel Kassel was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1653.    Plaintiff Chana Rachel Kassel brings this action individually.

1654.    Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff M.S.K., a minor child, as his legal guardian. M.S.K. is a citizen of the United States and resident of the State of Israel. M.S.K. is the son of Chana Rachel Kassel.

1655.    Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Sh.K., a minor child, as his legal guardian. Sh.K. is a citizen of the United States and resident of the State of Israel. Sh.K. is the son of Chana Rachel Kassel.

1656.    Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff S.K., a minor child, as her legal guardian. S.K. is a citizen of the United States and resident of the State of Israel. S.K. is the daughter of Chana Rachel Kassel.

1657.    Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff D.C.K., a minor child, as his legal guardian. D.C.K. is a citizen of the United States and resident of the State of Israel. D.C.K. is the son of Chana Rachel Kassel.

1658.    Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Av.K., a minor child, as his legal guardian. Av.K. is a citizen of the United States and resident of the State of Israel. Av.K. is the son of Chana Rachel Kassel.

1659.   Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Y.Y.K., a minor child, as his legal guardian. Y.Y.K. is a citizen of the United States and resident of the State of Israel. Y.Y.K. is the son of Chana Rachel Kassel.

1660.   Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff AhK., a minor child, as his legal guardian. Ah.K. is a citizen of the United States and resident of the State of Israel. Ah.K. is the son of Chana Rachel Kassel.

1661.   Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff E.K., a minor child, as his legal guardian. E.K. is a citizen of the United States and resident of the State of Israel. E.K. is the son of Chana Rachel Kassel.

1662.   Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff B-S.K., a minor child, as her legal guardian. B-S.K. is a citizen of the United States and resident of the State of Israel. B-S.K. is the daughter of Chana Rachel Kassel.

1663.   Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Ye.K., a minor child, as his legal guardian. Ye.K. is a citizen of the United States and resident of the State of Israel. Ye.K. is the son of Chana Rachel Kassel.

1664.   Chana was at home with her children in Okafim, Israel, on October 7, 2023.

1665.   As terrorists infiltrated Ofakim, Chana and her children feared for their lives as they heard rockets and gunfire in the area surrounding their home not knowing if their home would be the next one to be attacked.

1666.   Chana and her children continue to live in fear, and her children have difficulty sleeping alone at night as a result of their experiences on October 7.

1667.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs Chana Rachel Kassel, M.S.K., Sh.K., S.K., D.C.K., Av.K., Y.Y.K., Ah.K., E.K., B-S.K., and Ye.K. have suffered severe mental anguish and extreme emotional distress and economic loss.

**EEE.   The Koskas Family**

1668.   Plaintiff Barak Koskas was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1669.   Barak resides in Ashkelon. On October 7, 2023, he feared for his life as rockets began to rain down on the areas around Ashkelon and the proximity of Ashkelon to the Gaza Envelope, and the infiltrating terrorists made that fear even more palpable.

1670.   Since October 7, 2023, Barak has sought medical and psychological treatment as he has had extreme difficulty sleeping at night and has experienced nightmares about October 7 even when he is able to sleep.

1671.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Barak Koskas has suffered severe mental anguish and extreme emotional distress and economic loss.

**FFF.   The Russek Family**

1672.   Plaintiff Naomi Russek was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1673.   Plaintiff Naomi Russek brings this action individually and also on behalf of Plaintiffs R.R., S.R., T.R., A.R., Ef.R., C.P.R., M.H.R., Ep.R., and Av.R., her minor children who are all citizens of the United States and residents of the State of Israel.

1674.   On October 7, 2023, Naomi was at her home in Ofakim with her nine children when the attacks began.

1675.   Naomi and her children collectively sheltered in place in their home as terrorists infiltrated Ofakim, and she could hear shooting and screaming within her vicinity.

1676.   The events of October 7 have impacted the Russek family tremendously as Naomi and her children have sought psychological treatment to try and cope with the emotional strain and trauma caused by the October 7 Attacks.

1677.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs Naomi Russek, R.R., S.R., T.R., A.R., Ef.R., C.P.R., M.H.R., EpR., and Av.R. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**GGG.  The Knoller Family**

1678.   Nadav Knoller was a citizen of the United States when he was murdered by Hamas. He was 30 years old.

1679.   Nadav was in Gaza on July 1, 2024, as part of Battalion 121 of the Eighth Brigade of the IDF when he was killed in combat.

1680.   Nadav was killed by a planted explosive device in the Netzarim Corridor in Gaza.

1681.   Plaintiff Eli Knoller is a citizen of the United States and a resident of the State of Israel. He is the father of Nadav Knoller.

1682.   Plaintiff Eli Knoller brings this action individually, and as the proposed Personal Representative of the Estate of Nadav Knoller.

1683.   Plaintiff Roseanne Greenwald Knoller is a citizen of the United States and a resident of the State of Israel. She is the mother of Nadav Knoller.

1684.   Plaintiff Hadar Knoller is a citizen of the United States and a resident of the State of Israel. She is the widow of Nadav Knoller.

1685.   Plaintiff Hadar Knoller brings this action individually and on behalf of Y.K., a minor child. Y.K. is a citizen of the United States and a resident of Israel. Y.K. is the son of Nadav Knoller.

1686.   Plaintiff Yuval Knoller is a citizen of the United States and a resident of the State of Israel. He is the brother of Nadav Knoller.

1687.   Plaintiff Ortal Knoller is a citizen of the United States and a resident of the State of Israel. She is the sister of Nadav Knoller.

1688.   Plaintiff Itai Knoller is a citizen of the United States and a resident of the State of Israel. He is the brother of Nadav Knoller.

1689.   Plaintiff Gilit Knoller Stzrigler is a citizen of the United States and a resident of the State of Israel. She is the sister of Nadav Knoller.

1690.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on July 1, 2024, the Plaintiff Estate of Nadav Knoller experienced conscious pain and suffering and suffered economic loss.

1691.   As a direct and foreseeable result of the October 7 Attacks and the attack that followed on July 1, 2024, during which Nadav Knoller was killed, Plaintiffs Eli Knoller, Roseanne Greenwald Knoller, Hadar Knoller, Y.K., Yuval Knoller, Ortal Knoller, Itai Knoller, and Gilit Knoller Stzrigler have suffered severe mental anguish and extreme emotional distress, and economic loss.

**HHH.  The Messner Family**

1692.   Plaintiff David Messner was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1693.   From 2023 to 2024, David served as a soldier in the IDF. On May 15, 2024, David was involved in a firefight with Hamas terrorists in Gaza in which his company commander was shot in the head and killed. David was in immediate danger due to his proximity to Hamas terrorists.

1694.   During his time in Gaza, David was under constant duress from Hamas rockets, IEDs, grenades, and other munitions being fired at him and his unit.

1695.   Since his discharge from the IDF, David has sought help from a mental health professional, attending therapy sessions weekly, but he has suffered from substance abuse as a result of his emotional trauma while in Gaza.

1696.   As a direct and foreseeable result of the October 7 Attacks and his subsequent deployment to Gaza to fight against Hamas, Plaintiff David Messner has experienced severe mental anguish and extreme emotional distress, and economic loss.

### III.     The Holtzman Family

1697.   Plaintiff Aharon Holtzman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1698.   On October 7, 2023, Aharon was a soldier for the IDF engaging with Hamas terrorists in Kissufim near the border with Gaza. During the attack, he was in immediate danger due to his close proximity to Hamas terrorists in which he experienced shootings, mortar attacks, and rocket attacks for the next three days while trying to maintain security in Kissufim.

1699.   For the next month, Aharon was engaged in operations in Gaza and the Gaza Envelope in which he was on a constant state of alert for Hamas terrorists. From the middle of November 2023 to August 2024, Aharon fought against Hamas terrorists in Gaza where he witnessed other members of his unit killed in the fighting.

1700.   He also served in areas within Lebanon and Syria following the October 7 Attacks where he continued fighting terrorists while witnessing unimaginable violence.

1701.   As a direct and foreseeable result of the October 7 Attacks and continued violence perpetrated by Hamas and Hezbollah, Plaintiff Aharon Holtzman has experienced severe mental anguish and extreme emotional distress, and economic loss.

**JJJ.    The Sapir Family**

1702.    Plaintiff Shilo Sapir was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1703.    Shilo enlisted in the IDF on December 29, 2022.

1704.    Shilo was an active-duty soldier on October 7, 2023, and was immediately placed in the kibbutzim that were under attack in the Gaza Envelope, where he witnessed dead bodies along with burned houses. He remained in the area as part of the protection force for the kibbutzim for several weeks after the October 7 Attacks.

1705.    When Shilo was subsequently deployed into Gaza, he was involved in active combat against Hamas terrorists. Shilo inhaled numerous toxins such as burnt gunpowder and rubble dust, which led to lung infections. This resulted in him being in the army hospital for about two weeks.

1706.    Once released from the hospital, Shilo was back on the frontlines in Gaza where he was almost hit with shrapnel and gunshots or explosives multiple times for several months. These events have led to trauma, sleep disorders, and sensitivity to sounds.

1707.    Shilo was later readmitted to the hospital after breaking his ankle in Lebanon when he walked into a trap set by terrorists operating along the Lebanese border. After being treated at the hospital, he underwent three months of rehabilitation and recuperation for his broken ankle.

1708.    As a direct and foreseeable result of the October 7 Attacks and continued violence perpetrated by Hamas, Plaintiff Shilo Sapir has experienced severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

**KKK.  The Azulai Family**

1709.    Plaintiff Tayyir Azulai was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1710.   Tayyir was at home with her family in Moshav Yevul, Israel, on October 7, 2023.

1711.   Plaintiff Tayyir Azulai brings this action individually.

1712.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff L.A., a minor child, as his legal guardian. L.A. is a citizen and resident of the State of Israel. L.A. is the son of Tayyir Azulai.

1713.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff H.A., a minor child, as her legal guardian. H.A. is a citizen and resident of the State of Israel. H.A. is the daughter of Tayyir Azalai.

1714.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff T.A., a minor child, as her legal guardian. T.A. is a citizen and resident of the State of Israel. T.A. is the daughter of Tayyir Azulai.

1715.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff Y.A., a minor child, as her legal guardian. Y.A. is a citizen and resident of the State of Israel. Y.A. is the daughter of Tayyir Azuali.

1716.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Tayyir Azulai has suffered severe mental anguish and extreme emotional distress, and economic loss.

1717.   As a direct and foreseeable result of the October 7 Attacks on their mother, Plaintiffs L.A., H.A., T.A., and Y.A. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### LLL.   The Fayazi Family

1718.   Plaintiff Leah Fayazi was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1719.   Plaintiff Ebrahim Fayazi is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1720.   Plaintiff Avigail Aharonov is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1721.   Plaintiff Malka Michael is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1722.   Plaintiff Shlomo Fayazi is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1723.   Plaintiff Shlomo Fayazi also brings this action on behalf of Plaintiff L.F., a minor child, as her legal guardian. L.F. is a citizen of the United States and a resident of the State of Israel. L.F. is the daughter of Shlomo Fayazi.

1724.   Plaintiff Shlomo Fayazi also brings this action on behalf of Plaintiff Yi.F., a minor child, as his legal guardian. Yi.F. is a citizen of the United States and a resident of the State of Israel. Yi.F. is the son of Shlomo Fayazi.

1725.   Plaintiff Naomi Aronof is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1726.   Plaintiff Hadassa Mizrachi is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1727.   Plaintiff Elisheva Haziza is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1728.   Plaintiff David Fayazi is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1729.   Plaintiff Ayala Peretz is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1730.   Plaintiff Yocheved Fayazi is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1731.   Plaintiff Leah Fayazi brings this action on behalf of Plaintiff Yo.F., a minor child, as his legal guardian. Yo.F. is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1732.   Prior to October 7, 2023, the Fayazi family—consisting of Leah Fayazi, 11 of her children, and two of her grandchildren—converged on the Israeli town of Sderot near the Gaza border to celebrate the Jewish holiday of Simchat Torah together.

1733.   Alarms and sirens began sounding in the early morning of October 7, 2023, and the family began to desperately search for one another in Sderot as rockets began flying overhead and landing nearby.

1734.   Soon thereafter, terrorists began to infiltrate Sderot, shooting in all directions, and the Fayazi family members sought to escape and flee from the terrorist attack.

1735.   The Fayazi family members have undergone psychological treatment to attempt to address the emotional trauma they experienced on that day.

1736.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs Leah Fayazi, Ebrahim Fayazi, Avigail Aharonov, Malka Michael, Shlomo Fayazi, L.F., Yi.F., Naomi Aronof, Hadassa Mizrahi, Elisheva Haziza, David Fayazi, Ayala Peretz, Yocheved Fayazi, and Yo.F. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**MMM.    The Hordiner Family**

1737.   Plaintiff Chaya Mushka Hordiner was a citizen and resident of the United States when she was injured by Hamas.

1738.   On October 7, 2023, Chaya was stationed at an IDF base in the northern part of Israel.

1739.   In approximately September 2024, Chaya was repositioned near and in Gaza where she operated and read IDF drone information over Gaza.

1740.   Because of her proximity to the fighting, Chaya was constantly in the line of fire for rockets being fired from Gaza and also shooting from terrorists within Gaza while also obtaining visuals of precisely what was taking place on the ground in Gaza through her piloting of drones.

1741.   Chaya has been emotionally traumatized by her experiences both within the zone of danger on the ground in Gaza and from what she witnessed as a drone pilot.

1742.   As a direct and foreseeable result of the October 7 Attacks and the subsequent IDF action in Gaza, Plaintiff Chaya Mushka Hordiner has suffered severe mental anguish and extreme emotional distress, and economic loss.

**NNN.  The (David) Tawil Family**

1743.   Plaintiff David Tawil was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1744.   David served in Gaza in the IDF reserves for several two-month periods from October 2023 through the present where he has engaged with gunfire, grenades, and rockets, and also encountered IEDs emplaced by terrorists within Gaza.

1745.   As a direct and foreseeable result of the October 7 Attacks and the subsequent IDF action in Gaza, Plaintiff David Tawil has suffered severe mental anguish and extreme emotional distress, and economic loss.

**OOO.  The Kassin Family**

1746.   Plaintiff Naomi Rachel Kassin was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1747.   Naomi was visiting cousins in Ofakim for the Simchat Torah holiday.

1748.   On the morning of October 7, 2023, Naomi and her cousins heard the sirens indicating rocket fire and then later heard gunfire and screaming. She saw terrorists roaming the streets in Ofakim, so she hid in the house.

1749.   As a result of the fear that she experienced on October 7, 2023, Naomi would not go outside for nearly a month and a half after the attacks.

1750.   She has sought psychological treatment to address the fear that continues to overtake her.

1751.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Naomi Rachel Kassin has suffered severe mental anguish and extreme emotional distress, and economic loss.

**PPP.   The Berger Family**

1752.   Plaintiff Lisa Berger was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1753.   On the morning of October 7, 2023, Lisa was at her home in Ofakim when rocket sirens began to blare.

1754.   The sirens and rockets were then accompanied by the sounds of gunfire and screaming as terrorists infiltrated Ofakim, which was the furthest east point of terrorist infiltration on October 7, 2023.

1755.   As a result of the October 7 Attacks, Lisa was displaced from her home in Ofakim without designated shelter, and she has undergone various different types of therapy to address the emotional wounds she has experienced because of that day including group therapy, art therapy, and play therapy.

1756.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Lisa Berger has suffered severe mental anguish and extreme emotional distress, and economic loss.

**QQQ.  The Saffer Family**

1757.  Plaintiff Devorah Rachel Saffer was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1758.  On October 7, 2023, Devorah was at her home in Maslool, Israel, a moshav immediately west of the town of Ofakim and approximately 15 miles from the Gaza border.

1759.  Four young women who had fled from the Nova Music Festival came to Devorah's home and began to frantically tell her what had happened at the festival.

1760.  Recognizing that the young women might have been followed by the terrorists, Devorah experienced a panic attack as fear washed over her.

1761.  As the anticipation of the potential infiltration of Maslool overtook her, Devorah continued to experience panic attacks which continued for two weeks after October 7.

1762.  As a direct and foreseeable result of the October 7 Attacks, Plaintiff Devorah Rachel Saffer has suffered severe mental anguish and extreme emotional distress, and economic loss.

**RRR.  Haim Katzin**

1763.  Plaintiff Haim Katzin was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1764.  On the morning of October 7, 2023, Haim was with friends in Sderot near the Gaza border.

1765.  When the attack began, Haim could not remember where he was; all he could remember was shooting from the terrorists and screaming, and then he ran.

1766.  With the adrenaline, his friends later told him that he fell down the stairs as they sought to escape the oncoming terrorists, and he subsequently required two months to recover from the injuries he sustained in his fall that did not come to light until nearly a week after the fact.

1767.   Haim has sought psychological treatment in the aftermath of his experience in escaping from the terrorists who were infiltrating Sderot on October 7.

1768.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Haim Katzin has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

### SSS.   Israel Katzin

1769.   Plaintiff Israel Katzin was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1770.   On October 7, 2023, Israel was with cousins and friends in Ashkelon when he heard sirens and saw rockets falling close by to where he was. He also heard gunfire in the distance and proceeded to hide at his cousin's house for a full day fearful that the terrorists would attack Ashkelon, which was the closest large Israeli city to Gaza.

1771.   Israel has sought psychological treatment as a result of the October 7 Attacks, and he has also been diagnosed with a sleep disorder related to his psychological trauma.

1772.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Israel Katzin has suffered severe mental anguish and extreme emotional distress, and economic loss.

### TTT.   The Frank Family

1773.   Plaintiff Yonatan Frank was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1774.   Yonatan was at his home in Ofakim on October 7, 2023. As set forth in a psychiatric report issued following the attack, Yonatan was exposed to the infiltration of Hamas terrorists into Ofakim, and since that time, he suffers from adjustment disorder with anxiety.

1775.   As a direct and foreseeable result of the October 7 Attacks, Plaintiff Yonatan Frank has suffered severe mental anguish and extreme emotional distress, and economic loss.

### UUU.  The Cohen Family

1776.    Sandra Cohen was a citizen and resident of the State of Israel when she was injured by Hamas.

1777.    Plaintiff Natali Rotches is a citizen and resident of the United States. She is the sister of Sandra Cohen.

1778.    Sandra and her husband Ohad Cohen and their three children lived in Kibbutz Be'eri, but on October 7, 2023, their world changed forever.

1779.    As terrorists infiltrated Be'eri, the Cohen family retreated into their safe room; however, terrorists fired multiple shots through the safe-room door severely injuring Ohad and then set the house on fire.

1780.    As the family exited their safe room, Ohad took yet another bullet for his family and was killed in front of his wife and children.

1781.    Sandra and Ohad's baby daughter M.C. was killed when a terrorist's bullet went through Sandra's arm and into M.C.'s head killing her while she was being held by her mother when they were still in the safe room.

1782.    By the time the ordeal was over and the IDF had neutralized the terrorists in Be'eri, Sandra had been shot four times in the lungs and multiple times to her extremities placing her in a precarious life-or-death situation.

1783.    Natali immediately flew to Israel to assist her sister in whatever manner possible and to try and be there for her two nephews who had lost their father and sister and almost lost their mother.

1784.    As a direct and foreseeable result of the October 7 Attacks and the injuries to Sandra Cohen, Plaintiff Natali Rotches has suffered severe mental anguish and extreme emotional distress, and economic loss.

### VVV.  The Karten Family

1785.  Plaintiff Jonathan Karten was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1786.  Jonathan was a reserve soldier in the IDF who was activated and deployed to Gaza after October 7, 2023. He was clearing houses of terrorists and booby traps when his unit was hit with an IED, killing Jonathan's friend and spraying Jonathan with shrapnel to his lower back and glutes and causing bulging discs in his lumbar spine.

1787.  Jonathan returned to Gaza a week later in the capacity of a member of the explosives ordnance disposal team in the Khan Yunis, Sajaiya, and Beit Hanoun areas of the Gaza Strip where he experienced additional rocket attacks and trauma.

1788.  He subsequently was stationed in the West Bank where he was involved in arresting Hamas operatives who had stolen a car that they had loaded with Hamas paraphernalia along with explosives.

1789.  As a direct and foreseeable result of the October 7 Attacks and continued violence perpetrated by Hamas, Plaintiff Jonathan Karten has experienced severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

### WWW.        The Kassin Family

1790.  Ezra Kassin was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1791.  Plaintiff Ezra Kassin brings this action individually and also on behalf of Plaintiff E.K., his minor child. E.K. is a citizen of the United States and a resident of the State of Israel.

1792.  On the morning of October 7, 2023, Ezra was in Ashkelon with E.K. when sirens began to wail indicating that rockets had been fired in the direction of Ashkelon.

1793.   In the midst of the chaos that ensued, Ezra and his son heard gunfire, saw the rockets falling, and believed they saw terrorists in the street in Ashkelon. They hid in a friend's house for 12 hours before the IDF arrived.

1794.   Since the October 7 Attacks, Ezra and E.K. have received psychological treatment for the emotional trauma they endured. E.K. suffers from a massive sleep disorder and ear disturbances since the October 7 Attacks.

1795.   As a direct and foreseeable result of the October 7 Attacks, Plaintiffs Ezra Kassin and E.K. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**XXX.  The Blisko Family**

1796.   Plaintiff Samuel Blisko was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1797.   Samuel was a reservist with the IDF on October 7, 2023, and subsequently served in Gaza, Syria, and Lebanon following the Hamas attacks on October 7.

1798.   As a direct and foreseeable result of the October 7 Attacks and his subsequent deployment to Gaza, Syria, and Lebanon to fight against Hamas, Plaintiff Samuel Blisko has experienced severe mental anguish and extreme emotional distress, and economic loss.

## CLAIM FOR RELIEF

### AIDING AND ABETTING DESIGNATED FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)(2)
### (Against All Defendants)

1799.   Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1800.   Plaintiffs assert this cause of action against Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen under 18 U.S.C. § 2333(d)(2), which provides for liability (in an action under 18 U.S.C. § 2333(a) involving acts of international terrorism by a

designated foreign terrorist organization), against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."

1801.   Plaintiffs are nationals of the United States who were injured in their persons or property by acts of international terrorism, or the estates, survivors, or heirs of such U.S. nationals.

1802.   Hamas, the IRGC, Hezbollah, and PIJ were all designated FTOs at the time they committed, planned, and/or authorized the October 7 Attacks that injured and/or killed the Plaintiffs or their family members and those terrorist attacks that followed from the October 7 Attacks in both Israel and Gaza which were perpetrated subsequently by Hamas and other FTOs.

1803.   The October 7 Attacks and those terrorist attacks in Israel and Gaza perpetrated subsequently were acts of international terrorism as defined by 18 U.S.C. § 2331.

1804.   Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen knowingly provided Hamas, the IRGC, Hezbollah, and PIJ substantial assistance, which included: (a) transferring significant sums of cryptocurrency and fiat currency to Hamas, the IRGC, Hezbollah, and PIJ and their respective agents; (b) maintaining wallets on Binance's platform for the benefit of Hamas, the IRGC, Hezbollah, and PIJ and their respective front organizations; (c) providing Hamas, the IRGC, Hezbollah, and PIJ with access to U.S. dollar-denominated liquidity and the U.S. banking system; (d) concealing transfers of fiat currency and cryptocurrency transacted by or for the benefit of Hamas, the IRGC, Hezbollah, and PIJ; and (e) enabling Hamas, the IRGC, Hezbollah, and PIJ to access and transfer assets that could foreseeably be used to commit terrorist attacks, including those set forth herein.

1805.   Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen knowingly provided Hamas, the IRGC, Hezbollah, and PIJ with largely unrestricted access

to Binance's cryptocurrency exchange platform, enabling Hamas, the IRGC, Hezbollah, and PIJ to receive and send payments, and to engage in cryptocurrency trading, in violation of U.S. law.

1806.   Such unrestricted access included, but was not limited to: (a) concealing the presence of Hamas, the IRGC, Hezbollah, and PIJ on Binance's cryptocurrency exchange platform, in violation of U.S. law; (b) facilitating direct transmission of cryptocurrency to and from Hamas, the IRGC, Hezbollah, and PIJ, in violation of U.S. law; (c) failing to report known transactions involving Hamas, the IRGC, Hezbollah, and PIJ, in violation of U.S. law; and (d) permitting Hamas, the IRGC, Hezbollah, and PIJ to withdraw assets held with Binance.com, in violation of U.S. law.

1807.   Binance continued providing these services even after senior executives learned that the platform was providing services to Hamas, the IRGC, Hezbollah, and PIJ and their funders, despite knowing that Hamas, the IRGC, Hezbollah, and PIJ are designated terrorist organizations.

1808.   At the time Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen provided substantial assistance to Hamas, the IRGC, Hezbollah, and PIJ, they knew that: (a) the U.S. government had designated Hamas, the IRGC, Hezbollah, and PIJ as FTOs and/or SDGTs; (b) Hamas, the IRGC, Hezbollah, and PIJ engaged in acts of international terrorism resulting in the murder of hundreds of Israeli and U.S. citizens; and (c) clandestine funding was essential to Hamas, the IRGC, Hezbollah, and PIJ's ability to carry out terrorist attacks.

1809.   Defendants Binance Holdings Limited, Changpeng Zhao and Guangying "Heina" Chen also knew that their substantial assistance would facilitate the ability of Hamas, the IRGC, Hezbollah, and PIJ to carry out terrorist attacks like the ones described herein.

1810.   Given their knowing and substantial assistance to these terrorist organizations,

Defendants Binance Holdings Limited, Changpeng Zhao and Guangying "Heina" Chen demonstrated conscious, voluntary, and culpable participation in the terrorist organizations' wrongdoing.

1811.  Indeed, by knowingly moving and concealing the movement of hundreds of millions of dollars for Hamas, the IRGC, Hezbollah, and PIJ, Defendants Binance Holdings Limited, Changpeng Zhao and Guangying "Heina" Chen provided pervasive and systemic assistance to these terrorist organizations.

1812.  The October 7 Attacks and subsequent attacks, as well as Plaintiffs' injuries in the attacks, were foreseeable results of Defendants' substantial assistance to Hamas, the IRGC, Hezbollah, and PIJ.

1813.   Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs for:

(a)    Compensatory damages in amounts to be determined at trial;

(b)    Treble damages pursuant to 18 U.S.C. § 2333(a);

(c)    Any and all costs sustained in connection with the prosecution of this action, including attorneys' fees pursuant to 18 U.S.C. § 2333(a); and

(d)    Such other and further relief as justice requires.

Respectfully submitted this the 21st day of November, 2025.

By:    /s/ Aaron Schlanger
        Aaron Schlanger
        aschlanger@osenlaw.com
        Gary M. Osen (motion for admission pro hac vice forthcoming)
        gosen@osenlaw.com
        **OSEN LLC**
        190 Moore Street, Suite 272
        Hackensack, NJ 07601
        Telephone: (201) 265-6400
        Facsimile: (201) 265-0303

        **WILLKIE FARR & GALLAGHER LLP**
        Lee Wolosky (admission pending)
        Aaron E. Nathan (motion for admission pro hac vice forthcoming)
        787 7th Avenue
        New York, NY 10019
        Telephone: (212) 728-8000
        Facsimile: (212) 728-8111
        lwolosky@willkie.com
        anathan@willkie.com

        **STEIN MITCHELL BEATO & MISSNER LLP**
        Jonathan E. Missner (motion for admission pro hac vice forthcoming)
        Robert B. Gilmore (motion for admission pro hac vice forthcoming)
        Kevin L. Attridge (motion for admission pro hac vice forthcoming)
        2000 K St., NW, Suite 600
        Washington, D.C. 20006
        Telephone: (202) 737-7777
        Facsimile: (202) 296-8312
        jmissner@steinmitchell.com
        rgilmore@steinmitchell.com
        kattridge@steinmitchell.com

        *Attorneys for the Balva, Shalom, Sasi, Goldberg-Polin, Beniashvili, Elmalem, Waldman, Shay, Ziering, Rouusso, Katsmanm, Levy, Rosenfeld, Bomflek, Revivo, Weiser, Chen, Leiter, Shafer, Schenkolewski, Morell, and Zimbalist Plaintiffs*

**MOTLEY RICE LLC**

By: /s/ John M. Eubanks

John M. Eubanks (motion for admission pro hac vice forthcoming)
Michael E. Elsner (motion for admission pro hac vice forthcoming)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9250
Facsimile: (843) 216-9450
jeubanks@motleyrice.com
melsner@motleyrice.com

**MM~LAW LLC**

Gavriel Mairone (motion for admission pro hac vice forthcoming)
Ariel Mairone (motion for admission pro hac vice forthcoming)
Christine N. Crane (motion for admission pro hac vice forthcoming)
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (312) 253-7444
Fax: (312) 275-8590
ctlaw@mm-law.com

*Attorneys for the Newman, Vardi, Zafrani, Rothner, Edan, Donald Goodman, Cherney, Daniels, Davidovich, Ben Zaken, Hamo, Amar, Yehoshua Goodman, Zer-Chen, Gutstein, Natan a/k/a Teicher, Libin, Werde, Engle, Bours, Airley, Moses, Klughaupt, Thaler, Spitz, Shindman, Susskind, Shelomo Tawil, Benzakein, Apelbaum, Bing, Biton, Kama, Kassel, Koskas, Russek, Knoller, Messner, Holtzman, Sapir, Azulai, Fayazi, Hordiner, David Tawil, Naomi Kassin, Berger, Saffer, Haim Katzin, Israel Katzin, Frank, Cohen, Karten, Ezra Kassin, and Blisko Plaintiffs*