**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

EYAL BALVA, *et al.*,

              Plaintiffs,

v.

BINANCE HOLDINGS LIMITED, *et al.*,

              Defendants.

No. 3:25-cv-266-PDW-ARS

**MEMORANDUM OF LAW IN**
**SUPPORT OF MOTION TO**
**DISMISS**

## TABLE OF CONTENTS

                                                                         **Page**

I.     PRELIMINARY STATEMENT ....................................................................1

II.    PLAINTIFFS' ALLEGATIONS .................................................................5

     A.     Reliance on Prior U.S. Agency Filings................................................5

     B.     The Complaint Relies on Binance's Alleged KYC and AML Compliance
          Failures in Hindsight.........................................................................7

     C.     BHL's Purported Knowledge of Users' Connections to FTOs Requires
          Speculation.......................................................................................8

III.   ARGUMENT...............................................................................................9

     A.     The Complaint Must Be Dismissed for Failing to Set Forth a Short and
          Plain Statement of the Claim .............................................................9

     B.     This Court Lacks Jurisdiction Because Service on BHL Was Defective ..............10

     C.     The Complaint Fails to Adequately Plead Personal Jurisdiction Over BHL.........11

         1.     Plaintiffs Do Not Meet Three of the Four Required Elements for
             Personal Jurisdiction ................................................................11

         2.     Plaintiffs Have Not Served BHL ................................................12

         3.     Plaintiffs Do Not Assert a Valid Claim Arising Under Federal Law ........12

         4.     Exercising Personal Jurisdiction over BHL in This Case Does Not
             Comport with Due Process ........................................................12

             (a)     This Court Cannot Exercise General Jurisdiction Over BHL........13

             (b)     This Court Cannot Exercise Specific Jurisdiction Over
                 BHL.................................................................................13

D.      Venue Does Not Lie in This District ...................................................16

E.      The Complaint Fails to State a Claim Upon Which Relief Can Be Granted.........19

     1.     Plaintiffs Cannot Satisfy the Pleading Standard for their Sole Claim of Aiding-and-Abetting Liability Under JASTA ............................19

     2.     The Complaint Does Not Plausibly Plead That BHL "Knowingly and Substantially" Assisted the Attacks Under JASTA ............................20

          (a)     Precedent Sets a High Bar for Alleging Knowing and Substantial Assistance....................................................20

          (b)     Plaintiffs Fail to Meet Their High Pleading Bar............................23

               (i)     Plaintiffs Fail to Sufficiently Allege Any Nexus...............24

               (ii)     BHL's Passive Conduct Providing Exchange Services Is Insufficient to Plead Aiding-and-Abetting Liability................................................27

               (iii)     Plaintiffs Allege that BHL Allowed FTOs to Obtain Financing Generally, Not in Connection with the Attacks ...............................................................28

               (iv)     Plaintiffs Do Not Allege That BHL Provided "Pervasive, Systemic and Culpable" Assistance to FTOs Such That It Assumed Liability for Every FTO Attack .........................................................30

               (v)     Plaintiffs Fail to Sufficiently Allege That BHL Knowingly Assisted the Attacks.......................................31

     3.     The *Halberstam* Factors Confirm the Complaint Fails to Plead Substantial Assistance.................................................................33

     4.     The Complaint Does Not, and Cannot, Allege BHL Was "Generally Aware" of Any Role in the Attacks........................................36

          (a)     Plaintiffs Do Not Allege That BHL Was Aware of Customers' Connections with FTOs...............................36

          (b)     Plaintiffs Cannot Allege That BHL Could Foresee the Attacks ...................................................................38

F.      Certain Specific Plaintiffs Fail to Allege Standing...............................................39

IV.     CONCLUSION................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Amorosa* v. *Gen. Elec. Co.*,
  2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022)..........................................................................26

*Ashley v. Deutsche Bank Aktiengesellschaft*,
  144 F.4th 420 (2d Cir. 2025) .................................................................................... *passim*

*Atchley v. AstraZeneca UK Ltd.*,
  165 F.4th 592 (D.C. Cir. 2026)..................................................................................22, 23, 35

*Averbach for Estate of Averbach v. Cairo Amman Bank*,
  2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) ..........................................................................39

*Bell v. Pulmosan Safety Equip. Corp.*,
  906 F.3d 711 (8th Cir. 2018) .................................................................................................10

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022)..........................................................................................34, 36

*Bryant Portable Welding, Inc. v. Seville Indus., LLC*,
  2023 WL 3891668 (D.N.D. Apr. 11, 2023)............................................................................11

*Cody v. Loen*,
  468 Fed. Appx. 644 (8th Cir. 2012)....................................................................................9, 10

*Dent v. U.S. Tennis Ass'n, Inc.*,
  2008 WL 2483288 (E.D.N.Y. June 17, 2008) ........................................................................26

*Energy Transfer Equity, LP v. Greenpeace Int'l*,
  2018 WL 4677787 (D.N.D. July 24, 2018) ............................................................................12

*Everest Indem. Ins. Co. v. Ro*,
  200 F. Supp. 3d 825 (D. Minn. 2016).....................................................................................17

*Fraenkel v. Standard Chartered Bank*,
  2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025)................................................................ *passim*

*Fuld v. Palestine Liberation Organization*,
  606 U.S. 1 (2025).........................................................................................................14, 15, 16

*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
  564 U.S. 915 (2011)................................................................................................................13

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................................. *passim*

*Holmes v. Nebraska*,
  2021 WL 4710343 (D. Neb. Oct. 8, 2021) ..............................................11

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ..............................................................36, 37

*Kraft v. Essentia Health, Innovis Health, LLC*,
  600 F. Supp. 3d 965 (D.N.D. 2021) ........................................................19

*Larson v. Stow*,
  36 F.3d 1100, 1994 WL 512369 ..............................................................9

*Leroy v. Great W. United Corp.*,
  443 U.S. 173 (1979)..............................................................................17

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)...................................................................32

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2nd Cir. 1976)..................................................................25

*Maybelline Co. v. Noxell Corp.*,
  813 F.2d 901 (8th Cir. 1987) ..................................................................16

*Miller v. Cartel*,
  2022 WL 2286952 (D.N.D. June 24, 2022)...............................................12

*Mishkin v. Peat, Marwick, Mitchell & Co.*,
  1988 WL 391648 (S.D.N.Y. Nov. 7, 1988)................................................25

*Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*,
  259 F.3d 949 (8th Cir. 2001) ..................................................................40

*Nuevos Destinos, LLC v. Peck*,
  2019 WL 6481441 (D.N.D. Dec. 2, 2019) ......................................11, 12, 13

*In re Platinum & Palladium Commodities Litig.*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011).......................................................25

*Rare Breed Triggers, LLC v. Garland*,
  639 F. Supp. 3d 903 (D.N.D. 2022) ..................................................16, 19

*Risk Techs., Inc. v. Tennessee Mun. League Risk Mgmt. Pool, Inc.*,
  2003 WL 21018872 (N.D. Tex. May 1, 2003) ...........................................14

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
    605 U.S. 280 (2025)............................................................................................ *passim*

*Steen v. Murray*,
    770 F.3d 698 (8th Cir. 2014) ...............................................................................17

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*,
    113 F.3d 1484 (8th Cir. 1997) .............................................................................33

*Thomson v. Olson*,
    866 F. Supp. 1267 (D.N.D. 1994)..........................................................................9

*In re Trilegiant Corp., Inc.*,
    11 F. Supp. 3d 82 (D. Conn. 2014).....................................................................26

*Twitter, Inc.* v. *Taamneh*,
    598 U.S. 471 (2023)..................................................................................... *passim*

*United States v. 51 Pieces of Real Prop. Roswell, N.M.*,
    17 F.3d 1306 (10th Cir. 1994) .............................................................................15

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*,
    2014 WL 3569338 (E.D.N.Y. July 18, 2014)........................................................25

*Woodke v. Dahm*,
    70 F.3d 983 (8th Cir. 1995) ...........................................................................16, 17

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010).........................................................................40

**Federal Statutes**

Anti-Terrorism Act of 1990 (18 U.S.C. § 2333)....................................................... *passim*

18 U.S.C. § 2333(d)(2) ...............................................................................................19

18 U.S.C. § 2334(a) ....................................................................................................16

28 U.S.C. § 1391(b) ..............................................................................................17, 18

**Rules**

Federal Rule of Civil Procedure 4(k)(2) ...........................................................11, 12, 13

Federal Rule of Civil Procedure 8 ............................................................................3, 9

Federal Rule of Civil Procedure 12(b)(2) ...................................................................11

Federal Rule of Civil Procedure 12(b)(3) ..............................................................16, 19

Federal Rule of Civil Procedure 12(b)(5) ...................................................................10, 11

Federal Rule of Civil Procedure 12(b)(6) ...................................................................19, 20

Federal Rule of Evidence 201 .......................................................................................18

## I.    PRELIMINARY STATEMENT

Binance Holdings Limited ("BHL") unequivocally condemns all acts of terrorism, including the abhorrent attacks on the State of Israel on October 7, 2023 (the "Attacks"). The victims of those Attacks are entitled to justice against the perpetrators of those Attacks. But BHL is not responsible for those Attacks. The Complaint suffers from material pleading deficiencies and improperly relies on speculation to overcome the gaps in Plaintiffs' attempt to tie BHL to the Attacks.

BHL is a foreign company associated with one of the world's biggest cryptocurrency exchanges, Binance.com. BHL has one of the largest and most robust compliance programs in the digital asset industry. BHL regularly partners with law enforcement investigators to help dismantle transnational criminal networks and claw back stolen user funds. In 2025 alone, BHL supported authorities in confiscating more than $131 million in funds linked to illicit activity, processed more than 71,000 law-enforcement requests worldwide, and delivered more than 160 training sessions to strengthen law enforcement's capacity to tackle crypto-related threats.

By design, public blockchains allow users to send assets to deposit addresses hosted by centralized exchanges such as Binance.com without prior approval from the receiving exchange. Exchanges therefore rely on on-chain monitoring, screening, and post-receipt controls to detect, investigate, and mitigate exposure after funds are received into deposit wallets hosted by them. As a result, exposure to high-risk deposit transactions cannot be reduced to absolute zero on any blockchain platform. Bad actors will attempt to use broadly available financing services of all types, whether it is traditional banking services, fintech, or crypto. The fact that BHL is exposed to the same types of risks and bad actors as other platforms does not mean it participated in the Attacks.

Plaintiffs' Complaint mischaracterizes the content of 2023 U.S. government agency filings and resolutions concerning BHL's historical anti-money laundering and sanctions compliance functions in support of its claim for money damages from BHL (and two individual defendants). Plaintiffs' sole cause of action against BHL is brought under the Anti-Terrorism Act of 1990 ("ATA") (18 U.S.C. § 2333(a)), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA") (18 U.S.C. § 2333(d)), for allegedly aiding and abetting the terrorists that perpetrated the Attacks. But Plaintiffs fall far short of the high bar they must clear to sustain their JASTA aiding-and-abetting liability claim, which requires Plaintiffs to adequately allege and ultimately prove that BHL "gave such knowing and substantial assistance to [a foreign terrorist organization ("FTO")] that they culpably participated in the . . . [A]ttack[s]" in which Plaintiffs were injured. *Twitter, Inc.* v. *Taamneh*, 598 U.S. 471, 497, 498 (2023). The agency filings and civil resolutions do not and cannot help Plaintiffs clear this hurdle: they do not state that BHL was contemporaneously aware of terrorists using its platform, or that BHL intended they do so, and Plaintiffs cannot rely on the agency filings and civil resolutions as a substitute for independently pleading the underlying facts of liability necessary to sustain the Complaint.

As set forth by the Supreme Court in *Twitter* and *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), and various Circuit and District Courts that have applied these cases, Plaintiffs must establish this substantial and knowing assistance through (1) a concrete nexus between BHL's activity and the Attacks, or (2) BHL's pervasive, systemic, and culpable assistance of the FTOs. *See, e.g.*, *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 445 (2d Cir. 2025). As *Twitter* and other post-*Twitter* decisions make clear, it is "'not enough to say that the defendant assisted the terrorist organization's activities in general,' without 'offer[ing a] discernable nexus between [Defendant's conduct] and the attacks committed against Plaintiffs.'"

2

*Fraenkel v. Standard Chartered Bank*, 2025 WL 2773251, at *9 (S.D.N.Y. Sept. 26, 2025) (quoting *Ashley*, 144 F.4th at 444). Even "wrongdoing with regard to evading sanctions regimes and assisting customers to evade those sanctions" is "far too attenuated to establish a direct nexus between [the bank's] conduct and the [a]ttacks." *Id.* Instead, Plaintiffs must allege and prove that BHL engaged in specific affirmative misconduct, knowing that such misconduct was intended to support the Attacks. *See Twitter*, 598 U.S. at 498-500.

The Complaint, despite its length, comes nowhere near satisfying this pleading standard. Plaintiffs cannot allege that BHL gave knowing and substantial assistance to the relevant FTOs such that BHL can be said to have participated in the Attacks. Instead, the Complaint asserts only that: (1) BHL's compliance program allowed certain individuals or entities associated with FTOs to transact on the Binance platform, which resulted in those individuals or entities receiving or laundering money that ended up in the hands of FTOs; and (2) BHL knew, or should have known, that certain transactions or users on the Binance platform had connections to FTOs. These assertions largely rely on Plaintiffs' speculation concerning transactions that involve third parties that purportedly raise or launder money for the FTOs, as opposed to the FTOs themselves. This is not sufficient to state a JASTA aiding-and-abetting claim. *Fraenkel*, 2025 WL 2773251, at *9 ("The nexus between (i) SCB's purported clearing and laundering of money for customers connected to Iran or Iran's Terrorist Sponsors in some way and (ii) any of the Attacks is too attenuated to give rise to JASTA liability here.").

The Complaint fails to set forth a legal basis for recovery against BHL for numerous reasons, each mandating that the Complaint be dismissed.

***First,*** the Complaint violates Rule 8 by failing to set forth a short and plain statement of Plaintiffs' entitlement to relief. Instead, the Complaint meanders through hundreds of paragraphs

3

of irrelevant background to give a false appearance that the Complaint has any merit.

*Second*, Plaintiffs failed to properly serve BHL with the summons and Complaint in this action, instead mailing those documents to an incorrect address.

*Third*, Plaintiffs have failed to establish a *prima facie* case of personal jurisdiction over BHL. There are no connections between any of the supposed acts of assistance that BHL provided to any FTO or FTO-associated person and the U.S. The only potentially arguable "suit-related" contacts allegedly connected to North Dakota or the U.S. are two Binance.com accounts that were accessed a small number of times via IP addresses from Kindred, North Dakota. But as the Complaint alleges, even those minor and insufficient contacts with the forum were made by individuals using VPNs to disguise their true geographic location when they accessed those accounts. In any event, Plaintiffs do not connect these accounts or this VPN use to the Attacks, and one of those accounts ceased transacting over a year prior to the Attacks. Plaintiffs do not otherwise allege that BHL has any meaningful suit-related connection to the U.S., and all of the parties and conduct complained of are located or occurred outside the U.S.

*Fourth*, and relatedly, venue is improper in this Court. All of the parties, including Plaintiffs, are strangers to this forum, and none of the statutory bases for venue apply here. Plaintiffs are forum shopping. Plaintiffs could have sought to join any of four earlier-filed federal lawsuits involving the same claims and allegations against BHL. Indeed, one of the Plaintiffs here, Noach Newman, is pursuing the same claim here and in the Middle District of Alabama. The plaintiffs in those cases have alleged the same JASTA claims against the same defendants, for the same Attacks, based on the same legal theory and substantially similar alleged facts.

*Fifth*, Plaintiffs fail to state a legally cognizable claim under JASTA against BHL. Plaintiffs' legal theory improperly transmogrifies JASTA into a strict liability statute instead of an

4

aiding-and-abetting statute. Plaintiffs do not and cannot explain how BHL's purported compliance failures translate into knowing and substantial assistance by BHL of any FTO in furtherance of the Attacks, or into BHL's general knowledge of its purported involvement in an FTO's activities. Plaintiffs' attenuated theories are insufficient under JASTA and therefore their claim must be dismissed.

*Finally*, based solely on the allegations in the Complaint, several Plaintiffs do not meet JASTA's standing requirements. Even assuming that Plaintiffs' aiding-and-abetting claim survives the fatal pleading flaws set forth above and herein, those Plaintiffs must be dismissed from the case.

## II.   **PLAINTIFFS' ALLEGATIONS**

The Complaint contains no allegations that BHL: (1) planned or participated in the Attacks; (2) supported the Attacks; (3) had advance knowledge of the Attacks; (4) had any connection with, or relationship to, the Attacks' perpetrators; or (5) intentionally harmed any of the Plaintiffs. Indeed, Plaintiffs' lengthy descriptions of the FTOs at issue and the Attacks (Compl. §§ V & VI) do not mention BHL (or any other defendant) a single time. Tellingly, most of the voluminous Complaint does not even mention BHL, and is focused instead on Plaintiffs or their family members (*id.* ¶¶ 995-1798), the FTOs responsible for the Attacks and their relationships to each other (*id.* ¶¶ 803-903), and the Attacks themselves (*id.* ¶¶ 904-994). The Complaint otherwise strains to assert liability against BHL for physical and emotional harm Plaintiffs allegedly suffered from the Attacks, which Plaintiffs expressly state were carried out by FTOs, not by BHL.

### A.   **Reliance on Prior U.S. Agency Filings**

Plaintiffs' allegations concerning purported wrongdoing by BHL principally stem from plea agreements, consent orders, or settlements BHL reached with the Department of Justice

5

("DOJ"), the Financial Crimes and Enforcement Network ("FinCEN"), the Office of Foreign Assets Control ("OFAC"), and the Commodity Futures Trading Commission ("CFTC").[1] (*See* Declaration of Christopher N. LaVigne, dated March 4, 2026 ("LaVigne Decl.") Exs. 1-4.) Plaintiffs cherry-pick from these agency filings to attempt to connect BHL's conduct alleged in the filings with the Attacks. But the actual filings make clear that the central issues in those matters were that BHL did not have sufficient anti-money laundering and sanctions controls and failed to register with FinCEN as a money service business, not that BHL aided-and-abetting terrorism. (*See generally id.*)

Most of Plaintiffs' cherry-picked quotes are from the agencies' backward-looking reviews that do not address whether BHL knew any transactions on Binance.com were linked to terrorists *at the time they occurred*. (*See, e.g.*, Compl. ¶¶ 797, 798.[2]) Further, none of these agencies alleged that BHL intentionally supported terrorists, let alone the Attacks. Indeed, the FinCEN Consent Order acknowledges that although BHL may not have filed suspicious activity reports ("SARs"), BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing." (LaVigne Decl. Ex. 1 at 46; *see also id.* Ex. 4 (DOJ Plea Agreement) at 7-8.)

And, despite 250 pages of allegations, the Complaint contains no connection between BHL and any terrorist attacks, including the Attacks, and therefore cannot survive a motion to dismiss under *Twitter* and its progeny.

---

[1] As set forth *infra* § III.E.2.b.i, Plaintiffs may not rely on pre-adjudication agency complaints or settlements to plead the underlying facts of liability necessary to sustain the Complaint.

[2] For example, Plaintiffs allege that "[a]s FinCEN documented in its November 2023 Consent Order, [BHL] knowingly 'processed several transactions with . . . .'" (Compl. ¶ 553.) But the FinCEN Consent Order does not claim that BHL "knowingly" processed such transactions, underscoring Plaintiffs' unsupported speculation that BHL knew of transactions involving individuals associated with FTOs.

6

B.   **The Complaint Relies on Binance's Alleged KYC and AML Compliance Failures in Hindsight**

Plaintiffs transform the descriptions in the U.S. agency filings regarding BHL's historical AML, KYC, and sanctions policies and jump to the conclusion that BHL purposefully structured its compliance program to allow bad actors to use the Binance platform. (Compl. ¶¶ 280-376.) This is not something any of these backward-looking agency filings ever concluded. Plaintiffs plead that BHL's compliance failures led to criminal activity occurring on the platform, attempting to convert, without support, an ineffective AML program into terrorist financing. (*Id.* ¶ 366). But Plaintiffs plead no allegations to support their claim that BHL knowingly assisted the FTOs responsible for the Attacks for the purpose of bringing about the Attacks.

For example, Plaintiffs allege that BHL allowed U.S.-based VIP users to access the Binance.com platform (*id.* ¶¶ 280-300), "avoided keeping formal records of certain meetings and communications," (*id.* ¶ 334), and intentionally exempted certain users from KYC requirements and allowed users subject to sanctions, including users from Iran, and other bad actors to use its platform (*id.* ¶¶ 336-376). Plaintiffs also allege that BHL's goal was "to retain its vast number of U.S. customers" (*id.* ¶ 281) by providing its VIP U.S. users with "instructions and workarounds to allow them to access Binance.com via offshore shell companies, VPNs, and alternate documentation" (*id.* ¶ 287). But Plaintiffs do not connect any of those allegations to the Attacks, nor make any allegation that BHL was even aware of direct transactions between Binance.com accounts and FTOs, let alone any allegations that BHL intended to support FTOs or the Attacks.[3]

_____

[3] Some of Plaintiffs' allegations against BHL concern conduct and reports that post-date the Attacks. (*E.g.*, Compl. ¶¶ 332-335.) This alleged post-Attack conduct cannot create aiding-and-abetting liability under JASTA for those Attacks.

**C.    BHL's Purported Knowledge of Users' Connections to FTOs Requires Speculation**

Plaintiffs rely on stray comments by specific employees from over three years before the Attacks (*id.* ¶¶ 377-379) and third-party warnings and reports (*e.g. id.* ¶¶ 389-391) to allege that BHL knew Hamas and other FTOs used its platform, but again fail to allege any connection between those comments, warnings, or reports, on the one hand, and the Attacks, on the other. Plaintiffs allege that BHL supposedly "knew" it was assisting the IRGC, Hamas, Hezbollah, and PIJ (*id.* ¶¶ 385-387), but Plaintiffs do not allege that BHL "assisted" those FTOs beyond passively allowing users to transact on the Binance platform. Plaintiffs do not even allege that FTOs transacted directly on the exchange.

Plaintiffs instead allege Iranian users transacted on Binance.com (*id.* ¶¶ 394-408) and purport to identify a variety of Iranian users associated with general criminal activity (*id.* ¶¶ 412, 414, 421) or other designated IRGC individuals or entities (*id.* ¶¶ 549-619). But Plaintiffs do not allege that those users were involved in the Attacks (or other attacks). Again, though Plaintiffs estimate the volumes of transactions made by these accounts, Plaintiffs do not (and cannot) tie a single dollar of those transactions to an FTO carrying out the Attacks, or the Attacks themselves. Instead, Plaintiffs appear to rely on a general assumption that every dollar of a transaction involving an Iranian person was used to finance the Attacks.

Most of Plaintiffs' remaining allegations regarding BHL's purported knowledge of improper users accessing the Binance.com platform consist of generally alleged transactions involving individuals or entities purportedly associated with FTOs (*id.* ¶¶ 425-799), and a claim that BHL should have been aware of, or "willfully ignore[d]" (*id.* ¶¶ 276-277), those purportedly suspicious transactions. For example, Plaintiffs point to a number of specific Binance.com accounts, owned by individuals purportedly connected to money laundering or somehow

8

"associated" with FTOs. (*Id.* ¶¶ 446-548.) Setting aside the speculative jump required to get from those allegations to BHL's actual knowledge of these transactions, Plaintiffs' allegations, even if accepted, do not demonstrate (1) BHL's contemporaneous knowledge of actual FTOs transacting directly on the exchange, or (2) any connection between the accounts and transactions at issue, let alone BHL's conduct, and the Attacks.

## III.    ARGUMENT

### A.    The Complaint Must Be Dismissed for Failing to Set Forth a Short and Plain Statement of the Claim

The Complaint, spanning over 1,800 paragraphs and nearly 300 pages, violates the requirements of Federal Rule of Civil Procedure ("Rule") 8(a)(2) by failing to allege "a short and plain statement of the claim." *See Larson v. Stow*, 36 F.3d 1100 (Table), 1994 WL 512369, at *1 (affirming dismissal of 86-page complaint pursuant to Rule 8 because the averments were not "simple, concise and direct"). The primary purpose of "Rule 8 is to allow [the] court and opposing party to understand whether [a] valid claim is alleged and, if so, what it is; [the] complaint must be sufficiently clear so [the] court or opposing party is not required to keep sifting through it in search of what it is plaintiff asserts." *Cody v. Loen*, 468 Fed. Appx. 644, 645 (8th Cir. 2012) (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775-76 (7th Cir. 1994)). Indeed, the Complaint must be a plain statement "because under the Federal Rules[,] the principal function of pleadings is to give the adverse party fair notice of the claim asserted so as to enable him[] to answer and prepare for trial." *Thomson v. Olson*, 866 F. Supp. 1267, 1270 (D.N.D. 1994) (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)). The Complaint here wholly frustrates this objective.

A remarkable proportion of the allegations have no discernible relationship to the claims asserted against Defendants or the relief sought. For example, Plaintiffs dedicate nearly 10% of

their Complaint to discussions of Iran's history of terrorism sponsorship, along with detailed backgrounds on various FTOs and descriptions of their heinous acts on October 7, 2023—despite that none of those FTOs are named as defendants and that the vast majority of these allegations pre-date the creation of BHL, often by decades. (*See, e.g.*, Compl. ¶¶ 800-903.) Plaintiffs' lengthy descriptions of the FTOs at issue and the Attacks (*id.* §§ V & VI) do not mention BHL (or any other defendant) a single time.

Instead of any substantive allegations linking BHL to the Attacks, Plaintiffs have loaded up the Complaint with a treatise on the evolution of terrorist activity in certain parts of the world along with lengthy descriptions of terrorist cells and their weapons systems. Plaintiffs' decision to include these irrelevant allegations is a transparent attempt to obscure the weaknesses of their pleading. Neither BHL nor the Court should be forced to sift through this enormous and disconnected morass in an attempt to discern the few allegations that are actually relevant to the claims. The Court should dismiss the Complaint on this basis alone. *Cody*, 468 Fed. Appx. at 645.

### B.      This Court Lacks Jurisdiction Because Service on BHL Was Defective

Dismissal is further warranted under Federal Rule of Civil Procedure 12(b)(5) because Plaintiffs failed to serve BHL. *Bell v. Pulmosan Safety Equip. Corp.*, 906 F.3d 711, 715 (8th Cir. 2018) ("[I]f service was not proper, the district court lacked jurisdiction[.]").

Plaintiffs filed an affidavit of service alleging that service was made upon BHL on January 12, 2026, at "Sertus Chambers, Governors Square, Suite #5-204, 23 Lime Tree Bay Avenue, P.O. Box 2547, George Town, Grand Cayman, KY1-1104, Cayman Islands." (ECF No. 15 ¶¶ 6-8 and Ex. A.) Plaintiffs' "counsel's investigation" (ECF No. 13 ¶ 4) into BHL's business address, however, was faulty because that address is not BHL's business or mailing address, nor the address of any agent appointed to receive service. (LaVigne Decl. ¶ 7.) Plaintiffs disclose nothing

10

concerning their "investigation" or why they believe service to be appropriate at that address.

Because Plaintiffs used the wrong address, service of process was insufficient. *See, e.g.*, *Holmes v. Nebraska*, 2021 WL 4710343, at *6 (D. Neb. Oct. 8, 2021) ("There was also insufficient service of process under Rule 12(b)(5) because the summons was sent to the wrong address."). Plaintiffs have thus failed to carry their burden, and the Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5). *See Bryant Portable Welding, Inc. v. Seville Indus., LLC*, 2023 WL 3891668, at *4 (D.N.D. Apr. 11, 2023) (dismissing complaint on grounds of insufficient service despite defendant's "actual notice of the lawsuit" because the "evidence show[ed] no actual delivery of the summons and complaint ever occurred").

### C.    The Complaint Fails to Adequately Plead Personal Jurisdiction Over BHL

#### 1.    Plaintiffs Do Not Meet Three of the Four Required Elements for Personal Jurisdiction

The Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) because this Court does not have personal jurisdiction over BHL. Plaintiffs allege that this Court has personal jurisdiction over BHL "pursuant to FRCP 4(k)(2) because (1) this claim arises under federal law and (2) [BHL] has sufficient contacts with the United States to justify the exercise of personal jurisdiction under Fifth Amendment due-process principles." (Compl. ¶ 68.)

Federal Rule of Civil Procedure 4(k)(2), the federal equivalent of a long-arm statute, applies when all of the following elements have been met: (i) proper service has been made; (ii) the claim arises under federal law; (iii) the defendant is not subject to jurisdiction in any other state's courts of general jurisdiction; and (iv) the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment. *See Nuevos Destinos, LLC v. Peck*, 2019 WL 6481441, at *9 (D.N.D. Dec. 2, 2019) (Welte, J.). Plaintiffs "'carr[y] the burden of proof'" on a personal jurisdiction challenge. *Id.* at *7 (quoting *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th

11

Cir. 2003)). Plaintiffs cannot carry their burden on three of these four required elements.

### 2.   Plaintiffs Have Not Served BHL

As set forth *supra* § III.C, service has not been correctly effected upon BHL. Thus, personal jurisdiction under FRCP 4(k)(2) cannot be established. *See, e.g.*, *Miller v. Cartel*, 2022 WL 2286952, at *11 (D.N.D. June 24, 2022) (citing *Mwani v. Bin Laden*, 417 F.3d 1, 12-13 (D.C. Cir. 2005) for the proposition that Rule 4(k)(2) requires, *inter alia*, service of a summons for the assertion of personal jurisdiction).

### 3.   Plaintiffs Do Not Assert a Valid Claim Arising Under Federal Law

Even if service were proper—or Plaintiffs were able to re-serve the Complaint—Plaintiffs' claim does not arise under federal law because, as set forth *infra* § III.E, Plaintiffs have not alleged a valid JASTA claim. Without a valid claim under federal law, Rule 4(k)(2) does not provide a basis for jurisdiction over BHL. *See Energy Transfer Equity, LP v. Greenpeace Int'l*, 2018 WL 4677787, at *5 (D.N.D. July 24, 2018) (noting in the context of a RICO action that Rule (4)(k)(2) did not provide jurisdiction when there was not "a valid RICO claim"); *but see Nuevos Destinos*, 2019 WL 6481441, at *9 (finding that personal jurisdiction under Rule 4(k)(2) would not comport with the Due Process Clause of the Fifth Amendment "without wading into the merits of the RICO claim").

### 4.   Exercising Personal Jurisdiction over BHL in This Case Does Not Comport with Due Process

Exercise of personal jurisdiction over BHL in this action would not comport with due process considerations. "'The due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis[;] the only difference lies in that the forum under analysis shifts . . . to the United States as a whole.'" *Nuevos Destinos*, 2019 WL 6481441, at *10 (quoting *Fraserside IP, L.L.C. v. Youngtek Solutions, ltd.*, No. C11-3005-MWB, 2013 WL 139510, at *14

12

(N.D. Iowa Jan. 10, 2013)).

(a)     *This Court Cannot Exercise General Jurisdiction Over BHL*

There is no argument that BHL is subject to general jurisdiction in the United States. The Complaint does not allege the requisite "continuous and systematic" contacts required for BHL to be rendered "essentially at home" in the United States. *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). In fact, the Complaint alleges the opposite: BHL was founded in Shanghai (Compl. ¶ 84), relocated to Japan (*id.* ¶ 88), and then incorporated in the Cayman Islands. (*Id.* ¶ 90.) Plaintiffs allege that today, BHL's principal servers run in Japan. (*Id.* ¶ 91.) None of these contacts are sufficiently continuous and systematic so as to render BHL "essentially at home" in the United States, and instead compel the conclusion that the Court does not have general jurisdiction over BHL. Indeed, as this Court has correctly noted, finding BHL "subject to general jurisdiction under Rule 4(k)(2)—meaning in practical application that [it] could be subject to suit in any judicial district in the United States for any claim potentially implicating federal law arising anywhere in the world—would have frightening implications." *Nuevos Destinos*, 2019 WL 6481441, at *10.

(b)     *This Court Cannot Exercise Specific Jurisdiction Over BHL*

Nor is there specific jurisdiction over BHL. As this Court has noted:

For specific jurisdiction under Rule 4(k)(2), 'the defendant's suit-related conduct must create a substantial connection' with the United States as a whole. *Walden v. Fiore*, 571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). The analysis looks at 'contacts that the "defendant himself" creates with the forum' and not merely at the defendant's 'contacts with persons who reside there.' *Id.* at 285, 134 S.Ct. 1115 (emphasis in original) (quoting *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174). As a result, 'a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.' *Id.* at 286, 134 S.Ct. 1115 (citing *Rush*, 444 U.S. at 332, 100 S.Ct. 571).

*Id.* at *12.

Every event in Plaintiffs' 284-page narrative occurred somewhere else besides North

13

Dakota, including Israel, Gaza, Lebanon, Iran, Turkey, the UAE, Europe, and South America. North Dakota appears nowhere except through non-party use of VPNs and IP addresses related to two Binance.com accounts. (Compl. ¶¶ 713, 734.) Plaintiffs admit they do not know where at least one of these accounts (No. ***3901) was actually accessed from[4] (*id.* ¶ 734 n.81 (alleging that this account "was operated by a single person periodically using VPN services to disguise his/her location"), and also do not connect these accounts to any FTO or the Attacks. Even assuming that a foreign user's use of a VPN to appear as if the user was in North Dakota constituted "in-forum" and "suit-related" conduct, that is woefully inadequate to exercise personal jurisdiction over an out-of-forum defendant for JASTA claims. *See, e.g.*, *Risk Techs., Inc. v. Tennessee Mun. League Risk Mgmt. Pool, Inc.*, 2003 WL 21018872, at *7 (N.D. Tex. May 1, 2003) (suggesting that transmitting and receiving information via VPN "standing alone, cannot support the exercise of personal jurisdiction").

Though Plaintiffs point to purported contacts BHL has with the United States, none of those connections constitute "suit-related" conduct. As the Supreme Court held in *Fuld v. Palestine Liberation Organization*, the federal long-arm statute must be tied to specific conduct with a "close connection" between the claim alleged and the United States; general references to U.S.-related activity without that close—or any—connection to the predicate conduct at issue here (aiding and abetting FTOs in the perpetration of the Attacks) cannot confer jurisdiction. 606 U.S. 1, 24 (2025). For example, without factual reference or support, Plaintiffs baldly allege:

- BHL served, at some point prior to October 7, 2023, "5 million U.S. customers." (Compl. ¶ 69.[5])

---

[4] With respect to the other account that was allegedly accessed from Kindred, North Dakota (No. ***6082), Plaintiffs admit that a plurality of access activity occurred in the Gaza Strip and surrounding areas (Compl. ¶ 712) "strongly suggesting" that the purported access from North Dakota was the result of VPN use. (*See id.* ¶¶ 713, 734, n.81.)

[5] To the extent these allegations are based on the Statement of Facts in BHL's plea agreement with

14

- BHL conducted internal operations through a cybersecurity platform based in California. (*Id.* ¶ 70.)

- BHL's use of large trading firms in the U.S. (*Id.* ¶ 71.)

- BHL's use of U.S. banks, including Signature Bank. (*Id.* ¶ 72-76.)

- BHL's work with Paxos Trust Company LLC, a New-York chartered limited purpose trust company, to issue a stablecoin. (*Id.* ¶ 78-82.)

But none of these allegations are connected with the Attacks, or the FTOs responsible for the Attacks.

*Fuld* is instructive here. In *Fuld*, the Supreme Court analyzed a provision of the ATA specifically providing for personal jurisdiction over the Palestine Liberation Organization and the Palestinian Authority (and no other entities) in civil suits in the U.S. when either entity paid salaries to terrorists in prisons or to families of deceased terrorists, a far more active involvement in terrorist activity than Plaintiffs allege against BHL here. *See* 606 U.S. at 8-9. Because both District Courts "found evidence that [the PLO and PA] had engaged in conduct sufficient to satisfy at least the payments prong" of the PSJVTA's jurisdictional test, the Supreme Court analyzed whether exercising personal jurisdiction under PSJVTA complied with the Fifth Amendment. *Id.* at 10-11. In finding that the provision did not violate the Fifth Amendment's Due Process Clause, the Court noted:

> The PSJVTA also limits jurisdiction to only two enumerated nonsovereign foreign entities, both of which have been subject to a series of congressional enactments aimed at deterring terrorism and accomplishing other foreign relations objectives. *See, e.g.*, 8 U.S.C. § 1182(a)(3)(B); 22 U.S.C. §§ 286w, 2227(a), 2378b(a) and (b), 2378c(a), 2378c–1(a), 5201, 5202. Far from haling just any run-of-the-mill private defendant into American courts, the PSJVTA represents but one targeted aspect of a multifaceted foreign policy toward these two sui generis foreign entities, both of which exercise governmental functions in a geopolitically sensitive region and have

---

the DOJ, they do not provide an independent basis for jurisdiction in this case. *United States v. 51 Pieces of Real Prop. Roswell, N.M.*, 17 F.3d 1306, 1313 (10th Cir. 1994) ("The court's exercise of personal jurisdiction over Austin in the criminal proceeding, however, did not automatically confer jurisdiction on the court in the related civil proceeding.").

decades of 'meaningful "contacts, ties, [and] relations"' with the United States. *Id.* at 21-22. *Fuld*'s limitation applies with particular force here: BHL, a private defendant without meaningful or significant contacts (including suit-related contacts) with the United States, has been haled into court on a claim for liability taking place wholly outside the United States. Exercising jurisdiction here over BHL would therefore be patently unreasonable, and violative even of the more extensive jurisdictional reach under the Fifth Amendment. The case must be dismissed for lack of jurisdiction.

### D.      Venue Does Not Lie in This District

In addition to lacking personal jurisdiction and failing to effectuate service, the Complaint fails to set forth any cognizable basis as to why venue is proper in this District and thus should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(3). *Rare Breed Triggers, LLC v. Garland*, 639 F. Supp. 3d 903, 906 (D.N.D. 2022) (Senechal, J.) (explaining "improper venue leaves a court with two options: it can either dismiss the case or transfer it to a district where venue is proper," and deciding to dismiss). "Venue is a statutory requirement that reflects Congress' decision concerning where a case *should* be heard." *Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 904 (8th Cir. 1987) (cleaned up; emphasis in original); *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995) ("One of the central purposes of statutory venue is to ensure that a defendant is not haled into a remote district having no real relationship to the dispute.") (internal citations and quotations omitted). BHL cannot be "haled into" this Court because the Complaint's purported statutory bases for venue all fail. (Compl. ¶ 83 (citing 18 U.S.C. § 2334(a), 28 U.S.C. § 1391(b), or 28 U.S.C. § 1391(c)(3) as the purported bases for venue).)

Venue is not proper under 18 U.S.C. § 2334(a) because the Complaint does not allege that any one of the Plaintiffs "reside[]" in this District, or that BHL (or any other Defendant) "resides[,] [wa]s served, or has an agent" in this District. *Id.*

16

Venue is also not proper under 28 U.S.C. § 1391(b) because, under § 1391(b)(1), the Complaint does not allege "all [D]efendants," or indeed any Defendant, reside in this District. *Id.* Section 1391(b)(2) does not justify venue in this District either, because the Complaint does not allege "a ***substantial*** part of the events or omissions giving rise to the claim occurred [here]." 28 U.S.C. § 1391(b)(2) (emphasis added). Allegations that the acts which purportedly occurred in this District that simply have a "but for" connection, in that "the alleged wrongful conduct would have been impossible without the event," *Steen v. Murray*, 770 F.3d 698, 704 (8th Cir. 2014) (citing *Woodke*, 70 F.3d at 985-86), are insufficient to establish a substantial connection under section 1391(b)(2). *See Woodke*, 70 F.3d at 985-86; *Steen*, 770 F.3d at 704; *Everest Indem. Ins. Co. v. Ro*, 200 F. Supp. 3d 825, 836 (D. Minn. 2016) (in case where insurance policy was issued in Minnesota to a Minnesota-headquartered insured, "no substantial events or omissions occurred" in Minnesota for purposes of the claim because it was only a necessary event in a causal sense in the chain of causation leading up to the insurance dispute).

And, under § 1391(b)(3), venue does not lie in this District because BHL is not "subject to th[is] [C]ourt's personal jurisdiction." As set in Section § III.C.4, *supra*, out of the alleged thousands of transactions and billions of funds that Plaintiffs purportedly put in dispute in this case, their only allegations of any venue-related conduct are that two accounts were purportedly accessed a limited number of times using IP addresses from Kindred, North Dakota. (Compl. ¶¶ 713, 734.) Those allegations are plainly insufficient to render this District a proper venue. *See also Leroy v. Great W. United Corp.*, 443 U.S. 173, 185 (1979) ("[I]t is absolutely clear that Congress did not intend [§ 1391(b)(2)] to give [a plaintiff] an unfettered choice among a host of different districts."). And, as set forth *supra* § III.C.4, Plaintiffs do not and cannot plausibly allege that those limited online actions actually occurred in North Dakota. And Plaintiffs do not allege ***any*** in-forum

17

(or U.S.-connected) events or omissions "giving rise to the claim[.]" 28 U.S.C. § 1391(b)(2); *see supra* § III.C.4.

The lack of any connection between this forum and any of Plaintiffs, their claims, and BHL, emphasizes that Plaintiffs are forum shopping. Similar plaintiffs have previously filed lawsuits asserting the same claims and allegations against BHL in the District of Alabama, the District of Columbia, and the Southern District of New York.[6] Plaintiffs here could have sought to join these other cases.[7] But those cases are further down the path of deciding issues central to this case. The courts in the earlier-filed actions have fully-briefed motions to dismiss before them regarding, for example, whether the plaintiffs there have sufficiently alleged the same JASTA claims against the same defendants, based on the same legal theory and substantially similar facts, including the same Attacks and the same underlying U.S. government agency filings.

Filing this case well after the substantially similar ones in other districts, in a District with no meaningful connection to the parties or alleged events reveals the true story: Plaintiffs' counsel are late to the game and seeking their proverbial piece of the attorneys' fees pie in a Court with no pending ATA or JASTA actions and no Eighth Circuit precedent interpreting *Twitter*, in an effort to avoid potential adverse rulings in the districts where the prior cases are pending. Tellingly, after the magistrate judge in the related *Newman* case pending in the Middle District of Alabama found that plaintiffs failed to plead aiding-and-abetting liability against BHL on February 24, 2026,

---

[6] The ATA complaints previously filed against BHL include:
- *Newman et al. v. Binance Holdings Ltd.*, No. 24-cv-134 (M.D. Ala.) ("*Newman*")
- *Raanan et al. v. Binance Holdings Ltd.*, No. 24-cv-697 (S.D.N.Y.) ("*Raanan*")
- *Troell et al. v. Binance Holdings Ltd.*, No. 24-cv-7136 (S.D.N.Y.) ("*Troell*")
- *Atzili et al. v. Binance Holdings Ltd.*, No. 24-cv-3365 (D.D.C.) ("*Atzili*")

The Court can take judicial notice of the prior ATA cases and the matters of record therein pursuant to Federal Rule of Evidence 201.

[7] As set forth *infra* § III.F, Plaintiff Noach Newman both filed this lawsuit and the pending lawsuit in the Middle District of Alabama asserting the same claims twice.

18

another plaintiff in that case now seeks to be transferred to this one to avoid that ruling. (LaVigne Decl. ¶¶ 8-12.)

Plaintiffs have thus failed to meet their burden to show "venue is proper in this district," and therefore, the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(3). *See Rare Breed Triggers, LLC*, 639 F. Supp. 3d at 907.

### E.    The Complaint Fails to State a Claim Upon Which Relief Can Be Granted

#### 1.    Plaintiffs Cannot Satisfy the Pleading Standard for their Sole Claim of Aiding-and-Abetting Liability Under JASTA

The Complaint should also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because its sole claim—aiding-and-abetting liability under JASTA (Compl. ¶¶ 1799-1813)—is not "plausible on its face." *Kraft v. Essentia Health, Innovis Health, LLC*, 600 F. Supp. 3d 965, 970 (D.N.D. 2021) (Welte, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

JASTA imposes liability on "any person who aids and abets, by knowingly providing substantial assistance" to "the person who committed [the] act of international terrorism" that injured the plaintiff. 18 U.S.C. § 2333(d)(2). An aider and abettor must "intend to facilitate [the offense's] commission." *Smith & Wesson*, 605 U.S. at 291. JASTA therefore requires a plaintiff to plausibly plead that (1) the defendant "*knowingly* and *substantially* assist[ed] the principal violation[,]" and (2) "[was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance." *Twitter*, 598 U.S. at 485-86 (emphasis added). JASTA liability, like all aiding-and-abetting liability, is not "boundless," does not "sweep in . . . those who gave only tangential assistance" or "any assistance" because "our legal system generally does not impose liability for mere *omissions, inactions, or nonfeasance*[.]" *Id.* at 489-89; *id.* at 489 ("[C]ourts have long recognized the need to cabin aiding-and-abetting liability to cases of ***truly*** culpable conduct.") (emphasis added).

19

Because the Complaint fails to allege, and cannot allege, that (1) BHL "knowingly and substantially" assisted the Attacks, nor that (2) BHL had "general[] aware[ness]" of the Attacks, the Complaint fails to plead the necessary elements of a JASTA claim and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Twitter*, 598 U.S. at 486.

### 2. The Complaint Does Not Plausibly Plead That BHL "Knowingly and Substantially" Assisted the Attacks Under JASTA

#### (a) *Precedent Sets a High Bar for Alleging Knowing and Substantial Assistance*

Plaintiffs fall far short of plausibly pleading the JASTA element requiring knowing and substantial assistance because BHL did not "***knowingly* and *substantially* assist the [Attacks].**" *Twitter*, 598 U.S. at 486 (emphasis added) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Under these demanding "twin requirements," a plaintiff must demonstrate the defendant aided and abetted through "conscious, voluntary and culpable participation" in the ***specific*** terrorist attack at issue. *Id.* at 491, 493, 497. These requirements "work[] in tandem," and share an inverse relationship—*i.e.*, "less substantial assistance require[s] more scienter before a court c[an] infer conscious and culpable assistance," and vice versa. *Twitter*, 598 U.S. at 491-92, 503; *see also id.* at 500 (where there is "distance between [the] defendants' acts (or failures to act) and the . . . [specific] attack [that purportedly injured the plaintiffs], plaintiffs would need some other very good reason to think that defendants were ***consciously trying to help or otherwise participate in the . . . attack***") (emphasis added) (internal citation and quotation marks omitted).

In *Twitter*, for example, the plaintiffs alleged that the defendants, various social media companies, were liable under JASTA for aiding and abetting an attack on a Paris nightclub perpetrated by ISIS in 2017 by allowing ISIS to use their platforms in order to communicate, raise money, radicalize and recruit new members, and spread propaganda. *Twitter*, 598 U.S. at 481. The Supreme Court explained, however, that "[n]one of those allegations suggest that defendants

20

culpably 'associate[d themselves] with' the Reina attack, 'participate[d] in it as something that [they] wishe[d] to bring about,' or sought 'by [their] action to make it succeed.'" *Id.* at 498 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). The Court found this was not "conscious, voluntary, and culpable participation," under JASTA because they treated ISIS "like everyone else," and were simply "providing their services to the public writ large." *Id.* at 493, 498-99; *id.* at 498 (the defendants never "gave ISIS any special treatment or words of encouragement").

Following the Supreme Court's decision in *Twitter*, U.S. federal courts have continued to refine and limit liability under JASTA. For example, the Supreme Court reinforced the *Twitter* principles in *Smith & Wesson*. There, the plaintiff alleged under a different federal statute that gun manufacturers aided and abetted Mexican drug cartels by "supply[ing] firearms to retail dealers whom they know illegally sell to Mexican drug traffickers." *Smith & Wesson*, 605 U.S. at 280-81. But the Supreme Court dismissed the JASTA claim and, again, reiterated that the statute, and aiding-and-abetting liability generally, requires the defendant to "participate in a crime as in something that he wishes to bring about and seek by his action to make it succeed." *Id.* at 291 (internal citations and quotation marks omitted); *see also Twitter*, 598 U.S. at 498. As relevant here, the Supreme Court explained that an "ordinary merchant does not become liable for all criminal misuses of his goods, even if he ***knows*** that in some fraction of cases misuse will occur. The merchant becomes liable only if, beyond providing the good on the open market, he takes steps to ***promote*** the resulting crime and ***make it his own***. *Smith & Wesson*, 605 U.S. at 292 (cleaned up) (emphasis added).

In *Ashley*, 144 F.4th at 440, the Second Circuit affirmed dismissal of JASTA claims based upon allegations that the defendant bank provided substantial assistance to the relevant terrorist organizations by providing access to resources that those groups needed to commit their attacks.

21

The Second Circuit rejected that theory of liability:

> The complaint offers not a single allegation of fact that [Standard Chartered] sought to indirectly assist the Syndicate's bomb operations by violating sanctions or other restrictions as they relate to banking services provided to the [intermediary companies]. Plaintiffs do not allege that SCB's customers were themselves terrorists. SCB simply offered the Companies basic commercial banking services— foreign exchange, export finance, and letter-of-credit services—which SCB had been providing when the Government met with SCB's executives and were utilized across the Companies' entire book of business.

*Id.* at 441 (footnote omitted).

Subsequently, in *Fraenkel*, the court dismissed a JASTA aiding-and-abetting claim where plaintiffs alleged that the defendant bank assisted FTOs by "providing both legitimate and illegitimate financial services to customers that were agents or [funders] of the 'Terrorist Sponsors,' which in turn funded the FTOs that committed the [a]ttacks." 2025 WL 2773251, at *2. The Court held that the complaint failed to allege "knowing and substantial assistance" under *Twitter* and *Ashley*. *Id.* at *9-10. Because pleading the "knowing and substantial assistance" element requires "either a concrete nexus between [the defendant's] activity and the [a]ttacks or [the defendant's] pervasive, systemic, and culpable assistance of the FTOs." *Id.* at *9 (cleaned up); *see also Twitter*, 598 U.S. at 506; *Ashley*, 144 F.4th at 444. It was "not enough to say that the defendant assisted the terrorist organization's activities in general, without offering a discernable nexus between defendant's conduct and the attacks committed against [p]laintiffs." *Fraenkel*, 2025 WL 2773251, at *9 (cleaned up). "Even though [the bank] clearly engaged in some wrongdoing with regard to evading sanctions regimes and assisting customers to evade those sanctions, this conduct is far too attenuated to establish a direct nexus between [the bank's] conduct and the [a]ttacks." *Id.*

In *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026), the D.C. Circuit reinstated dismissed JASTA aiding-and-abetting claims based on sufficiently severe and culpable

conduct—far more than alleged in the Complaint here—against the defendants in that case. *AstraZeneca* stands in marked contrast to the allegations here. The culpability allegations in *AstraZeneca* reflected "***direct" assistance*** through "***unusual and corrupt means***" with a specific FTO, including "pa[ying] illegal cash bribes directly to the group and suppl[ying] extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations." *Id.* at 596, 606-08 (emphasis added). Specifically, the complaint there alleged that defendants entered into "a long-running scheme to provide Jaysh al-Mahdi with cash and in-kind bribes that amounted to at least 20 per cent of the value of each contract, as well as off-the-books shipments of 'free goods' that were not tied to any particular contract." *Id.* at 611. As the court summarized, "[p]erhaps the strongest support for the inference of culpable association there was the 'unusual' kind of assistance defendants allegedly provided." *Id.* at 610.

The D.C. Circuit also highlighted the tight temporal and geographic nexuses alleged between defendants' conduct and the relevant attacks. The *AstraZeneca* plaintiffs alleged that the defendants made bribery payments directly to the FTO inside the FTO's *de facto* headquarters, Iraq's Ministry of Health building, while passing past terrorist propaganda posters and fighters in the hallways and while the FTO's attacks took place just outside the Ministry's front gate. *Id.* at 607, 609-10. Based on these extreme and specific allegations, the D.C. Circuit found the defendants' conduct was so directly connected to the alleged terrorist attacks as to permit the JASTA claim to proceed based on defendants' "'conscious, voluntary and culpable participation in [the FTO's] wrongdoing.'" *Id.* at 613 (quoting *Twitter*, 598 U.S. at 493).

(b)    *Plaintiffs Fail to Meet Their High Pleading Bar*

Across their voluminous allegations about BHL's compliance failures and purported suspicious transactions, Plaintiffs' theory as to why BHL "knowingly and substantially" assisted the FTOs responsible for the Attacks boils down to the following: BHL failed to comply with

23

certain AML and KYC policies in the United States, and, as a result, individuals and entities purportedly were able to raise or launder money for those FTOs, including some of the FTOs responsible for the Attacks. (Compl. ¶¶ 280-391.) But this legal theory and its corresponding allegations fall short of the twin requirements of "substantial" and "knowing" assistance required for aiding-and-abetting liability under JASTA.

(i)      <em>Plaintiffs Fail to Sufficiently Allege Any Nexus</em>

In order to "substantially assist" a terrorist attack under JASTA there must be a "concrete" and "definable nexus between [BHL's] [alleged substantial] assistance and th[e] attack." *Twitter*, 598 U.S. at 503 ("The Ninth Circuit framed the issue of substantial assistance as turning on defendants' assistance to ISIS' activities in general. But . . . the question is whether defendants gave substantial assistance to ISIS with respect to the Reina attack. The focus thus ***must*** remain on the Reina attack[.]").[8]

But Plaintiffs allegations do not plead ***any*** nexus between any activity by BHL and the Attacks. There is not a single allegation in the Complaint that any Binance.com transaction was used to fund or assist the Attacks in any way. There are no non-conclusory allegations that an actual member of an FTO, let alone one who carried out the Attacks, transacted on Binance.com.

Recognizing their Complaint does not allege this required nexus, Plaintiffs rely heavily on the U.S. agency filings and consent resolutions to attempt to satisfy their pleading requirements. However, most of Plaintiffs' cherry-picked quotes are from the agencies' backward-looking reviews (*see supra* § II.A) regarding BHL's AML and sanctions controls, and its failure to register with FinCEN as a money service business. (*See* LaVigne Decl. Exs. 1-4.) These agency filings do

---

[8] As set forth *infra* § III.E.3, the six common law factors espoused in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the case on which Congress based its interpretation of aiding-and-abetting liability under JASTA, "help determine whether a defendant's assistance was 'substantial.'" *Twitter*, 598 U.S. at 486-87.

24

not assert that BHL was contemporaneously aware of terrorists using its platform, or that BHL intended they do so. And none of these filings indicates that BHL was connected to or supported the Attacks. They indicate the opposite: that BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing." (LaVigne Decl. Ex. 1 at 46).

Regardless, even if the Plaintiffs could transform the U.S. agency filings to say what Plaintiffs need them to say, Plaintiffs may not rely on pre-adjudication regulatory complaints or settlements to plead the "underlying facts of liability" necessary to sustain the Complaint. *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011) ("'[N]either a complaint nor references to a complaint [that] results in a consent judgment may properly be cited in the pleadings" because "preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial[.]"). In *Lipsky v. Commonwealth United Corp.*, the Second Circuit affirmed the District Court's decision to strike references in the complaint to a prior SEC complaint against the defendant because "[t]he consent decree entered into by the SEC and CUC was the result of private bargaining, and there was no hearing or rulings or any form of decision on the merits by the district court." 551 F.2d 887, 894 (2d Cir. 1976).

"'Generally speaking, when a particular fact is established not by judicial resolution but by stipulation of the parties, that fact has not been "actually litigated" and thus is not a proper candidate for issue preclusion.'" *Mishkin v. Peat, Marwick, Mitchell & Co.*, 1988 WL 391648, at *2 (S.D.N.Y. Nov. 7, 1988) (quoting *Otherson v. Dep't of Justice, I.N.S.*, 711 F.2d 267, 274 (D.C. Cir. 1983)); *see also Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*, 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014) ("A plaintiff would therefore be 'prohibited from relying on the [consent order] to plead the underlying facts of liability' even where it 'included

25

certain factual findings.'") (quoting *In re Platinum*, 828 F. Supp. 2d at 594); *Dent v. U.S. Tennis Ass'n, Inc.*, 2008 WL 2483288, at *2 (E.D.N.Y. June 17, 2008) (noting Second Circuit's approval of striking allegations concerning consent decrees because "they were not the product of adjudications on the merits and thus could not be used as substantive evidence of previous wrongdoing in a subsequent litigation"); *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 82, 131 (D. Conn. 2014) ("The only purpose that the [c]ourt can draw from the inclusion of these [Senate Report] allegations in the [c]omplaint is to show proof of the Defendants' liability either for past activities of prior bad acts or for activities identical to the claims alleged here."). And courts "'generally do not consider averments taken directly from uncorroborated allegations embedded in a complaint in another action or parroted allegations for which counsel has not conducted independent investigation.'" *Amorosa* v. *Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022) (quoting *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *8 (S.D.N.Y. Sept. 30, 2016)).

For these same reasons, Plaintiffs cannot rely on any of the allegations in the U.S. agency filings to support their claims here. None of the U.S. agency actions involved any trials or adjudications on the merits, and therefore the resulting plea, consent orders, and settlement agreement do not contain facts that have been "actually litigated." Indeed, the OFAC settlement agreement noted that BHL and OFAC entered into that Agreement "without any finding of fault." (LaVigne Decl. Ex. 2 (OFAC Settlement Agreement) at 5.) And in the CFTC Consent Order, BHL specifically did "not consent to the use of th[at] Consent Order, or the findings or conclusions [t]herein, by any other party in any other proceeding." (*Id.* Ex. 3 (CFTC Consent Order) at 4.) Accordingly, these allegations cannot be utilized by Plaintiffs to plead their claims.

(ii)    *BHL's Passive Conduct Providing Exchange Services Is Insufficient to Plead Aiding-and-Abetting Liability*

Plaintiffs allege that BHL's purported compliance failures allowed FTO-associated third parties to transact on the Binance exchange. Under *Twitter* and *Smith & Wesson*, passive nonfeasance—as opposed to affirmative misconduct—is insufficient to plead aiding-and-abetting liability where, as here, Plaintiffs do not make the required strong showing of assistance or scienter. (*See infra* § III.E.2.b.v; *Twitter*, 598 U.S. at 498 ("At bottom, the allegations here rest less on affirmative misconduct and more on passive nonfeasance. To impose aiding-and-abetting liability for passive nonfeasance, plaintiffs must make a strong showing of assistance and scienter."); *Smith & Wesson*, 605 U.S. at 292 (noting that nonfeasance ("a person's 'failure[s],' 'omissions,' or 'inactions'") will "rarely support aiding-and-abetting liability").)

At best, Plaintiffs allege that BHL passively made its exchange available to the world and should have acted affirmatively to keep some users off. Plaintiffs allege that, as a result, BHL's nonfeasance allowed third parties affiliated or linked with FTOs to transact on the exchange. (Compl. ¶¶ 44, 54, 289, 331, 392, 394.) For example, Plaintiffs point to BHL's failure to file SARs with respect to certain wallets or accounts (*see, e.g.*, *id.* ¶¶ 413, 799), but do not allege that BHL knowingly or consciously did not file SARs to allow FTOs to transact on the Binance.com platform or to "consciously . . . help or otherwise participate in the" Attacks. *Twitter*, 598 U.S. at 500. And Plaintiffs do not attempt to argue that BHL gave special treatment to FTOs or purported FTO-associated accounts. (*See, e.g.*, Compl. ¶ 380 (BHL failed "to file **any** SARs with FinCEN") (emphasis added).)

This is not sufficient to plead liability. *Smith & Wesson*, 605 U.S. at 297 (omissions and inactions constituting "passive nonfeasance" "are rarely the stuff of aiding-and-abetting liability"); *Ashley*, 144 F.4th at 437 (similar); *Fraenkel*, 2025 WL 2773251, at *8 (similar); *see also* LaVigne

27

Decl. Ex. 5 (*Troell* November 25, 2025 Transcript ("Nov. Tr.")) 27:22-24 ("THE COURT: Well, haven't a number of courts said that mere sanctions evasion activities are not sufficient to meet the nexus standard? Isn't that *Fraenkel*?").Thus, by merely alleging that BHL failed to adequately police Binance.com, Plaintiffs have not pleaded a viable JASTA claim.

(iii)    *Plaintiffs Allege that BHL Allowed FTOs to Obtain Financing Generally, Not in Connection with the Attacks*

At best, Plaintiffs allege that funds from FTO-"affiliated" third party transactions on the Binance exchange may have flowed to FTOs. That is also insufficient to make the severe jump to impose liability for the Attacks on BHL. *Fraenkel*, 2025 WL 2773251 at *9 ("Plaintiffs allege that SCB assisted its customers with both routine and fraudulent financial transactions, and that these customers were agents or fronts for organizations or government entities that then funded the FTOs that then committed the Attacks that injured Plaintiffs. Even though SCB clearly engaged in some wrongdoing with regard to evading sanctions regimes and assisting customers to evade those sanctions, this conduct is far too attenuated to establish a direct nexus between SCB's conduct and the Attacks."); *see also Ashley*, 144 F.4th at 440 ("[C]onsidering the **tenuous** connection between the banking services and the terrorist attacks, [defendant's] services were not substantial.") (emphasis added).

Plaintiffs allege that BHL "[a]ssisted" Hamas and PIJ (Compl. §§ IV.H & IV.I) because Hamas- and PIJ-associated individuals used the Binance platform and BHL purportedly did not take sufficient efforts to remove those individuals from the platform. (*Id.* ¶¶ 620-32.) As a result, Plaintiffs allege that several individuals and entities associated with or providing financial transaction services for Hamas or PIJ were able to access the Binance platform. (*Id.* ¶¶ 633-799.) But, despite claiming that BHL knowingly assisted these FTOs, Plaintiffs' allegations supporting that conclusion are, in fact, about individuals or entities somehow associated down the blockchain

28

with an FTO. There are no allegations explaining why or how BHL knew these particular individual accounts were ultimately associated with an FTO. And though Plaintiffs identify various amounts transferred to, from, and between these accounts and other users, Plaintiffs do not identify any connection between those transfers and the Attacks.

For example, Plaintiffs point to BHL offboarding "a Hamas-*linked* account" (*id.* ¶ 382 (emphasis added)), while permitting the user to take its funds and leave. (*Id.* ¶ 383.) But Plaintiffs do not allege that the account or funds were connected to terrorism or to the Attacks. And this allegation is emblematic of a fatal flaw endemic throughout the Complaint: Plaintiffs ask the Court to speculate regarding any connection between BHL and any FTO by describing accounts or transactions that are "linked" to or "associated" with FTOs, not direct FTO accounts or transactions. (*See, e.g.*, *id.* ¶ 632 (referring to "Hamas-affiliated wallets").) This is exactly the type of "attenuated conduct" courts have rejected as a means to plead a concrete nexus between BHL's conduct and the Attacks. *See, e.g.*, *Fraenkel*, 2025 WL 2773251 at *9.

Further, even if Plaintiffs were able to cover the gaps in their pleading through reference to FTO-linked and affiliated accounts, Plaintiffs only allege that BHL's compliance failures allowed funds from Binance.com transactions to flow eventually to FTOs "in general." *Ashley*, 144 F.4th at 444. The Second Circuit squarely addressed and rejected this argument as a basis for imposing JASTA liability. *Ashley*, 144 F.4th at 444 ("Plaintiffs posit a theory based on money's fungibility: because Defendants engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists, some of the money must have gone to the terrorists' violent activities. But we have already rejected the notion that . . . aiding-and-abetting liability [may] attach based on such a 'fungibility theory.'"). "Likewise, it is not enough for Plaintiffs to say that [BHL] aided and abetted the Attacks that harmed Plaintiffs by moving

29

money for people or entities who were not themselves FTOs but had apparent connections to entities . . . known to support terrorist activities, which activities included funding or sponsoring some of the FTOs that then carried out the Attacks." *Fraenkel*, 2025 WL 2773251, at *10.

> (iv)   *Plaintiffs Do Not Allege That BHL Provided "Pervasive, Systemic and Culpable" Assistance to FTOs Such That It Assumed Liability for Every FTO Attack*

Plaintiffs cannot cure their failure to allege a concrete nexus by alleging that BHL provided "pervasive, systemic, and culpable" assistance to the FTOs responsible for the Attacks, such that BHL can be held liable for every activity of an FTO everywhere. As set forth in *Twitter*:

> Given the lack of any concrete nexus between defendants' services and the Reina attack, plaintiffs' claims would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world . . . Plaintiffs thus must allege that defendants so systemically and pervasively assisted ISIS that defendants could be said to aid and abet every single ISIS attack. Viewed in that light, the allegations here certainly fall short. ***Plaintiffs do not claim that defendants intentionally associated themselves with ISIS' operations or affirmatively gave aid that would assist each of ISIS' terrorist acts. Nor have they alleged that defendants and ISIS formed a near-common enterprise of the kind that could establish such broad liability.*** These allegations are thus a far cry from the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act.

*Twitter*, 598 U.S. at 501–02 (emphasis added). Plaintiffs do not come close to alleging that BHL "intentionally associated themselves" with the operations of the FTOs responsible for the Attack, or that BHL formed "a near-common enterprise" with those FTOs.

*Ashley* is instructive here. The defendant banks in *Ashley* were alleged to have provided money laundering services to bad actors "writ large," which the Second Circuit found undercut any notion the banks had culpably attempted to aid terrorists:

> Even assuming the Banks' aid was pervasive and systemic, the complaint does not support the inference that the Banks' money laundering operations were designed or performed with the intent to aid the Syndicate. The Banks are alleged to have culpably executed financially suspect transactions writ large, not in a manner that actively sought to "associate[ ] themselves" with the Syndicate's "operations" or to

form "a near-common enterprise" with the Syndicate. *See id.* at 502, 143 S.Ct. 1206. With each money laundering scheme, the Syndicate was at least one step removed, and the endpoint of the laundered money was entirely amorphous. As pled, the Banks may have opened their doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the Syndicate's pile of resources. That is insufficient.

*Ashley*, 144 F.4th at 445.

As with *Twitter*, *Ashley*, and *Fraenkel*, Plaintiffs' allegations that BHL's conduct allegedly allowed FTO-associated parties to engage in purportedly suspicious transactions that allegedly enriched FTOs further down the blockchain do not establish that BHL intentionally sought to associate itself with or aid the FTOs responsible for the Attacks. To the contrary, the Complaint alleges BHL's motive was entirely unconnected and agnostic to the FTOs or Attacks and was instead generically profit-driven and aimed at retaining "its vast number of U.S. customers" who "accounted for 15 to 20 percent of [BHL's] transaction fees and generated billions of dollars in revenue." (Compl. ¶¶ 281, 283.) Accordingly, Plaintiffs fail to adequately plead the substantial assistance requirement of their JASTA aiding-and-abetting liability claim.

(v)    *Plaintiffs Fail to Sufficiently Allege That BHL Knowingly Assisted the Attacks*

Even if there were substantial assistance (there is not), there is no basis to find that BHL "knowingly" and "consciously [tried] to help or otherwise participate in the . . . [Attack]."[9] *Twitter*, 598 U.S. at 500. Again, to meet this stringent *mens rea* requirement, the Complaint must plausibly state that the Attacks were something "that [BHL] wish[ed] to bring about," or "sought by [its] action[s] to make it succeed," *Smith & Wesson*, 605 U.S. at 291, including through any "special treatment or words of encouragement." *Twitter*, 598 U.S. at 498. No such allegation is made, nor

---

[9] Assuming *arguendo* the Court finds the existence of any substantial assistance, because the assistance is so attenuated and thus minimal, "more scienter [is required] before a court c[an] infer conscious and culpable assistance." *Twitter*, 598 U.S. at 481, 503.

31

could be made, in the Complaint. Again, the agency filings Plaintiffs rely on so heavily indicate that BHL desired the opposite and "proactively . . . combat[ed] terrorism financing." (LaVigne Decl. Ex. 1 at 46.)

Plaintiffs' main allegations (based on the agreements BHL reached with the U.S. regulators) argue that BHL was negligent with respect to its KYC and AML compliance, and thus must have been aware that some bad actors generally were taking advantage of its products downstream. (Compl. ¶¶ 280-376.) But, again, this theory is foreclosed by precedent and Plaintiffs cannot meet their high burden to demonstrate BHL "knowingly" aided-and-abetted FTOs. *Smith & Wesson*. 605 U.S. at 293 ("When a company merely knows that 'some bad actors' are taking 'advantage' of its products for criminal purposes, it does not aid and abet. And that is so even if the company could adopt measures to reduce their users' downstream crimes.") (internal citation omitted); *see also Twitter*, 598 U.S. at 495 ("[I]t is not enough . . . that a defendant [has] given substantial assistance to a transcendent enterprise separate from and floating above all the actionable wrongs that constitute it."); *Ashley*, 144 F.4th at 443 (affirming dismissal where bank "failed to 'impose constraints on its distribution chain because of downstream bad actors'"); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (plaintiffs must plead defendant was "'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities.").

Nor do Plaintiffs' other theories of BHL wrongdoing establish that BHL provided "conscious and culpable assistance" in furtherance of the Attacks. *Twitter*, 598 U.S. at 492. For example, Plaintiffs allege that BHL should have been aware of, or "willfully ignore[d]," specified transactions or user activity amongst billions of transactions on its platform. (Compl. ¶¶ 276-77.) Similarly, Plaintiffs argue that BHL should have "known" that it was assisting the IRGC, Hamas, Hezbollah, and PIJ because of warnings from the government and third-party compliance and

32

monitoring services that it had terrorist customers. (*Id.* ¶ 385.) But this theory of willful ignorance is foreclosed by *Twitter*, *Smith & Wesson*, and their progeny. (*See supra* § II.C; *Twitter*, 598 U.S. at 498; *Smith & Wesson*, 605 U.S. at 297; *Ashley*, 144 F.4th at 437; *Fraenkel*, 2025 WL 2773251, at *8; LaVigne Decl. Ex. 5 (Nov. Tr.) 50:9-11 ("THE COURT: But willful blindness doesn't meet the third prong of the aiding and abetting test. There has to be specific intent there or severe and persuasive assistance.").)

Plaintiffs do not, and cannot, allege that BHL was seeking to bring about any of the goals or objectives of those groups or individual account holders, let alone seeking to assist any specific FTOs in their commission of the Attacks. Indeed, Plaintiffs' allegation of "willful ignorance" underscores the lack of alleged intent or consciousness with respect to BHL's alleged assistance to FTOs generally, and with respect to the Attacks specifically.

For these reasons, under binding Supreme Court precedent, Plaintiffs' JASTA claim should be dismissed because BHL did not "knowingly and substantially assist the [Attacks]." *Twitter*, 598 U.S. at 486.

3.  **The *Halberstam* Factors Confirm the Complaint Fails to Plead Substantial Assistance**

In addition to the foregoing, the legal framework espoused in *Halberstam*, 705 F.2d at 483-84, further supports that BHL did not provide knowing and substantial assistance under JASTA. *See Twitter* 598 U.S. at 485 (discussing *Halberstam* factors, explaining "[i]n enacting JASTA, Congress provided additional context by pointing to *Halberstam v. Welch*, 705 F.2d 472 (CADC 1983), as 'provid[ing] the proper legal framework' for 'civil aiding and abetting and conspiracy liability.'"); *see also In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1495 (8th Cir. 1997) (citing *Halberstam* in "determining what constitutes 'substantial assistance'" for purposes of aiding and abetting). Because the purported allegations at issue in this

33

case, like those in *Twitter*, "are a far cry from the facts of *Halberstam*, . . . its precise three-element and six-factor test thus may not be entirely adequate to resolve these new facts." *See Twitter* 598 U.S. at 488.

The ***first*** *Halberstam* factor—"the nature of the act assisted"—supports dismissal. At its core, the Complaint takes issue with BHL's alleged compliance failures that allowed purported FTO-associated parties from accessing Binance's generally available cryptocurrency services, which Plaintiffs allege then allowed FTOs to purportedly "transfer and conceal the equivalent of hundreds of millions of U.S. dollars through the Binance platform." (Compl. ¶ 3.) However, providing routine services at scale to the public does not draw the nexus required to show "substantial assistance" rule espoused in *Twitter*. (*Supra* § III.E.b.2.) And even if BHL's compliance failures were erroneously recast as providing FTOs with financing, which BHL did not do, it is still the case that Plaintiffs fail to allege that BHL's conduct was "indisputably important" to the commission of the specific alleged Attacks. *Halberstam*, 705 F.2d at 488.

The ***second*** *Halberstam* factor—"the amount and kind of assistance given"—supports dismissal, as well. In *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022), the court found the allegation "that HSBC facilitated over $19 billion in transactions with Iranian institutions and provided almost $1 billion in currency sales to Al Rajhi Bank," failed to "allege how much (if any) of that money indirectly flowed to al-Qaeda," and thus it "severely undermin[ed] a finding of substantiality." *Bernhardt*, 47 F.4th at 871. Like in *Bernhardt*, this *Halberstam* factor also severely undermines substantiality here because the Complaint in this case also fails to allege how any of the purported funds at issue "indirectly flowed to [the FTOs]." *Id.*; *see also supra* § III.E.b.3.

The ***third*** *Halberstam* factor—"the defendant's absence or presence at the time of the

34

tort"—also weighs heavily in favor of BHL because Plaintiffs have not (and cannot) plead any facts to show that BHL was present during the Attacks. *Cf. AstraZeneca*, 165 F.4th at 607-10 (attacks occurred outside the front gates of building where defendants contemporaneously made bribery payments).

The ***fourth*** *Halberstam* factor—the defendant's "relationship to the tortious actor"—supports that BHL provided no substantial assistance, either, because the Complaint does not allege (nor can it) that BHL had any relationship with any of the FTOs at issue, or gave them any special treatment as compared to the hundreds of millions of other users who transacted on the Binance platform. In fact, Plaintiffs' allegations about specific users that did allegedly receive special treatment—such as VIP users located in the U.S. (Compl. ¶¶ 286-293)—have no connection to the FTOs responsible for the Attacks.

The ***fifth*** *Halberstam* factor—"state of mind"—also heavily leans in favor of BHL as outlined *supra* § III.E.2.b.v. The Complaint alleges no affirmative act, nor even an omission, by BHL with the intent of facilitating the Attacks. *Cf. Halberstam*, 705 F.2d at 487-88 ("continuous participation" in two-person stolen goods venture as "banker, bookkeeper, recordkeeper, and secretary" reflected "intent and desire to make the venture succeed"); *see also Twitter*, 598 U.S. at 490 (no aiding-and-abetting liability where defendants were not alleged to have taken an "affirmative act" with "intent of facilitating" the attack).

The ***sixth*** *Halberstam* factor—"duration of the assistance provided"—does not support Plaintiffs' position, either. That factor seeks to equate the "length of time an alleged aider-abettor has been involved with a tortfeasor" with "the quality and extent" of their relationship and "the amount of aid provided." *Halberstam*, 705 F.2d at 484. At base, this factor *cannot* be met here because there was no "assistance" provided, and therefore no relationship between BHL and any

FTO. *Supra* § III.E.2; *see also Twitter*, 598 U.S. at 500 ("[D]efendants' relationship with ISIS and its supporters appears to have been the same as their relationship with their billion-plus other users: arm's length, passive, and largely indifferent.").

Thus, the *Halberstam* factors confirm that, assuming BHL provided any assistance (it did not), that such assistance cannot be construed as substantial.

### 4.   The Complaint Does Not, and Cannot, Allege BHL Was "Generally Aware" of Any Role in the Attacks

Even if the Complaint alleged "knowing and substantial" assistance (it does not), it fails to plead that BHL was "generally aware of [its] role in an overall illegal activity from which an act of international terrorism was a foreseeable risk"—*i.e.*, that BHL was "assuming a role in [the FTOs'] terrorist activities[.]" *Bernhardt*, 47 F.4th at 867, 869; *see also Ashley*, 144 F.4th at 438. Where an aider-and-abettor is alleged to have aided the principal through its customers, the inquiry into general awareness has two prongs:

> (1) whether the [defendant] was aware of the customers' connections with the terrorist organization before the relevant attacks; and (2) whether the customers 'were so closely intertwined with' the terrorist organization's 'violent terrorist activities that one can reasonably infer' that the [defendant] 'was generally aware of its role in unlawful activities from which the [A]ttacks were foreseeable while it was providing financial services' to those customers.

*Ashley*, 144 F.4th at 438 (citing *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021)). "Foreseeability is thus **central** . . . to JASTA aiding-and-abetting liability." *Honickman*, 6 F.4th at 487, 496-97 (emphasis added).

#### (a)   *Plaintiffs Do Not Allege That BHL Was Aware of Customers' Connections with FTOs*

Plaintiffs' allegations do not support an inference that BHL was aware that its *specific* customers or accounts were associated with any of the FTOs at issue. Plaintiffs only allege that: (1) in 2019, a video was purportedly posted by, allegedly, a person affiliated with Hamas showing

36

"Binance" as one of six cryptocurrency exchanges used for "donations" (Compl. ¶ 622); (2) in April 2019 and July 2020, BHL purportedly received reports that "Hamas-*associated* transactions" may have been on its platform (*id.* ¶ 20 (emphasis added)); and that (3) in July 2020, BHL's former employee flagged these accounts and instructed staff to "offboard" them. (*Id.* ¶ 383.)[10]

In *Honickman*, the Second Circuit dismissed a JASTA aiding-and-abetting claim based on allegations that "certain leaders of Hamas were board members of the [bank's] Three Customers," that two of the bank's Customers "were identified as unindicted co-conspirators in [a] criminal trial" of a charity "designated as a[n Specially Designated Global Terrorist ("SDGT")] which transferred money to [one of the Three Customers]," and that, *inter alia*, Al-Aqsa (a designed SDGT) "transferred at least $50,000 into" one of the Customers accounts after it was designated as an SDGT. 6 F.4th at 492-93, 502. Plaintiffs' allegations here fall far short of *Honickman*'s dismissed allegations: Plaintiffs do not allege that BHL knew it had Hamas members as customers, let alone **leaders** of Hamas as customers. And Plaintiffs allege throughout the Complaint that BHL "purposefully" did **not** monitor its accounts or users, thus, by Plaintiffs' logic, there is no possible inference that BHL was "aware of the connections between [any of its users] and [the FTOs]," *id.* at 502-03 (footnote omitted), at the relevant time, because BHL was not aware of any of the identities of its users or accounts. (*See, e.g.*, Compl. ¶¶ 342-43, 346, 348.) Additionally, each of these allegations pertains to three or four years *before* the Attacks, thus militating against any

---

[10] To be sure, Plaintiffs allege and refer to various public and government sources about what may have been purportedly publicly available during the relevant period, as well as what the government's investigation uncovered about the Binance.com exchange. However, Plaintiffs' specifically rely on allegations that BHL *did not* (purposefully) know any of its users' identities, which are fatal to their theory. If BHL failed to properly conduct KYC checks on its customers, then Plaintiffs cannot simultaneously claim that BHL knew it had customers associated with FTOs. In any case, as discussed in *Honickman* and *Ashley*, public sources and governmental designations are not enough to allege general awareness. (*Infra* § III.E.4.b at pp. #.)

inference that BHL had any knowledge, whatsoever, of any account in 2023 that was purportedly associated with any specific FTOs responsible for the Attacks, including Hamas.

(b)   *Plaintiffs Cannot Allege That BHL Could Foresee the Attacks*

Because there is no allegation that BHL was aware of a connection between any one of its *specific* users and an FTO, the Complaint therefore fails to give rise to any inference that BHL could have "reasonably infer[red] [that] the [Attacks] were [a] foreseeable [consequence] while it was providing financial services to those customers." *Ashley*, 144 F.4th at 438 (citing *Honickman*, 6 F.4th at 501).

In *Ashley*, the plaintiffs alleged the banks were "generally aware" of the VAT fraud terrorist scheme, because (1) "an internal compliance employee raised concerns about [the] fraud," (2) there were "several public sources connecting VAT fraud with terrorism generally," (3) after Azizi's arrest, he implicated the defendant banks naming them "willing financial partner[s]," and that various other red flags existed. *Id.* at 446-47. Based upon these allegations, which mirror those in this case, the Second Circuit found they supported, at most, that the banks may have been aware that "they were involved in tax fraud" and that it was "*possible*—not *plausible*—that [their] customers'] transactions were closely intertwined with [terrorists]." *Id.* at 447 (citing *Honickman*, 6 F.4th at 501). For these reasons, the Second Circuit affirmed "the complaint fails to plausibly allege that when the Banks made trades and transactions connected to Azizi's scheme, they were generally aware of their role in an activity from which the Syndicate's attacks ***were foreseeable***." *Id.* (emphasis added).

Like *Ashley*, the Complaint alleges at best that BHL left open its platform for the public at large to use, and that one employee at BHL was concerned that "crime," generally, may have been taking place on the platform. (Compl. ¶ 328.) But like the "compliance employee" in *Ashley* who

merely "raised concerns," this allegation is insufficient to make terrorist attacks foreseeable. *Id.* at 446. Nothing about BHL purportedly allowing the public at large to use Binance.com makes the Attacks a reasonably foreseeable consequence.

### F.      Certain Specific Plaintiffs Fail to Allege Standing

Certain Plaintiffs do not have standing to bring claims under JASTA because they are not nationals of the United States. The ATA and JASTA each provide that:

> ***Any national of the United States*** injured in ***his or her*** person, property, or business by reason of an act of international terrorism, or ***his or her*** estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages ***he or she*** sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a) (emphasis added). The statutory text is clear: it refers singularly to "any" national of the United States injured in "his or her" person, property, or business, and provides treble damages "he or she" sustains. *Id.* Accordingly, the ATA only provides a remedy for injuries sustained by a U.S. national. A non-U.S. national can only bring claims under JASTA if that non-U.S. national represents a U.S. national's estate, survivors, or heirs, and even then, such non-U.S. national can only seek to recover the U.S. national's damages, not individual damages suffered by the non-U.S. national. *See Averbach for Est. of Averbach v. Cairo Amman Bank*, 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020) ("[A]ny United States national, or his estate, survivors, or heirs, may sue for any injuries that the national receives to his person, property, or business by reason of an act of international terrorism. Nowhere in the statute does Congress provide remedies for non-nationals claiming damages for personal injuries.").

The Complaint's allegations make clear that 32 Plaintiffs are not U.S. nationals yet seek to recover individual damages, in contravention of the clear text of JASTA, so their claims must be dismissed. (*See, e.g.*, Compl. ¶¶ 1043, 1111-14, 1137, 1140, 1180, 1199, 1227-34, 1236, 1270, 1273, 1236, 1712-15 (describing 32 Israeli citizens seeking personal damages).) Further, the

39

Complaint alleges that Plaintiff Inbal Chen brings this action "as the legal guardian of A.Z.," but does not allege A.Z.'s citizenship. (*Id.* ¶ 1137.) By failing to plead this required element for JASTA liability, Chen's claim on behalf of A.Z. fails as a matter of law. *Cf. Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 43 (D.D.C. 2010) (plaintiffs adequately pled ATA liability by alleging that the estate-plaintiff was the estate of a U.S. citizen and all other survivor-plaintiffs are survivors of a U.S. citizen).

Finally, Plaintiff Noach Newman has already asserted a JASTA claim in a pending lawsuit against BHL and Changpeng Zhao. (*See Newman* Am. Compl. (Noach Newman as the lead plaintiff asserting JASTA and ATA claims, *inter alia*, against BHL and Zhao arising out of Attacks).) Plaintiff Newman cannot file multiple claims on the same purported injury in various fora, and his claims should be dismissed. *See Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*, 259 F.3d 949, 954 (8th Cir. 2001) ("Plaintiffs may not pursue multiple federal suits against the same party involving the same controversy at the same time.").

## IV.    CONCLUSION

For these reasons, the Court should grant BHL's motion to dismiss the Complaint.

Dated this 4th day of March, 2026

**WITHERS BERGMAN LLP**                    **VOGEL LAW FIRM**

Christopher N. LaVigne (*pro hac vice*)        */s/ Robert J. Pathroff*
Joseph Gallo (*pro hac vice*)              BY: Robert. J. Pathroff (#07759)
Alexander Haden (*pro hac vice*)              Nicholas M. Surma (#08830)
430 Park Avenue, 10th Floor                US Bank Building
New York, NY, 10022-3505                  200 North 3rd Street, Suite 201
Telephone:  212.848.9800                  PO Box 2097
Facsimile:  212.848.9888                  Bismarck, ND  58502-2097
christopher.lavigne@withersworldwide.com   Telephone:  701.258.7899
joseph.gallo@withersworldwide.com          rpathroff@vogellaw.com
alex.haden@withersworldwide.com           nsurma@vogellaw.com

ATTORNEYS FOR DEFENDANT BINANCE HOLDINGS LIMITED

40