**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

EYAL BALVA, *et al.*,

Plaintiffs,

v.

BINANCE HOLDINGS LIMITED, *et al.*,

Defendants.

No. 3:25-cv-266-PDW-ARS

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

Page


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................5

I. FACTS AND PROCEDURAL HISTORY ....................................................................5

A. The Original Complaint and Binance's First Motion to Dismiss ............................5

B. Subsequent Decisions from the Southern District of New York and the D.C. District Court Dismissing Analogous Complaints Against Binance in Their Entirety.............................................................................................7

1. S.D.N.Y.'s Decision Dismissing the Complaint in *Troell* ..........................7

2. D.D.C.'s Decision Dismissing the Complaint in *Atzili* .............................10

II. THE ALLEGATIONS IN THE AMENDED COMPLAINT ..........................................12

A. The Amended Complaint Largely Focuses on Binance's Alleged Compliance Failures.............................................................................................13

B. Plaintiffs Improperly Rely on Prior U.S. Agency Filings....................................15

LEGAL STANDARD.............................................................................................16

ARGUMENT.........................................................................................................16

I. THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH RULE 8 ...................................................................................................16

II. PLAINTIFFS FAIL TO ADEQUATELY PLEAD PERSONAL JURISDICTION OVER BINANCE .........17

A. The Court Lacks General Personal Jurisdiction over Binance .............................18

B. The Court Also Lacks Specific Personal Jurisdiction over Binance .....................18

1. Plaintiffs' Allegations Do Not Satisfy the Minimum-Contacts Analysis.............................................................................................19

2. The Supreme Court's Decision in *Fuld* Does Not Displace the Minimum-Contacts Analysis in Rule 4(k)(2) Cases ................................23

C. Plaintiffs Cannot Establish Jurisdiction Under Rule 4(k)(1)(C)...........................26

III. PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING-AND-ABETTING LIABILITY UNDER JASTA....27

A. Plaintiffs Cannot Establish a Concrete Nexus Between Binance's Conduct and Any Specific Attack....29

B. Plaintiffs Cannot Establish that Binance Provided "Pervasive, Systemic, and Culpable" Assistance....36

C. Plaintiffs' Factual Allegations Suffer from Two Additional Flaws....38

IV. CERTAIN PLAINTIFFS MUST BE DISMISSED BECAUSE JASTA PROVIDES A CAUSE OF ACTION ONLY FOR U.S. NATIONALS....40

CONCLUSION....40

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*,
480 U.S. 102 (1987) ........ 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 16

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) ........ *passim*

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026) ........ *passim*

*Atzili v. Islamic Republic of Iran*,
No. 1:24-cv-3365, 2026 WL 1500823
(D.D.C. May 29, 2026) ........ *passim*

*Averbach ex rel. Averbach v. Cairo Amman Bank*,
No. 1:19-cv-4, 2020 WL 1130733
(S.D.N.Y. Mar. 9, 2020) ........ 40

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022) ........ 12

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ........ 19, 21, 25

*Cody v. Loen*,
468 F. App’x 644 (8th Cir. 2012) ........ 16, 17

*Epps v. Stewart Info. Servs. Corp.*,
327 F.3d 642 (8th Cir. 2003) ........ 16

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ........ 19

*Fraenkel v. Standard Chartered Bank*,
No. 24-cv-4484, 2025 WL 2773251
(S.D.N.Y. Sep. 26, 2025) ........ 32

*Freeman v. HSBC Holdings PLC*,
465 F. Supp. 3d 220 (E.D.N.Y. 2020) ........ 31

**TABLE OF AUTHORITIES—Continued**


Page(s)

*Freeman v. HSBC Holdings PLC*,
No. 18-cv-7359, 2026 WL 880107
(E.D.N.Y. Mar. 31, 2026) ....................37, 38, 39

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) .................... *passim*

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ....................18

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ....................28

*Hanson v. Denckla*,
357 U.S. 235 (1958) ....................19

*Hardy v. Scandinavian Airlines Sys.*,
117 F.4th 252 (5th Cir. 2024) ....................18

*Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*,
89 F.4th 1023 (8th Cir. 2023) ....................18

*Honickman ex rel. Goldstein v. BLOM Bank SAL*,
432 F. Supp. 3d 253 (E.D.N.Y. 2020) ....................31

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ....................31

*In re Diisocyanates Antitrust Litig.*,
No. 18-1001, 2026 WL 522845
(W.D. Pa. Feb. 25, 2026) ....................25

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011) ....................39

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ....................3, 18, 19, 22, 23

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*,
256 F.3d 548 (7th Cir. 2001) ....................24

*Jekyll Island-State Park Auth. v. Polygroup Macau Ltd.*,
140 F.4th 1304 (11th Cir. 2025) ....................18

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021)....................33, 34

*King v. Bon Charge*,
823 F. Supp. 3d 508 (D. Del. 2025)....................25, 26

*Larson v. Stow*,
36 F.3d 1100 (Table), 1994 WL 512369 (8th Cir. 1994) ....................17

*Lightfoot v. Cendant Mortg. Corp.*,
580 U.S. 82 (2017)....................16

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976)....................39

*Nuevos Destinos, LLC v. Peck*,
No. 3:19-cv-45, 2019 WL 6481441
(D.N.D. Dec. 2, 2019)....................4, 18, 19, 20

*Ofisi v. BNP Paribas, S.A.*,
77 F.4th 667 (D.C. Cir. 2023)....................31

*Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987)....................24

*Owens v. BNP Paribas, S.A.*,
897 F.3d 266 (D.C. Cir. 2018)....................31

*Risk Techs., Inc. v. Tenn. Mun. League Risk Mgmt. Pool, Inc.*,
No. 3:02-cv-2614, 2003 WL 21018872
(N.D. Tex. May 1, 2003)....................22

*Rodriguez v. Imperial Brands, PLC.*, --- F.4th ----,
No. 24-11487, 2026 WL 2118957
(11th Cir. July 23, 2026)....................25

*Salahuddin v. Cuomo*,
861 F.2d 40 (2d Cir. 1988)....................16

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025).................... *passim*

*Stone v. Harry*,
364 F.3d 912 (8th Cir. 2004) ....................33

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010) ........ 21

*Thomson v. Olson*,
866 F. Supp. 1267 (D.N.D. 1994) ........ 16

*Triple Up Ltd. v. Youku Tudou Inc.*,
235 F. Supp. 3d 15 (D.D.C. 2017) ........ 22

*Troell v. Binance Holdings Ltd.*,
No. 24-cv-7136, 2026 WL 636849
(S.D.N.Y. Mar. 6, 2026) ........ *passim*

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ........ *passim*

*Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*,
646 F.3d 589 (8th Cir. 2011) ........ 20

*Walden v. Fiore*,
571 U.S. 277 (2014) ........ 19, 20

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*,
No. 10-cv-864, 2014 WL 3569338
(E.D.N.Y. July 18, 2014) ........ 39

*World Tanker Carriers Corp. v. M/V Ya Mawlaya*,
99 F.3d 717 (5th Cir. 1996) ........ 24

*Wultz v. Islamic Republic of Iran*,
762 F. Supp. 2d 18 (D.D.C. 2011) ........ 26, 27

*X Corp. v. World Fed'n of Advertisers*,
826 F. Supp. 3d 772 (N.D. Tex. 2026) ........ 25

*Zobay v. MTN Grp. Ltd.*,
695 F. Supp. 3d 301 (E.D.N.Y. 2023) ........ 38

**STATUTES:**

18 U.S.C. § 2333(a) ........ 23, 40

18 U.S.C. § 2333(d)(2) ........ 28, 40

18 U.S.C. § 2334(a) ........ 26

## TABLE OF AUTHORITIES—Continued

Page(s)

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016)................5

**RULES:**

Fed. R. Civ. P.:

4 advisory committee's note to 1993 amendment ..........................................................24, 25

4(k)(1)(C).........................................................................................................4, 26, 27

4(k)(2) ............................................................................................................... *passim*

4(k)(2)(A)...............................................................................................................24

8(a)(2) ...........................................................................................................4, 16, 17

12(b)(2) ..............................................................................................................3, 18

12(b)(6) ...........................................................................................................3, 16, 27

**OTHER AUTHORITY:**

*Failed Bank Information for Signature Bank*, New York, NY, FDIC (Mar. 18, 2026), https://perma.cc/48GE-KR3E ...............................................................................21

## INTRODUCTION

This case concerns the Binance.com platform—a global digital asset platform that allows its customers to store, transfer, and trade digital assets like Bitcoin. Plaintiffs seek to hold Defendant Binance Holdings Limited ("Binance") liable for the abhorrent attacks on the State of Israel on October 7, 2023 (the "Attacks") based on allegations that certain transactions occurring on Binance's platform may have been used to provide funds to the Foreign Terrorist Organizations ("FTOs") responsible for the Attacks. Binance unequivocally condemns all acts of terrorism, including the Attacks, but it is undisputed that Binance did not plan, perpetrate, or fund the Attacks. Rather, Plaintiffs allege that Binance's general policies and practices facilitated such illicit uses of its platform.

As multiple courts have already concluded, these allegations against Binance do not satisfy the demanding standard that *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), established for pleading aiding and abetting liability under the Justice Against Sponsors of Terrorism Act ("JASTA"). In *Twitter*, the Supreme Court held that plaintiffs cannot state a claim for aiding and abetting a terrorist attack unless their allegations demonstrate that "defendants culpably 'associated themselves with' the . . . attack, 'participated in it as something that they wished to bring about,' or sought 'by their action to make it succeed.' " *Id.* at 498 (citation modified). Plaintiffs' allegations do not come close to meeting this high bar. Plaintiffs seek to hold Binance responsible based on a sweeping theory of liability: In an effort to court VIP customers, they claim, Binance failed to institute or enforce certain anti-money-laundering and know-your-customer protocols, which allowed criminal actors to use its platform to raise and launder money, which might have been eventually transferred to FTOs, who, in turn, might have used some of that money to fund the Attacks.

Court after court has rejected precisely this kind of attenuated theory of JASTA liability. Thus, in March, the Southern District of New York dismissed analogous claims that Binance had aided and abetted the October 7 attacks through intentionally lax compliance protocols, explaining that plaintiffs' theory of "liability [wa]s predominantly premised on the allegation that individuals and entities with terrorist affiliations were permitted to transact on the Binance exchange," and such allegations are not enough to establish the "knowing and substantial assistance" *Twitter* requires. *Troell v. Binance Holdings Ltd.*, No. 24-cv-7136, 2026 WL 636849, at *16-17 (S.D.N.Y. Mar. 6, 2026) (capitalization altered). Two months later, the D.C. District Court reached the same conclusion, dismissing another analogous complaint with prejudice and observing—among other things—that accepting plaintiffs' claim that Binance should be liable for facilitating transactions potentially associated with the October 7 attacks would make Binance liable for "every potential act of terrorism perpetuated by Hamas." *Atzili v. Islamic Republic of Iran*, No. 1:24-cv-3365, 2026 WL 1500823, at *11 (D.D.C. May 29, 2026). Both decisions relied heavily on recent court of appeals precedents recognizing that *Twitter* demands more than allegations that the defendant failed to police "financially suspect transactions *writ large*." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 445 (2d Cir. 2025) (emphasis added); *see Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 608 (D.C. Cir. 2026) ("*AstraZeneca*") (an allegation that "a defendant generally knew its assistance was going to a terrorist organization is insufficient" to establish JASTA liability).

Those courts were right. As Plaintiffs themselves acknowledge, Binance "is the largest global cryptocurrency trading platform" serving "more than 280 million users globally," "with over $300 billion in daily volume across spot and futures markets." Am. Compl. ¶¶ 22-23, Dkt. No. 56 ("AC"). Binance—like any other financial institution, fintech platform, or financial

intermediary—can be misused by bad actors. But JASTA is not a strict-liability statute for platforms allegedly accessed by illicit users. It requires plausible allegations that financial institutions "gave such knowing and substantial assistance" to a terrorist organization that they can be said to have "culpably participated in the . . . attack" in which plaintiffs were injured. *Twitter*, 598 U.S. at 497. And the Supreme Court has made exceptionally clear that the key to establishing aiding-and-abetting liability is a plausible showing that the defendant in fact "intend[ed] to facilitate the offense's commission." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291 (2025) (citation modified).

That is a demanding standard—and rightly so. Aiders-and-abettors are equally liable for the attacks as the primary perpetrators, *Twitter*, 598 U.S. at 483-484, so plaintiffs must establish that they are equally culpable. That is why "the concept of 'helping' in the commission of a crime—or a tort—has never been boundless." *Id.* at 488. Yet Plaintiffs' theory relies on precisely that kind of boundless liability. If Binance can be held liable for the October 7 attacks because it failed to implement and enforce certain anti-money-laundering and know-your-customer requirements, then any financial institution that commits a compliance violation may find itself liable for any and all of its customers' offenses—even where the institution neither intended nor took any affirmative action to support, facilitate, or further those offenses. The Court should therefore follow the path set by its fellow district courts and dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Separately, the Court should dismiss under Rule 12(b)(2) for lack of personal jurisdiction. Plaintiffs allege only a handful of contacts between Binance and the United States, none of which is linked to the Attacks. Those scant allegations cannot satisfy the minimum-contacts analysis established in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), under which courts ask

whether a "'defendant's *suit-related conduct* . . . create[s] a substantial connection' with the United States," *Nuevos Destinos, LLC v. Peck*, No. 3:19-cv-45, 2019 WL 6481441, at *12 (D.N.D. Dec. 2, 2019).

Further, while some plaintiffs have asserted that the Supreme Court's decision in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), displaces traditional minimum-contacts analysis in all cases arising under federal laws, that is incorrect. *Fuld* upheld the constitutionality of a statute that dispensed with the minimum-contacts analysis in a narrow set of circumstances involving specific claims against specific foreign defendants. But it is undisputed that the statute in *Fuld* has no application here. Instead, Plaintiffs rely on Rule 4(k)(2), which was understood from its inception to incorporate the usual minimum-contacts analysis. In any event, as courts have uniformly recognized, *Fuld* itself found that some form of nexus and reasonableness requirement applies even when formal minimum-contacts analysis does not. Plaintiffs' scant allegations of contacts with the United States cannot satisfy even that more relaxed standard. Nor do Plaintiffs avoid the problem through their summary suggestion that the Court alternatively has jurisdiction under Rule 4(k)(1)(C). As relevant here, that Rule conveys jurisdiction over a foreign defendant in the same place the defendant was served. That is not this case: Binance was served in Washington, D.C., not North Dakota.

Finally, there are at least two other significant problems with the Amended Complaint. First, it violates Rule 8(a)(2)'s "short and plain statement" requirement and then some. It spans nearly 2,400 paragraphs, much of it devoted to historical, geopolitical, and post-Attacks allegations that do not even mention Binance. Second, certain Plaintiffs lack statutory standing under JASTA because they are not U.S. nationals (or proper representatives of injured U.S. nationals). The Court should dismiss for those reasons, as well.

## BACKGROUND

### I. Facts and Procedural History

Binance is the world's largest cryptocurrency exchange. Cryptocurrency exchanges provide critical financial infrastructure worldwide, allowing retail and institutional users to buy, sell, and hold digital assets, like Bitcoin. As most relevant here, customers can use a cryptocurrency exchange like a bank, storing their cryptocurrencies in a digital "wallet" and transferring those digital assets as needed. That feature aids the billions of people worldwide who lack access to traditional banks—including those living in developing economies and political dissidents in countries where the banking system is controlled by the government. It also aids those who prefer to store and transfer their assets in digital currencies that traditional banks may not accommodate.

Plaintiffs are a group of individuals who allege they were injured by the atrocious acts of international terrorism perpetrated on October 7, 2023. Plaintiffs do not allege that Binance played any role in planning or perpetrating these attacks. Instead, they allege that individuals with Binance accounts transferred funds to and from wallets associated with FTOs, and that some of those funds could have been used to finance the October 7 attacks.

#### A. The Original Complaint and Binance's First Motion to Dismiss

Plaintiffs filed their original complaint on November 24, 2025. Dkt. No. 1. The 284-page complaint alleged that Binance aided and abetted the commission of acts of international terrorism in violation of JASTA, Pub. L. No. 114-222, 130 Stat. 852 (2016). To state a claim for aiding and abetting under JASTA, a plaintiff must—among other things—allege that the aider and abettor "consciously and culpably participated in a wrongful act so as to help make it succeed." *Twitter*, 598 U.S. at 493 (citation modified). While the defendant need not "always" know "all particulars of the primary actor's plan," "it is not enough" to allege that a defendant provided "substantial

assistance to a transcendent 'enterprise.' " *Id.* at 495, 501, 504 (citation modified). Moreover, if "the relationship between" a defendant's assistance and the ultimate tortious act is "attenuated," then "plaintiffs . . . need some other very good reason to think that defendants were consciously trying to help or otherwise participate in the [specific] attack," such as "encouraging, soliciting, or advising" the primary actor. *Id.* at 500 (citation modified).

Plaintiffs' original complaint sought to satisfy *Twitter*'s requirements primarily through conclusory allegations that Binance deliberately built and operated the world's largest cryptocurrency exchange as a money-laundering vehicle, "purposely attract[ing] criminals including terrorist organizations like Hamas, the IRGC, Hezbollah, and PIJ." Compl. ¶ 11, Dkt. No. 1. Plaintiffs also alleged that Binance consciously declined to implement know-your-customer and anti-money-laundering programs in order to attract illicit business, *id.* ¶ 114, including terrorist-affiliated customers, *id.* ¶ 115—and that this conduct culminated in Binance's November 21, 2023, guilty plea for violating U.S. laws requiring such compliance programs, *id.* ¶ 120.

Binance moved to dismiss the original complaint on March 4, 2026. Mem. in Supp. of Mot. to Dismiss, Dkt. No. 30 ("First MTD Mem."). Binance explained that Plaintiffs' nearly 300-page complaint suffered from numerous fatal defects, including that Plaintiffs had failed to satisfy Rule 8(a)(2)'s requirement of a "short and plain statement of the claim"; failed to establish personal jurisdiction over Binance—a foreign corporation that lacks anything close to minimum contacts with the United States; and failed to state a claim for aiding and abetting. *See id.* at 9-16, 19-39. On the last point, Binance observed that there was not a single allegation in the entire complaint asserting that "any Binance.com transaction was used to fund or assist the Attacks in any way." *Id.* at 24. Instead, Plaintiffs had attempted to rely on plainly insufficient allegations that there were FTO-associated transactions on the exchange that Binance should have kept off. *Id.* at 27-28.

### B. Subsequent Decisions from the Southern District of New York and the D.C. District Court Dismissing Analogous Complaints Against Binance in Their Entirety

#### *1. S.D.N.Y.'s Decision Dismissing the Complaint in* Troell

Just two days after Binance filed its motion to dismiss, the Southern District of New York dismissed analogous aiding-and-abetting allegations against Binance in their entirety in *Troell*. Like Plaintiffs here, the *Troell* plaintiffs alleged that FTOs, including Hamas, conducted transactions on Binance.com, relying heavily on U.S. agency filings regarding Binance's historical compliance efforts. *See* 2026 WL 636849, at *7-8, *21. The *Troell* plaintiffs also alleged that defendants' failure to comply with anti-money-laundering and know-your-customer obligations, as well as their failure to file suspicious activity reports, "indiscriminately permitted illicit activity on the Binance platform." *Id.* at *5, *21. And the *Troell* plaintiffs alleged that defendants were aware from public and third-party reporting that Hamas affiliates were using Binance.com. *Id.* at *21.

Judge Vargas found that *none* of those allegations was sufficient to state a claim for aiding and abetting under JASTA. In reaching that conclusion, she relied heavily on the Second Circuit's recent decision in *Ashley*. In that case, the Second Circuit applied *Twitter* to reject allegations that a bank could be held liable under JASTA for providing financial services to entities associated with FTOs that conducted attacks in Afghanistan because the bank failed to employ robust anti-money-laundering and counter-terrorist finance policies and operated in high-risk terrorist finance jurisdictions. 144 F.4th at 430. The Second Circuit explained that, under *Twitter*, plaintiffs cannot state a claim for aiding and abetting unless they plausibly allege that defendants "knowingly and substantially" assisted the relevant terrorist acts. *Id.* at 435 (citation omitted). To do so, plaintiffs must either establish a "concrete nexus" between defendants' conduct and the specific terrorist attacks in question, or they must show that defendants' "participation" was so "pervasive,

systemic, *and culpable* . . . that we can say the defendant aided every wrongful act." *Id.* at 445 (emphasis added) (citation modified). The Second Circuit emphasized, however, that this was a "high bar" that could not be met simply by alleging that defendants' "aid was pervasive and systemic." *Id.* Rather, a plaintiff must plausibly allege that defendants' activities were "designed or performed with the intent to aid" the terrorist organization. *Id.*

*Ashley* held that plaintiffs could not satisfy either of these requirements through their allegations that the defendant bank facilitated money laundering and thereby "allowed" the terrorists "to access funds" they used in their terrorist activities. 144 F.4th at 443-444. The Second Circuit held that theory impermissibly relies on "money's fungibility" by assuming that any activities that enrich a terrorist organization must support particular terrorist acts. *Id.* at 444. The court of appeals explained that "it is not enough to say that the defendant assisted the terrorist organization's activities in general," or that it is "possible that some of the Banks' transactions . . . produced money that was transferred to" the terrorist organization for use in the attacks that harmed plaintiffs. *Id.* (citation modified). Such "attenuated" theories are not enough to plausibly plead the "concrete nexus" required to establish knowing and substantial assistance. *Id.* at 445 (citation modified).

The Second Circuit further held that such allegations do not show the sort of "pervasive, systemic, *and culpable*" conduct that can occasionally establish liability in the absence of a concrete nexus. 144 F.4th at 445 (emphasis added) (citation omitted). It explained that satisfying this culpability requirement demands more than allegations that the defendant "culpably executed financially suspect transactions *writ large*." *Id.* (emphasis added). The allegations must show that the transactions were undertaken "in a manner that actively sought to 'associate' " the defendant with the terrorist organization or to "form 'a near-common enterprise' " between the defendant and

the terrorist organization. *Id.* (brackets omitted) (quoting *Twitter*, 598 U.S. at 502). The Second Circuit concluded that the *Ashley* plaintiffs had not made this showing even though "the Banks may have opened their doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the [FTO]'s pile of resources." *Id.* Those allegations were "insufficient" to support a JASTA claim. *Id.*

Judge Vargas determined that *Ashley*'s reasoning—which was firmly rooted in the Supreme Court's decision in *Twitter*—required the dismissal of the *Troell* plaintiffs' allegations that Binance aided and abetted the October 7 attacks. She explained that plaintiffs had failed to allege either "plausible factual allegations sufficiently linking [d]efendants' actions to [the Attacks] that injured [the] [p]laintiffs," or that defendants "were intentionally seeking to associate themselves with [FTOs] or to form a common enterprise with them." 2026 WL 636849, at *15, *21 (citing *Ashley*, 144 F.4th at 445). The court explained that plaintiffs' theory of "liability [wa]s predominantly premised on the allegation that individuals and entities with terrorist affiliations were permitted to transact on the Binance exchange," and such allegations are not enough to establish "knowing and substantial assistance." *Id.* at *16-17 (capitalization altered). She further observed that, while plaintiffs had alleged that Binance had "given special accommodations" to "VIP customer[s] on the platform," they had "not alleged that [Binance] uniquely flouted [anti-money-laundering and related] regulations and reporting requirements for the benefit of Hamas or the PIJ" in particular, as required under *Twitter* and *Ashley*. *Id.* at *21. Rather, plaintiffs had alleged "that the Binance exchange permitted all sorts of illicit actors to engage in transactions unchecked, routinely refused to file SARs for any suspicious transactions, and took elaborate steps to protect the accounts of any VIP user." *Id.* Those generalized allegations simply were not

enough to "suggest[ ] that [d]efendants sought to form a common enterprise with Hamas or the PIJ, or any FTO for that matter." *Id.*

One month after the *Troell* dismissal, another court in the Southern District of New York agreed to reconsider its prior denial of a motion to dismiss analogous claims against Binance. Order, *Raanan v. Binance Holdings Ltd.*, No. 1:24-cv-697 (S.D.N.Y. Apr. 28, 2026), Dkt. No. 109. That prior decision was issued before *Ashley*, and the court recognized that it would be "folly" to deny reconsideration in light of *Ashley* and *Troell*'s application of *Twitter*. Letter Mot. to Stay Discovery at 2, *Raanan* (S.D.N.Y. May 8, 2026), Dkt. No. 117. That motion is now fully briefed and awaiting decision.

*2. D.D.C.'s Decision Dismissing the Complaint in* Atzili

Shortly after *Troell* was decided, Plaintiffs in this case obtained an extension on their deadline to respond to Binance's motion to dismiss, indicating that they might file an amended complaint instead of a response—presumably in the hopes of remedying the fatal pleading defects identified in *Troell*. Dkt. Nos. 39, 41, 53, 54. But before Plaintiffs could do so, another district court held that nearly identical allegations against Binance failed to state a claim for aiding and abetting under JASTA.

In *Atzili*, the D.C. District Court dismissed plaintiffs' JASTA claims arising out of the October 7 attacks *with prejudice*, holding that "[p]laintiffs' allegations fail[ed] to establish that the assistance . . . [Binance] provided to Hamas was substantial or connected enough to the October 7 attacks to merit liability." 2026 WL 1500823, at *1. In reaching that conclusion, the court drew heavily on *Twitter* and the D.C. Circuit's recent opinion in *AstraZeneca*. *AstraZeneca* found that certain plaintiffs had adequately alleged aiding and abetting where the complaint contained specific and detailed allegations that the defendants *directly* assisted a specific FTO through "*unusual and corrupt means*," including by "pa[ying] illegal cash bribes directly to the group and

suppl[ying] extra, off-the-books batches of valuable medical goods that [the FTO] monetized on the black market to fund its operations." 165 F.4th at 596, 606-608 (emphasis added). But the D.C. Circuit emphasized that allegations that lacked similar specificity or failed to establish a direct link between the defendants and the alleged terrorist acts would not suffice. *Id.* at 607-608. *AstraZeneca* held, for example, that an allegation that "a defendant generally knew its assistance was going to a terrorist organization is insufficient" to establish JASTA liability. *Id.* at 608.

The *Atzili* court held that plaintiffs had not come close to satisfying the aiding-and-abetting standard established in *Twitter* and *AstraZeneca*. The court explained, for example, that plaintiffs' allegations that Binance was aware that some "Hamas-associated transactions" occurred on its publicly available platform were "not enough to establish a culpable 'state of mind with respect to [its] actions and the tortious conduct.' " 2026 WL 1500823, at *8 (citation modified) (quoting *Twitter*, 598 U.S. at 504). The court also determined that plaintiffs had not alleged any "unusual" assistance specific to Hamas because "[t]here are no allegations that . . . [Binance] treated Hamas-linked users any differently from anyone else"; rather, plaintiffs alleged that Binance provided help evading sanctions to "VIP users generally" rather than to Hamas-affiliated users "in particular." *Id.* at *9 (citation modified). Those allegations, the court held, were a "far cry" from the "bespoke dealings" and "voluntary, tailored relationship" with an FTO that *AstraZeneca* demands. *Id.* at *8-9 (citation modified).

The *Atzili* court further concluded that "the assistance that . . . [Binance] allegedly provided was not particularly substantial." 2026 WL 1500823, at *9. The court observed that plaintiffs did not allege Binance " 'directly supplied [Hamas] with cash' "; they instead "blame[d] . . . Binance for not taking more aggressive action to stop *others* from financially assisting terrorists." *Id.* at *10 (quoting *AstraZeneca*, 165 F.4th at 612). The court explained that holding Binance liable

"merely because [its] generally available services are financial-related and money is fungible would contravene *Twitter*'s warning" against focusing on a platform's value to terrorists rather than on defendant's culpability. *Id.* Nor could plaintiffs overcome this defect by alleging that Binance had provided its services over a long period of time because "a lengthy financial relationship does not terrorism assistance make." *Id.* (quoting *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022)).

In addition, the court in *Atzili* held that because "[p]laintiffs d[id] not allege that any particular Binance transaction supported the October 7 attacks, they fail[ed] to adequately link any alleged assistance from . . . [Binance]" to their injuries. 2026 WL 1500823, at *10. At most, Binance "allegedly did not stop others from transferring money to Hamas-associated accounts on [its] platform[ ]," and even treating platform access as financial assistance, "there is not much 'closeness between defendants' assistance and the act of international terrorism that injured plaintiffs.' " *Id.* (ellipsis omitted) (quoting *AstraZeneca*, 165 F.4th at 604). The court added that plaintiff's theory would "improperly encompass every potential act of terrorism perpetuated by Hamas," contrary to *Twitter*. *Id.* at *11.

## II. THE ALLEGATIONS IN THE AMENDED COMPLAINT

On June 10, 2026, Plaintiffs filed the Amended Complaint, adding almost 100 pages of new allegations. None of those allegations, however, meaningfully addresses the problems that led the other courts to dismiss analogous claims for failure to state a claim. Plaintiffs, for example, do not allege that Binance planned or participated in the Attacks, directly funded or supported the Attacks, had advance knowledge of the Attacks, or otherwise intentionally associated themselves with the Attacks in any way. Indeed, the 40 pages of the Amended Complaint devoted to describing the FTOs and the Attacks barely reference Binance or any other defendant at all. *See* AC ¶¶ 1274-1479. In the entire 400-page complaint, the closest Plaintiffs come to alleging any

connection between Binance and the October 7 attacks are speculative and conclusory allegations about certain Binance accounts that allegedly made transactions around the time of the Attacks. *See, e.g.*, *id.* ¶¶ 1046-60. Those allegations about activity by Binance customers (rather than Binance) that *might* have been connected with the Attacks come nowhere close to establishing the kind of knowing-and-substantial assistance that *Twitter*, *Ashley*, *Troell*, *Atzili*, and a host of other cases have required.

Instead of the requisite allegations of knowing-and-substantial assistance, Plaintiffs continue to rely primarily on generalized assertions that Binance violated certain compliance requirements and otherwise allowed malefactors onto its platform—precisely the sort of allegations that *Troell* and *Atzili* already rejected. And Plaintiffs compound their pleading deficiencies by impermissibly relying on (and mischaracterizing) U.S. agency filings.

### A. The Amended Complaint Largely Focuses on Binance's Alleged Compliance Failures.

The crux of Plaintiffs' allegations is that Binance failed to comply with certain anti-money-laundering and know-your-customer safeguards and otherwise created a hospitable environment for malfeasance. AC ¶ 419. The Amended Complaint implausibly alleges, for example, that Binance was deliberately designed as a "criminal enterprise to facilitate money laundering on a global scale." *Id.* ¶ 21. And it alleges that Binance exempted anonymous accounts from identity verification, *id.* ¶¶ 393-395, maintained an internal ledger system that rendered inter-customer transfers invisible to outside observers, *id.* ¶¶ 96-98, and offered favorable treatment to VIPs that aided some FTO-linked users, *e.g.*, *id.* ¶¶ 432-437.

On Plaintiffs' theory, a more effective monitoring system or better compliance efforts would have identified and prevented certain financial transactions, which were "associated with" groups involved in the October 7 attacks. AC ¶ 41; *see also id.* ¶¶ 322-429, 470, 573, 1010. But

even setting aside the giant logical leaps that theory requires, Plaintiffs fail to allege that Binance had any contemporaneous awareness of direct transactions with any FTOs—much less transactions with any concrete nexus to the October 7 attacks—or that Binance intended to support the Attacks in any way. Indeed, many of Plaintiffs' allegations demonstrate that Binance did *not* intend to fund the Attacks but merely sought "to retain its vast number of U.S. customers" who engaged in particularly profitable transactions. *Id.* ¶¶ 323, 325.

Where Plaintiffs do attempt to allege knowledge or intent, their allegations are conclusory and in tension with one another. For example, Plaintiffs spend many pages alleging that Binance knew of but "willfully ignore[d]" transactions involving persons "associated" with FTOs. AC ¶¶ 316, 433-799. According to Plaintiffs, "Binance's compliance team almost certainly identified" (or should have identified) "terrorist-associated" accounts. *See id.* ¶¶ 442, 497-498, 789. Not only are those allegations devoid of factual support, but they also conflict with the AC's repeated claims that Binance's "guidelines and compliance tools were a sham." *Id.* ¶ 314; *see also, e.g.*, *id.* ¶ 52.

Plaintiffs also allege that Binance should have known that its customers were engaged in suspicious transactions and closed their accounts, and they provide a 10-page chart that describes "more than 150 Binance accounts" and associated transactions that—in Plaintiffs' view—Binance should have spotted and dealt with. AC ¶ 442 (emphasis omitted). But by Plaintiffs' own allegations, Binance has more than *280 million* users globally, and more than *$300 billion* moves through Binance.com *on a daily basis*. *See id.* ¶¶ 22-23. Plaintiffs' failure to acknowledge that context only reveals the weakness of their allegations.

Further, many of Plaintiffs' amended allegations are plainly irrelevant because they post-date the Attacks, and should be disregarded by the Court. *See* AC ¶¶ 780-916. As just one example, consider Plaintiffs' claim that Binance's purported failure to screen out transactions

related to the 2026 U.S.-Iran conflict somehow proves that Binance knowingly assisted the IRGC to launder cryptocurrency through its platform in 2023. *See id.* ¶ 781. Allegations about Binance's purported actions in 2026 cannot plausibly establish JASTA liability for an attack three years before.

**B. Plaintiffs Improperly Rely on Prior U.S. Agency Filings.**

Unable to allege a direct connection between Binance's conduct and the Attacks, Plaintiffs seek to close the gap by incorporating a plea agreement with the Department of Justice, consent orders with the Financial Crimes Enforcement Network (the "FinCEN Consent Order") and the Commodity Futures Trading Commission, and a settlement agreement with the Office of Foreign Assets Control ("OFAC"). *See* Declaration of Colleen E. Roh Sinzdak ("Sinzdak Decl."), Exs. 1-4, filed contemporaneously herewith. These citations cannot help Plaintiffs, for many reasons.

As an initial matter, as discussed *infra* at pp. 39-40, Plaintiffs may not rely on these filings for any substantive allegations because the filings are akin to settlement agreements that do not admit fault. But even setting that aside, the filings do not shed light on Binance's liability because they merely discuss Binance's historical anti-money-laundering, know-your-customer, and sanctions policies; they do not even hint that Binance purposefully structured its compliance program to allow terrorists to use its platform to fund any terrorist activities, let alone the specific Attacks in question here. *Contra* AC ¶¶ 322-429. None of the agencies ever concluded that.

In any event, the filings *undercut* Plaintiffs' conclusions in many ways. For example, the filings show there were multiple degrees of separation between Binance and any FTO. *See* FinCEN Consent Order at 45-46, Sinzdak Decl. Ex. 1 ("[Binance] failed to file SARs" after "Binance [1] user addresses were found to [2] interact with bitcoin wallets [3] associated with [FTOs]"). And far from concluding that Binance facilitated terrorist attacks, the FinCEN Consent

Order acknowledges that, despite any failure to file SARs, Binance "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing." *Id.* at 46.

## LEGAL STANDARD

A federal court "must have . . . power over the parties (personal jurisdiction) before it can resolve a case." *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017). Plaintiffs "carr[y] the burden of proof" to establish personal jurisdiction. *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003).

To survive a motion to dismiss for failure to state a claim, a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must accept as true a plaintiff's factual allegations in the complaint, but "naked assertions devoid of further factual enhancement" and "legal conclusions" will not satisfy the plaintiff's burden. *Id.* (citation modified).

## ARGUMENT

### I. THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH RULE 8.

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim." "Each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). Those requirements are necessary to give "fair notice of the claim asserted" and avoid " 'unjustified burden[s] on the court and the party who must respond to' " the complaint. *Thomson v. Olson*, 866 F. Supp. 1267, 1270 (D.N.D. 1994) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)). The Eighth Circuit has therefore held that, where a complaint violates Rule 8, dismissal is appropriate. *See*

*Cody v. Loen*, 468 F. App'x 644, 645 (8th Cir. 2012) (per curiam) (affirming dismissal of a 75-page complaint containing "repeated references to various other declarations and documents filed with earlier complaints"); *Larson v. Stow*, 36 F.3d 1100 (Table), 1994 WL 512369, at *1 (8th Cir. 1994) (per curiam) (similar).

The Amended Complaint, which spans nearly 2,400 paragraphs and 400 pages, does not come close to complying with Rule 8(a)(2)'s "short and plain statement" requirement. Indeed, Binance's initial Motion to Dismiss explained that the original 300-page complaint was not "short and plain." First MTD Mem. 9-10. But rather than streamline the allegations on the second go-around, the Amended Complaint *adds* another 100 pages. Even worse, much of the now 400-page complaint has no discernible relationship to Binance, the aiding-and-abetting claim, or the relief sought. Nearly 40 pages amount to a general treatise on Iran's history of terrorism sponsorship, detailed backgrounds of the FTOs, and descriptions of their heinous acts on October 7, 2023—even though none of those FTOs is named as a defendant, and many of those alleged events pre-date Binance by decades. *See, e.g.*, AC ¶¶ 1274-1479. Another 20 pages describe events occurring *after* the Attacks that similarly cannot establish Binance's liability. *Id.* ¶¶ 775-916. This long complaint full of extraneous details requires dismissal under the "short and plain" statement rule. *See Cody*, 468 F. App'x at 645.

## II. PLAINTIFFS FAIL TO ADEQUATELY PLEAD PERSONAL JURISDICTION OVER BINANCE.

This Court does not have personal jurisdiction over Binance under Federal Rule of Civil Procedure 4(k)(2). Rule 4(k)(2) provides for personal jurisdiction for "a claim that arises under federal law" if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" and "exercising jurisdiction is consistent with the United States Constitution and laws." Plaintiffs' allegations flunk the second requirement because they do not plead sufficiently close contacts with the United States. The Supreme Court has expressly foreclosed just such

attempts to hale a "run-of-the-mill private defendant into American courts." *Fuld*, 606 U.S. at 22. The Court should therefore dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(2).

**A. The Court Lacks General Personal Jurisdiction over Binance.**

As a threshold matter, Plaintiffs cannot establish general personal jurisdiction over Binance. A defendant may be subject to general personal jurisdiction only in the forum where the defendant is domiciled or "fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Binance is indisputably a foreign company that was founded in Shanghai, relocated to Japan, incorporated in the Cayman Islands, and runs its servers out of Japan. AC ¶¶ 131, 135, 137-138. Accordingly, Binance has no domicile in the United States, and this form of jurisdiction does not apply. Indeed, courts have overwhelmingly recognized that general jurisdiction is typically unavailable in Rule 4(k)(2) cases. *See, e.g.*, *Jekyll Island-State Park Auth. v. Polygroup Macau Ltd.*, 140 F.4th 1304, 1316-17 (11th Cir. 2025); *Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 265 (5th Cir. 2024); *Nuevos Destinos*, 2019 WL 6481441, at *10. That stands to reason: Rule 4(k)(2) applies only where a defendant "is not subject to jurisdiction in any state's courts of general jurisdiction" and thus lacks a domicile in the United States.

**B. The Court Also Lacks Specific Personal Jurisdiction over Binance.**

Plaintiffs also fail to allege facts sufficient to establish specific personal jurisdiction. Courts may exercise specific jurisdiction over a defendant when "the cause of action arise[s] from or relate[s] to a defendant's actions within the forum state," as required by the Constitution's Due Process Clauses. *Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*, 89 F.4th 1023, 1032 (8th Cir. 2023) (citation omitted). For claims under Rule 4(k)(2), courts in this Circuit typically apply the traditional minimum-contacts analysis from *International Shoe*. *Nuevos*

*Destinos*, 2019 WL 6481441, at *8, *10. "The only difference lies in that the forum under analysis shifts . . . to the United States as a whole" rather than a particular State. *Id.* at *10 (citation omitted). Plaintiffs' scant allegations of activity in the United States cannot satisfy this standard, particularly because they do not connect that activity to any FTO or the Attacks. Further, while plaintiffs in analogous cases have sometimes suggested that specific jurisdiction should instead be analyzed under the more forgiving standard set out in *Fuld*, that argument fails. *Fuld*'s standard does not apply to cases like this one, and—even if it did—Plaintiffs' allegations would not satisfy *Fuld*'s requirements.

*1. Plaintiffs' Allegations Do Not Satisfy the Minimum-Contacts Analysis.*

Plaintiffs have not alleged that Binance had the sort of meaningful, case-related contacts with the United States that *International Shoe* requires. Under that standard, a plaintiff establishes jurisdiction where the defendant "purposefully avail[ed] itself of the privilege of conducting activities" in the forum, *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), the plaintiff's claims "arise out of or relate to" those activities, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citation omitted), and the exercise of jurisdiction is fair and reasonable, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Courts therefore ask whether a " 'defendant's *suit-related conduct* . . . create[s] a substantial connection' with the United States," evaluating " 'contacts that the "defendant himself" creates with the forum' and not merely . . . the defendant's 'contacts with persons who reside there.' " *Nuevos Destinos*, 2019 WL 6481441, at *12 (emphasis added) (quoting *Walden v. Fiore*, 571 U.S. 277, 284-285 (2014)).

Here, despite filing a nearly 400-page complaint, Plaintiffs allege only *five* contacts with the United States. And even then, Plaintiffs do not connect any of that U.S.-based activity to any specific FTOs or the Attacks. Whether taken on their own or together, those allegations flunk the minimum-contacts test.

*First*, Plaintiffs attempt to rely on the fact that Binance "served more than 5 million U.S. customers" at some point "[p]rior to October 7, 2023." AC ¶¶ 110, 112. But plaintiffs must establish a case-related connection between the defendant and "the forum"—not merely a connection between the defendant and "persons who reside there." *Nuevos Destinos*, 2019 WL 6481441, at *12 (quoting *Walden*, 571 U.S. at 285). Plaintiffs do not allege that Binance's U.S. customers were somehow involved in the Attacks; nor do they otherwise attempt to connect Binance's alleged aiding-and-abetting activities with these American customers.

*Second*, Plaintiffs claim that Binance employees "us[e] a 'dongle' " which "routes their connection through" "a cybersecurity platform based in California." AC ¶ 111 & n.25. But even if the mere use of the dongle could constitute purposeful availment, Plaintiffs do not connect the dongle or the cybersecurity platform to their aiding-and-abetting claims. They do not, for example, assert that the use of that cybersecurity platform facilitated any FTO transactions. Indeed, they do not even assert that Binance employees were using the cybersecurity platform at the time of the Attacks, let alone that it enabled the terrorist activity.

*Third*, Plaintiffs vaguely assert that Binance "and its affiliates" allegedly "utilized U.S. bank accounts," including Signature Bank, facilitating "the flow of U.S. dollar funds integral to Binance's operations." AC ¶¶ 113-114, 117. These allegations improperly lump Binance with "its affiliates." Because Binance and its affiliates are separate entities, Binance's amenability to suit must rest on its own "*individual*, suit-related contacts" with the United States. *Nuevos Destinos*, 2019 WL 6481441, at *12 (emphasis added); *see Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011) (requiring allegations of "an actual agency relationship" before conduct could be imputed to the defendant). Earlier this year, a district court in Alabama found a complaint bringing analogous allegations against Binance "legally and

factually deficient" precisely because the plaintiffs engaged in this sort of impermissible group pleading to disguise their lack of allegations against Binance itself. Order at 2, *Newman v. BAM Trading Servs., Inc.*, No. 2:24-cv-134 (M.D. Ala. Mar. 11, 2026), Dkt. No. 127; *see id.* at 4, 6, 7 (ordering plaintiffs to replead under Rule 8 where plaintiffs made "no effort to distinguish factual grounds that would permit liability to be imposed against any of [the defendants] *separately*"). Plaintiffs' efforts should similarly be rejected.

Further, even if the U.S. accounts could be attributed to Binance, "[t]he mere maintenance of a correspondent account in New York" does "no[t]" "establish[ ] minimum contacts with the United States." *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 731-732 (S.D.N.Y. 2010). And in any event, Plaintiffs do not allege any connection between the Signature Bank accounts and the Attacks—nor can there be, because Signature Bank was placed into FDIC receivership in March 2023—months before the October 7, 2023 attacks. *See Failed Bank Information for Signature Bank, New York, NY*, FDIC (Mar. 18, 2026), https://perma.cc/48GE-KR3E.

*Fourth*, Plaintiffs claim that Binance "worked with" "a New York-chartered" company to issue a stablecoin, "BUSD." AC ¶¶ 112-119. At most, this establishes a single, discrete commercial relationship with one U.S. counterparty for one commercial product, which is not enough to establish purposeful availment. *See Burger King*, 471 U.S. at 475 (requiring more than "random, fortuitous, or attenuated" contacts (citation modified)). And again, Plaintiffs do not explain how the issuing of BUSD is related to its allegations that Binance aided and abetted the October 7 attacks. The sum total of Plaintiffs' allegations on this point is that *one* FTO-affiliated account used BUSD "between April 2020 and the end of September 2021"—two years before the Attacks occurred. AC ¶¶ 1188-93. Plaintiffs do not even specify the amount involved in that transaction. *See id.* That is not enough.

*Finally*, Plaintiffs allege that FTO-affiliated operatives "initiated transactions from IP addresses in the United States" and in "some" cases off-ramped fiat currency through U.S. payment systems like Zelle. AC ¶¶ 123-127. Plaintiffs, however, do not allege that any of these customers were located in the United States, rather than merely using a VPN to route the transaction through a U.S. IP address.[1] Transmitting and receiving information via VPN of course "cannot support the exercise of personal jurisdiction." *Risk Techs., Inc. v. Tenn. Mun. League Risk Mgmt. Pool, Inc.*, No. 3:02-cv-2614, 2003 WL 21018872, at *7 (N.D. Tex. May 1, 2003). And besides, the fact that Binance's platform may have been accessible from the United States in the same way it was accessible from other countries shows only that Binance failed to "geo-block[ ]" its platform. AC ¶¶ 327-328. That "failure to act" is not "purposeful availment" under *International Shoe*. *E.g.*, *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 24-26 (D.D.C. 2017) (emphasis omitted). As for the allegation that certain persons off-ramped Bitcoin into traditional currencies using U.S. payment systems, that allegation is not even connected to *Binance*'s conduct. In any event, Plaintiffs—once again—fail to link those allegations to the Attacks. For example, Plaintiffs identify Account No. ***6082 as using a U.S. IP address, but it was active only "from September 8, 2021, through January 22, 2022"—years before the Attacks. AC ¶¶ 1050, 1052.

[1] In fact, Plaintiffs' original complaint admitted they could not determine where account No. ***3901 was accessed. *See* Compl. ¶ 734 n.81, Dkt. No. 1 (alleging that account "was operated by a single person periodically using VPN services to disguise his/her location"). Plaintiffs also previously admitted that the vast majority of activity on account No. ***6082—the account allegedly accessed from Kindred, North Dakota—occurred in the Gaza Strip and surrounding areas, "strongly suggesting" that the purported access from North Dakota was the result of VPN use. *Id.* ¶¶ 712-713, 734 & n.81. Plaintiffs deleted those admissions in the AC without any explanation.

Whether analyzed separately or together, none of those allegations establishes sufficient minimum contacts under the traditional due-process analysis. Rather, as a whole, they represent only a handful of U.S.-based activities, none of which is plausibly connected to Binance's alleged aiding-and-abetting activities in this case.

#### 2. *The Supreme Court's Decision in* Fuld *Does Not Displace the Minimum-Contacts Analysis in Rule 4(k)(2) Cases.*

Perhaps recognizing that Binance lacks the requisite minimum contacts with the United States, plaintiffs in similar cases have asserted that *Fuld* established a new, more lenient specific jurisdiction analysis for cases involving Rule 4(k)(2). That is error. If anything, *Fuld* confirms that a federal court cannot exercise personal jurisdiction under Rule 4(k)(2) unless the alleged conduct giving rise to the suit is "closely related to the United States." *Fuld*, 606 U.S. at 18.

As an initial matter, *Fuld* involved the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), not Rule 4(k)(2). *Id.* at 6-7 (citing 18 U.S.C. § 2333(a)). As amended, the PSJVTA provides that two specific organizations—the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA")—will "be deemed to have consented to personal jurisdiction" in the United States if they engage in certain conduct in or related to the United States. *Id.* at 8-9 (citation omitted). *Fuld* considered a narrow question: whether that statutory grant of personal jurisdiction was constitutional under the Fifth Amendment's Due Process Clause even if it does not satisfy *International Shoe*'s minimum-contacts standard, which was developed under the Fourteenth Amendment's Due Process Clause. The Court upheld the law's constitutionality. It reasoned that "the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard," which emerged as "a consequence of territorial limitations" on the States that do not apply to the federal government. *Id.* at 14, 23 (citation modified). The Court further explained that the PSJVTA's personal jurisdiction provision was constitutional because it extended

jurisdiction over "two *sui generis* foreign entities" for a "narrow category of claims" based on "the political branches' balanced judgment of competing concerns over sensitive and weighty interests of national security and foreign affairs." *Id.* at 20-22 (citation modified).

Nothing about that analysis requires—or permits—personal jurisdiction in this case under Rule 4(k)(2). That Rule is not a highly specific law reflecting "the political branches' balanced judgment" on national security. *Id.* at 20. Rather, Rule 4(k)(2) is simply a general rule governing *all* claims "aris[ing] under federal law" so long as "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," Fed. R. Civ. P. 4(k)(2)(A)—including patent, RICO, securities-fraud and antitrust claims, to name just a few. *See, e.g.*, *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 721 (5th Cir. 1996). There is no indication that the political branches would want to dispense with the minimum-contacts analysis in all of these cases, and doing so would inevitably threaten foreign policy by embroiling American courts in all manner of international disputes without an adequate connection to the United States.

Moreover, dispensing with the minimum-contacts analysis is at odds with the history of Rule 4(k)(2) and the Advisory Committee's commentary. Rule 4(k)(2) was adopted in response to the Supreme Court's opinion in *Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987), which discovered a "gap" in the enforcement of federal law, *id.* at 103, whereby a foreign defendant could escape jurisdiction despite "hav[ing] *ample contacts* with the nation as a whole" if "[t]hose contacts [we]re so scattered among states that none of them would have jurisdiction," *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001) (emphasis added); *see* Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment. The Advisory Committee explained that Rule 4(k)(2) was designed to close that "gap" by allowing courts to consider the defendants' contacts with the United States as a whole—not by excusing

plaintiffs from making the minimum-contacts showing altogether. Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment.

Regardless, even if the Court reads *Fuld* broadly to displace the formal minimum-contacts inquiry for all claims arising under federal law, *Fuld* still requires some version of the nexus analysis. *Fuld* expressly declined to adopt a "maximalist theory of federal jurisdiction," which would "impose[ ] *no* territorial limits on personal jurisdiction" and would allow "any run-of-the-mill private defendant" to be haled into American courts. 606 U.S. at 18, 22. Instead, the Court emphasized that the PSJVTA allowed courts to exercise jurisdiction over "*sui generis* foreign entities" that have had "decades of meaningful contacts, ties, and relations with the United States." *Id.* at 22 (citation modified) (citing *Burger King*, 471 U.S. at 472). The Court further indicated that the Fifth Amendment—like the Fourteenth—likely imposes a "reasonableness" requirement that was satisfied in that case. *Id.* at 23 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 115 (1987)).

Thus, even if *Fuld* applies, Plaintiffs must still establish some nexus between their allegations and Binance's alleged activities in the United States, and that exercising personal jurisdiction over Binance in this case would be "reasonable[ ]." *Id.* (citation omitted); *see Rodriguez v. Imperial Brands, PLC.*, --- F.4th ----, No. 24-11487, 2026 WL 2118957, at *9-13 (11th Cir. July 23, 2026) (finding that the exercise of jurisdiction was unreasonable where the dispute did not have a "close connection" to the United States); *see also*, *e.g.*, *X Corp. v. World Fed'n of Advertisers*, 826 F. Supp. 3d 772, 794-795 (N.D. Tex. 2026) (clarifying that even after *Fuld*, Rule 4(k)(2) requires that "the conduct giving rise to th[e] case or controversy [is] closely connected with the United States"); *In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2026 WL 522845, at *6 (W.D. Pa. Feb. 25, 2026) (recognizing that *Fuld* still requires "some showing of

minimum contacts and purposeful availment" (citation omitted)); *King v. Bon Charge*, 823 F. Supp. 3d 508, 517 (D. Del. 2025) (Bibas, Circuit J., sitting by designation) (explaining that even if Rule 4(k)(2) no longer requires full-blown minimum-contacts analysis, "the breadth of asserted jurisdiction and the extent of a defendant's contacts with the United States may still be relevant to the constitutionality of asserting jurisdiction in a particular case"). Plaintiffs cannot make that showing. As explained, Plaintiffs have alleged only a handful of scattered contacts between Binance and the United States, none of which has any connection to the alleged aiding-and-abetting activities in this case. That is not nearly enough under *Fuld*, especially in light of the Supreme Court's "foreign policy" concerns. 606 U.S. at 21-22.

### C. Plaintiffs Cannot Establish Jurisdiction Under Rule 4(k)(1)(C).

Plaintiffs likewise fail in their summary effort, AC ¶ 105, to establish personal jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(C), which provides that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." The only federal statute Plaintiffs cite is 18 U.S.C. § 2334. It reads, in relevant part:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

18 U.S.C. § 2334(a). All agree that the second sentence providing for service of process can provide the jurisdictional hook under Rule 4(k)(1)(C). But "a plain reading" of § 2334(a) requires that the defendant be served *in the same district* where the action is commenced because the plaintiff must "establish that venue is proper under" the first sentence. *Wultz v. Islamic Republic of Iran*, 762 F. Supp. 2d 18, 25, 29 (D.D.C. 2011). As *Wultz* explained: "the Act's provision of nationwide service—which is in the second clause of the section, and follows the description of venue under the statute—begins by stating that such service is permitted 'in such a civil action.' "

*Id.* (quoting 18 U.S.C. § 2334(a)). "The meaning of this phrase, 'in such a civil action,' is an unmistakable reference back to the preceding clause," requiring a match between where the case is venued and where the process was served. *Id.*

There is no match here. Plaintiffs bring this case in North Dakota, but Binance was served in Washington, D.C. *See* AC ¶ 105. And as discussed above, Binance plainly does not "reside" in North Dakota. *Supra* at p. 18. Nor do Plaintiffs allege that Binance "has an agent" in North Dakota (or anywhere else in the United States). *See generally* AC. Further, even if Plaintiffs could meet the statute's requirements, the assertion of personal jurisdiction is still subject to the due-process requirements of the Fifth Amendment, *Fuld*, 606 U.S. at 11-12; as just discussed, *supra* at pp. 18-26, Plaintiffs do not satisfy those requirements. Rule 4(k)(1)(C) cannot help Plaintiffs.[2]

## III. PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING-AND-ABETTING LIABILITY UNDER JASTA.

The Amended Complaint should also be dismissed under Rule 12(b)(6) because it fails to state a claim for aiding and abetting terrorist activities under JASTA. AC ¶¶ 2369-83. Plaintiffs' original complaint faced dismissal because, among other things, Plaintiffs did not plausibly allege any facts establishing that Binance intended to assist the FTOs in perpetrating the October 7 attacks. If anything, the original complaint supported the *opposite* inference—that Binance was motivated solely by profit and treated all VIP customers equally. Plaintiffs have now added more

[2] Of course, Plaintiffs could have simply joined one of the other pending lawsuits against Binance alleging identical claims. *See Newman v. BAM Trading Servs.*, No. 2:24-cv-134 (M.D. Ala. filed Feb. 26, 2024); *Raanan v. Binance Holdings Ltd.*, No. 1:24-cv-697 (S.D.N.Y. filed Jan. 31, 2024); *Troell v. Binance Holdings Ltd.*, No. 1:24-cv-7136 (S.D.N.Y. filed Sep. 20, 2024); *Atzili v. Islamic Republic of Iran*, No. 1:24-cv-3365 (D.D.C. filed Nov. 29, 2024). Indeed, most of the Haggai family *did* file in the *Newman* case, only to voluntarily dismiss their claims there and refile in this case instead. *See* Stipulation at 1, *Newman*, No. 2:24-cv-134 (M.D. Ala. Nov. 21, 2025), Dkt. No. 109; AC ¶¶ 2295-2314. Rahm Haggai even remained a plaintiff in *Newman* until the *Newman* court dismissed that complaint for failure to comply with Rule 8(a)(2); only then did he file in this Court. The Court should not condone those blatant attempts at forum shopping.

than 100 pages in the AC, but they still allege absolutely no facts establishing that Binance gave preferential treatment to FTOs or had any intent to further their (or any other) terrorist activities.

JASTA's aiding-and-abetting provision imposes liability on "any person who aids and abets, by knowingly providing substantial assistance" to "the person who committed [the] act of international terrorism" that injured the plaintiff. 18 U.S.C. § 2333(d)(2). In *Twitter*, the Supreme Court held that plaintiffs cannot state a claim for aiding and abetting under JASTA unless their allegations establish that the defendant "consciously and culpably participated in a wrongful act so as to help make it succeed." 598 U.S. at 493 (citation modified). And in *Smith & Wesson*, a subsequent aiding-and-abetting case regarding the liability of gun manufacturers for organized crime, the Supreme Court reiterated that to plausibly state a claim for aiding and abetting, a defendant must "intend to facilitate the offense's commission." 605 U.S. at 291 (citation modified). Applying these precedents, the courts of appeals have recognized that an aiding-and-abetting claim must be dismissed unless plaintiffs plausibly plead that the defendant "knowingly and substantially assist[ed] the principal violation." *Ashley*, 144 F.4th at 435 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). That analysis intentionally establishes a high bar—otherwise, a defendant could be held "liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them," which "would run roughshod over the typical limits on tort liability and take aiding and abetting far beyond its essential culpability moorings." *Twitter*, 598 U.S. at 503.

Plaintiffs may satisfy that standard in two ways. They may allege a "concrete nexus" between the defendant's conduct and the specific tortious act at issue. *Id.* at 501. Alternatively, plaintiffs may allege that the defendant's assistance was so "pervasive and systemic" as to amount to aiding and abetting every wrongful act committed by the terrorist enterprise. *Id.* at 506.

Plaintiffs fail under either pathway. They do not allege *any* direct link between Binance and the Attacks, that Binance "intentionally associated themselves with [the terrorists'] operations," or that Binance "affirmatively gave aid that would assist each of [the] terrorist acts." *Id.* at 502. And Plaintiffs' generalized allegations that Binance failed to comply with anti-money-laundering and know-your-customer requirements are "a far cry from the type of pervasive, systemic, and culpable assistance" that *Twitter* had in mind. *Id.*

The failure to plead knowing-and-substantial assistance is alone sufficient to warrant dismissal, as multiple district courts have already held. *E.g.*, *Troell*, 2026 WL 636849, at *22; *Atzili*, 2026 WL 1500823, at *8-11.

### A. Plaintiffs Cannot Establish a Concrete Nexus Between Binance's Conduct and Any Specific Attack.

Simply put, Plaintiffs cannot establish a "concrete nexus" because they have not alleged a single fact establishing a "direct, active, and substantial" connection between Binance's conduct and the specific Attacks at issue in this case. *Twitter*, 598 U.S. at 501-503. Instead, their allegations boil down to compliance failures common to all of Binance's 280 million users, as well as alleged special treatment accorded to *every* Binance user that trades enough to be deemed a "VIP." *See* AC ¶¶ 23, 52, 112, 326-341, 345-429. Plaintiffs allege that these activities paved the way for third parties to raise and launder money on behalf of terrorist groups that then *might* have been used to finance the Attacks. No court has endorsed such a limitless theory of liability, and this Court should not be the first.

The concrete-nexus pathway requires a plaintiff to allege facts connecting the defendant's conduct to "the tort itself"—here, the specific terrorist attacks that caused Plaintiffs' injuries. *Twitter*, 598 U.S. at 494. The Supreme Court in *Twitter* was exceedingly clear that "[t]he focus must remain on assistance to the tort for which plaintiffs seek to impose liability," requiring

plaintiffs to establish a direct link between the defendant's alleged assistance and "each" specific wrongful act. *Id.* at 503, 506. Said another way, plaintiffs must plausibly plead that the defendant in some way "associate[d] himself with the [tortious] venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he s[ought] by his action to make it succeed." *Id.* at 490 (citation modified). Or, as the Supreme Court put it in *Smith & Wesson*, aiding-and-abetting allegations must establish that the defendant "intend[ed] to facilitate" the commission of the offense. 605 U.S. at 291 (citation omitted).

The Second Circuit's decision in *Ashley* recently applied this "concrete nexus" requirement to reject analogous allegations that a defendant bank aided and abetted terrorist organizations by providing "banking services" to intermediaries who ended up laundering money on the terrorists' behalf. 144 F.4th at 441, 443. Specifically, plaintiffs claimed that the banking services allowed terrorist organizations to convert profits from opium trafficking, protection rackets, and other criminal activities to U.S. dollars, which were used to purchase weapons and pay personnel for terrorist attacks. *Id.* at 443-444. The court swiftly rejected that theory of liability as impermissibly relying "on money's fungibility" by assuming that any activities that enrich a terrorist organization must support particular terrorist acts. *Id.* at 444. The court explained that "a JASTA claim requires *intent* to further" a specific tortious act, and it was "not enough" to plead that the defendant "assisted the terrorist organization's activities in general." *Id.* (emphasis added) (citation modified).

*Ashley* is on all fours with this case. Plaintiffs here do not plead any facts establishing that Binance knew of the October 7 (or any other) attacks, directed any funds towards an attack, or in any way participated in planning an attack. Instead, Plaintiffs rely primarily on allegations that Binance committed general compliance failures and created a hospitable environment for

malfeasance, which allegedly allowed persons associated with FTOs to raise or launder money for the FTOs responsible for the Attacks. *See* AC ¶¶ 322-498. That is precisely the theory *Ashley* rejected, and no other court has endorsed it.

To the contrary, district courts across the country have held that nearly *identical* claims against Binance fail to allege a sufficient connection "between Binance's conduct" and specific "terrorist attacks." *Troell*, 2026 WL 636849, at *25; *see Atzili*, 2026 WL 1500823, at *11 ("imposing aiding-and-abetting liability on . . . [Binance] for the October 7 attacks has no limiting principle because any attack carried out by Hamas could theoretically have been funded with money linked to a Binance transaction"). The analysis in *Ashley*, *Troell*, and *Atzili* is not new. Even before *Twitter* and *Smith & Wesson*, courts regularly dismissed aiding-and-abetting claims that failed to allege a "direct connection between" banking services and specific "terrorist activities." *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 231 (E.D.N.Y. 2020); *see also, e.g.*, *Honickman ex rel. Goldstein v. BLOM Bank SAL*, 432 F. Supp. 3d 253, 268 (E.D.N.Y. 2020) (dismissing where plaintiffs failed to allege that "funds processed by the [defendant] actually went to Hamas, or that [the defendant], at the time it provided banking services to [persons affiliated with FTOs] was aware or intended that Hamas would receive the corresponding funds"), *aff'd*, 6 F.4th 487 (2d Cir. 2021); *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 679 (D.C. Cir. 2023) (affirming dismissal where plaintiffs "fail[ed] to plausibly allege that any currency processed by [a defendant bank] was either in fact sent to al Qaeda or necessary for Sudan to fund the embassy bombings" (quoting *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 277 (D.C. Cir. 2018))). None of Plaintiffs' allegations can overcome that fundamental defect.

Plaintiffs also fault Binance for failing to make sufficient efforts to remove Hamas- and PIJ-affiliated persons from the platform. *See* AC ¶¶ 917-1273. Those allegations do not solve the

problem. As an initial matter, allegations of nonfeasance do not trigger aiding-and-abetting liability, which applies only to *culpable* conduct. Indeed, that was the central holding in *Twitter*, which unanimously declined to impose liability on social-media platforms for failing to remove content promoting terrorism. The Court explained that "defendants' relationship with [an FTO] . . . appears to have been the same as their relationship with their billion-plus other users: arm's length, passive, and largely indifferent." 598 U.S. at 500; *see also id.* at 498 (defendants never "gave [the FTO] any special treatment or words of encouragement"). The Court was even clearer in *Smith & Wesson*, holding that there can be no secondary liability for "routine and general activity that happens on occasion to assist in a crime," and that "an ordinary merchant does not become liable for all criminal misuses of his goods, even if he knows that in some fraction of cases misuse will occur." 605 U.S. at 292 (citation modified); *accord Ashley*, 144 F.4th at 437 (similar); *Fraenkel v. Standard Chartered Bank*, No. 24-cv-4484, 2025 WL 2773251, at *8 (S.D.N.Y. Sep. 26, 2025) (similar).

Plaintiffs suggest this case is different because Binance knew that certain *specific* persons affiliated with FTOs transacted on Binance.com. *See, e.g.*, AC ¶ 1272. Binance vigorously disputes those allegations, but in any event, they fall far short of establishing liability because Plaintiffs do not identify any connection between those persons, their transactions on Binance.com, and the Attacks. For example, Plaintiffs allege that Binance offboarded "a Hamas-*linked* account" without reporting it, essentially permitting the user to take its funds and leave. *Id.* ¶¶ 436-437 (emphasis added). But there are no allegations that those funds were subsequently used to fund the Attacks (or any terrorist activity at all). Nor is there any allegation that Binance afforded this account special treatment *because* it was linked to Hamas. To the contrary, Plaintiffs themselves allege that Binance was focused on whether it was a "VIP account," *id.* ¶ 437 (citation omitted),

not any connection to terrorism. Those are exactly the type of "attenuated" allegations courts have rejected. *Atzili*, 2026 WL 1500823, at *9-10; *see id.* at *8, *9 n.10 (allegations that Binance was aware that "Hamas-associated transactions" occurred on its publicly available platform are "not enough to establish a culpable state of mind with respect to [its] actions and the tortious conduct" (citation modified)); *see also Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (declining to "assume[ ] facts that have not been pleaded" even when reviewing pro se complaints—let alone 400-page complaints prepared by sophisticated counsel (citation omitted)).

Nor do Plaintiffs' conclusory allegations of specific transactions establish a sufficient nexus to the Attacks. *See, e.g.*, AC ¶¶ 516-1266. Plaintiffs provide no reason whatsoever to infer that any of those transactions was used to fund or assist the Attacks. *See Atzili*, 2026 WL 1500823, at *10 (even assuming that hosting Binance.com was a form of " ' financial assistance,' there is not much 'closeness . . . between defendants' assistance and the act of international terrorism that injured plaintiffs' " (quoting *AstraZeneca*, 165 F.4th at 605)).

Allegations that have been held sufficient to trigger secondary liability look very different. In *AstraZeneca*, for example, plaintiffs alleged that defendants orchestrated "a long-running scheme to provide [the relevant terrorist organization] with cash and in-kind bribes that amounted to at least 20 per cent of the value of each contract, as well as off-the-books shipments of free goods that were not tied to any particular contract." 165 F.4th at 611 (quotation marks and citation omitted). The D.C. Circuit held that *those* allegations sufficiently established knowing and culpable conduct. Similarly, in its pre-*Twitter* decision in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), the Second Circuit held that a complaint sufficiently alleged aiding and abetting where plaintiffs alleged that the bank had given FTO-linked officials special treatment "pursuant to [the bank's] long-standing official policy and practice of support for

*Hizbollah*." *Id.* at 853 (citation modified). Among other things, the complaint alleged that the bank had responded to a U.N. report stating that the bank's "service to one of its customers constituted money laundering for Hizbollah . . . by stating that the report was 'part of the propaganda and war launched by the Jewish state against Lebanon' and by increasing that customer's credit limit." *Id.* at 862 (citation omitted). *Kaplan*—like *AstraZeneca*—illustrates the type of unusually direct, tailored, and culpable assistance to an FTO that has been found to withstand a motion to dismiss under the aiding-and-abetting standard.

As other district courts have already recognized, the allegations here are nothing of that sort. Far from alleging a deliberate policy of supporting Hamas, Plaintiffs' complaint repeatedly ties Binance's alleged special treatment to users' "VIP status." *E.g.*, AC ¶¶ 163, 437. Accordingly, *Atzili* emphasized that plaintiffs failed to plead any "unusual" assistance by defendants that was specific to Hamas, which would have been "perhaps the strongest support for an inference of culpable association." 2026 WL 1500823, at *9 (citation modified). Had plaintiffs plausibly alleged that Binance "had a direct relationship with Hamas or any other terrorist organization," that might have been enough to support aiding-and-abetting liability. *Id.* But plaintiffs failed to show that Binance treated Hamas-linked users "any differently from anyone else." *Id.* (citing *Twitter*, 598 U.S. at 500). On the contrary, plaintiffs alleged that Binance treated *all* "VIP users" in the same way. *Id.* (citation omitted). Those allegations are very different from the "bespoke dealings" and "voluntary, tailored relationship" that have been found sufficient in other cases. *Id.* (citations omitted). If anything, "allegations that [Binance] ha[s] indiscriminately permitted illicit activity on the Binance platform *undermine[]* such a claim of aiding-and-abetting liability." *Troell*, 2026 WL 636849, at *21 (emphasis added).

Plaintiffs cannot avoid this fatal problem by recasting allegations of compliance violations as some nefarious scheme "designed to attract bad actors to the platform." AC ¶ 370, *see also id.* ¶¶ 21, 47, 98, 401. No amount of reframing can get around the defect *Atzili* and *Troell* identified—that Plaintiffs allege absolutely no facts establishing that Binance somehow singled out FTOs for preferential treatment. An indiscriminate compliance failure that affects 280 million users equally by definition does not constitute "conscious, voluntary, and culpable participation" in any *particular* user's wrongdoing. *Twitter*, 598 U.S. at 493. As *Twitter* explained: where plaintiffs fail "to allege any definable nexus between the defendants' assistance and th[e] attack," plaintiffs face a "drastically increase[d]" burden and must provide "some other very good reason to think that defendants were consciously trying to help or otherwise participate in the . . . attack." *Id.* at 500, 503 (citation modified). Plaintiffs plead no such allegations here; nothing in the AC even remotely shows that Binance attempted to "make [the attacks] [its] own." *Smith & Wesson*, 605 U.S. at 292 (citation omitted).

Plaintiffs' theory also proves too much. If a financial institution's failure to detect and block every illicit transaction constitutes knowing participation in terrorism, then *every* bank, payment processor, and telecommunications company with imperfect compliance controls would face liability whenever a customer misuses its services. That is exactly the kind of boundless standard that *Twitter* warned against: conflating a regulatory failure with conscious participation in terrorism would "take aiding and abetting far beyond its essential culpability moorings," *Twitter*, 598 U.S. at 503, and effectively impose strict liability on any financial institution that has ever been sanctioned for compliance deficiencies. *See also Atzili*, 2026 WL 1500823, at *11 (reasoning that "[p]laintiffs' theory of liability would improperly encompass every potential act of terrorism perpetuated by Hamas"). That is not the law.

* * *

At bottom, Plaintiffs allege the same core theory other courts have already rejected: Plaintiffs "blame . . . [Binance] for not taking more aggressive action to stop *others* from financially assisting terrorists," but that "attenuation . . . illustrates that Hamas's ability to benefit from these platforms was merely incidental to defendants' services and general business models; it was not attributable to any culpable conduct of [Binance] directed toward Hamas." *Atzili*, 2026 WL 1500823, at *10 (citation modified). As in *Troell* and *Atzili*, this Court should hold that Plaintiffs failed to establish a concrete nexus to the Attacks.

**B. Plaintiffs Cannot Establish that Binance Provided "Pervasive, Systemic, and Culpable" Assistance.**

*Twitter* recognized that where plaintiffs fail to establish a "concrete nexus" between the defendant and the attack, they can establish aiding-and-abetting liability only by alleging "pervasive, systemic, and culpable assistance." 598 U.S. at 501-502. Because finding liability without a direct nexus to the specific attack "would justify holding a secondary defendant liable for all of [a] group's actions," *id.* at 502, courts have emphasized that there is an extraordinarily "high bar" to establishing liability under this pathway, *Ashley*, 144 F.4th at 445. In *Twitter*, the Court explained that plaintiffs' allegations against social media platforms did not come close to overcoming this bar because they did not establish "that defendants intentionally associated themselves with ISIS' operations" or "affirmatively gave aid that would assist each of ISIS' terrorist acts" or "that defendants and ISIS formed a near-common enterprise." 598 U.S. at 502.

Plaintiffs plainly cannot meet that standard either. Indeed, while Plaintiffs summarily assert that Binance's assistance was "pervasive and systemic," AC ¶ 405, they offer no factual allegations to support that claim. For example, even accepting Plaintiffs' claim (at ¶ 442) that Binance processed some 5,000 transactions totaling $184 million, *but see infra* at pp. 38-39

(explaining that a large chunk of those transactions occurred *after* the Attacks), those transactions represent an infinitesimal fraction of Binance's overall activity. As Plaintiffs themselves assert, Binance processes *trillions* of dollars every month. AC ¶¶ 22, 303. Binance is therefore squarely in *Smith & Wesson* territory because Binance does not aid and abet a terrorist activity by providing general-purpose financial services to hundreds of millions of users. *See Smith & Wesson*, 605 U.S. at 292 (an "ordinary merchant does not become liable for all criminal misuses of his goods, even if he knows that in some fraction of cases misuse will occur," unless "he takes steps to promote the resulting crime" (citation modified)).

In any event, *Twitter* made clear that there can be no liability under this pathway unless "defendants so systemically and pervasively assisted [the terrorists] that defendants could be said to aid and abet *every single*" one of their attacks. *Twitter*, 598 U.S. at 501-502 (emphasis added). Nothing in Plaintiffs' complaint could possibly justify holding Binance liable for every single terrorist attack committed by the FTOs involved in the October 7 atrocities.

Accordingly, every court that has considered this question has declined to impose liability under the "pervasive and systemic" theory on financial institutions providing general banking services. *Id.* at 506. The Second Circuit in *Ashley*, for example, explained that plaintiffs could not succeed on this theory based on allegations that the defendant-bank "executed financially suspect transactions writ large." 144 F.4th at 445. The result was the same in *Freeman v. HSBC Holdings PLC*, No. 18-cv-7359, 2026 WL 880107 (E.D.N.Y. Mar. 31, 2026), where a defendant bank provided "billions of dollars" in financial services to persons affiliated with terrorist groups and used "manual workarounds to ensure that the entities' financial transactions would not be flagged under U.S. sanctions regulations." *Id.* at *14-15 (citation modified). Even that was not enough to establish "pervasive and systemic" assistance, the court explained, because the

defendant's conduct only "suggest[ed] a general desire to obtain the business of *any* sanctioned entity," not a "desire to 'form a near-common enterprise' " with a particular terrorist group. *Id.* at *16 (citation modified).

The same is true here, which is why *Atzili* and *Troell* had no difficulty in rejecting the "pervasive and systemic" theory. *See Atzili*, 2026 WL 1500823, at *11 (reasoning that plaintiffs failed to show "any tailored assistance" to any specific FTO); *Troell*, 2026 WL 636849, at *22 (allegations that Binance "generally permitted and solicited" bad actors of "all ilks" cannot establish that Binance "sought to engage in a common enterprise with any of the FTOs who committed the terrorist attacks at issue").

Indeed, in the rare cases where pervasive-and-systemic claims have survived the pleading stage, the allegations went far beyond general financial services. Those cases involved defendants that *actively and directly* participated in furthering terrorist operations. *See Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 348 (E.D.N.Y. 2023) (finding that plaintiff adequately alleged pervasive-and-systemic assistance where defendant directly provided "many millions of dollars in funding, embargoed dual-use technologies, and operational or technical support" to the IRGC, taking "a leadership role in a procurement scheme"). Plaintiffs allege nothing of the sort here.

**C. Plaintiffs' Factual Allegations Suffer from Two Additional Flaws.**

While the above analysis is more than sufficient to establish that the Amended Complaint must be dismissed for failure to state a claim, Plaintiffs' factual allegations also suffer from two additional defects.

*First*, the Amended Complaint is replete with allegations about events that happened *after* the Attacks. *E.g.*, AC ¶¶ 780-916 (discussing conduct from 2024-2026); *id.* ¶¶ 420, 422-423, 492 (discussing November 21, 2023, FinCEN Consent Order); *id.* ¶¶ 556-559 (describing transactions with wallets "later designated by NBCTF"); *id.* ¶ 442 (identifying 44 instances where accounts

"designated for terrorism financing activities" after the Attacks were active). Those post-Attack allegations, which Plaintiffs do not even attempt to tie to the events of October 7, obviously cannot support a claim for injuries suffered as a result of the October 7 attacks. *Freeman*, 2026 WL 880107, at *10 (allegations involving an FTO that was not designated until "nearly a decade after the attacks that injured Plaintiffs" would "fail to state a JASTA aiding-and-abetting claim"); *Troell*, 2026 WL 636849, at *20 (similar).

*Second*, Plaintiffs repeatedly rely on U.S. agency filings and consent resolutions. But plaintiffs may not rely on any allegations discussed in pre-adjudication regulatory complaints or settlements to establish liability here because "preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial." *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011) (citation omitted); *see id.* (explaining that "neither a complaint nor references to a complaint [that] results in a consent judgment may properly be cited in the pleadings"); *accord Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976) (affirming the district court's decision to strike references to a prior Securities Exchange Commission complaint because "[t]he consent decree . . . was the result of private bargaining, and there was no hearing or rulings or any form of decision on the merits by the district court"); *Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*, No. 10-cv-864, 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014) (same).

Here, none of the U.S. agency actions Plaintiffs rely on involved an adjudication on the merits. On the contrary, the OFAC agreement expressly noted that Binance settled "without any finding of fault." Sinzdak Decl. Ex. 2 (OFAC Settlement Agreement) at 5. Similarly, in the CFTC Consent Order, Binance did "not consent to the use of th[at] Consent Order, or the findings or

conclusions [t]herein, by any other party in any other proceeding." Sinzdak Decl. Ex. 3 (CFTC Consent Order) ¶ 16. The Court should strike those allegations.

## IV. CERTAIN PLAINTIFFS MUST BE DISMISSED BECAUSE JASTA PROVIDES A CAUSE OF ACTION ONLY FOR U.S. NATIONALS.

The Anti-Terrorism Act ("ATA") and JASTA do not "provide remedies for non-nationals claiming damages for personal injuries." *Averbach ex rel. Averbach v. Cairo Amman Bank*, No. 1:19-cv-4, 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020). The ATA provides a cause of action for "[a]ny national of the United States injured . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a). And JASTA permits aiding-and-abetting liability only "[i]n an action under subsection (a)." *Id.* § 2333(d)(2). Thus, a non-U.S. national can only state JASTA claims on behalf of a U.S. national's estate, survivors, or heirs.

The Amended Complaint includes 33 Plaintiffs who are not U.S. nationals who seek to recover damages on their own behalf. AC ¶¶ 1486, 1528, 1596-99, 1622, 1624, 1664, 1683, 1711-18, 1720, 1754, 1757, 1930, 2196-99 (Israeli citizens seeking personal damages for mental anguish, emotional distress, and economic loss).[3] The Amended Complaint also includes one non-U.S. national Plaintiff who brings this action "as the legal guardian of A.Z." but does not allege A.Z.'s citizenship. *Id.* ¶ 1621. The Court should dismiss those claims for this separate reason.

## CONCLUSION

For these reasons, the Court should dismiss the Amended Complaint against Binance.

[3] Those Plaintiffs are: Shahar Balva, Shulamith Zani, Ronit Rahoum, Ester Halif, Yosef Sasi, Vito Sasy, Izhak Sasi, Eyal Waldman, Ella Waldman, Guy Waldman, Sharon Waldman, David Zafrani, Osnat Tal Zafrani, Izhar Shay, Yaniv Rousso, Yael Levy Oppenheimer, I.O., Y.L., J.L., Tzuria Levy, Zohar Levy, A.L., Judith Levy, Shlomo Levy, Eliyahu Levy, Nir Yehezkel Levy, Eitan Mor, Leron Mor, Hagit Chen, L.A., H.A., T.A., and Y.A.

Dated: August 10, 2026

Respectfully submitted,

**MILBANK LLP**

/s/ *Colleen E. Roh Sinzdak*
Neal Kumar Katyal (*pro hac vice*)
Colleen E. Roh Sinzdak (*pro hac vice*)
Kristina Alekseyeva (*pro hac vice*)
Samantha Ilagan (*pro hac vice*)
Zois Manaris (*pro hac vice*)
1101 New York Ave. NW
Washington, DC 20005
Telephone: 202.835.7505
nkatyal@milbank.com
crohsinzdak@milbank.com
kalekseyeva@milbank.com
silagan@milbank.com
zmanaris@milbank.com

Nola B. Heller (*pro hac vice*)
Matthew J. Laroche (*pro hac vice* forthcoming)
55 Hudson Yards
New York, NY 10001
Telephone: 212.530.5108
nheller@milbank.com
mlaroche@milbank.com

**VOGEL LAW FIRM**

Robert J. Pathroff (#07759)
Nicholas M. Surma (#08830)
US Bank Building
200 North 3rd Street, Suite 201
PO Box 2097
Bismarck, ND 58502-2097
Telephone: 701.258.7899
rpathroff@vogellaw.com
nsurma@vogellaw.com

**WITHERS BERGMAN LLP**

Christopher N. LaVigne (*pro hac vice*)
Joseph Gallo (*pro hac vice*)
Alexander Haden (*pro hac vice*)
430 Park Avenue, 10th Floor
New York, NY 10022-3505
Telephone: 212.848.9800
christopher.lavigne@withersworldwide.com
joseph.gallo@withersworldwide.com
alex.haden@withersworldwide.com

*Attorneys for Defendant Binance Holdings Limited*